# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARSEILLE-KLINIKEN AG,
Chamerstrasse 67, 6300 Zug, Switzerland;

       Petitioner;

v.

REPUBLIC OF EQUATORIAL GUINEA,
Presidential Palace, Rue du 12 Octobre,
Malabo, Equatorial Guinea;

       Respondent.

                            /

## **DECLARATION OF ULRICH MARSEILLE**

1.     My name is Ulrich Marseille.

2.     The facts set forth in this declaration are true and correct, based upon my personal knowledge.

3.     I am over the age of 18 years old and am a citizen and resident of the Federal Republic of Germany.

4.     I currently serve as Consultant with Power of Attorney for Marseille-Kliniken AG ("Marseille-Kliniken") and have served in this role since November 12, 2009.

5.     Marseille-Kliniken entered into the Management Contract for the Polyclinic La Paz (Bata) (the "Polyclinic") on December 14, 2009 (the "Management Contract") with the Republic of Equatorial Guinea ("Equatorial Guinea"). A true and correct copy of the Management Contract is attached as Exhibit "A-1" to this Declaration.

6.     Equatorial Guinea sought this agreement with Marseille-Kliniken as part of an effort to establish an organized health-care system throughout the country at European standards.

- 1 -



7.     The Polyclinic, currently known as the La Paz Medical Center, is located in Bata, Equatorial Guinea. It first opened in 2007 and is the principal referral hospital in Equatorial Guinea. It was a key part of the effort by Equatorial Guinea to develop modern health care infrastructure.

8.     Pursuant to the Management Contract, Marseille-Kliniken was to become the operator of the Polyclinic, including responsibility for personnel decisions, training and continuing education for personnel, and development and supply of software for hospital administration.

9.     The Management Contract contemplated a take-over process which entailed two phases: (i) Phase A, which involved taking financial control of the Polyclinic, commencing installation of new software systems, management and selection of drugs and supplies, and implementation of new personnel standards; and (ii) Phase B, which involved taking full control of technology, personnel, as well as physical management of the Polyclinic.

10.    Compensation for Phase A under the Management Contract was to be an all-inclusive fixed fee of EUR 840,000, not including housing costs, water, electricity, and local transportation for employees.

11.    Compensation for Phase B was to be a fixed Management Fee of EUR 700,000 per month (the "Management Fee").

12.    After Marseille-Kliniken completed all of its obligations under Phase A of the Management Contract at the beginning of August 2010, Equatorial Guinea began to block Marseille-Kliniken's access to the newly installed software and IT system at the Polyclinic in December 2010. At approximately the same time, the Health Minister of Equatorial Guinea, Mr. Marcelino Oyono Ntutumo, who also served as President (Chair) of the Board of Administration



U. Marseille
- 7. Dez. 2020

of the Polyclinic hired Frank Mensching, without informing Marseille-Kliniken, who at the time was also an IT employee of Marseille Kliniken for the Polyclinic.

13.    Marseille-Kliniken attempted to continue performing under the Management Contract and expressed serious concerns about its lack of access to the Polyclinic's IT system, but was never able to regain access to the new state-of-art system it had just finished implementing.

14.    In conversations during this period, including in January 2011, the Minister of Health of Equatorial Guinea, Marcelino Oyono Ntutumo, indicated to Marseille-Kliniken's local director at the Polyclinic, Fritz Kronenberger, that the government "wanted to get out of the contract." See Award at ¶¶ 179-184.

15.    Just three months later, on March 14, 2011, Marseille-Kliniken's local director and the technological director of the Polyclinic – Fritz Kronenberger and Kurt Gerard, respectively – were ousted from the Polyclinic and instructed to leave the country within 48 hours by the Board of Administration for the Polyclinic together with its President (Chair) Dr. Salomon Nguema Owono, who at the time was also the new Minister of Health, having replaced Marcelino Oyono Ntutumo. See Award at ¶ 66.

16.    Immediately following the expulsions of their key staff from Equatorial Guinea in March 2011, Marseille-Kliniken withdrew from the Polyclinic and Equatorial Guinea altogether later in same month.

### *The First Arbitration*

17.    Following Equatorial Guinea's breach of the Management Contract and expulsion of Marseille-Kliniken's employees from the Polyclinic, Marseille-Kliniken initiated arbitration

- 3 -



against Equatorial Guinea on June 20, 2011, pursuant to the arbitration agreement Article 14 of the Management Contract (the "First Arbitration").

18.     In the First Arbitration, Marseille-Kliniken asserted a partial claim for 90% of the damages it incurred, including payment of that portion of Management Fees, for the period from August 2010 through March 2011 and 90% of the complete Management Fee of EUR 700,000 per month – expenditures to be deducted – for the period from April 2011 through August 2012. Such partial claims are permissible under Swiss law and the claimant may reserve the right to seek the balance of their damages in a later proceeding.

19.     The tribunal in the First Arbitration issued an award on December 5, 2014, in which it awarded Marseille-Kliniken a total amount of EUR 14,036,400, plus interest and costs.

20.     On May 28, 2015, the Parties entered into a Dispute Settlement Agreement (the "Dispute Settlement Agreement"), pursuant to which they fixed a specific amount to be paid in connection with the settlement of the award issued in the First Arbitration.

### *The Second Arbitration*

21.     On January 28, 2015, Marseille-Kliniken initiated a second arbitration (the "Second Arbitration") against Equatorial Guinea, again under Article 14 of the Management Contract, in which it sought the remaining 10% portion of the Management Fees for the period from August 2010 until August 2012, which it did not initially claim in the First Arbitration, and the full unpaid Management Fees (minus expenses) for the period from September 2012 through January 2020, which represented the full term of the Management Contract, including a 5-year additional term, because the Tribunal decided in the First Arbitration that Equatorial Guinea did not terminate the Management Contract.

- 4 -



22. The Tribunal, noting that the Parties conceded that Article 14 of the Management Contract – the Arbitration Clause – was enforceable and binding under Swiss law, which was the substantive law applicable to the Arbitration, found that it had jurisdiction. See Award at ¶ 139.

23. After the Parties – both of which were represented by counsel – had fully briefed the matter, the Tribunal conducted an Evidentiary Hearing on December 5, 2016, at which both Parties presented witness testimony.

24. The Tribunal issued the Final Award on December 19, 2017,[1] which granted Marseille-Kliniken the remaining 10% of the Management Fees for the period from August 2010 through August 2012, as described above, and the full Management Fees for the period from September 2012 through January 2015. From these amounts, the tribunal deducted the expenditures it calculated Marseille-Kliniken had saved to determine the amount of damages, which it set at EUR 7,380,611, plus interest at the default rate of 5% established under Swiss law. In addition, the tribunal in the Second Arbitration awarded costs to Marseille-Kliniken in the separate amounts of CHF 92,470.35 and EUR 27,568.58. A true and correct copy of the Award is attached as Exhibit "A-2" to this Declaration.

25. At current exchange rates, the damages and costs awarded to Marseille-Kliniken, not including interest, amount to an approximate total of USD 9,315,309.[2]

---

1 The Final Award was sent to the parties by email on December 19, 2017, followed by a hard copy on December 20, 2017. A true and correct copy of the email communication dated December 19, 2017, from the Tribunal issuing the Final Award to the Parties is attached hereto as Exhibit "A-3" to this Declaration.

2 Calculated as of November 17, 2020 using the Currency Converter available at www.OANDA.com.



U. Marseille
-7. Dez. 2020

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 7th, 2020, in Hamburg, Germany.

U. Marseille

7. Dez. 2020

Ulrich Marseille

- 6 -

# EXHIBIT A-1

Managementvertrag
Stand: 14.12.2009

1

| Contrato de gestión del Hospital Policlínico La Paz (Bata) | Managementvertrag für die Poliklinik La Paz (Bata) |
|---|---|

Entre el Gobierno de

Zwischen der Regierung der

la República de Guinea Ecuatorial, Malabo, representada por el Ministro de Obras Públicas e Infraestructuras

Republik Guinea Ecuatorial, Malabo, vertreten durch den zuständigen Ministers für Bauentwicklung und Infrastruktur

- denominada a continuación mandante o S.A. -

- im folgenden Auftraggeber oder AG genannt -

Y de otra

Und andere

Marseille-Kliniken Sociedad Anónima, con sede en Suiza, en CH-6300 Zug, c/Neugasse, 4, inscrita en el Registro Mercantil número CH-170.3.030.383-0, ésta representada por el Presidente y Delegado del Consejo de Administración, don Axel Hölzer, quien a la vez es el Presidente de la Junta Directiva de las Marseille-Kliniken AG, con sede en c/Sportallee,1, en D-22335 Hamburgo, y esta última representada por su apoderado, don Ulrich Marseille

Marseille-Kliniken Aktiengesellschaft mit Sitz in CH 6300 Zug, Neugasse 4, zur Handelsregisternummer CH - 170.3.030.383-0, diese vertreten durch den Präsidenten und Delegierten des Verwaltungsrates Axel Hölzer, welcher zugleich Vorstandsvorsitzender der Marseille-Kliniken AG, Sportallee 1 in 22335 Hamburg ist, vertreten durch den Bevollmächtigten Ulrich Marseille

- denominada a continuación Marseille -

- im folgenden Marseille genannt -

## 1. Preámbulo

## 1. Präambel

1.1. El mandante en la ciudad de Bata ha construído un hospital-policlínica con tres unidades Staff Housing Apartments así como otro edificio para hotel y centro de rehabilitación. El edificio con sus 100 camas comenzó a funcionar en el mes de Setiembre del 2007.

1.1. Der Auftraggeber hat in der Stadt Bata eine Polyllinik Hospital mit drei Stück Staff Housing Apartments sowie einem weiteren Gebäude als Hotel und Rehabilitationszentrum errichtet. Das Gebäude mit 100 Betten wurde im September 2007 in Betrieb genommen.

1.2. La Marseille-Clínicas AG, Hamburgo, es un acreditado operador-gestionador de establecimientos sociales y clínicas en Alemania. Actualmente, la sociedad en más de 70 emplazamientos está operando con éxito establecimientos sociales con cerca de 5.500 colaboradores.

1.2. Die Marseille-Kliniken AG, Hamburg, ist ein in Deutschland ausgewiesener Betreiber von Sozialeinrichtungen und Kliniken. Zurzeit betreibt die Gesellschaft an über 70 Standorten erfolgreich Sozialeinrichtungen mit fast 5.500 Mitarbeitern.



Managementvertrag
Stand: 14.12.2009

2

1.3. Para una explotación profesional del complejo clínico arriba detallado las dos partes contratantes pretenden realizar una cooperación estrecha y de larga duración para llevar a cabo un alto grado de asistencia sanitaria, por el bien de la población. Es ésta la voluntad explícita de todas las personas participantes en el presente contrato.

1.4 Otro objetivo básico de este contrato es que la República de Guinea Ecuatorial a largo plazo esté en condiciones de administrar y dirigir el Hospital exclusivamente con ciudadanos de la República de Guinea Ecuatorial. A tal efecto es obligatoriamente necesario desarrollar y llevar a la práctica un plan de formación con una duración de varios años para todos los grupos de empleados.".

1.5 Para tal propósito Marseille pone a disposición el correspondiente instrumento de estudio, de naturaleza electrónica para cursar Unidades de Aprendizaje denominadas "E-Learning

## 2. Definiciones

En este contrato se van a utilizar las siguientes definiciones con las explicaciones en ellas contenidas:

2.1. Presupuesto
La suma - por regla general denominada como monto anual - que el mandante con carácter fiduciario le pondrá a disposición de Marseille, para que ésta pueda, según su leal saber y entender, sufragar todos los gastos operativos/ empresariales necesarios; especialmente formarán parte de estos gastos (no exclusivamente)

a) los costes del personal
b) los costes para especialistas,
c) el coste de material, y especialmente:

aa) para material del hospital;

---

1.3. Für einen professionellen Betrieb des oben näher bezeichneten Klinikkomplexes wollen beide Parteien eng und langfristig zusammenarbeiten, um zum Wohle der Bevölkerung ein hohes Maß an sicherer Gesundheitsversorgung durchzuführen. Dies ist erklärter Wille aller an diesem Vertrag beteiligten Personen.

1.4 Ein weiteres zentrales Ziel dieses Vertrages ist es die Republik Guinea Ecuatorial langfristig in die Lage zu versetzen das Krankenhaus ausschließlich von Bürgern der Republik Guinea Ecuatorial betreiben und führen zu lassen. Hierzu ist es zwingend erforderlich einen langjährigen Ausbildungsplan für alle Mitarbeitergruppen zu entwickeln und umzusetzen.

1.5 Hierzu stellt Marseille ein entsprechendes Instrument in Form von elektronisch zu absolvierenden Lerneinheiten „E-Learning" zur Verfügung.

## 2. Definitionen

Im vorliegenden Vertrag kommen folgende Definitionen mit der hierin enthaltenen Erklärung zur Anwendung:

2.1. Budget
Die Summe - in der Regel als Jahressumme bezeichnet –, welche der Auftraggeber an Marseille treuhänderisch zur Verfügung stellt, damit Marseille hieraus nach bestem Wissen und Gewissen alle betriebswirtschaftlich notwendigen Kosten bestreitet, insbesondere zählen hierzu (nicht ausschließlich)

a) die Personalkosten,
b) die Kosten für Spezialisten,
c) die Sachkosten, als da sind insbesondere
:
aa) für Krankenhausmaterial,

bb) medicamentos;

cc) gastos de alimentación de pacientes y colaboradores;

dd) tasas para comunicación y costes de energía;

ee) adquisición de bienes de valor inferior;

ff) derechos de licencia para terceros, así como gastos corrientes de mantenimiento para los programas informáticos;

gg)seguros de personas y de cosas para la explotación económica;

ii) gastos operacionales para los edificios a ceder;

d) otros costes, relacionados necesariamente con la explotación y el funcionamiento de un hospital.

bb) Medikamente,

cc) Verpflegung für Patienten und Mitarbeiter,

dd) Kommunikationsgebühren und Energiekosten,

ee) Anschaffung von geringwertigen Wirtschaftsgütern,

ff) Lizenzgebühren für Dritte, sowie laufende Wartungsgebühren für Software

gg) Sach- und Personenversicherung für den Geschäftsbetrieb

ii) Betriebskosten für die zu überlassenden Gebäude

d) sonstige, mit dem Betrieb eines Krankenhauses notwendigerweise verbundenen Kosten.

## 2.2. Cifra de negocios

La suma - por regla general denominada como monto anual - que el hospital obtendrá en total.

## 2.2. Umsatz

Die Summe – in der Regel als Jahressumme bezeichnet -, welche das Krankenhaus insgesamt vereinnahmt.

## 2.3. Beneficio

La suma - por regla general denominada como monto anual - que resultará una vez deducido el total de los gastos de la cifra de negocios y sin presentar pérdida.

## 2.3. Gewinn

Die Summe – in der Regel als Jahressumme bezeichnet -, welche sich ergibt, nachdem vom Umsatz die Gesamt-kosten in Abzug gebracht worden sind und kein Verlust vorliegt.

## 2.4. Contrato de gestión

Denomina el acuerdo con fuerza vinculante según el cual Marseille, en nombre y por encargo de la República de Guinea Ecuatorial, dirigirá/gestionará con responsabilidad el Hospital-Policlínica de Bata, en favor de ella, pero también a cargo de ella, con carácter fiduciario, a saber, tan bien y en tal sentido como si de su propio hospital se tratase. La actividad está orientada para que a largo plazo la República de Guinea Ecuatorial obtenga un beneficio.

## 2.4. Managementvertrag

Bezeichnet die verbindliche Vereinbarung, wonach Marseille im Namen und im Auftrag der Republik Guinea Ecuatorial, zu deren Gunsten aber auch zu deren Lasten treuhänderisch die Polyllinik Hospital Bata verantwortlich führt, und zwar so gut und in dem Sinne, wie, wenn es ihr eigenes Hospital wäre. Die Tätigkeit ist langfristig darauf gerichtet, für die Republik Guinea Ecuatorial einen Gewinn zu erzielen.

## 2.5. Euro

La moneda corriente del medio legal de

## 2.5. Euro

Währung des in der Bundesrepublik

pago válido en la República Federal de Alemania.

Deutschland gültigen gesetzlichen Zahlungsmittels.

## 3. Objeto del contrato

## 3. Vertragsgegenstand

3.1. Mediante el contrato de gestión aquí celebrado Marseille se hace cargo de manera responsable de la gestión, siendo dotado por el mandante, para la duración de este contrato, de un poder general ilimitado e ilimitable que autoriza a Marseille a dar y recibir toda clase de declaraciones necesarias para la gestión y el funcionamiento del Hospital-Policlínica de Bata. *Marseille llevará cuenta de forma permanente al consejo de Administración —*

3.1. Marseille übernimmt das Management mittels des hier geschlossenen Managementvertrages verantwortlich, indem es vom Auftraggeber mit einer für die Dauer des Vertrages unbeschränkten und unbeschränkbaren Generalvollmacht ausgestattet ist, welche Marseille berechtigt, alle Erklärungen abzugeben und in Empfang zu nehmen, welche für den Betrieb der Poliklinik Hospital Bata notwendig sind.

3.2. Marseille está autorizada para tomar todas las decisiones concernientes al personal, especialmente las de efectuar contrataciones y despidos laborales, dar ocupación a especialistas a través de contratos de servicios, formalizar toda clase de contratos de suministro, contratos terapéuticos con pacientes y sus familiares, así como todos los demás contratos que a Marseille le puedan parecer idóneos para llevar a cabo la gestión de una clínica de modo razonable en términos económicos. *De conformidad acuerdo del consejo de Administración*

3.2. Marseille darf alle Personalentscheidungen treffen, insbesondere Einstellungen und Entlassungen vornehmen, Spezialisten über Dienstleistungsverträge beschäftigen, alle Arten von Lieferverträgen schließen, Behandlungsverträge mit Patienten und Angehörigen schließen, sowie alle anderen Verträge, die Marseille geeignet erscheinen, um einen wirtschaftlich vernünftigen Klinikbetrieb durchzuführen.

3.3. Marseille se encuentra obligada a organizar la formación profesional y el perfeccionamiento de los empleados y, especialmente, concederles a los colaboradores la oportunidad de gozar de un entrenamiento permanente con los aparatos médicos utilizados. Las habilidades en la asistencia a los pacientes en cuanto a todas las patologías indicativas han de ser elevadas al nivel más avanzado según el estándar internacional. En particular, Marseille está autorizada para mandar a los colaboradores a Europa para su formación y perfeccionamiento profesional y que allí sean entrenados. Le incumbe a Marseille de fijar el tipo y la duración de cada uno de estos

3.3. Marseille ist verpflichtet, die Aus- und Fortbildung der Beschäftigten zu organisieren, insbesondere den Mitarbeitern ein ständiges Training an den im Einsatz befindlichen medizinischen Geräten angedeihen zu lassen.
Die Fertigkeiten in der Behandlung der Patienten zu allen indikativen Krankheitsbildern sind auf den neuesten, internationalen Stand zu bringen. Dazu ist Marseille insbesondere berechtigt, Mitarbeiter zur Aus- und Fortbildung nach Europa zu schicken und dort trainieren zu lassen. Es obliegt Marseille, Art- und Dauer der einzelnen Fortbildung festzulegen. Die Kosten hierfür werden aus dem Budget bestritten.

programas de formación. El coste para ello ha de ser sufragado mediante el presupuesto.

3.4. Marseille está obligada a desarrollar los programas informáticos adecuados para la administración del hospital y el personal, así como para el control de los procesos esenciales del funcionamiento y ponerlos a disposición del hospital. Con ello está previsto que las facilidades básicas estarán listas para funcionar dentro de un plazo de 4 meses después de haber asumido la gestión del hospital. Para los servicios altamente especializados así como para la organización del aprovisionamiento de medicamentos desde el extranjero y el controlling operativo así como para la planificación de la asignación de personal el soporte informático deberá estar listo para funcionar 12 meses después de la entrega del establecimiento, a más tardar.

El coste para el desarrollo de los programas informáticos ha de ser asumido por Marseille misma y no se costeará mediante el presupuesto.

3.5. Marseille pone a disposición del mandante su "Brand Name" [nombre de marca] para que éste lo pueda usar para su Hospital-Policlínica de Bata por la duración del presente contrato. Con ello se ha de adoptar el color y la configuración del trazo del respectivo original utilizado por Marseille. El mandante tiene la autorización expresa para hacer publicidad para su Hospital-Policlínica en Bata en todos los medios con este logotipo. Los detalles se fijarán más tarde en un convenio aparte. Los derechos de licencia para el uso ya están incluídos y pagados dentro del Management Fee / Honorario de la gestión convenido bajo el numeral 7.

**4. Cesión de Derechos**

4.1. El día 1° de febrero de 2010, la

3.4. Marseille ist verpflichtet, eine adäquate Software für die Krankenhausadministration, für das Personalwesen, sowie für die Steuerung der wesentlichen Betriebsabläufe zu entwickeln und dem Krankenhaus beizustellen. Dabei sollen die grundlegenden Fazilitäten innerhalb von 4 Monaten nach Übernahme des Krankenhauses betriebsbereit sein. Für die hochspeziellen Abteilungen sowie für die Steuerung der Medikamentenversorgung aus dem Ausland, des betriebswirtschaftlichen Controllings sowie der einzelnen Personaleinsatzplanung soll die Software spätestens 12 Monate nach Übergabe der Einrichtung betriebsbereit sein.

Die Kosten für die Entwicklung der Software sind von Marseille selbst zu tragen und nicht aus dem Budget zu bestreiten.

3.5. Marseille stellt seinen „Brand Name" dem Auftraggeber zur Nutzung für seine Poliklinik Hospital Bata für die Laufzeit dieses Vertrages zur Verfügung. Dabei sind Farbe und Ausbildung des Schriftzuges von dem jeweils von Marseille verwendeten Original zu übernehmen. Der Auftraggeber darf ausdrücklich hiermit für seine Poliklinik Hospital Bata Werbung in allen Medien betreiben. Die Einzelheiten werden in einer gesonderten Vereinbarung und zu einem späteren Zeitpunkt fixiert. Die Lizenzgebühr für die Nutzung ist mit der zu 7. vereinbarten Management Fee abgegolten.

**4. Abtretung der Rechte**

4.1 Am 1 Februar 2010 tritt die erste

Managementvertrag
Stand: 14.12.2009

6

primera fase de este contrato entrará en vigor. En caso de que la gestión del resto del servicio se vea paralizada, Marseille asumirá de manera total la gestión del Hospital y en este caso, el Gobierno entregará a Marseille todos los inmuebles y equipamientos de la clínica completamente amueblado en posesion. Marseille está obligada a gestionar la Clínica con mucho cuidado y responsabilidad, velando particularmente por un trato cuidadoso de los objetos del equipamiento.

Antes de que Marseille reciba el objeto le entregará al mandante una lista de las cosas que todavía hacen falta para que la clínica pueda entrar íntegramente en funcionamiento. De carácter enunciativo aquí se menciona ropa, uniformes de servicio, instrumentos de quirófano, etc., o sea, todos los objetos que aún están por comprar o están en mal estado.

4.2. Marseille, dentro del presente contrato de gestión, puede tratar el objeto de manera tal como si fuese el propietario pero sin disponer de la propiedad.

4.3. Marseille tendrá el derecho de repudiar fuera del hospital a cualquier enfermo, trabajador o persona exógena que comprometa la seguridad y normalidad del hospital.

4.4. Marseille está obligada a asegurar el Hospital-Policlínica de Bata, dentro de lo posible y en cuanto fuere indicado observando coste y utilidad, contra los riesgos que puedan resultar de fuego, tormenta o daños por agua (daños elementales), siempre y cuando hubiere una compañía de seguros que a precios aceptables y con condiciones usuales en el mercado estaría dispuesta a cerrar semejante contrato.

4.5. El riesgo de pérdida fortuita o, a causa de fuerza mayor (force majeure), de deterioros por desórdenes públicos o

Phase dieses Vertrages in Kraft. Falls die restliche Dienstleistung seitens des Ministeriums nicht durchführbar sein sollte, übernimmt Marseille die Führung des Krankenhauses. In diesem Fall übergibt das Ministerium an Marseille die Belegenheit und die Einrichtung total möbliert. Marseille ist verpflichtet die Klinik mit der erforderlichen Sorgfalt und Vorsicht zu führen, insbesondere in Hinblick auf die Behandlung und den Umgang mit der Einrichtungsgegenstände.

Vor Übergabe wird Marseille eine Aufstellung der Gegenstände an den Auftraggeber übergeben, die zur vollständigen Inbetriebnahme der Klinik noch fehlen. Wie zum Beispiel Wäsche, Dienstkleidung, Operationsbestecke etc., nämlich alle Gegenstände, die noch anzuschaffen sind oder in einem schlechten Zustand sind.

4.2. Marseille darf im Rahmen dieses Managementvertrages mit der Sache verfahren, wie ein Eigentümer, jedoch ohne über das Eigentum zu verfügen.

4.3. Marseille hat das Recht jede Person, die die Sicherheit und den normalen Ablauf in Hospital gefährdet, der Räumlichkeiten zu verweisen.

4.4. Marseille ist verpflichtet, soweit dies möglich und unter Beachtung von Kosten und Nutzen angezeigt ist, die Poliklinik Hospital Bata gegen Risiken, welche aus Feuer, Sturm oder Wasserschäden (Elementarschäden) resultieren können, zu versichern, soweit es eine Versicherungsgesellschaft gibt, welche zu annehmbaren und marktüblichen Konditionen bereit ist, einen Versicherungsvertrag einzugehen.

4.5. Die Gefahr des zufälligen Untergangs oder bei höherer Gewalt (Force majeure), der Beschädigung

huelgas, hechos de guerra u otros incidentes no previsibles o catástrofes naturales irán a cargo del mandante. Marseille, en este respecto, queda libre de toda responsabilidad.

durch Unruhen oder Streik, durch Kriegseinwirkungen oder sonstiger nicht vorhersehbarer Ereignisse oder Naturkatastrophen geht zu Lasten des Auftraggebers. Marseille wird diesbezüglich von jeglicher Haftung freigestellt.

## 5. Detalles de la gestión

## 5. Einzelheiten des Managements

5.1. Marseille está obligada a informar periódicamente, por escrito, y por lo menos una vez por trimestre - es decir, cada tres meses – (si se desea también cada mes) al mandante sobre el desarrollo comercial del Hospital-Policlínica de Bata. Con ello han de presentar con exactitud los acontecimientos esenciales así como la situación financiera (ingresos y gastos, inversiones necesarias, estadística de pacientes).

5.1. Marseille ist verpflichtet, in regelmäßigen Abständen, mindestens jedoch einmal im Quartal - also alle drei Monate - (auf Wunsch aber auch monatlich), dem Auftraggeber über die kaufmännische Entwicklung der Poliklinik Hospital Bata schriftlich zu berichten. Dabei sind die wesentlichen Ereignisse, sowie die finanzielle Situation (Einnahmen und Ausgaben, notwendige Investitionen, Krankenstatistiken) präzise darzustellen.

5.2. Marseille está obligada a mandar que se realicen inmediatamente las reparaciones necesarias, en tanto que no excedan un importe de EUR 5.000,-- en cada caso y financiarlas mediante el presupuesto que tiene a su disposición. Cualquier gasto por reparaciones o inversiones necesarias de reposición que además se produzca fuera del presupuesto ha de ser asumido adicionalmente, luego de su confirmación por el mandante, por este último.

5.2. Marseille ist verpflichtet, notwendige Reparaturen, soweit sie nicht einen Betrag von EURO 5.000,-- je Einzelfall übersteigen, unverzüglich zu veranlassen und aus dem zur Verfügung gestellten Budget zu bestreiten. Darüber hinaus gehende Reparaturkosten oder notwendige Ersatzinvestitionen sind nach Bestätigung durch den Auftraggeber von diesem außerhalb des Budgets zu zahlen.

## 6. Presupuesto / El beneficio

## 6. Budget / der Gewinn

6.1. Fase A del contrato.-Esta fase que consiste en la presentacion de los siguientes servicios:
a) Control de los ingresos y gastos
b) Control Organización financiera
c) Instalación del SOFTWARE Estandar Internacional
d) Gestión y selección de medicamentos de calidad estandar europeo, así como todo el material hospitalario.

6.1. Phase A des Vertrages. Diese Phase besteht aus den folgenden Dienstleistungen:
a)Kontrolle der Ein- und Ausgaben
b)Kontrolle der Finanzorganisation
c) Beginn mit der Installation der SOFTWARE im internationalen Standard
d)Management und Auswahl aller Medikamente mit europäischen Standard und in entsprechende Qualität, ebenso im Bezug auf das gesamte



e) Control de calidad profesional y cantidades y criterios de rendimiento del personal, dando cuenta al Consejo de Administración.

El coste de esta prestación es de Ochocientos cuarenta mil ( 840.000,.) Euros. Este importe cubre todos los gastos a excepción de vivienda, agua, luz, transporte local para el personal ya contratado.

6.2. Fase B del contrato.-Esta fase comprende la gestión completa del Hospital con la responsabilidad de la parte técnica, personal, inmueble y todo el patrimonio del Hospital a Marseille. El coste de esta fase es de setecientos mil ( 700.000)Euros cada mes y los Ocho millones cuatrocientos mil ( 8.400.000) Euros.Este precio incluye el coste de todo el personal de Mraseille , cuatro personas, ya expatriado a excepción de: vivienda, luz,agua y vehículo.

6.3. Es de conocimiento de las partes, que por la inmediata asunción de la Administración, se producen – costes accesorios por la necesidad de contratación de personal especializado y en corto plazo, así como por la incorporación de terceros externos. El Mandante toma a su cargo la totalidad de los costes y pone a disposición antes del comienzo de las actividades mencionadas un importe de Ochocientos cuarenta mil (840.000) Euros para la fase A y Ocho millones cuatrocientos mil ( 8.400.000) Euros para la fase B. Esto rige inmediatamente  a la firma del contrato. Marseille  entrega un aval bancario por el período de seis (6) meses, por un importe de 4.200.000 euros. Los fondos se transferirán en la cuenta bancaria de UBS AG, en la ciudad de Zurich, número de cuenta 0206-238828, Código Bancario 33000206206238828D7F

Krankenhausmaterial.

e)Professionelle Kontrolle der Qualität der Auswertung und der Quantität der Mitarbeiter, und Mitteilung an den Verwaltungsrat.

Die Kosten für diese Dienstleistung belaufen auf 840.000 Euro. In diesem Betrag sind alle Kosten beinhaltet ausgenommen die Wohnkosten, Wasser, Strom, und lokale Transporte für die bereit gestellte Mitarbeiter.

6.2. Phase B des Vertrages. Diese Phase beinhaltet die vollständige Verantwortung für den technischen Teil, Personal, Belegenheit und das gesamte Eigentum auf Marseille. Die Kosten für diese Phase  belaufen sich auf 700.000 Euro monatlich, bzw. 8.400.000 Euro jährlich. In diesem Betrag sind alle Kosten für die vier von Marseille bereitgestellte Mitarbeiter enthalten, ausgenommen deren Wohnkosten, Wasser, Strom, und Fuhrpark.

6.3. Den Parteien ist bekannt, dass aufgrund der kurzfristigen Übernahme der Verwaltung zusätzliche Kosten notwendig werden, wie die Beschäftigung von externen spezialisiertem Personal. Der Auftraggeber übernimmt die gesamten Kosten und stellt vor dem Beginn der genannten Tätigkeiten einen Betrag von 840.000, Euro für die Phase A und 8.400.000 Euro für die Phase B  zur Verfügung. Die Bereitstellung der vorgenannten Beträge erfolgt unverzüglich nach Vertragsunterzeichnung. Marseille stellt einen befristeten Bankaval für eine Laufzeit von 6 Monaten in Höhe von 4.200.000 Euro zu Verfügung.. Die Beträge werden gezahlt auf das Konto der UBS AG in Zürich, Kontonummer 0206-238828, BLZ 33000206206238828D7F

Managementvertrag
Stand: 14.12.2009

9

## 7. Management Fee / Honorario de la gestión

7.1. Marseille obtiene por sus actividades arriba detalladas, llevadas a cabo en nombre del mandante, un honorario fijo que asciende a un importe de setecientos mil euros mensuales ( 700.000) durante la vigencia del contrato -

7.2-. El Management Fee / ... hay que abonarlo cada año por antelación en un solo pago, y eso determinando que la actividad de Marseille no comenzará antes del acuse de recibo de la primera suma anual en la cuenta de Marseille.

7.3-. Las siguientes anualidades vencerán, respectivamente, tres meses antes de transcurrir el ejercicio corriente. El Management Fee está libre de gastos y pagadero sin deducción de costes, derechos o impuestos a la cuenta en la UBS AG, Zurich, número 0206-238828, código de identificación bancaria IBAN CH 3300206206238828D7F. Una compensación de contrarreclamaciones del mandante se permite únicamente en caso de que Marseille hubiese reconocido en forma escrita y con carácter vinculante tales contrarreclamaciones.

7.4. No se permitirá ningún tipo de reducción u otro tipo de retención del Management Fee.

## 8. Suministro de Medicamentos

8.1 Marseille conseguirá por cuenta y con fondos del presupuesto de la clínica todos los medicamentos necesarios para el funcionamiento de la clínica. Éstos serán adquiridos tomando como base los precios mas ventajosos existentes en un país miembro de la Unión Europea y en tanto sea posible, estos deben ser medicamentos permitidos y publicados

## 7. Management Fee

7.1. Marseille erhält für seine oben näher bezeichneten Tätigkeiten, welche er im Namen des Auftraggebers durchführt, ein festes Honorar in Höhe von monatlich siebenhunderttausend (700.000) EURO über die Laufzeit des Vertrages.

7.2. Die Management Fee ist jeweils für ein Jahr im Voraus in einer Summe zu zahlen, wobei die Tätigkeit von Marseille erst mit dem Eingang der ersten Jahressumme auf dem Konto von Marseille beginnt.

7.3. Die folgenden Jahresraten sind jeweils drei Monate vor Ablauf des laufenden Abrechnungsjahres zur Zahlung fällig. Die Management Fee ist spesenfrei und ohne Abzug von Kosten, Gebühren oder Steuern auf das Konto bei der UBS AG, Zürich, Kontonummer 0206-238828 Bankleitzahl IBAN CH 3300206206238828D7F zu zahlen. Eine Aufrechnung mit Gegenforderungen des Auftraggebers ist nur gestattet, soweit diese Gegenforderungen schriftlich und rechtsverbindlich von Marseille anerkannt worden sind.

7.4. Eine Minderung oder sonstige Zurückhaltung der Management Fee ist nicht gestattet.

## 8. Medikamentenversorgung

8.1 Marseille beschafft auf Rechnung und aus dem Budget der Klinik sämtliche für den Klinikbetrieb erforderlichen Medikamente. Diese werden auf Basis des günstigsten Einkaufspreises in einem Mitgliedsstaat der europäischen Union eingekauft und es ist sofern möglich, Medikamente die in Deutschland auf der Liste der

en Alemania en (la Lista Roja) . Sobre el precio de estos medicamentos, adicionará el ejecutor un suplemento de comisión por trámite de un 2,5% sobre el precio de lista de compra presentando la publicación de una documentación adecuada de los precios de compra.El pago se realizará - mensualmente dentro del plazo de cuatro semanas (momento del vencimiento)luego de la exhibición de la correspondiente documentación.

zugelassen Medikamente (Rote-Liste) enthalten sind auszuwählen. Auf diese Medikamente erhebt der Auftragnehmer eine Handling-Charge von 2,5 % auf die Listeneinkaufspreise bei Offenlegung sämtlicher Einkaufspreise anhand geeigneter Dokumentation. Die Zahlung erfolgt monatlich nach Vorlage der schriftlichen Nachweise innerhalb von vier Wochen .(Fälligkeitszeitpunkt)

### 9.Honorarios de actuación

### 9. Performance Fees

9.1 El mandatario recibe anualmente una comisión del 2,5% del volumen anual de negocios. *Esta percepcion corresponde solo a la fase (B)*

9.1 Der Auftragnehmer erhält jährlich eine umsatzabhängige Gebühr von 2,5 % des Jahresumsatzes.

### 10.Enseñanza y perfeccionamiento

### 10. Schulung und Weiterbildung

10.1 Cada empleado durante la jornada de trabajo deberá asistir a los cursos de perfeccionamiento del E-Learning-System de Marseille y aprobar ciertos controles de resultado. Por la utilización del Software recibe Marseille un importe global de T€ 100.p.a así como un importe de -100,- euros por empleado y por año. Estos importes globales respectivamente vencen el 1 de Diciembre para el año siguiente. Los importes globales por empleado deben ser abonados dentro de las cuatro semanas a contar de la finalización del trimestre.

10.1 Jeder Mitarbeiter soll während der Arbeitszeit Fortbildungskurse auf dem E-Learning-System von Marseille absolvieren und entsprechende Erfolgskontrollen bestehen. Für die Nutzung der Software erhält Marseille einen Pauschalbetrag von T€ 100. p. a. sowie einen Betrag von € 100,- je Mitarbeiter und Jahr. Die Jahrespauschale wird jeweils zum 1. Dezember für das Folgejahr fällig. Die Pauschalen pro Mitarbeiter werden innerhalb von vier Wochen nach Quartalsende zur Zahlung fällig.

### 11.Adquisición de participaciones sociales

### 11. Erwerb von Geschäftsanteilen

11.1 Marseille adquiere el 10 % de las participaciones sociales de la Sociedad propietaria del hospital y tiene además el derecho de incrementar el porcentaje hasta un 45% *todo ello se hará según contrato aparte y especifico.*

11.1 Marseille erwirbt 10 % der Geschäftsanteile der Krankenhausgesellschaft und erhält das Recht diesen auf bis zu 45 % der Geschäftsanteile auszubauen.

11.2 El precio de adquisición de las participaciones se desprende de acuerdo a la normativa de evaluación establecidas en las normas internacionales sobre Rendiciones de Cuentas tomando en consideración los resultados económicos de un año completo comercial y

11.2 Der Kaufpreis der Anteile ergibt sich entsprechend der Bewertungsstandards zur Bewertung von Unternehmen nach internationalen Vorschriften der Rechnungslegung unter Zugrundelegung der Ergebnisse eines vollen Geschäftsjahres und unter Anwendung

Managementvertrag
Stand: 14.12.2009

11

aplicando los multiplicadores usuales del precio de adquisición así como los factores de riesgo para las empresas del sector de la salud

üblicher Kaufpreismultiplikatoren sowie Risikofaktoren für Unternehmen der Gesundheitsbranche.

### 12. Duración del contrato / Garantías

### 12. Laufzeit des Vertrages / Sicherheiten

12.1.
Este contrato tiene una duración de un total de 5 años renovables tácitamente, salvo renuncia de una de las partes con un año de anticipación.

12.1.
1.Dieser Vertrag hat eine feste Laufzeit von fünf Jahren und verlängert sich automatisch um weitere fünf Jahre ,es sei denn er wird mit einer Frist von einem Jahr vorher gekündigt.

### 13. Impuestos sobre rendimiento

### 13. Steuern und Abgaben / Erlaubnisse

13.1. Todos los empleados contratados por Marseille que no sean de nacionalidad ecuatoguineana serán eximidos del pago de impuestos y tasas que estuviesen vinculados con el funcionamiento del hospital.En caso que por motivos legales no se conceda la exoneración de impuestos u otros tributos, el mandante toma a su cargo los costes que se originen.

13.1. Für alle von Marseille fest beschäftigten Mitarbeiter, welche nicht aus dem Staatsgebiet der Republik Guinea Ecuatorial kommen, wird der Auftraggeber Freiheit von der Zahlung jeglicher Steuern oder Abgaben, welche mit dem Beschäftigungsverhältnis verbunden sind, gewähren.
Falls aus gesetzlichen Gründen Steuern und Abgabefreiheit nicht gewährt werden kann, übernimmt der Auftraggeber die insoweit entstehenden Kosten.

13.2. Para la importación de bienes de inversiones así como de bienes de consumo, en especial de material de uso medico y técnico, piezas de recambio, medicamentos, vehículos técnicos especiales etc., concederá el Mandante a Marseille la exoneración de derechos aduaneros e impuestos, así como del impuesto del valor añadido.

13.2. Für den Import von Investitionsgütern als von auch allen Verbrauchsgütern, insbesondere medizinischen und technischen Verbrauchsmaterialien, Ersatzteilen, Medikamenten, Spezialfahrzeugen etc., welche im Rahmen des Auftrages von Marseille angeschafft werden, gewährt der Auftraggeber Freiheit von allen Einfuhrzöllen, Abgaben sowie Steuern, insbesondere der Mehrwertsteuer.

13.3. Para todos los honorarios o ingresos que Marseille obtenga en vinculación con este contrato o con la explotación de la clínica, quedará eximido del pago de impuestos y tasas.

13.3. Für alle Gebühren (Fees) oder Einnahmen, welche Marseille im Zusammenhang mit diesem Managementvertrag oder mit dem Betrieb der Klinik erlangt, gewährt der Auftraggeber umfassende Freiheit von der Zahlung von Steuern und Abgaben.

Managementvertrag
Stand: 14.12.2009

12

13.4. Hasta tanto que el Mandante no esté en condiciones de la liberación de impuestos y tasas, él se responsabilizaría de que el Gobierno de la República de Guinea Ecuatorial regule esta liberación a través del correspondiente Ministerio o Administración.

En los casos en que esto no sea posible – cualesquiera fueran los motivos – se considerarían como adicionales a los servicios y rendimientos prestados a Marseille los impuestos y tasas que surgiesen. Los gastos adicionales que surgiesen en los casos de los puntos 9.1 y 9.2 implementarían un incremento del presupuesto acordado en el punto 6 en la medida correspondiente.

13.5. El Mandante concedería de forma rápida y los mantendría en su extensión, por solicitud de Marseille, todos los requisitos de residencia y permisos laborales necesarios a todos los empleados y familiares y especialistas y personal de Dirección de Marseille que requiera el funcionamiento de la clínica, según Marseille lo indique.

## 14. Cláusula de salvedad

En caso de que alguno o varios pactos de este contrato fuesen considerados nulos o anulados, no podría ello menoscabar la validez de los otros pactos acordados en este contrato.

En ese caso queda acordado que entre las dos partes se formularía un nuevo acuerdo, el cual equilibraría en sentido económico el pacto anulado.

En caso de litigio, las partes se sentarán para resolver amigablemente el problema, caso contrario se dirigirán a

13.4. Soweit der Auftraggeber nicht selbst die vorbezeichnete Steuer- und Abgabefreiheit bewirken kann, wird er dafür Sorge tragen, dass dies die Regierung der Republik Guinea Ecuatorial durch das zuständige Ministerium oder Amt bewirken wird.

Soweit es hierzu – aus welchen Gründen auch immer – nicht kommt, verstehen sich alle nach diesem Vertrag an Marseille oder die zu beschäftigenden Mitarbeiter zu gewährenden Leistungen oder Gehälter zuzüglich der zu erhebenden oder erhobenen Steuern oder Abgaben. Wegen der zusätzlichen Abgabenlast auf die zu 9.1. und 9.2. zu zahlenden Kosten erhöht sich das zu 6. vereinbarte Budget summenmäßig entsprechend.

13.5. Der Auftraggeber wird auf Anfrage von Marseille Aufenthalts- und Arbeitserlaubnisse für zu beschäftigende Mitarbeiter und deren Angehörige, für Spezialisten und Managementpersonen von Marseille möglichst unverzüglich gewähren und in dem Umfang aufrecht erhalten, wie Marseille diese Personen für den Klinikbetrieb benötigt.

## 14. Salvatorische Klausel

Sollten eine oder mehrere Bestimmungen dieses Vertrages ungültig oder unwirksam sein, so soll dies nicht die Gültigkeit der anderen, geschlossenen Vereinbarungen beeinträchtigen.

Stattdessen gilt zwischen den Parteien als vereinbart, dass eine neue Vereinbarung getroffen wird, die der ungültigen oder unwirksamen Vereinbarung in wirtschaftlicher Hinsicht am nächsten kommt.

Bei Streitigkeiten aus diesem Vertrag, werden die Parteien versuchen vor der Anrufung der Gerichte von Guinea

los tribunales de Guinea Ecuatorial. En caso de desacuerdo de una de las partes, podrá recurrir al tribunal de la Cámara de Comercio de Zurich.

Ecuatorial eine einvernehmliche Lösung zu finden. Für den Fall von Streitigkeiten verpflichten sich die Parteien ein Schiedsverfahren vor der Handelskammer in Zürich durchzuführen.

Bata, 14 de diciembre de 2009

Bata, den   14. Dezember 2009

_____

Por el Gobierno de la República de Guinea Ecuatorial

Für die Regierung der Republik Guinea Ecuatorial

Bata, el 14 / 012 / 09

Bata den ………………

_____

Por Marseille-Kliniken Aktiengesellschaft, CH 6300 Zug

Marseille-Kliniken Aktiengesellschaft, CH 6300 Zug

**9101 E Nr.: 1424/2019**

**APOSTILLE**
(Convention deLa Haye du 5 octobre 1961)

1. Land: Bundesrepublik Deutschland

   Diese öffentliche Urkunde

2. ist unterschrieben von      Dr. Hans-Peter Ensenbach

3. in seiner Eigenschaft als Notar

4. sie ist versehen mit dem Siegel des Notars

**Bestätigt:**

5. in Bremen                          6. am 15.05.2019

7. durch die Landgerichtspräsidentin    i. A. Kampen
                                         Verwaltungsangestellte

8. Nr. 1060/2019

9. Siegel/Stempel                        10 Unterschrift

## Management Agreement for Polyclinic La Paz (Bata)

Between the Government of the Republic of Equatorial Guinea, Malabo represented by the appointed Minister for Building Development and Infrastructure

-   following referred to as Customer or AG

and others

Marseille Kliniken Aktiengesellschaft with domicile in CH 6300 Zug, Neugasse 4,  Trade Register No.  CH – 170.3.030.383-0, represented by the president and delegate of the Administrative Council Axel Hölzer, who also is Chairman of the Board of Marseille-Kliniken AG, Sportalle 1 in 22335 Hamburg, represented by authorized representative

Ulrich Marseille

-    following referred to as Marseille

## 1.   Preamble

1.1  The Customer has a Polyclinic Hospital with 3 lots of staff  housing apartments and another building as hotel and rehabilitation center in Bata. The 100 bed capacity building became operational in September 2007.

1.2  Marseille-Kliniken AG, Hamburg is a well known operator of social facilities and clinics. Presently the company successfully operates social facilities in more than 70 locations with nearly 5,500 employees.


                                                             (*signed*)


        (Stamp)
*Freie Hansestadt Bremen*
*Bremen District Court*
        *38*

1.3  Both parties wish to collaborate closely and for the long term on professional operations of the clinic complex described above in more detail, to benefit the population through a high measure of safely conducted health care. This is the declared will of all of the persons involved in this agreement.

1.4  Another central goal of this agreement is to enable the Republic of Equatorial Guinea to operate and manage the hospital exclusively with the aid of citizens of the Republic of Equatorial Guinea. To this aim it is imperative to develop and implement a long-term training plan for all employee groups.

1.5  To attain this goal, Marseille shall provide a corresponding instrument in the form of electronic teaching programs, so-called E-learning courses to be completed.

## 2.   Definitions

The present agreement contains the following definitions, explained here as follows:

2.1  Budget
The sum, usually referred to as annual amount – which the Customer provides to Marseille on a fiduciary basis, so that Marseille may cover all necessary operational costs according to its best knowledge and conscience; this includes in particular (but not exclusively)

    a)  personnel costs
    b)  specialist fees
    c)  material costs as they arise, particularly

    :

    aa)  medical supplies                                        *(signed)*

    bb)  medication

    cc)  patient and employee food

    dd)  communication costs and energy costs

    ee)  procurement of low-value assets,

    ff)  license fees for third parties, as well as
        continuous software maintenance fees

    gg)  property- and personal insurance for business operations

    ii)  operating costs for the buildings to be taken over

    d)  other costs necessary for operating a hospital

## 2.2  Revenue

The sum – generally referred to as yearly total – which
is received by the hospital.

## 2.3  Profit

The sum – generally referred to as yearly total -
which results from deducting the total cost from the
revenue, without loss

## 2.4  Management Agreement

Refers to the binding agreement by which Marseille conducts
Polyclinic Hospital Bata in its fiduciary function in the name of
and on behalf of the Republic of Equatorial Guinea, for the latter's
benefit but also at its expense, that is to say as well as and in
the spirit of conducting its own hospital operations. The activity is
intended to represent a profit to the Republic of Equatorial Guinea
in the longterm.

## 2.5  Euro

Currency of the Federal Republic of Germany, lawful tender.

*(signed)*

## 3.  Object of the Agreement

3.1   Marseille shall take over the management on the basis of the
present Management Agreement and, by virtue of the unlimited und
unrestricted general power of attorney bestowed by the Customer,
by which Marseille is authorized to issue and receive all statements
required for operating the Polyclinic Hospital Bata.

3.2  Marseille may make all personnel decisions, particularly with
regard to employment and dismissals, employment of specialists via
service contracts, entering into all kinds of  supplier contracts, have
treatment plans and agreements with patients and relatives, as well
as any and all contracts which Marseille deems suitable to carry out
economically sensible clinic operations.

3.3  Marseille is obligated to organize the training and continued education
of  the employees, particularly in handling the medical equipment in use.

Skills for treating patients must be brought to the latest international
state-of-the-art with regard to all indicative diseases. In so doing,
Marseille is particularly authorized to send employees to Europe for
 training and continued education, in order to receive training there.
It is up to Marseille's discretion to determine the type and duration
of each individual training course. The costs for such training shall be
covered by the established budget.

(*signed*)

3.4  Marseille is obligated to develop and provide adequate software
for hospital administration, personnel administration and management of
essential operations for running the hospital. The basic facilities shall be
operational within a period of 4 months after taking over the hospital.
For highly specialized departments and to manage hospital supplies received
from abroad, business administration issues and individual personnel
planning, the software shall be ready for operations 12 months after the
facility has been handed over, at the latest.

The costs for software development are to be borne by Marseille and shall
not be covered by the budget.

3.5  Marseille shall provide its "brand name" for Customer's use in connection
with Polyclinic Hospital Bata for the duration of this agreement. In doing so,
color and design of the lettering of each original used by Marseille shall be
adopted.  The Customer may expressly advertise for its Polyclinic Hospital
Bata in all forms of media. Details shall be provided  in a separate agreement
in the future. The license fee for utilization is considered paid with the
management fee under 7.

## 4.  Transfer of  Rights

4.1  On February 1, 2010 the first phase of this agreement shall go into effect.
In the event that the remaining service agreement cannot be carried out on the
part of the Ministry, Marseille shall take on the management of the hospital.
In such a case, the Ministry shall hand over the fully furnished premises to
Marseille. Marseille is obligated to manage the clinic with the necessary care
and caution, and with handling the furnishings, in particular.

(*signed*)

Prior to the hand-over, Marseille shall provide the Customer with
a list of objects that are still missing from the clinic to fully operate,
such as linens, uniforms, surgical instruments, etc., and specifically
all such  objects which must still be procured,  or which are in poor
condition.

4.2   Within the scope of this Management Agreement Marseille may
conduct the matter as though it were the owner, but without claiming
ownership.

4.3  Marseille is entitled to deny access to anyone who represents a
threat to the safety and/or normal functioning of the hospital.

4.4  Marseille is obligated, inasmuch as possible while minding
cost and usage, to ensure the Polyclinic Hospital Bata against risks
which might arise from fire, storm or from water damage
(natural hazards), inasmuch as there is an insurance carrier willing
to write an insurance contract at acceptable and common market
terms.

4.5  The risk of accidental loss or destruction, or as a result of
Force majeur, unrest or strike, the effects of war, or other unforeseeable
events or natural disasters or calamities, shall be borne by the
Customer.  Marseille shall be held harmless in this regard.

(signed)

Management Agreement                          7                          Translation
Status: 12/14/2009

## Management Related Details


5.1   Marseille is obligated to provide a written report to the Customer
on the business development of Polyclinic Hospital, in regular intervals,
at least once a quarter - i.e. every three months - (or monthly if requested).
Such report shall include essential events as well as the financial situation
(income, expenses, necessary investments, hospital statistics) and shall
be carried out in a precise manner.


5.2   Marseille is obligated to make any necessary repairs, insofar as
they do not exceed an amount of 5,000.00 Euro per incident, and to
do so without delay; this shall be covered from the available budget.
Any repair costs in excess of this amount, or necessary investments in
replacement, shall be paid for by the Customer after approval, outside
of the budget range.


## 6.  Budget  / Profit

6.1   Phase A of the Agreement. This phase consists of the following
      functions and services:
   a)  Control of  receivables and expenditures
   b)  Financial control
   c)  Begin of installation of SOFTWARE according to international standards
   d)  Management and selection of medications by European standards and
       corresponding quality standards,  including all of the hospital supplies.


*(signed)*

   e) Professional quality control of  assessment and the quantity of employees
     and reporting to the administrative council.

The costs for these services are 840,000 Euro. This amount shall include all costs with the exception of housing, water, electricity and local transportation for the employees as provided.

6.2  Phase B of the Agreement. This phase includes full responsibility for the technology end, personnel, premises and all of the property of Marseille. The costs for this phase are 700,000 Euro per month, or 8,400,000 Euro per year, respectively. This amount shall include all| costs for the four employees provided by Marseille, with the exception of their housing cost, water, electricity and transportation, respectively.

6.3  The Parties are aware that due to the short-term take-over of the administration additional costs will be incurred, such as for the employment of specialized personnel from external sources, for example. The Customer shall accept all of the costs and will make an amount of 840,000 Euro available for Phase A and 8,400,000 Euro for Phase B, prior to begin of the above mentioned actions. The afore-mentioned sums shall be made available immediately after signing the agreement. Marseille shall provide a temporary bank guarantee in the amount of 4,200,000 Euro over a period of 6 months. The sums shall be paid to  UBS AG account Nr. 0206-238828   with bank routing nr. 33000206206238828D7F.

*(signed)*

## 7.  Management Fee

Management Agreement                    9                           Translation
Status: 12/14/2009

7.1  For the services described in more detail above, and which are
carried out on behalf of the Customer, Marseille shall receive a fixed
monthly fee in the amount of sevenhundredthousand (700,000) Euro
for the duration of the agreement.

7.2  The management fee shall be paid in advance for one year, in
one sum, while Marseille's services begin upon receipt of the first
annual payment to Marseille's account.

7.3  The following yearly installments are each due  three months prior
to the conclusion of the current billing year, respectively.
The management fee is paid free of charge and without deduction of
costs, fees or taxes to the account at UBS AG  account Nr. 0206-238828,
bank routing Nr. IBAN CH 33000206206238828D7F.  An offset with
a counter demand from the Customer is permissible only insofar as such
counter demand has been recognized by Marseille in binding form and
in writing.

7.4   A reduction or any other withholding of the management fee is not
permissible.

## 8.  Hospital Supplies

8.1  Marseille shall procure all required hospital supplies and medications
as necessary for clinic operations, through its account and from the clinic's
budget. These supplies shall be purchased on the basis of best sales price in
a member state of the European Union and, inasmuch as possible, hospital

*(signed)*

supplies from the list of admissible medications in Germany (Red List) shall
be selected. The Contractor shall add a handling charge of 2.5% of the listed

purchase price with disclosure of all purchase prices, with proper documentation.
Payment shall be made on a monthly basis, after submission of documented
proof, within a period of four weeks (the due date).

## 9.  Performance Fees

9.1   The Contractor shall receive an annual fee of 2.5% of  the
annual turnover.

## 10.  Training and Continued Education

10.1  During his/her employment each employee shall complete continuing
education courses on Marseille's E-Learning System and pass through
respective phases and checks successfully. For the use of the software
Marseille shall receive a fixed sum of T€ 100 p.a. as well as  € 100 per
employee per year. The annual fixed sum is due on December 1st for the
following year. The fixed sum per employee is payable within a time period
of four weeks after the end of each quarter.

## 11.  Acquisition of Shares

11.1  Marseille shall acquire 10% of  the hospital corporation's shares
along with the right to extend such acquisition to 45% of shares.

11.2   The purchase price of the shares is calculated on the basis of the
valuation standard used to assess enterprises according to international
regulations for accounting principles, with the results based on a full
business year, utilizing common purchase price multiplicators and risk
factors for enterprises serving the health industry.

(*signed*)

## 12. Duration of the Agreement / Guarantees

12.1   This Agreement is valid for a fixed duration of five years with automatic renewal for another 5 years, unless it is terminated with a one year notice.

## 13. Taxes and Duties

13.1   For all of Marseille's permanent employees who do not originate from the Republic of Equatorial Guinea, Customer grants the Contractor exemption from any taxes or duties in connection with the employment. If a tax free or duty free status cannot be granted for legitimate reasons, Customer shall bear the costs incurred hereby.

13.2   For importation of investment goods as well as all consumer goods, particularly medical and technological consumer goods, spare parts, medications, special vehicles, etc. procured in the scope of Marseille's assignment, the Customer permits exemption from all import duty, taxes and fees, and value added tax in particular.

13.3.   For all fees or income which Marseille acquires in connection with the management agreement or clinic operations, the Customer shall grant comprehensive exemption from taxation and duties.

*(signed)*

13.4  Inasmuch as the Customer is unable to effect the above mentioned
 tax and duty exemption status, the Customer shall see to it that such
will be granted by the proper Ministry or Office of the Government of
the Republic of Equatorial Guinea.

Should this be unsuccessful, for whatever reason, based upon this
agreement it is understood that it shall apply to all benefits or salaries
of Marseille or employees to be employed by Marseille, in addition to
any taxes or duties that might arise. Due to the additional fiscal burden
of the costs payable under 9.1 and 9.2, the budget amount as agreed
upon in 6. shall increase accordingly.

13.5  At Marseille's request, the Customer shall issue residence- and
work permits to prospective employees and their family members, for
Marseille's specialists and management personnel, and do so without
delay inasmuch as possible, to maintain their status to the extent that
Marseille requires their services for clinic operations.

## 14.  Severability Clause

In the event that one or more of the provisions of this agreement should
become invalid or ineffective, the validity of the other provisions of
of the agreement shall not be affected.

Rather, it is considered agreed upon between the Parties that a new
agreement shall be made which, in an economic sense, will in effect be
closest to the invalid or ineffective provision.

*(signed)*

Management Agreement                    13                              Translation
Status: 12/14/2009


Should a dispute arise from this agreement the Parties shall attempt
to find an amicable solution prior to calling upon the Courts of Equatorial
Guinea. If disputes do occur, the Parties shall commit to Arbitration
Proceedings before the Chamber of Commerce in Zürich.


Bata, December 14, 20009


_____
for the Government of the Republic of Equatorial Guinea


Bata, date …………………………….

_____
Marseille-Kliniken Aktiengesellschaft, CH 6300 Zug




                                    Bremerhaven, ........... May 08, 2009 (illeg.)
                                              Notary Public


          (Stamp)

Management Agreement                        14                              Translation
Status: 12/14/2009

**9101 E Nr.: 1424/2019**


**APOSTILLE**

(Hague Convention from October 5, 1961)


1.  Country:   Federal Republic of Germany


This public record


2.  is signed by            Dr. Hans-Peter Ensenbach

3.  in his capacity as Notary Public

4.  it bears the Notary's seal


**Certified:**


5.  in Bremen                              6.  On 05/15/2019

7.  by the District Court President        in repr.:  Kampen
                                           Administrative Assistant

8.  Nr. 1060/2019        (Stamp)          ___*(signed)*_____
                                           10.  Signature

9.  Seal/Stamp       District Court Bremen

# Affidavit of Translation

**STATE OF COLORADO**
**DENVER COUNTY**

I, the undersigned Certified Translator hereby certify that I have
translated the three documents attached to this Affidavit:

**Document 1:** Original German document, with the following document title, case number, and names of disputing parties:
**Obergericht des Kantons Zürich**
Document title (center of cover page)
**Beschluss vom 24. September 2018**
**Verfahrens-Nr. 600413-2015**

Names of disputing parties (top center of cover page:
**Marseille-Kliniken AG/**
**Regierung der Republik**
**Äquatorialguinea**

**Document 3:** Original German document title, case number, and names of disputing parties:
**Eidesstattliche Erklärung, Proced.Nr. 600413-2015,**

**Marseille-Kliniken AG/Regierung der Republik Äquatorialguinea**
**Document 5:** Original German document, title: **Managementvertrag für die Poliklinik La Paz (Bata), 14 pages**

**Document 2:** Translation of Document 1, title, case number, and names of disputing parties:
High Court of Appeals Zürich
**Document title** (center of cover page)
**Decision from September 24, 2018**
Re: Certificate of Enforceability
**Case number:** No. 600413-2015

Names of disputing parties (top center of cover page:
**Marseille-Kliniken AG/**
**Government of the Republic of**
**Equatorial Guinea**

**Document 4:** Translation of document 3 title, case number, and names of disputing parties:
**Declaration in Lieu of Oath,**
**Proced. Nr.600413-2015,**

**Marseille-Kliniken AG/Government of the Republic of Equatorial Guinea**
**Document 6:** Translaton of document 5
**Management Agreement for Polyclinic La Paz (Bata, 14 pages**

I further certify that to the best of my knowledge, the English documents are a true and accurate translation of the original German.

*(Signature of Translator/Verifier)*
Gabriella Bertelmann

Subscribed to and sworn before me this ___23___ day of
__JULY__ , __2019__ , by _GABRIELLA BERTELMANN_

_____
(Signature of Notary Public - State of _COLORADO_ )
_KEVIN T SHIGIO_
(Print, type or stamp commissioned name of Notary Public)

KEVIN T SHIGIO
NOTARY PUBLIC - STATE OF COLORADO
NOTARY ID 20024039063
MY COMMISSION EXPIRES DEC 28, 2022

# EXHIBIT A-2



---

**Marseille-Kliniken AG / Government of the Republic of Equatorial Guinea**

**Swiss Chambers' Arbitration Institution**
**Arbitration No. 600413-2015**

# Arbitral Award

---

**Marseille-Kliniken AG**, Chamerstrasse 67, CH-6300 Zug

**Claimant**

Represented by Prof. Dr. Bernd Reinmüller, Bory & Associés, Avocats, 1, Place Longemalle, CH-1204 Genève

vs.

**The Government of the Republic of Equatorial Guinea**, Presidential Palace,
Rue du 12 Octobre, Malabo, Equatorial Guinea

**Respondent**

Represented by Jean-Charles Tchikaya, Cabinet d'Avocats, 15, Cours Georges Clemenceau, F-33000 Bordeaux

and/or Francisco Evui Nguema Mukue, GETESA-MALABO, C/Rey Bonkoro n°7, Malabo, Equatorial Guinea

and/or Peter J. Merz and/or Dr. Lulcien Valloni, Froriep, Bellerivestrasse 201, CH-8034 Zürich

Before the Arbitration Tribunal consisting of:
Dr. Felix Fischer (Co-Arbitrator)
Melissa Magliana (Co-Arbitrator)
Dr. Andrea Meier (Chairman

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | **ABBREVIATIONS** | 4 |
| II. | **INTRODUCTION** | **6** |
| A. | Subject of Dispute | 6 |
| B. | Parties | 6 |
| | 1. Claimant | 6 |
| 2. | Respondent | 7 |
| C. | Arbitration Tribunal | 7 |
| D. | Remedy Sought by Parties | 9 |
| | 1. Claimant | 9 |
| | 2. Respondent | 13 |
| E. | Arbitration Clause | 16 |
| F. | Seat of Arbitration Tribunal | 16 |
| G. | Applicable Law | 16 |
| H. | Applicable Procedural Rules | 17 |
| III. | **HISTORY OF PROCEEDINGS** | **17** |
| IV. | **FACTS** | **25** |
| A. | Management Contract Polyclinic La Paz (Bata) December 14, 2009 | 25 |
| B. | Claimant's Withdrawal from Equatorial Guinea in March of 2011 | 26 |
| C. | First Arbitration and Conclusion of Dispute Settlement Agreement from May 28, 2015 | 26 |
| V. | **ARGUMENTS BY THE PARTIES** | **27** |
| A. | Claimant's Position | 27 |
| B. | Respondent's Position | 34 |
| VI. | **CONSIDERATIONS** | **41** |
| A. | Arbitration Tribunal's Jurisdiction | 41 |
| | 1. Effects of Dispute Settlement Agreement on Claims from Management Contract | 41 |
| | 2. Arbitration Tribunal's Jurisdiction Based on the Management Contract's Arbitration Clause | 45 |
| B. | Substantive Law | 52 |
| | 1. Question as to the Termination of Contract by Respondent | 52 |
| | a) Evaluation of the Management Contract | 52 |
| | b) Question of Applicability of Art. 404 OR | 54 |

|  | 2. | Implied Termination by Respondent at the End of the Regular Contract Term | 59 |
|  | 3. | Start and End Dates for Term of Management Fee | 61 |
|  |  | a) Start of Phase B | 61 |
|  |  | b) End of Regular Contract term | 63 |
|  |  | c) Result | 64 |
|  | 4. | Savings in Expenditures |  |
|  |  | a) Claimant's Supplementary Information on Expenditures Saved with the Aid of an Auditor | 64 |
|  |  | b) Expenses to be Covered By Management Fee | 66 |
|  |  | c) Salary Expenses, Ancillary Salary Costs, External Legal and Consulting Fees and Other Operational Expenses | 67 |
|  |  | d) Continuous Training and Education | 68 |
|  |  | e) Software for Hospital Administration | 68 |
|  |  | aa) Software Development Costs | 68 |
|  |  | bb) Software Adaptation and Maintenance Costs | 69 |
|  |  | f) Additional Costs at Central Office in Hamburg | 70 |
|  |  | g) Relevance of Project Costs for Portal Clinics | 70 |
|  |  | h) Overview of Savings in Expenditures | 71 |
|  | 5. | Country Risk Assessment | 72 |
|  | 6. | Other Income and Related Efforts | 75 |
|  | 7. | Amount of Compensation Owed | 76 |
| **VII.** | **INTEREST** | | **77** |
| **VIII.** | **COSTS** | | **78** |
| A. | Determination and Distribution of Arbitration Costs | | 78 |
| B. | Costs of Arbitration Tribunal Proceedings and Administrative Costs | | 80 |
| C. | Costs Incurred by Parties | | 81 |
|  | 1. Costs Claimed by Claimant | | 81 |
|  | 2. Costs Claimed by Respondent | | 82 |
|  | 3. Appropriateness of Costs Borne By Parties | | 82 |
| **IX.** | **ARBITRAL AWARD** | | **86** |

## I.    LIST OF ABBREVIATIONS

| | |
|---|---|
| Appendix B | Schedule of the Cost of Arbitration acc. To Swiss Rules, In force as of June 1, 2012 |
| B-KN | Respondent's Cost Sheet dated March 7, 2017 |
| B-SB | Respondent's Statement from February 28, 2017 regarding Outcome of the Evidence |
| B-SeA | Respondent's Statement from August 14, 2017 regarding K-SeA |
| First Arbitration Decision | Arbitral Award from Dec. 5, 2014 in Arbitration Proceedings No. 600257-2011 |
| First Arbitration Decision | Swiss Rules Arbitral Award No. 600257-2011 (with Arbitral Award from Dec. 5, 201 finalized) |
| MV | Management Contract for Polyclinic La Paz (Bata) from Dec. 14th, 2009 (= Supplement K-1) |
| KA | Statement of Defense from July 13, 2016 |
| K-KN | Claimant's Own Cost Statement from March 6, 2017 |
| KS | Plea from April 26, 2016 |
| K-SB | Claimant's Statement from February 28, 2017 regarding the outcome of the evidence |
| K-SeA | Claimant's Statement from May 29, 2017 regarding Savings in Expenditures Secretariat of the Arbitration Tribunal's Swiss Chambers Arbitration Institution |
| Secretariat | Secretariat of the Arbitration Court of the Swiss Chambers' |

|  | Arbitration Institution |
|---|---|
| SPwC | Statement of Pricewaterhouse Coopers GmbH from May 24, 2017 regarding Savings in Expenditures at Claimant's request (= Supplement K-93) |
| WP | Verbatim Minutes of Arbitration Session from Dec. 5, 2016 |
| ZE | Witness Statements |

## II.    INTRODUCTION

### A.    Matter of Dispute

1     The dispute in arbitration is based upon a management contract entered into by the Parties with regard to the Polyclinic La Paz (Bata) on December 14, 2009 (*Contrato de gestión del Hospital Polyclinic of La Paz (Bata)*) ("**Management Contract**" or " **MV**", Supplement K-1). Claimant demands that Respondent pay a fee ("**Management Fee**") of EUR 53,891,600 plus interest. Respondent raised an objection to Arbitration Court's jurisdiction. Moreover, Respondent contests Claimant's Claim and asserts that the Management Contract had been terminated.

### B.    Parties

### 1.    Claimant

2.    Claimant, **Marseille-Kliniken AG**, is a Corporation organized under Swiss Law with seat in

Chamerstrasse 67
6300 Zug
Switzerland

3.     Claimant is represented by:

**Prof. Dr. Bernd Reinmüller**
Bory & Associés, Avocats
1, Place Longemalle
1204 Genève
Switzerland
Telephone.: +41 22 718 88 44
Fax:      +41 22 718 88 48
Email:     bre@verslaw.ch

## 2    Respondent

4    Respondent is the **Government of the Republic of Equatorial Guinea,** official address:

Presidential Palace
Rue du 12 Octobre
Malabo
Equatorial Guinea

5    Respondent is represented by:
**Jean-Charles Tchikaya**
Cabinet d'Avocats
15, Cours Georges Clemenceau
F-33000 Bordeaux
Email: jctchikaya@avocatline.fr

**Francisco Evui Nguema Mukue**
GETESA-MALABO
C/ Rey Bonkoro no7
Malabo
Equatorial Guinea
Email: sejomse@gmail.com

**Peter J. Merz and/or Dr. Lucien Valloni**
Froriep Legal AG
Bellerivestrasse 201
CH-8034 Zürich
Telephone:      +41 44 386 60 00
Email:          pmerz@froriep.ch
                lvalloni@froriep.ch

## C.    Arbitration Court

6    The Arbitration Court was established in accordance with the Rules of the International Swiss
Arbitration Regulations ("**Swiss Rules**", in force since June 2012).

7    The Co-Arbitrator appointed by Claimant and confirmed by the Arbitration Tribunal of the
Swiss Chambers' Arbitration Institution ("**Court of Law**") is:

**Dr. Felix Fischer**
BodmerFischer AG
Limmatquai 94
Postfach 3978
8021 Zürich
Switzerland
Telephone:      +41 44 711 71 71
Fax:      +41 44 711 7111
Email:      fischer@bodmerfischer.chh

8      Through Claimant's default, the Co-Arbitrator appointed by the Tribunal is:

**Melissa Magliana, J.D.**
Homburger AG
Prime Tower
Hardstrasse 201
8005 Zürich
Switzerland
Telephone:      +41 43 222 10 00
Fax:      +41 43 222 15 00
Email:      melissa.magliana@homburger.chh

9      The Tribunal's Chairman appointed by the Co-Arbitrators and confirmed by the Tribunal is:

**Dr. Andrea Meier**
Wattmann & Merker
Kirchgasse 48
8024 Zürich
Switzerland
Telephone:      +41 44 212 10 11
Fax:      +41 44 212 15 11
Email:      a.meier@wartmann-merker.ch

10      The Secretary appointed by the Arbitration Tribunal with Claimant's consent and without objection from Respondent, unavailable to be heard, is:

**Gerarda Coppola**
Wartmann & Merker
Kirchgasse 48
8024 Zürich

Switzerland
Telephone:      +41 44 212 1011
Fax:            +41442121511
Email:          g.coppola@wartmann-merker.ch


## D.    The Parties' Request for Remedy

### 1.    Claimant

11    In the Notice of Arbitration from January 28, 2015, Claimant files the following request for remedy:

> *Based upon the Management Contract from December 14, 2009 Cl-1, Respondent shall be obligated to pay Claimant EUR 53,891,600 plus 5% interest from the due date of the individual claim portions or monthly remunerations, respectively.*

> *All costs and damages shall be borne by Respondent*

12    This request for remedy is specified by Claimant in the Statement of Claim from April 26, 2016 as follows:

> *I.     With regard to the Arbitration Tribunal's jurisdiction, I request that the following be recognized:*

> *1.     The Arbitration Tribunal has jurisdiction over the Parties' dispute.*

> *2.     Respondent shall bear all costs in connection with the Arbitration Tribunal's jurisdiction issue, regardless of the outcome of the Proceedings in the principal matter.*

> *3.     The Arbitration Tribunal's Costs shall be determined within the scope of the ruling in the Principal Legal Matter.*

> *II.    As to the Request for Remedy I ask the following be recognized:*

> *1.     Based upon the Management Contract from December 14, 2009, Respondent shall pay the partial amount of 10% of EUR 5,600,000.00 for the Polyclinic "La Paz" (Bata) for the months of August until and including December 2010, and for the months of January up until and including March 2011 a partial amount of 10% on EUR 5,600,000.00 for a total of EUR 560,000.00 plus 5% interest*

- *on EUR 5,600,000.00 from the date of 05/01/2010*

2. *Respondent shall pay Claimant for the months beginning in April 2011 up until and including December 2011 and for the months of January 2012 up until and including August 2012 an amount of EUR 700,000.00 per each month, respectively, minus the monthly savings in expenses of EUR 112,000.00, i.e. EUR 588,000.00 per month, multiplied by 17 months, for a total of EUR 9,996.000.00, and a partial 10% payment thereof, i.e. EUR 999,600.00 plus 5% interest*

   - *on EUR 235,200.00 beginning 05/01/2010 and*
   - *on EUR 705,600.00 beginning 05/01/2011 and*
   - *on EUR 58,800.00 beginning 05/01/2012*

3. *Respondent shall pay Claimant for each month from September 2012 up until and including January 2015 an amount of EUR 700,000.00 minus savings in monthly expenses of EUR 112,000.00, i.e. EUR 588,000.00 per month, multiplied by 29 months, for a total of EUR 17,052,000.00, plus 5 % payment interest*

   - *on EUR 6,468,000.00 beginning 05/01/2012 and*
   - *on EUR 7,056,000.00 beginning 05/01/2013 and*
   - *on EUR 3,528,00.00 beginning 05/01/2014*

4. *Respondent shall pay Claimant for the months beginning in February   2015 up until and including July 2015 an amount of EUR 700,000.00 each, minus the monthly savings in expenses of EUR 112,000.00, i.e. EUR 588,000.00 per month multiplied by 6 months, resulting in the sum of EUR 3,528,000.00 plus 5% interest*

   - *on EUR 3,528,000.00 beginning 05/01/2014.*

5. *Respondent shall pay Claimant for the months beginning in August 2015 up until and including July 2016 an amount of EUR 700,000.00 each minus monthly savings in expenses of EUR 112,000.00, i.e. EUR 588,000.00 per month multiplied by 12 months, resulting in EUR 7,056,000.00 plus 5% interest*

   - *on EUR 7,056,000.00 beginning 05/01/2015*

6.     *Respondent shall pay Claimant for the months beginning in August 2016 up until and including July 2017 an amount of EUR 700,000.00 each minus monthly savings in expenses of EUR 112,000.00, i.e. EUR 588,000.00 per month multiplied by 12 months, resulting in a sum of EUR 7,056,000.00 plus 5% interest*

    *- on EUR 7,056,000.00 beginning 05/01/2016.*

7.     *At Claimant's request it was determined that the Management Contract from December 14, 2009 was not terminated and continues to be effective beyond January 2015, including from August 2017 up until and including January 2020.*

    *It was further determined that*

    *Respondent is obligated to pay the contractually agreed upon annual Management Fee three months prior to the end of the billing year in an advance sum for each subsequent year according to Item 7.2 of the Management Contract from December 14, 2009, on the due date of the individual annual sums in the amount of EUR 8,400,000.00 minus monthly savings in expenses of EUR 112,000.00 multiplied by 12 months, i.e.    EUR 588,000.00 per month multiplied by 12 months, totaling EUR 7,056,000.00 \ per year up until the end of the management contract, up until and including January 2020; if in    default, add 5% interest from the due   date of the respective annual sum for the time period beginning August 1,2017 up until and including July 31, 2018 from 05/01/2017, for the time period beginning August 1, 2018 up until and including July 31, 2019 from 05/01/2018, and for the time period from August 1, 2019 up until and including January 31, 2020, beginning 05/01/2019.*

8.     *Costs and damages from the Arbitration Tribunal Proceedings are borne by Respondent, in any case in the amount of Respondent's default of advance cost payment.*

9.     *Moreover, we request admission and acceptance of further explanations and pieces of evidence, particularly from the decision regarding the Arbitration Tribunal's jurisdiction from September 16, 2013 in the Arbitration Proceedings No. 600257-2011 and from the Arbitration Proceedings No. 600257-2011 for the modification/supplementation and specification of Claimant's Statement (besides the claims filings) by the Arbitration Tribunal.*

13    In the reply from September 16, 2015 Claimant added the following Request:

> 1.    *Respondent's Request to 1.) to determine that Respondent's objection regarding the Arbitration Tribunal's jurisdiction was admissible and justified, is to be dismissed.*
>
> 2.    *Respondent's request to 2.) that the Arbitration Tribunal's jurisdiction for this current litigation be pronounced altogether invalid, should be dismissed.*
>
> 3.    *Claimant's requests regarding jurisdiction (A.I. 1-3 Grounds for Plea) shall be accepted.*
>
> 4.    *Respondent's Alternative Requests concerning Claims 1 and 2:*
>
>> a)    *The Arbitration Tribunal shall suspend Proceedings until Claimant has initiated the arbitration process followed by due process in Equatorial Guinea, and, having obtained a court decision, intends to seek recourse against it.*
>>
>> b)    *The Arbitration Tribunal shall suspend Proceedings until Claimant has sought due process before the competent Courts in Equatorial Guinea, and, having obtained a court decision, intends to seek recourse against it.*
>
> 5.    *Respondent shall bear the costs incurred by the Arbitration Proceedings including appropriate compensation to be determined by the Arbitration Tribunal in Claimant's favor).*
>
> 6.    *Respondent's Requests 1 - 7 on pages 3 and 4 of the statement of defense from July 13, 2016 are to be dismissed with costs assigned.*
>
> *Claimant further requests – beyond the grounds given in Requests 1 – 6 of the application – that instead of the current request for assessment according to Claimant's Request 7 in its Grounds for Claim from April 26, 2016 - the following be recognized:*
>
> 7    *a) It is ascertained that the management contract from December 14, 2009 was not terminated and continues to be effective beyond January 31, 2015, as well as from August 2017 up until and including January 2020.*

*b) Three months prior to the end of the billing year, Respondent shall pay Claimant the contractually agreed-upon annual Management Fee for each respective following year, according to Item 7.2 of the Management Contract from December 14, 2009, on the due date of the individual annual sums in the amount of EUR 8,400,000.00 minus the savings in monthly expenses of EUR 112,000.00 multiplied by 12 months, creating a total of EUR 7,056,000.00 per year up until the end of the Management Contract up until and including January 2020; if in default, an additional 5% interest from the due date of the respective annual sum for the period beginning August 1, 2017 up until and including July 31, 2018 beginning May 1, 2017, for the period beginning August 1, 2018 from May 1, 2017, up until and including July 31, 2019 from May 1, 2018, for the period from August 1, 2018 up until and including July 31, 2019 beginning on May 1, 2018, and for the period beginning August 1, 2019 up until and including January 31, 2020, beginning May 1, 2019.*

*Alternatively:*

*Respondent shall pay Claimant for lost profit for the months beginning August 2017 up until and including January 2020 a sum of EUR 700,000.00 per month minus the monthly savings in expenses of EUR 112,000.00, i.e. EUR 588,000.00 per month multiplied by 30 months, a total of EUR 17,640,000.00 plus 5% interest on EUR 17,640,000.00 from July 14 2016.from July 14, 2016.*

*Requests 8 and 9 in the Grounds for Claim are upheld.*

**2    Respondent**

14    In its statement of Defense from July 13, 2016, Respondent raised the following legal request:

1.    *The Arbitration Tribunal finds that Respondent's objection to the Arbitration Tribunal's jurisdiction is admissible and justified.*

2.    *The Arbitration Tribunal declares that it does not have jurisdiction for the litigation in its entirety.*

3.    *Claimant's Requests as to jurisdiction (A.I.1 to 3 of the Grounds) shall be dismissed, inasmuch as they should even be taken into consideration.*

4.     *Alternative to Requests 1 and 2:*

      *a) The Arbitration Tribunal suspend Proceedings until Claimant has initiated the arbitration process followed by due process in Equatorial Guinea, and, having obtained a court decision, intends to seek recourse against it.*

      *b) The Arbitration Tribunal shall suspend Proceedings until Claimant has sought due process before the competent Courts in Equatorial Guinea, and, having obtained a court decision, intends to seek recourse against it.*

5.     *Claimant shall bear the costs of the Arbitration Proceedings (incl. appropriate cost compensation awarded by the Arbitration Tribunal in favor of the Respondent.)*

*And in the event that the Arbitration Tribunal confirms its jurisdiction over the following*

### REQUESTS:

1.     *The Arbitration Tribunal dismisses Claimant's Claim in its entirety, insofar as it should even be acknowledged.*

2.     *Alternative to Request 1:*

      *The Arbitration Tribunal finds that the Management Contract from December 14, 2009 was terminated, effective immediately, on September 12, 2011 at the latest, and dismisses the Claim comprising Requests II.2 to II.9 (Grounds for Claim).*

3.     *Alternative to Request 2:*

      *The Arbitration Tribunal finds that the Management Contract from December 14, 2009 was terminated on September12,2011, at the latest, effective immediately, and dismisses the Claim comprising Requests II.2 to 9 (Grounds for Claim).*

4.     *Alternative to Request 3:*

      *The Arbitration Tribunal finds that the Management Contract from December 14, 2009 was terminated on December 14, 2014 at any rate, and dismisses the Claim comprising Requests II.4 to 9 (Grounds for Claim) .*

5.     *Alternative to Request 4:*

      *The Arbitration Tribunal finds that the Management Contract from December 14, 2009 was terminated effective immediately at the latest with the conclusion*

*of the Agreement from May 26, 2015 and dismisses the Claim comprising Requests II.4 to 9 (Grounds for Claim).*

6.    *Alternative to Request 5:*

*The Arbitration Tribunal finds that the Management Contract from December 14, 2009 was terminated effective immediately, at the latest with the delivery of this Statement of Defense to Claimant, and dismisses the Claim comprising Requests II.6 to 9 (Grounds).*

7.    *Claimant bears the costs of the Arbitration Proceedings (including appropriate cost compensation awarded by the Arbitration Tribunal in favor of Respondent).*

15    Moreover, Respondent submits the following filings on October 19, 2017 and in duplicate the following Requests (cf. Rejoinder* p. 5):

1.    *Respondent's Request 1 made in the Reply from September 16, 2016 ("Request to 1.) to determine that Respondent's objection to the Arbitration Tribunal's jurisdiction is not admissible and justified, is to be dismissed") shall be dismissed.*

2.    *Respondent's Request 2 ("Request to 2.) made in the Reply from September 16, 2016, stating that the Arbitration Tribunal shall declare its lack of jurisdiction and justification") shall be dismissed.*

3.    *Request 3 made in the Reply from September 16, 2016 (Claimant's Requests regarding jurisdiction (A.I. 1-3 Grounds for Claim) shall be recognized") shall be dismissed.*

4.    *Request 4 made in the Reply from September 16, 2016 ("Alternative Requests to Respondent's Requests 1 and 2 [...]")shall be dismissed.*

5.    *Request 5 made in the Reply from September 16, 2016 ("Respondent  shall bear the costs [...]") shall be dismissed.*

6.    *Request 6 made in the Reply from September 16, 2016 ("Respondent's Requests 1 to 7, pages 3 and 4 [...]") shall be dismissed.*

7.    *Request 7a made in the Reply from September 16, 2016 ("It is found that the Management Contract was not terminated[...]") shall be dismissed.*

8.    *Request 7c made in the Reply from September 16, 2016 ("Respondent shall ((*
*(\*Rejoinder: German = Duplik; transl. note)*

> pay Claimant the contractually agreed-upon annual Management Fee in advance, three months prior to the end of the billing year [...]") shall be dismissed.

> 9.      The Alternative Request 7b made in the Reply from September 16, 2016 ("The Respondent shall pay Claimant for lost profits for the months beginning August 2017 [...]") shall be dismissed.

## E.    Arbitration Clause

16    In the present Arbitration Proceedings, Claimant refers to the Arbitration Clause according to Art. 14, Para. 3 of the Management Contract:

> (Translated) German Version:

> In the event of disputes arising from this contract, the Parties shall attempt to find an amicable solution prior to calling upon the courts of Equatorial Guinea. In the event of a dispute the Parties agree to seek Arbitration Proceedings before the Chamber of Commerce in Zürich.

> Spanish Version:

> En caso de litigio, las partes se entarán para resolver amigablemente el problema, caso contrario se dirigiarán a los tribunales de Guinea Ecuatorial. En caso de desacuerdo de una de las partes, podrá recurrir al tribunal de la Cámara de Comercio de Zurich.

## F.    Seat of the Arbitration Tribunal

17    The Court in Zürich declared Zürich, Switzerland the seat of the Arbitration Tribunal.

## G.    Applicable Law

18    By virtue of its Interim Decision from March 15, 2016, the Arbitration Tribunal determined that the present litigation is subject to Swiss Law.

## H.    Applicable Procedural Rules

19    These Arbitration Proceedings are subject to Swiss Rules, Art. 176 et seq. of the Federal Law governing the International Private Law (IPRG) and special procedural rules contained in the Procedural Decision No. 1 from December 16, 2015, which the Arbitration Tribunal has issued in the ongoing proceedings.

## III.    History of Proceedings

20    Claimant initiated the current Arbitration Proceedings by virtue of the Notice of Arbitration from January 28, 2015 to the Secretariat of the Arbitration Tribunal of the Swiss Chambers' Arbitration Institution ("**Secretariat**"). In correspondence from February 13, 2014, the Secretariat asked Respondent to enter its answer to this notice within a 30 day period, wherein it was to also comment on the number of Arbitration Judges as well as the language of the proceedings. Furthermore, the Parties were asked to agree to a location of the Arbitration Proceedings within a period of 30 days.

21    In a letter from March 11, 2015 Claimant reported that it had not been able to reach agreement with Respondent regarding the location of the Arbitration Proceedings, due to a lack of reply from Respondent.

22    In correspondence dated April 20, 2015 the Secretariat established that Respondent had not issued an answer to the Notice of Arbitration within the required time period, had not commented on the number of arbitrators and that the Parties had not agreed on a location for the Arbitration Proceedings. Therefore, the Court had assigned the matter to a three member Arbitration Tribunal under application of Art. 6 (1) and 6 (2) of the Swiss Rules. Claimant was told to name a member of the Arbitration Tribunal within a period of 15 days, Respondent within a 30 day period. Moreover, the Secretariat informed the Parties that according g to Art. 16 (1) of the Swiss Rules the Court itself would determine the location of the Arbitration Proceedings, or request that the Arbitration Tribunal make this decision. In response, Claimant named Dr. Felix Fischer the Arbitrator in correspondence from May 1, 2015.

23     By e-mail dated May 5, 2015 Attorney Jean-Charles Tchikaya informed the Secretariat that he was Respondent's legal representative and requested a Notice of Arbitration. He repeated this message by e-mail from May 11, 2015, which he also forwarded to Claimant's legal representative (cf. Supplement K-66). In his letter from July 3, 2015 the Secretariat asked Attorney Tchikaya to submit a power of attorney. Unfortunately this request was not met.

24     Instead, via email from July 8, 2015, Attorneys Dr. Sergio Esono Abeso Tomo and Francisco Evui Nguema announced that they were Respondent's legal representatives.

25     In their letter from September 2015 the Secretariat informed the Parties that the Court had confirmed Arbitrator Dr. Felix Fischer, appointed by Claimant and, supported by Art. 5 (1) of the Swiss Rules, had appointed Mrs. Melissa Magliana as a member of the Arbitration Tribunal. In a letter from November 5, 2015, the Parties were informed that the Court had confirmed Dr. Andrea Meier as Chairwoman of the Arbitration Tribunal.

26.     In a letter from November 9, 2015, the Arbitration Tribunal suggested to the Parties several dates for an organizational meeting to discuss the Arbitration Rules and a provisional schedule. Moreover, the Arbitration Tribunal established an advance on costs in the amount of CHF 724,000 and asked the Parties to each pay half of the amount, i.e. CHF 362,000, each within 20 days' time. This letter was delivered to Claimant's representative on November 10, 2015 and to Respondent's representatives on November 11, 2015; however it could not be delivered directly to Respondent until November 20 via courier.

27     In her letter from November 16, 2014, Claimant stated her availability for an organizational meeting on December 11, 2015. Nothing was heard from Respondent.

28     In a letter from November 19, 2015, the Arbitration Tribunal sent to the Parties the draft of the Procedural Decision No. 1 as well as the tentative time schedule and set the deadline for a

for a written reply to no later than December 8, 2015. This letter was delivered to Claimant's legal representative on November 20, 2015 and to Respondent's legal representatives; it was delivered directly to Respondent on November 23, 2015 via courier.

29　　After Respondent did not comment on the recommended date for an organizational meeting, the Arbitration Tribunal set the date for these meetings in its letter from November 26, 2015 to take place on December 11, 2015 in Zürich. This letter was delivered to Claimant's representative on November 27, 2015 and to Respondent's representatives on November 30, 2015. After several unsuccessful delivery attempts due to a refusal to accept the courier shipment, the letter was finally delivered to Respondent on December 14, 2015.

30　　Claimant submitted its comments for a draft of the Procedural Guide Decision No. 1 and the tentative time schedule before the deadline on December 7, 2015. Nothing was heard from Respondent.

31　　While half of the amount of the advance on costs was paid in a timely manner by Claimant with a validated date of November 30, 2015, payment was not received from Respondent, even after an extension was granted by the Arbitration Tribunal in its letter from December 4, 2015. Therefore, based upon Art. 41 Section 4 of the Swiss Rules, the Arbitration Tribunal requested in its letter from December 21, 2015 that Claimant pay Respondent's portion. In response, Claimant paid Respondent's portion of the advance on costs in the amount of CHF 362,000 timely on January 6, 2016.

32　　In a letter from December 7, 2015, the Secretariat informed the Parties that the Court had decided on the Arbitration Proceeding's location in Zürich.

33　　The organizational meeting took place on December 11, 2015 in Zürich and was attended by Claimant. Respondent did not attend the meeting, without notice or apology. On the

occasion of this organizational meeting the draft of the Procedural Decision No. 1 was discussed as well as the tentative time schedule.

34    Following the organizational meeting, the Arbitration Tribunal provided the Parties with the clean Procedural Decision No. 1 on December 16, 2015, including the tentative time schedule; this was delivered to Claimant's representative on December 17, 2015 and Respondent's representatives, as well as Respondent directly, on December 18, 2015. The Arbitration Tribunal provided both Parties simultaneously with a deadline to comment on the question of applicable law, the procedural language and the binding effects of the Arbitral Award from December 5, 2014 in the Swiss Rules Arbitration No. 600257-2011 between the Parties ("**first Arbitral Award**"). Claimant responded by the deadline in its correspondence from January 23, 2016. Nothing was heard from Respondent.

35    On March 15, 2016 the Arbitration Tribunal issued an Interim Decision with Procedural Decision No. 2, wherein it determined that the evaluated fact-finding requests in the <u>Dispositiv</u> Items 1, 4, 5, 7, and 10 of the first Arbitral Award had binding effect for evaluating Claimant's claims, while beyond the scope of this binding effect, the claims were free to be judged. Moreover, the Arbitration Tribunal decided that the litigation was subject to Swiss Law. Furthermore, German was selected to be the language used in the Proceedings.

36    In his email from March 15, 2016, Attorney Dr. Sergio Esono Abeso Tomo indicated that he no longer was Claimant's legal representative. On March 17, 2016 Attorney Jean-Charles Tchikaya informed the Arbitration Tribunal that he and attorneys Peter J. Merz and Evuy Francisco were Claimant's new legal representatives; whereupon the Arbitration Tribunal requested in a letter from March 22, 2016 that attorneys Peter J. Merz and Francisco Evuy Nguema et al. confirm their representation of Respondent and clarify for the continuation of

the Proceedings whether all courier dispatches for Respondent were to be sent only to attorney Peter J. Merz at his location in Switzerland.

37    In his letter from April 7, 2016, Attorney Peter J. Merz confirmed that he and/or Dr. Lucien Valloni would represent Respondent and that courier items could be sent to Respondent's Swiss Legal Representatives, with simultaneous notification to all of Respondent's remaining representatives via email. Moreover, he requested that French be used as the secondary language in the Proceedings.

38    In a correspondence from April 11, 2016, Claimant was asked to comment on Respondent's request regarding a secondary language for the Proceedings. Claimant replied by the deadline of April 19, 2016 and requested that Respondent's request be dismissed.

39    On April 26, 2016, Claimant submitted its timely Statement of Grounds.

40    With Procedural Decision No. 3 from May 2, 2016, the Arbitration Tribunal approved French as the secondary language in the Proceedings under consideration of certain modalities. In its submission from May 13, 2016, Claimant asked the Arbitration Tribunal to revert to the Procedural Decision and to make the respective changes to state that Respondent's entries in French could be submitted only along with a German translation. This request was denied by the Arbitration Tribunal with Procedural Decision No. 4 from May 18, 2016.

41    The statement of defense reached the Arbitration Tribunal by the given deadline (cf. Procedural Decision No. 5 from June 2, 2016) on July 13, 2016. By virtue of Procedural Decision No. 6 from July 19, 2016, the Arbitration Tribunal asked Respondent to submit the missing written Witness Statements.

42    With their submissions from July 25, 2016 and July 28, 2016, respectively, both Parties requested the implementation of a second written exchange and an Evidentiary Hearing.

43.    On August 5, 2016, an organizational meeting between the Parties took place via telephone conference. As a result, the Arbitration Tribunal issued its Procedural Decision No. 7 from August 11, 2016 with the revised provisional time schedule.

44     With submission from August 18, 2016, Respondent filed the Witness Statements ("**ZE**") by Mr. Jean-Charles Tchikaya and Pantaléon Mayiboro in a timely manner. The Arbitration Tribunal noted in an e-mail from August 22, 2016 that the Witness Statements by Mr. Juan Oló Mba Nseng and Marcellino Oyono were still missing. Therefore, it ordered Respondent to inform the Tribunal when the missing Witness Statements would be submitted, pointing to Art. 9.2.2 of Procedural Decision No.1. With correspondence from August 23, 2016, Respondent informed the Arbitration Tribunal that the missing Witness Statements would be available no later than September 5, 2016. On September 5 or 6, 2016, respectively, Respondent submitted Juan Oló Mba Nseng's Witness Statement and declared that Marcellino Oyono's Witness Statement was still unavailable.

45     The Reply from September 16, 2015 and the Rejoinder from October 19, 2016 were submitted in due time.

46     With the Procedural Decision No. 8 from October 25, 2016, the Arbitration Tribunal issued a deadline to the Parties to provide notification as to which of the witnesses named by the Parties were to appear for questioning at the Evidentiary Hearing.

47     In his correspondence from November 8, 2016, Respondent's legal representative Peter J. Merz announced that all contact to Respondent's previous representative had ceased and he was unable to provide the names of the Witnesses participating in the Evidentiary Hearing. As he was unable, due to the cessation of contact, to say whether Witnesses and Respondent had been duly summoned, he requested an extension for the Evidentiary Hearing for December 5/6. Claimant requested in its comments from November 11, 2016 that Respondent's request for an extension be dismissed.

48    In its Procedural Decision No. 9 from November 15, 2016, the Arbitration Tribunal extended the requested date for the Parties to provide notification as to which Witnesses were participating in the Evidentiary Hearing and dismissed Respondent's request for a postponement.

49    With submission from November 25, 2016, Claimant named the Witnesses to be deposed. The same day, Respondent's legal representative stated that he had not received confirmation of whether or not the Witnesses named by Respondent would participate in the Evidentiary Hearing.

50    The Evidentiary Hearing took place on December 5, 2016 on the premises of Homburger AG in Zürich.

51    With Procedural Decision No. 10 from December 12, 2016, the Arbitration Tribunal issued the revised provisionary time schedule.

52    The Parties' statements regarding the evidentiary results were received by the Arbitration Tribunal on the due date of February 28, 2017 **("K-SB" or "B-SB")**, and the Parties' Statement of Cost was received March 6 and 7, 2017, respectively **("K-KN" or "B-KN")**. The Parties each commented on the submitted Statement of Cost **("K-KN" or "B-KN")** with their submission from March 14, 2017.

53    In Procedural Decision No. 11 from March 30, 2017, the Arbitration Tribunal invited Claimant to provide additional explanations for the calculation of the Management Fee, savings in expenditures and other income.

54    In correspondence from April 6, 2017, Respondent requested that, regardless of the outcome of the Proceedings, the cost for additional exchange of pleadings should be borne by Claimant, based upon the costs-by-cause principle. Moreover, the additional exchange of pleadings should not have any disadvantageous effects for Respondent in light of the principles of equal treatment and procedural equality.

55    In correspondence from May 1, 2017, Claimant requested an extension of the submission date for its statement regarding Management Fee calculations, savings in expenditures and ancillary income (cf. para. 53 above). This deadline was extended by the Arbitration Tribunal via email from May 2, 2017, namely to May 29, 2017, honoring its request.

56    Claimant's statement was received by the Arbitration Tribunal by the deadline of May 29, 2017 (**"K-SeA"**). That same day, Respondent requested via e-mail that the date for a statement in response to Claimant's new claims be set for the end of August 2017 because the client's document still required translation and due to absence for vacation time in July/August. With Procedural Decision No. 12 from May 30, 2017, the Arbitration Tribunal moved the due date for Respondent to August 15, 2017. Respondent submitted its statement in due time on August 14, 2017 (**"B-SeA"**).

57    In correspondence from August 21, 2017, Claimant requested that the Arbitration Tribunal set a submission date for a response to Respondent's statement from August 14, 2017. With Procedural Decision No. 13 from August 22, 2017, the Arbitration Tribunal set September 5, 2017 as Claimant's due date and September 19, 2017 as Respondent's due date for its rejoinder. Both submissions were made by the due dates. With Procedural Decision No.14 from October 2, 2017, the Arbitration Tribunal pronounced the Proceedings closed and ordered the Parties to submit the additional Statements of Cost by October 20, 2017. These were submitted by the due date.

58    With Procedural Decision No. 15 from October 23, 2017, the Arbitration Tribunal invited the Parties to add certain additional declarations to their Statement of Cost. The Parties submitted the supplemental information by the due date of November 3, 2017.

## IV.    FACTS

### A.    Management Contract for Polyclinic La Paz (Bata) from December 14, 2009

59    The Parties entered into a Management Contract for Polyclinic La Paz (Bata) on December 14, 2009. (*Contrato de gestión del Hospital Policlínico La Paz (Bata)*, Supplement K-1).

60    Therein, Claimant agreed to take over the Management of Polyclinic La Paz including various training and continued education tasks and the development and supply of software for hospital administration.

61    Claimant's main duties are described in the Management Contract as follows:

- Item 3.1: Operation of the Polyclinic (Management), granted full, unlimited power of attorney by Respondent

- Item 3.2: Duty to carry out all personnel decisions required for operating the Polyclinic

- Item 3.3: Training- and continued education for the personnel (including advanced training courses on Claimant's e-learning system for a fee; cf. Item 10.1)

- Item 3.4: Development and supply (incl. installation; cf. Item 6.1) of software for hospital administration

- Item 3.5: Permission to use the "Brand Name."

62    According to the Management Contract, Claimant's services were divided into two phases:

63:    According to Item 6.1 of the MV, *Phase A* of the Contract includes a) control of revenue and expenditure as well as b) control of the financial organization, c) commencement of the installation of software by international standards, d) management and selection of all

medicinal drugs and hospital supplies by European standards and the respective quality and, finally e) professional quality control of the evaluation and quantity of staff, and notification of the administrative council. A compensation of EUR 840,000 was assessed for these services. This amount is all inclusive, with the exception of housing costs, water, electricity and local transportation for the associates working there.

64     According to Item. 6.2, *Phase B* of the Management Contract includes taking full responsibility for the technology portion, personnel, location and the entire property. It was agreed that Claimant would receive a so-called "Management Fee" of EUR 700,000 per month for these services (Item 7.1. MV).

65     It is undisputed that Phase A was completed in 2011, at the latest (cf. Rejoinder para. 47). Disputed, however, is the precise point in time of conclusion of Phase A, or the beginning of Phase B, respectively (cf. para. 186 et seq. below).

**B**     **Claimant's Withdrawal from Equatorial Guinea in March 2011**

66     The Parties maintain agreement that Claimant no longer had access to Respondent's software as of December 2010 (see Reply. para. 313 a.E. and Rejoinder para.15). On March 14, 2011, Claimant's local director and the technical director of the Polyclinic La Paz (Mr. Kronenberger and Mr. Gerard) were asked to leave the Polyclinic within 48 hours and to leave the country. They departed on March 16, 2011 (KS para. 121; Supplement K-42; ZE Kronenberger, p. 5, Supplement K-39). With the departure of Mr. Kronenberger and Mr. Gerard Claimant, Claimant withdrew from the Clinic and from Equatorial Guinea, respectively (cf. KS para. 121, KA para. 57 and Rejoinder para. 125).

**C.**     **First Arbitration Proceedings and Conclusion of the Agreement Protocol from May 28, 2015**

67     After Claimant withdrew from Equatorial Guinea in March 2011, Claimant entered into Arbitration Proceedings No. 600257-2011 on June 20, 2011 ("**First**

**Arbitration Proceedings**"). Claimant filed a partial claim comprising 90% and demanded payment of the Management Fee for Phase B beginning August 2010 up until and including August 2012.

68    The first Arbitration Proceedings resulted in a decision from December 5, 2014 (cf. Supplement K-2), by which Respondent was obligated to pay Claimant for the months of August until December 2010 and the months of January up until and including March 2011 EUR 5,040,000 plus 5% interest beginning February 1, 2011 as well as for the months of April 2011 up until and including December 2011, and the months of January 2012 up until and including August 2012 an amount of EUR 8,996,400 plus 5% interest beginning September 3, 2012 (cf. Supplement K-2 p. 85), i.e. a total amount of EUR 14,036,400 plus interest and costs.

69    In the Dispute Settlement Agreement from May 28, 2015, the Parties agreed to set the claim resulting from the Arbitral Award at EUR 16,460,218.77 (cf. B-1; Preamble and Art. 1). In doing so, the pertinent payment modalities to "*implement*" the Arbitral Award from December 5, 2014 (cf. B-1; Preamble and Art. 3) were also determined. It is disputed whether the Claims made in the present Proceedings were resolved in the Dispute Settlement Agreement and satisfied by payment of the settlement sum (cf. para. 117 et seq. below).

70    It is further disputed whether Respondent had properly and duly terminated the Management Contract on the basis of numerous claims and the expulsion of Claimant's staff in March of 2011, or, by implication, at a later date, with immediately effect, or had, at any rate, properly terminated it, or whether the contract was extended for another five years for lack of termination.

## V.    ARGUMENTS BY THE PARTIES

### A.    Claimant's Position

71    Claimant filed claims vs. Respondent on the basis of a Management Contract from December 14, 2009. The present claim includes further assertions from the Management Contract, in

addition to the compensation awarded by the first Arbitral Award (para. 68 above). Claimant declared continued willingness to resume its services for Respondent if Respondent fulfills its contractual obligations (KS para. 1 et seq.).

72    Regarding the Arbitration Tribunal's jurisdiction, Claimant offers the following explanation: Claimant refers to the Dispute Settlement Agreement from May 28, 2015. It was not correct that the Arbitration Clause therein took priority over and replaced the Arbitration Clause in the Management Contract. This agreement was made exclusively to resolve the claims awarded in the first Arbitration Proceedings. After the decision from December 5, 2014 was issued, Claimant initiated proceedings to enforce it against Respondent. Notwithstanding this action, Claimant demanded payment directly through Attorney Tomo (Reply para. 6 et seq.).

73    Claimant also points to a discussion in Hamburg on March 23, 2015 and additional correspondence and phone conversations with Jean-Charles Tchikaya, during which an agreement was reached regarding payment of the claim in three installments. Prior to signing the Dispute Settlement Agreement, Ulrich Marseille allegedly pointed out that this Arbitral Award mentioned a partial claim only, and further claims were attached to Arbitration Proceeding No. 600413-2015, whereas Jean-Charles Tchikaya was of the opinion that the claims for which judgment had been entered should be satisfied first. Hence the Dispute Settlement Agreement merely served to settle the Claims from the Arbitral Award from December 5, 2014 (Reply para. 31 et seq.).

74    The same interpretation, it was said, was clear from the Dispute Settlement Agreement, since in the Preamble and in Art. 1 and 4 reference was made to the first Arbitration Proceedings and its Award. According to Art. 3, the sum of the three installments thus corresponded precisely to the claims awarded. It was said that Claimant's other claims were not included in this (Reply para.75 et seq.). The Arbitration Clause in the Dispute Settlement Agreement was

accepted because, in the event of a (partial) default on Respondent's part, the agreed-upon payment installments would have necessitated the filing of new litigation (response para. 87.et seq.).

75    Insofar as Respondent disputes the Arbitration Tribunal's jurisdiction on the grounds that the Courts of Equatorial Guinea needed to be called upon first, one just needs to interpret the Arbitration Clause because there was general consent from the Parties to have an arbitration agreement; it was primarily a question of whether or not due legal process in Equatorial Guinea should be pursued first, prior to calling upon the Arbitration Tribunal. The Arbitration Clause should normatively be interpreted in such a way that it can function in the most efficient manner. An incremental approach to the legal recourse was challenged by the fact that the legal force of the State Court's decision would undoubtedly stand in the way of a new decision by an Arbitration Tribunal (KS para. 23 et seq.).

76    The aforementioned explanations were also confirmed by the Parties' behavior displayed in the current Arbitration Proceedings: Respondent was informed about the Arbitration Proceedings' initiation but failed to comment, which could be interpreted as agreement to the Arbitration Tribunal's jurisdiction. (KS para. 37 et seq.).

77    Furthermore, the Arbitration Clause was formulated by Respondent and should therefore be interpreted to the latter's detriment, according to the ambiguity rule. Moreover, insisting on an agreement regarding jurisdiction of a State Procedure as an imperative prerequisite of an arbitration procedure is a surprising clause. Moreover, insisting on carrying out a State Procedure could be regarded as a misuse of legal practice (KS para. 43 et seq.) There is no priority for the Spanish Version. It was allegedly clear during the Parties' negotiations that neither the Spanish nor the German version should be given priority (Reply para. 109).

78   Claimant justifies its claim in that on December 14, 2009 after lengthy negotiations, the Parties' signing of a Management Contract took place (cf. Supplement K-1). Claimant's responsibilities were divided into Phase A and Phase B (No. 6MV) (KS para. 54 et seq.).

79   Respondent's contribution in return consisted of several payments, particularly a Management Fee (No. 7 MV). The cost of Phase A was EUR 840,000; the cost for Phase B was EUR 700,000 per month (KS para. 61 f.).

80   On September 7, 2010 Claimant provided a comprehensive report on the Management Contract (Supplement K-21), wherein it concluded that the services of Phase A had been 100% completed and the services for Phase B were 58% completed. Therefore, Phase B had already been reached, which means that payment of the agreed-upon Management Fee of EUR 700,000, payable one year in advance, was now due. Moreover, Dr. Donato Ndong Oburu and Dr. Pedro Ndong Asumu confirmed on behalf of Respondent in January 2010 (recte: 2011) that Phase A had been completed (Supplement K-36; KS para. 85 et seq.).

81   After completion of Phase A, Respondent did not pay the owed amount of EUR 8,400,000. Claimant, however, continued the work and repeatedly requested payment. Subsequently there were difficulties and problems, which aggravated the fulfillment of the Management Contract as well as the poaching of employee Mensching, non-adherence to set dates, considerable delays in salary payments, satellite lines interrupted at the Minister's orders, so that Claimant had no support for the IT system, the maintenance of which occurred in Germany, and thus could not be provided, outstanding payments on Respondent's part for services provided by Claimant, etc. (KS para. 107 et seq.).

82      Software Engineer Kanbari was sent to the hospital at Bata on January 6, 2011 to deal with any possible difficulties in running the software solutions; he was however refused access to the property. Claimant made Respondent repeated offers to rectify the IT system, although the cause of it was purely based on Respondent's actions of having ordered interruptions in the satellite lines. During a telephone conversation with Fritz Kronenberger on January 15, 2011 Minister Marcellino Oyono Ntumutu simply wanted to know how the contract could be terminated (KS para. 111 et seq.).

83      On March 11, 2011 a meeting took place between the Administrative Council, Respondent's and (in part) Claimant's staff. Before Claimant's staff, Mr. Kronenberger (Finance Manager) and Gerard (Technical Manager) could make any statement, they were told to leave the room. On March 14, 2011 they were ordered to leave the Hospital La Paz within 48 hours and to leave the country (KS para. 117 et seq.).

84      It was not correct that the contract could be terminated at any time, regardless of contractual settlement according to Art. 404 OR. The Parties had agreed to a contract of a fixed term of five years, with automatic renewal if not terminated. This was a mixed contract, wherein not the agency-based * part, and, specifically, the required basis of trust were important, but the work- and service driven part far outweighed it.  Moreover, particularly trust and the need for protection were lacking between the Parties. Indeed, it is Respondent who engaged in a considerable breach of contract. Based upon the Parties' mutual willingness, successful work performance had been expected in numerous areas. From a legal point of view, the Management Contract thus echoed primarily a success-oriented and thus a work/services oriented character. Claimant should be classified as a general contractor. Even a work contract can be terminated; such prerequisites, however, were definitely not given (Resp. para. 209 et seq.).

Translator's Note: *Agency is an area of commercial law dealing with a contractual or quasi-contractual tripartite, or non-contractual set of relationships when an agent is authorized to act on behalf of another (called the Principal) to create a legal relationship with a Third Party.[1] Succinctly, it may be referred to as the relationship between a principal and an agent whereby the principal, expressly or impliedly, authorizes the agent to work under his control and on his behalf. The agent is, thus, required to negotiate on behalf of the principal or bring him and third parties into contractual relationship. http://en.wikipedia.org/wiki/Agency_(law)

Case 1:20-cv-03572-RJL Document 1-1 Filed 12/08/20 Page 70 of 221

85    It is thought that the contract was not terminated. Yes, a phone conversation took place between Witnesses Kronenberger and Minister Marcellino, during which the Minister indicated that the contract could be terminated. There was no further discussion on this subject. A termination did not take place; the questioning of Witness Kronenberger did show, however, that he was not granted an opportunity to return to his work place and continue his work (K-SB para. 290). The employees who returned to Germany, particularly Witness Kanbari, continued to work on developing the IT system, i.e. were ready anytime to support the system on site again (cf. K-SB para. 372-376).

86    The contract in its original version had run undisputed up until January 31, 2015 but did not end on January 31, 2015 because it is subject to automatic renewal for another five years, unless it is terminated with a one year notice period. It was never pronounced terminated (KS para. 177 et seq.; Resp. para. 161 et seq., 329 et seq.).

87    The current Claim, after issuance of the first Arbitral Award, is for the remaining 10% of the monthly compensation of EUR 700,000 per every month for the months from August 2010 up until and including August 2012. Moreover, Claimant has claims for the period from September 2012 up until and including January 2015, and for the period up until and including January 2020, since the Management Contract was not terminated (KS para. 150 et seq.).

88    The Evidentiary Hearing showed that this is a case of contract remorse. After Respondent had gladly taken advantage of and accepted Claimant's services and seen that the hospital was reorganized with professional standards, Respondent thought that it could now continue operations without Claimant (K-SB para.5). Claimant, however, continued to provide work and services, or attempted to do so, respectively (K-SB para. 10, reference WP Kronenberger p. 260 N 13-15).

89     With regard to savings in expenditures, Claimants maintains that these amounted to a monthly sum of EUR 118,404 plus one-time costs of EUR 118,891 for software enhancement for hospital administration, etc. (K/SeA para. 4). Claimant hereby supports its statement through an "Expert Statement" by Statutory Auditors PricewaterhouseCoopers GmbH ("**SPwC**" Supplement K-93). As to Respondent's objection that the submitted PwC documents were not accessible, Claimant explained that they were documents made available within the scope of the current proceedings (Statement to B-SeA para. 11).

90     *Expenses for preparations of the project concerning the development of a Healthcare System in Equatorial Guinea,* i.e. the completion of a clinic in Malabo as well as establishing satellite clinics were so-called advance services in the form of acquisition costs of Claimant which were not reimbursed. In the absence of factual references to the Management Fee according to Item 6.2. MV, these costs shall therefore not be taken into consideration (K-SeA para. 23 et seq.; SPwC para. 51).

91     As to the *country risk*, Claimant states that this was evaluated as being particularly high at the time the Management Contract MV was signed, as it is today. For the majority of circumstances, Respondent would be considered to be in the highest risk category. The economic feasibility assessment on long-lasting projects is preferably obtained on the basis of present value calculations while the respective country risk is reflected in the discounted interest rate. Precise present value calculations had not been performed by Claimant in view of the Management Contract. However, an analogous evaluation of an expected return on the advance costs incurred and investments had been formulated, which, for a favorable assessment of the project, required that future risk-adequate returns would be generated in the form of a Management Fee in the contractually agreed-upon amount, minus anticipated costs. A quantification of sovereign

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 72 of 221

risk within project calculations in the form of a monetary sum was not possible. The country risk did prove true in Respondent's case (K-SeA para. 28-36; cf. the entire SPwC para. 55 et seq.).

92    As to *ancillary income,* Claimant explains that it had not acquired any income through the use of staff available since its dismissal on March 16, 2011 and did not intentionally avoid this. Claimant did not have an opportunity to reassign the largely external service providers engaged for the Bata project elsewhere. At that time no other projects were available and the contractual conditions with the external service providers ceased to exist. The entire project with its multifaceted tasks and responsibilities, including the development of a healthcare system in an African country, had a dimension that could not be replaced by other projects of the same type and complexity, not even on a smaller scale.  (K-SeA para. 39 et seq.). Such a complex development project is not something that could be quickly replaced over a short period of time, in order to "seamlessly" reassign Claimant's staff (Statement B-SeaA, para. 29).

**B      Respondent's Position**

93    In its statement of defense, Respondent raises the objection to the jurisdiction issue, with the following reasons:

94    On May 28, 2015 the Parties had entered into a comprehensive agreement for a definite settlement of the dispute between them (Supplement B-1). This Dispute Settlement Agreement represents an *overall settlement*; at its conclusion on May 28, 2015, the first Arbitration Proceedings had been completed and the second Proceedings had already begun. Item 7 of the Agreement contains an Arbitration Clause, Item 4 an Account-Balance Clause (KA para. 14 et seq.)

95    Based upon the Parties' aim to reach a comprehensive settlement of the current litigation, it was clearly the Parties' intent to have the Arbitration Clause of the Dispute Settlement Agreement take priority over and replace the Arbitration Clause embedded in the Management Contract. This

purpose becomes evident in that the Parties concurred under Item 5 that the entire agreement would become invalid in the event of a default of Respondent's payments. The Parties allegedly had wanted to find a comprehensive and final overall solution (KA para. 19 et seq.)

96     For Respondent, the matter was resolved with the conclusion of the Dispute Settlement Agreement (Rejoinder para. 13). Claimant agreed to forgo EUR 2,000,000 in the Dispute Settlement Agreement. So many concessions on the part of Claimant could mean nothing more than Claimant's desire to have the matter settled (Rejoinder para. 15 et seq.).

97     In the current proceedings, Claimant knowingly withheld the existence of the agreement from May 28, 2014, apparently viewing that agreement as non-binding; if however, Claimant wanted to contest this agreement, this would have to be done before an ICC Arbitration Tribunal (KA para. 22).

98     In the event that the Arbitration Tribunal should conclude that the Arbitration Clause of the Management Contract was not replaced by the new agreement, the following point should be raised: the German translation of the Arbitration Clause in the Management Contract *("In the event of disputes arising from this Contract, the Parties shall attempt to find an amicable solution prior to calling upon the courts of Equatorial Guinea [...]"* does not concur with the original Spanish version.

99     It was the Parties' intent to give the Spanish version of the Management Contract priority. The Parties had made and authenticated handwritten changes to the Agreement in Spanish. Moreover, both Parties had signed the left side (Spanish version) and not the German version. Therefore, the Spanish version was the valid one and the Parties should first have pursued Court Proceedings in the Republic of Equatorial Guinea, and called for the current Arbitration Proceedings only after a decision had been obtained (KA Para. 26 et seq.; Resp. para. 25 et seq.).

Case 1:20-cv-03572-RJL Document 1-1 Filed 12/08/20 Page 74 of 221

100  An objective interpretation of the Arbitration Clause would lead to the same result: it was not clear that Spanish and German were valued equally if changes to the agreement were made in Spanish only and the translation was not ordered together. Moreover, the Parties could not even have misunderstood a wrong translation of the Arbitration Clause ("*before calling upon the courts of Equatorial Guinea*") to mean anything else but that these courts had to be addressed first (KA Para. 38, Rejoinder para.31 et seq.).

101  Witness Marseille confirmed that Claimant wanted a German or neutral place of jurisdiction, and that Respondent was unwilling to agree to a legal venue or Arbitration Clause without the involvement of the Courts of the Republic of Equatorial Guinea. Accordingly, a compromise was found, whereby first the Courts of the Republic of Equatorial Guinea and then an Arbitration Tribunal according to the rules of the Swiss Chamber of Commerce were to be engaged. The Witness Marseille merely confused the sequence (first the Arbitration Tribunal in Zürich, then the Republic of Equatorial Guinea, was the intended order); this represents a serious contradiction to the translated contractual text (B-SB para. 19).

102  Claimant had gone directly to the Arbitration Tribunal, without pursuing Court proceedings in the Republic of Equatorial Guinea. Hence the Arbitration Tribunal should declare its lack of Jurisdiction. Alternatively the proceedings should be suspended and the Parties given a deadline to enable them to carry out the arbitration process, as well as due process in Equatorial Guinea (KA para. 39 et seq.).

103  As to substantive law, Respondent explains the following: the agreement from May 28, 2015 governs the dispute among the Parties in a conclusive manner, which is why the request should be dismissed. Because Claimant withheld the central agreement from May 28, 2015, this indicates a misuse of rights on Claimant's part (KA para. 73 et seq.)

104    The first Arbitration Proceedings and the Grounds for the Claim of the current proceedings reveal further that Claimant had definitely left the Republic of Equatorial Guinea and has not been working for Respondent since. And since that time, Respondent has considered the Management Contract terminated and void, and has claimed this in the Counter Claim during the first Arbitration Proceedings. Claimant acknowledged that Respondent attempted to terminate the Contract since the beginning of 2011, and stated also that Claimant's staff was expelled by Respondent in March 2011. With the first Arbitral Award, Claimant received compensation until August 2012. Since March 2011, at the latest, Claimant has not provided any work or services for Respondent, as such services were neither needed nor requested because meanwhile the clinic was managed by another enterprise. Nevertheless, Claimant attempts to obtain compensation for services not performed and insists on compensation until 2020, knowing full and well that it will never work for Respondent again, due to lack of fundamental trust which is indispensable in the hospital- and caregiving field. (KA Para. 55 et seq.).

105    Respondent refers to the statements made by Witness Marseille, based upon which the contract was effectively terminated in December 2010, or terminated by Claimant, respectively (cf. –SB para. 21 et seq.). Claimant had understood the conduct by March 2011, at the latest, to be a cancellation or termination of the contract, respectively, and it was clear to Claimant that Respondent had renounced Claimant's services (B-SB Para. 30). Moreover, Witness Marseille stated that non-compliance with the instructions to treat patients only for prepayment or a guarantee for treatment costs led to a breach of contract. The reason for this breach of contract is a result of Claimant's actions (cf. B-SB para.24 and 30).

106    The statements of Witness Regenhardt show that IT development was fully completed by the end of 2010 and the IT system was functional. Further, it was clear that, from the end of

2010, Claimant no longer had access to Respondent's IT system, that from this time on it never gained access again and was informed in January 2011, at the latest, that Respondent no longer required its services. The termination of the contract was thus clearly communicated (cf. B-SB para. 44-47). Witness Kanbari, as Claimant's recipient of the statement, had also received Respondent's implied statement of intent to terminate the MV and conveyed this (B-SB para. 51). Additionally, Witness Kronenberger had surely knowingly accepted that Respondent no longer wished to work with Claimant, and knew that the Management Contract was terminated when he left the country (B-SB para. 55-63).

107     The Management Contract is, in actuality, an order, which consisted of the administration of the Polyclinic in Bata. Projects regarding portal clinics or a nursing school had never been part of the Management Contract (Rejoinder para. 54 et seq.). This was a mixed contract, whereby the agency-based aspect and mutual trust were very important. Art. 404, Section 1 OR is therefore compellingly applicable to the Management Contract, which is why Item 12 MV does not apply and Respondent could have terminated the contract at any time, effective immediately (KA para. 89 et seq., Rejoinder para. 60 et seq.).

108     Such a termination had already been expressed by Respondent in March 2011 on the grounds of numerous complaints and the expulsion of staff. This implied termination did not take place in an untimely fashion. Claimant received a compensation of EUR 16,460,218.77 for the time until August 2012, although Claimant was no longer providing services for Respondent, and special disadvantages were neither evident nor substantiated by Claimant to indicate that the termination took place in an untimely manner (KA para. 97 et seq., Rejoinder 65 et seq.).

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 77 of 221

109   Alternatively, the termination occurred with the filing of the Counter Claim in the first Arbitration Proceedings, where Respondent clearly stated that it considered its collaboration with Claimant as having ceased (KA para. 105 et seq.).

110   Insofar as the Arbitration Tribunal did not base its view on an immediately effective termination right, Respondent terminated the Management Contract by March 2011 at the latest and in compliance with Item 12. The Management Contract did not prescribe any particular form of termination, which is why it was possible to terminate it by implication. All implied actions by Respondent represented a termination and the Management Contract, if not terminated immediately, was, in any case, not extended automatically by another five years, (KA para. 109 et seq.).

111   As the case may be, Respondent had terminated the Management Contract, effective immediately, by signing the Dispute Settlement Agreement from May 28, 2015. Should the Arbitration Tribunal be of the opinion that Respondent has not terminated the Management Contract to date, Respondent declared in its statement of defense that the contract is terminated effective immediately (KA para. 115 et seq.).

112   Regarding the "expert statement" by PwC on savings in expenditures and in consideration of the country risk (Supplement K-93) submitted by Claimant, Respondent maintains that PwC relied on Claimant's general documentation and descriptions when preparing its findings. These documents are not available to Respondent, therefore PwC's explanations could not be examined. SPwC is not considered to be conclusive evidence (B-SeA, para. 9-12).

113   *The salary expenses* for Claimant's four employees on location were not covered by the Management Fee. Item 6 MV deals with the cost of carrying out the MV for Phase A and B; these costs should strictly be kept separate from the Management Fee. Item 6 shows that the costs for services rendered during Phase A were EUR 840,000 (Item. 6.1). For Phase B of the

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 78 of 221

Contract, the monthly costs were EUR 700,000 and thus EUR 8,400,000 per year (Item 6.2). This amount included all costs for the four employees provided by Marseille, with the exception of their housing costs, water, electricity and transportation. These costs were passed on to Respondent. The Management Fee (Item 7) was not intended to cover these costs, but was separate and owed additionally (B-SEA, para. 14). Contrary to Claimant's explanations and those by PwC, it should be considered that current costs, including costs in connection with the central office in Hamburg were covered by Item 6.2 in the MV Contract, and that the Management Fee (Item 7.1) represented pure profit (consisting of the profit for the past period and future loss of profit) (B-SeA Para. 22). Claimant stated its savings in expenditures to be EUR 118,404 which is the minimum amount that should be deducted from the Management Fee. (B-SeA para. 17).

114    Moreover, Claimant's *acquisition services* have nothing to do with the filed claims from the Management Contract and could therefore not be charged to Respondent (cf. B-SeA Para. 18). Claimant has rightfully acknowledged that there is no contractual basis for the acquisition costs and those are unrelated to the Management Contract MV, which is why they should not be taken into consideration in the Management Fee (B-S-SeA para. 9)

115    The Management Fee consists exclusively of profit and country risk (B-SeA para. 30). The risk of an immediate termination of contract at any time is already calculated in the Management Fee and comprises an offset for future loss of profit in case of a potential termination of contract executed at any time. With the payment of the Management Fee up to the breach of contract, Claimant should already be compensated for a breach-of-contract scenario (cf. B-SeA para. 32 f.). The awarded sum of EUR 16,460,218.77 for the Management Fee up until August 2012 according to the first Arbitral Award includes the country risk and therefore

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 79 of 221

also the risk of a contract termination executed at any time as well as future loss of profit (B-SeA para. 36). Claimant acknowledges that in the calculation of the Management Fee the risk of a termination of contract at any time was taken into account. The Management Fee comprises, so to speak, the offset of a future loss of profit in the event of a termination of contract at any time (statement on K-SeA Para. 10, para. 25).

116    Respondent thus disputes that Claimant could not have gained any other income. With Respondent's termination of the Management Contract, Claimant's own staff was no longer required for the project by March 2011.  With this staff, Claimant could have gained added value from elsewhere, which in the present case could have been considered as added additional income. Claimant is subject to damage mitigation duty, that is to say Claimant is required to reassign available employees elsewhere within reasonable limits and opportunities available. However, Claimant has omitted any documentation as to how much effort at all was made to reassign the freed-up staff after termination of the Management Contract (B-SeA Para. 38 f.; Statement to K-SeA para. 20).

## VI.    CONSIDERATIONS

### A    Arbitration Tribunal's Jurisdiction

### 1.    Effects of Dispute Settlement Agreement on Claims from Management Contract

117    Claimant has based the Arbitration Tribunal's Jurisdiction on the Arbitration Clause in the Management Contract. Respondent counters that the Arbitration Clause was replaced by the Arbitration Clause in the overall settlement of the Dispute Settlement Agreement from May 28, 2015, which stipulates an ICC arbitration procedure. Therefore the Arbitration Tribunal does not have jurisdiction.

118    First and foremost it should be examined whether or not the Arbitration Clause in the Management Contract was replaced by the Clause in the Dispute Settlement Agreement. This question depends largely on whether or not the Dispute Settlement Agreement in the sense

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 80 of 221

of an overall settlement is intended to govern the claims from the Management Contract, or whether it is limited to Claimant's claims from the first Arbitral Award. In the first case, the Arbitration Tribunal's jurisdiction should be examined on the basis of the Arbitration Clause in the Dispute Settlement Agreement, in the latter instance on the basis of that in the Management Contract.

119    The Parties' actual intent is the determining factor for the interpretation of the Contract. If this cannot be found out, then the Parties' presumed intent should be determined using an interpretation of the Contract based upon good faith. Using such an objectified consideration aims at the understanding that reasonable Parties would have had under the given circumstances and with the present wording, or the explanations given (BSK OR I-Wiegand, Art. 18 N 11, 13; BGE 143 III 157 E. 1.2.2; 138 III 659 E. 4.2.1; 132 III 24 E. 4; 128 III 265 E. 3).

120    In the investigation of the actual as well as the presumed intent of the Parties, the starting point is the wording and systematic approach of the statements made, followed by additional supplemental means of interpretation such as concomitant circumstances and the Parties' conduct prior to and after conclusion of the contract (entire text BSK OR I-Wiegand, Art. 18N 18 et seq.).

121    One such interpretation based upon the wording and systemic approach of the Dispute Settlement Agreement leads to the following result: the Preamble refers explicitly to Arbitration Proceedings No. 600257-2011 and Respondent's sentencing therein to make payment of EUR 16,460,218.77 *("For the Implementation of the Arbitral Award [...] THE FOLLOWING AGREEMENT WAS MADE").* The settlement text itself refers to *"the final Claim resulting from the Arbitral Award"* in Art. 1; in Art. 2, Claimant agrees to end the period of interest accrued as awarded by the Arbitral Award in Claimant's favor as of January 31, 2015, and

to permanently waive any claims in connection with subsequent interest. In Art. 3, Claimant agrees to the settlement of its claim according to Art.1 in three equal payments. Art. 4 states that after Respondent's fulfillment of its payment obligations, Claimant shall forgo all claims against the State *"in connection with the Arbitral Award"*. Under Art. 5, the consequences of default in payment are specified and Claimant is given the right to pursue the payment of the total amount of *"its Claim"* (Supplement -1).

122      Hence all quoted Articles refer clearly and exclusively to the first Arbitration Proceedings, or the claims resulting thereof. The second Arbitration Proceedings, which had already begun, were not mentioned. Nothing is specified in the Dispute Settlement Agreement that would indicate that those claims were satisfied with a settlement. On the contrary, Art. 4 which deals with the *"legal validity"* of the Dispute Settlement Agreement, is limited to all claims in connection with *"the Arbitral Award,"* i.e. claims from the first Arbitration Proceedings. In Art. 4 Claimant shall forgo these – but not those from further Arbitration Proceedings – provided Respondent *fulfills his financial obligations.*

123      Hence the wording and the systematic approach of the Dispute Settlement Agreement are clear in terms of applicability: it comprises the claims from the first Arbitration Proceedings. Not included are any further claims from the Management Contract, including those from the second Arbitration Proceedings. The fact that the Dispute Settlement Agreement contains its own Arbitration Clause, which deviates in content from the Arbitration Clause in the Management Contract, changes nothing in this reasoning: there is no reason why Parties seeking a dispute settlement, or in connection with such settlement, would not be able to deviate from the Arbitration Clause provided in the underlying contract.

124      The correspondence submitted and the Witness Statements on the concomitant circumstances of the finalization of the Dispute Settlement Agreement confirm this conclusion:

Case 1:20-cv-03572-RJL Document 1-1 Filed 12/08/20 Page 82 of 221

125      Claimant's witnesses, Christiane Knak-Kammenhuber and Ulrich Marseille, have confirmed that during the meeting from March 23, 2015 in Hamburg the claims of the second Arbitration Proceedings were not discussed (WP Knak-Kammenhuber p. 24 N 29-33; WP Marseille p. 38 N 29-33, p. 39 N 1-5, 19-21, 29-31, pp. 40-41). Equally, Ulrich Marseille's letter to Respondent's legal representative, Jean-Charles Tchikaya from March 31, 2015 (Supplement K-56) mentions *"outstanding payments from the Arbitral Award by the International Arbitrage Zürich (Swiss Rules) vs. the Republic of Equatorial Guinea,"* i.e. the letter refers to the payments from the first Arbitral Award only.

126      According to Ulrich Marseille's Witness Statement, he addressed the claims from the second Arbitration Proceedings during a phone conversation with Jean-Charles Tchikaya, which took place after April 25, 1015. Jean-Charles Tchikaya voiced his opinion that first the titled claims should be taken care of; subsequently one could address the other claims and an out-of-court settlement (WP Marseille p. 38 N 27-33, p. 39, N 1-6, p. 40 N 1-7, p. 80 et seq.). This was mentioned again by Jean-Charles Tchikaya during a phone conversation with him after May 22, 2015 (Supplement. K-54, p. 5).

127      Jean-Charles Tchikaya failed to attend the Oral Proceedings, without apology, although Claimant had requested his attendance. His written Witness Statement should therefore be considered insignificant (cf. Art. 9.2.4 of Procedural Decision No. 1). The same applies to the Witness Statements of the Minister of Justice, Juan Olo Mba Nseng, who failed to appear, but who was not directly involved in the settlement discussions between the Parties with regard to the Dispute Settlement Agreement.

128      Respondent's Witness Mayiboro stated that according to his understanding the matter was settled when the Dispute Settlement Agreement was signed (WP Mayiboro p. 121, p. 132 N 3-19). Witness Mayiboro's statements prove that he has no detailed knowledge of the facts and

merely functioned as an attendee of the discussion between the two Parties in Hamburg (cf. WP Mayiboro p. 121 N 32 et seq., p. 125 N 7-11, p. 131 f. N 26 et seq., p. 142 et seq.). As to his role in the negotiations, he explained that he was selected for his German skills; he accompanied Jean-Charles Tchikaya (WP Mayiboro p. 121 a.E., cf. also p. 125 N 7-11).

129     Negotiations for Respondent were conducted by Jean-Charles Tchikaya, who, according to Ulrich Marseille's statement, held the opinion that the claims from the second Arbitration Proceedings should only be discussed after finalization of the settlement (para. 126 above). It remains to be seen whether this is in fact Respondent's opinion, but it may not be of significance in an external relationship. In its attempt to honor all of the circumstances, the Arbitration Tribunal concludes that it corresponded to the Parties' actual concurring wish or that of its representatives, that the Arbitration Clause of the Dispute Settlement Agreement was related only to the claims from the first Arbitration Proceedings. Even if one were to conclude that this actual wish cannot be discovered, an objectified interpretation of the Arbitration Clause, in view of the clarity of wording and systematic approach of the Dispute Settlement Agreement (para. 121 et seq. above) leads to the same conclusion.

130     As the Dispute Settlement Agreement is related only to the claims from the first Arbitration Proceedings, the claims raised in the current Arbitration Proceedings shall have the Arbitration Clause of the Management Contract applied.

## 2.     Arbitration Tribunal's Jurisdiction Based on the Management Contract's Arbitration Clause

131     Therefore, if the Arbitration Clause from the Management Contract is applicable, the next question is: does the Arbitration Tribunal have jurisdiction over the present claims in accord with this Arbitration Clause?

132     It is undisputed that the Management Contract contains an Arbitration Clause and that it was the mutual wish of the Parties to have any arising disputes judged according to the rules of an

Arbitration Tribunal appointed by the Zürcher Chamber of Commerce. It is also undisputed that the Arbitration Clause in the Management Contract is binding for the Parties (*ratione personae*) and that the claims filed by Claimant fall under this Arbitration Clause (*ratione materiae*).

133    However, Respondent insists that the Arbitration Tribunal lacks jurisdiction because Claimant should first have called upon the courts of Equatorial Guinea prior to initiating the Arbitration Proceedings (cf. KA para. 36 et seq., 42). For lack of a claims initiation and the finalization of Circuit Court Proceedings in the Republic of Equatorial Guinea, the Arbitration Tribunal should have to declare its lack of jurisdiction or, alternatively, suspend the proceedings and set a due date for the Parties, to enable them inasmuch as possible to conduct the Arbitration Proceedings as well as due process in Equatorial Guinea, (cf. KA para. 45).

134    To answer the question whether or not Claimant should have called upon the Courts in Equatorial Guinea prior to the Arbitration Tribunal, the Arbitration Clause must be interpreted on the basis of applicable law. For international Arbitration Proceedings with seat in Switzerland, this is, in accordance with Art. 178 Section 2 IPRG, (i) the law selected by the Parties, (ii), applicable to the dispute, in particular to the main contract, or (iii) Swiss Law. Presently, the Parties have not defined any separate applicable law for the Arbitration Clause. Therefore, in accordance with Art. 178 Section 2 (ii) and (iii), Swiss Law is applicable (Interim Decision from March 15, 2016, para. 35). The Arbitration Clause according to Art. 14 Section 3 of the Management Contract reads as follows:

(Translated) German Version:

In the event a dispute should arise from this contract the Parties shall attempt to find an amicable solution prior to calling upon the Courts in Equatorial Guinea. In the event disputes should arise, the Parties agree to engage in Arbitration Proceedings before the Chamber of Commerce in Zürich.

Case 1:20-cv-03572-RJL Document 1-1 Filed 12/08/20 Page 85 of 221

Spanish Version:

En caso de litigio, las partes es sentarán para resolver amigablemente el problema, caso contrario se dirigiarán a los tribunales de Guinea Eucatorial. En case de desacuerdo de una de las partes, podrá recurrir al tribunal de la Cámara de Comercio de Zurich.

Translation according to certified translation by Claimant (Supplement K-82): In the event of disputes the Parties will meet and solve the problem amicably, otherwise they will turn to the Court of Equatorial Guinea. If one of the parties does not agree, the Court of the Chamber of Commerce in Zürich may be called upon.[1]

135    The Parties disagree on the point whether the Spanish version of the Management Contract takes priority over the German version. Claimant states that the German version of the Arbitration Clause does not correspond to the Spanish one, the Spanish version being the relevant one (KA para. 28 et seq.). Claimant insists that both versions have the same meaning (Reply. Claimant, para. 109).

136    In the Arbitration Tribunal's opinion, there is no reason to give priority to the Spanish version in interpreting the Arbitration Clause. The Parties have decided to have a bilingual version of the contract, without giving priority to any one language. Respondent's argument that the Spanish version has priority due to the (undisputed) fact that prior to signing handwritten changes were made in Spanish to the wording of the contract (para. 98 above), does not apply to the Arbitration Clause (Item 14 MV): no such handwritten changes appear there. Also, the (undisputed) fact that the contract was signed only on the left, i.e. beneath the Spanish text, (para. 98) is no indication that the German version should be secondary. If the Parties had

---

[1]    The Arbitration Tribunal agrees with the translation in Supplement K-82. The translation offered by Respondent (KA para. 29) is not accurate.

intended this to be so, they could have clarified this in the contract text. Further, it must be assumed that the Parties would not have had the German and the Spanish version printed parallel to each other in the same document, if they had wanted to give priority to the Spanish version.

137    In the interpretation of the Arbitration Clause, the Arbitration Tribunal can hence use the wording of the German as well as the Spanish version. The first sentence in both versions of the Arbitration Clause mentions the Courts of Equatorial Guinea. According to the German version, the Parties shall attempt to seek an amicable solution *"prior to engaging"* the Courts of Equatorial Guinea. Similarly the Spanish version demands that the Parties shall attempt to resolve any disputes amicably and, if this is not achieved *("caso contrario"),* seek assistance from the Courts in Equatorial Guinea. However, the second sentence in both versions of the Arbitration Clause mentions an Arbitration Tribunal. In the German version, it is the Arbitration Tribunal that is to be consulted "[i]n the event of disputes." In the Spanish version, the Arbitration Tribunal is to be consulted *"[e]n caso de desacuerdo de una de las partes /if one of the Parties disagrees").*

138    What form of relationship should apply between the Courts of Equatorial Guinea and the Arbitration Tribunal remains unclear from the wording.

139    As already pointed out, it is presently undisputed that it was the mutual wish of the Parties to have any disputes decided by an Arbitration Tribunal. Therefore, the validity of the Arbitration Clause is not in question.

140    The point of dispute is merely whether the Parties wish to make the Arbitration Tribunal's jurisdiction dependent upon prior implementation of State Proceedings before the Courts of Equatorial Guinea. Claimant's Witness, Ulrich Marseille states on this point that on the occasion of the contract negotiations on December 14, 2009 in Malabo it was agreed to use

*"a neutral institution, an internationally operating Arbitration Tribunal"* in case an unconventional agreement could not be reached (Witness Statement Marseille, p. 6). It was mutual intent, that in the event of a dispute both Parties could go directly to the Arbitration Tribunal, without having to call upon the Courts in Equatorial Guinea; for Claimant, a court process in Equatorial Guinea was unimaginable (Witness Statement Marseille, p. 6-7; WP Marseille, p. 44 N 5-11; p. 89 et seq.).

141    As to the point that the Arbitration Clause also mentions the Courts of Equatorial Guinea, Witness Marseille (WP Marseille, p. 90 N 7-10, confirmed in WP p. 104 N 1-9):

> *At first they weren't inclined. Then we said: then we cannot do that. So then it was announced that he said: well yes, but somehow Equatorial Guinea also has to be mentioned. That's how this clause came to be.*

142:    Respondent did not call any Witnesses or ask for any other evidence regarding the interpretation of the Arbitration Clause, including Mr. Marseille's statements on the negotiations in Malabo and the Parties' intent concerning direct access to the Arbitration Tribunal. The Arbitration Tribunal holds that the actual mutual intent of the Parties cannot be determined. Therefore, an objective interpretation of the Arbitration Clause must be made in order to focus on what reasonable Parties would have understood under the present circumstances and the present wording, or the explanations given (cf. para. 118 and BSK OR I-Wiegand, Art. 18 N 11, 13; BGE 143 III 157 E 1.2.2; 138 III 659 E. 4.2.1; 132 III 24 E.4; 128 III 265 E.3). It must be considered what the proper assessment is here, as it cannot be assumed that the Parties wanted an inadequate solution (BGE 140 III 134 E.3.2 p.139; 122 III 420 E. 3a p.424; 117 II 609 E. 6c p. 621; cf. also BGE 133 III 607 E. 2.2 p. 610).

143    It is not clear from the German wording what the formulation *"in the event of disputes"* in the second sentence of the Arbitration Clause in the Management Contract refers to. Instead, the Spanish wording says *"[i]n the event of a disagreement;"* but it is equally unclear what this

disagreement refers to. It is conceivable that the *"disputes"* or the *"disagreement"* refers to a decision from the Courts in Equatorial Guinea. It is also conceivable that the *"disputes"* or *"disagreement"* refers to the question of calling upon the Courts of Equatorial Guinea per se, which would mean that one Party, if unwilling to go to these Courts, may go to the Chamber of Commerce in Zürich instead. In comparison to the first interpretation, the second interpretation makes more sense, since it enables the Parties to initiate Arbitration Proceedings directly, rather than having preceding State Proceedings. As Claimant rightfully points out, an Arbitration Tribunal should respect substantive res judicata regarding a previous decision (State Court or Arbitration Tribunal) and could not deviate from this (para. 98 above; cf. BGE 128 III 191, E. 4.a; 136 III 345, E. 2.1). Hence, a second submission to an Arbitration Tribunal would not be reasonable.

144    The question arises as to whether Parties can agree that, irrespective of the legal prejudice of a state judgment, the same matter can be heard again before an Arbitration Tribunal. This is questionable, especially because, according to the case law of the Federal Supreme Court, legal prejudice belongs to the "ordre public" (BGE 136 III 345). In any case, irrespective of the question of admissibility of such an approach, this would not be sensible, because it would result in two enforceable decisions in the same case. Such an approach is not appropriate and it is therefore unlikely that reasonable Parties would agree to do so.

145    In addition, if the Parties actually wished that an Arbitration Tribunal should act as a type of tribunal to which to appeal a state judgment, they would agree on a time limit for bringing an appeal before the tribunal and expressing their opinion on the Arbitration Tribunal's jurisdiction. It would also be reasonable to assume that, in such case, they would regulate

whether the State Courts need to be exhausted before the Court ruling can be referred to the Arbitration Tribunal. But all this is missing in the Arbitration Clause of the Management Contract.

146    Respondent's comparison with the *Court of Arbitration for Sport* (CAS) as a Court of Appeal (Rejoinder, para. 33) is inadequate, because there, the appeal would result in the ruling of an association, which cannot come into legal force if there is a challenge to the ruling before CAS.

147    Thus, an objective interpretation of the Arbitration Clause of the Management Contract leads to the conclusion that a Party may seek recourse for disputes arising from the Management Contract before an Arbitration Tribunal in Zurich without first having to submit to Proceedings before the Courts in Equatorial Guinea. Accordingly, the Arbitration Tribunal is competent to handle the claims.

148    There is also no reason for the suspension, alternately requested by Respondent, until the initiation of an arbitration and subsequent due process in Equatorial Guinea resulting in a court decision, or until a decision has been obtained from the competent Courts in Equatorial Guinea (contingent claim a and b on applications 1 and 2, KA p 3). It cannot be inferred from the Arbitration Clause that Claimant would first have to initiate Arbitration Proceedings before seeking recourse before the Arbitration Tribunal. According to the German version of the Arbitration Clause, in case of disputes arising from this contract, the Parties shall *"attempt to find an amicable solution prior to calling upon the Courts of Equatorial Guinea."* According to the Spanish version, the Parties will in case of disputes *"will meet and solve the problem amicably"* (para. 134 above). There is no mention of an arbitration procedure, so that Respondent's corresponding objection that it must first be carried out is not convincing.

149    The Arbitration Tribunal is therefore competent for handling the submitted claims.

**B. Substantive Law**

**1. Question as to the Termination of Contract by Respondent**

150    In the present arbitration, Claimant asserts further compensation claims under the Management Contract for the period from August 2010 to and including August 2012, for which it was already awarded a compensation totaling EUR 14,063,400 (plus interest) in the first arbitration (cf. Award of first arbitration, Dispositiv Item 2 and 3). At that time, Claimant had only requested a partial amount of 90%. Furthermore, Claimant asks for reimbursement for the period from September 2012 until and including January 2015 and beyond until and including January 2020, as it claims that the Management Contract was automatically extended by five years due to lack of termination (cf. KS p. 3 et seq. and Reply p. 3 et seq.).

151    Respondent argues that the Management Contract was subsequently terminated by implication by March 2011, at the latest, with immediate effect. Such a right of termination is thought to necessarily result from Article 404 (1) OR (cf. KA, para. 89 et seq.).

152    In Art.12. 1 MV, the Parties have agreed to a fixed term of the contract of five years, with automatic renewal for five years, unless the contract is terminated prior with a notice of one year (cf. Supplement K-l). The question thus arises as to whether Respondent was able to terminate the Management Contract with immediate effect, based on the agency-based provision of Art. 404 para. 1 CO before the expiry of the agreed term. For this purpose, it must be examined whether the agency-based provision of Article 404 (1) OR is applicable to the present contract.

*a)*      *Evaluation of the Management Contract*

153    The evaluation of the components of the Management Contract to be assessed in the present case shows that this is an innominate contract, namely a mixed contract in which elements of

different contract types are combined (BSK OR I-Amstutz/Morin/Schluep, Einl. Vor Art. 184 et seq. N 8 et seq.):

154    In Item 3.1 MV, Claimant commits to the operation of the Polyclinic (management). Respondent gives Claimant an unlimited power of attorney. Claimant also makes all necessary personnel decisions for the clinic's operation (Item 3.2). These tasks are of an agency-based nature, as Claimant undertakes to provide services independently (cf. Schmid/Stöckli/Krauskopf, Swiss Code of Obligations, Special Section, 2.A., N I 877).

155    The obligation to provide training and further education for employees including advanced training courses on the applicant's e-learning system in exchange for a fee (cf. Items 3.3 and 10.1) is a mixed contract in the form of a combination contract. The obligation to provide education is of an agency-based nature, while the use of the e-learning system is subject to renting/leasing law (cf. Huguenin, Code of Obligations General and Special Section, 2.A., N 4062). Creation and adaptation of e-learning units are subject to a contract for work and services; the e-learning units must comply with a training plan that is to be developed (Items 1.4 and 1.5 MV).

156    It must be concluded that regarding the development and provision of the software for hospital administration (Item 3.4 MV, including installation, cf. Item 6.1 MV and software adaptation and maintenance costs, cf. para. 212 et seq. below) – and besides the components related to a sales contract – it is the service and work contract elements that outweigh all other contractual elements because Claimant committed to an individually determined work result (cf. BGE 124 III 456, E. 4.b, with further references, BK-Koller, Art. 363 N 220).

157    The provision of the "Brand Name" including authorization to use Claimant's logo (cf. Item 3.5 MV) is similar to having received a license. There is a certain proximity to renting or leasing rights; however, the prevailing doctrine rejects their analogous application (cf. Huguenin, Ibid. N 3801, CHK-Zenhäusern, Vorb OR 184/Licensing and Know-How Contract, N 13).

158    The conception of a nursing school mentioned in the reply (cf. Reply para. 257, cf. also WP Reinmüller, p. 12 N 17 et seq.) is not one of the clearly defined tasks according to the Management Contract. Any expenses related to this and other projects in Equatorial Guinea, e.g. the completion and operation of the hospital in Malabo, were not part of the Management Fee (cf. WP Marseille, p. 109 N 12 et seq., cf. also Respondent's document Rejoinder para. 154, B-SB para. 27, 33, B-SeA para. 18, BS-SeA para. 9 et seq., 14, 24, and also all of para. 215 et seq. below).

### *b)*    *Question of Applicability of Art. 404 OR*

159    Next, the applicability of Art. 404 OR is to be examined. The majority of the Arbitration Tribunal (Dr. Andrea Meier and Dr. Felix Fischer) concludes for the following reasons that Art. 404 OR is not applicable in the present case.

160    Article. 404 para. I OR stipulates that the mandate can be revoked or terminated at any time. The exercise of the right of revocation or termination at any time does not presuppose any particular reason for dissolution (for example, an "important reason") (BSK OR I-Weber Art. 404 N 5, BGE 106 II 160 = Pra 1980, 597).

161    The agency-based right of termination according to Article 404 (1) OR is a peremptory right and cannot be revoked or terminated at any time (BGE 115 II 464, E. 2a; BGE 109 II 462, E. 3e; BGer 4A 284/2013, E. 3.5.I; Gauch, Ibid., N 1966). Justification of this rule can be found, based on federal jurisdiction, in the fact that the agent is given a special position of trust and that there isn't any reason for keeping the contract in force when the relationship of trust between the Parties no longer exists (BGE 104 II 108 E.4).

Case 1:20-cv-03572-RJL Document 1-1 Filed 12/08/20 Page 93 of 221

162    In the case of a mixed contract (innominate contract*), the Federal Supreme Court holds the view that the right to immediate termination under Article 404 (1) OR is only applicable if the provisions of the agency-based contract appear to be appropriate with regard to the Parties being bound to a certain contract term (BGer 4A_284/2013 E 3.5.1, 4A_2011 E. 2.2). Regarding this issue, it is significant whether, according to the nature of the contract, a relationship of trust between the Parties is indispensable and whether or not it is of particular importance (BGer 4A_284/2013 E 3.5.I; 4C.24 / 1989 E. 2c).

163    The Federal Supreme Court dealt with the application of Art. 404 (1) OR to mixed contracts in more detail in its decision 4A_284/2013 from February 13, 2014. The decision was based on an agreement with which the real estate administration of Y. Immobilien AG was relocated to the premises of X. AG as part of a "cooperation agreement," where it was organized and managed by X. AG. The shared right of use of the rooms including infrastructure was not granted to Y. Immobilien AG by a separate agreement, but integrated into Claimant's organization under the latter's direction. The right of joint use itself was therefore based on the existing relationship of trust between the Parties. Furthermore, X. AG was granted a power of attorney over the operating account, from which it was able to make withdrawals. In fact, X. AG made various transfers to itself even after termination by Y. Immobilien AG in order to compensate itself for the losses due to the premature termination of the contract. The Federal Supreme Court came to the conclusion that incorporation into the operation of X. AG as well as the extensive competencies assigned to it required an increased relationship of trust compared to ordinary property management, which made the application of the agency-based provisions for the dissolution of the contract appear to be reasonable (E. 3.5.2).

164    The present contract under adjudication concerns management of a hospital, training of employees and development of hospital software. The Management Contract consists

Case 1:20-cv-03572-RJL Document 1-1 Filed 12/08/20 Page 94 of 221

of provisions used in agency, work and services, licensing, renting/leasing and sales contracts (para.154 et seq. above). Significant contractual tasks, such as operation of the hospital and training and further education of employees include agency-based elements. With regard to the overall assessment of whether an application of Art. 404 OR is appropriate, it is held that the other contract types represented in the Management Contract are also significant because the option to terminate without good cause is limited to the law of agency, and is not applicable to other contract types. In addition, the subsequent consideration of all circumstances shows that, according to the nature of the contract and in particular its implementation by the Parties, a relationship of trust between the Parties was not an indispensable condition for the performance of the contract and that Respondent did not need the protection against a right to immediate termination executable at any time and without good cause.

165      Without a doubt, the provision of health care services is a sensitive area. However, Respondent chose a professional service provider whose obligations were contractually regulated. The contractual arrangement in turn provided Claimant with extensive authority for managing the clinic: Item 3.1, gave Claimant full power of attorney which entitled it to provide or receive all declarations necessary for the operation of the hospital. According to Item 3.2. MV, Claimant was permitted to make all personnel decisions, to conclude various types of supply contracts with patients and relatives and to conclude all other contracts that it deemed suitable for a financially sound operation of the clinic. For this purpose, Claimant, in accordance with Item 2.1 MV, was provided with a budget that it was expected to use, to the best of its knowledge, to cover all necessary business expenses.

166      In addition to the contract text, other relevant factors must also be taken into account, including, in particular, the performance of the contract by the Parties and related limitations on contractual powers. Such overall considerations make it clear that Respondent had

extensive rights of control in operational decisions, including financial matters, and that Claimant's decisions required Respondent's approval. In detail:

167    Ulrich Marseille stated that Claimant's staff members were required to have all decisions, including personnel decisions, approved by Dr. Ing. Pedro (cf. WP Marseille, p 45 N 11 et seq.):

> *Witness Marseille: Mr. Marcelino was the Minister, but in the administration, there was some kind of a watchdog. That was a professor or a doctor - I don't have the name with me right now - who was sitting there all day and always observed. Whenever decisions were made, one had to always go to him first, and he had to confirm them again. So, if we hired new doctors from Israel or from South America, our people could not sign, but one had to always go to him - I do not know what his name was - -*
>
> *Prof. Dr. Bernd Reinmüller: Was it Dr. Pedro?*
>
> *Witness Marseille: Dr. Pedro. /... }*

168    Fritz Kronenberger stated in his Witness Statement that Dr. Pedro and Dr. Donato were in the clinic as functionaries of the government (WP Kronenberger, p. 250 N 15 et seq.).

169    According to Ralf Reinsch's testimony, administration of local staff was carried out under the sole authority of Dr. Ing. Pedro (Witness Statement Reinsch, Supplement K-14, p. 5 below).

170    The responsibility for the purchase and selection of medicinal drugs and other hospital materials remained, as directed by the Administrative Council, contrary to Item 6.l.d) of the Management Contract with Dr. Ing. Stamler (KS para. 96, Supplement K-36, undisputed). Dr. Stamler reported directly to Respondent as the latter's employee (KS para 96, undisputed).

171    Mr. Marcellino Oyono Ntutumu, Minister of Health of Equatorial Guinea, was Chairman of the Administrative Council of the Clinic (cf. Witness Statement by Fritz Kronenberger from

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 96 of 221

Kronenberger from April 28, 2011, Supplement K-39, p. 4). Mr. Kronenberger, who was responsible to Claimant for carrying out local financial administrative duties, had to report the figures to the Administrative Council (WP Kronenberger, p. 271, N 6-17).

172   After all, Mr. Mensching, who was previously employed as an accountant by Claimant and directly reported to Mr. Kronenberg, was directly employed by Respondent as of January 1, 2011 (KS para. 110; Supplement K-38 p. 1 et seq., not disputed).

173   The ultimate decision-making power with regard to operational management thus lay as before with Respondent or its representatives on site. Respondent therefore did not need the special protection offered by the right of termination executable at any time under Art. 404 OR.*

174   It should also be borne in mind that it was established conclusively during the first Arbitration Proceedings that Claimant had duly fulfilled its obligations under the Management Contract. The first Arbitration Tribunal has made a binding determination for this Arbitration that Respondent's objection concerning the non-fulfillment or improper performance of the contract by Claimant was unfounded (cf. Interim Decision paras. 49-51). Because of its proper fulfillment, Claimant therefore had no reason for mistrust, which would have necessitated a special relationship of trust on Respondent's part in order to continue the contractual relationship.

175   In view of the mixed nature of the Management Contract, the selection of a professional service provider for the operation of the hospital in Bata, the fact that Respondent had reserved extensive decision and control options regarding management of the hospital, and in view of the contractual fulfillment by Claimant, it appears that *in this case* a special relationship of trust was not an indispensable condition for Claimant's continued work under the Management Contract. It would therefore not be appropriate to grant Respondent the right to immediate termination executable at any time without important cause in accordance with Art. 404 OR.

*OR= Obligationenrecht/Swiss Code of Obligations; transl. note)

176    Respondent's argument (para. 104 above) that it had lost trust in Claimant (whereby this cannot be attributed to incorrect performance on Claimant's part; para. 174 above) does not justify an *immediate* termination under Art 404 OR. On the other hand, whether Respondent communicated to Claimant this loss of trust and a desire to withdraw from the contract does have a bearing on the question of termination by implication at the end of the regular contract term. This will be examined in the following section.

## 2.    Implied Termination by Respondent at the End of the Regular Contract Term

177    Because the contractually agreed provisions for termination, in accordance with Item 12.1 MV do not provide any formal requirements for termination, such termination is also possible by implication. Based on the evidence, particularly due to the findings at the Oral Hearing, the Arbitration Tribunal holds it has been proved that Respondent terminated the Management Contract in March 2011 by implication:

178    This is supported by the fact that Mr. Kronenberger and Mr. Gerard were expelled from the country on March 16, 2011 (cf. Witness Statement Kronenberger, Supplement K-39, p. 5, WP Marseille, p. 50 N 10 et seq.; WP Kronenberger, p. 272 N 6-14; cf. also Supplement K-42). After leaving the country in March 2011, it is undisputed that Claimant no longer provided services to Respondent in Equatorial Guinea (WP Regenhardt p. 180, N17-21, WP Kronenberger p. 272 N 16-24).

179    Respondent informed Claimant several times that it wished to terminate the contract. According to Fritz Kronenberger, the Minister had told him the following on January 15, 2011 (cf. Witness Statement Kronenberger, Supplement K-39 p.5):

> *We no longer trust the Marseille-Kliniken. Further collaboration no longer makes sense. [...] I do not feel like it anymore. And it's best that we cancel the contract!*

180     Fritz Kronenberger also stated this in his e-mail to Axel Regenhardt from January 15, 2011 (cf. Supplement K-40).

181     On the occasion of the Arbitration Hearing on December 5, 2016, Fritz Kronenberger confirmed that Minister Marcellino wanted to withdraw from the contract (WP Kronenberger p. 277 N28 et seq.):

> *He [Minister Marcellino] wanted to get out of the contract, very clearly, yes.*

182     Ulrich Marseille also stated in his letter from January 31, 2011 (cf. Supplement K-38 page 4):

> *After all this, it should be clear that you no longer have any interest in ensuring that the concluded contract is also performed in accordance with its provisions, but rather want to just "coldly" force us out of the contract..*

183     In his testimony, Ulrich Marseille confirmed that he had understood Respondent's intention to terminate the contract. He stated (WP Marseille p. 53 N 19-24):

> *We felt that the contract was to be terminated by the normative power of the facts. To put it a bit crudely. We have a contract that we have negotiated for a few years, we have tried very hard, and now the contract is simply terminated by sending people away like that.*

184     The Witness Testimonies thus show that Claimant clearly understood Respondent's wish to terminate the contract and to no longer use Claimant's services.

185     It follows that Respondent terminated the contract by implication in March 2011 by expelling Claimant's employees. Thus, in accordance with Art. 12.1 MV, Respondent properly terminated the contract at the end of its five-year term (for contract tern, cf. para. 196 et seq. below).

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 99 of 221

### 3.   Start and End Dates for Term of Management Fee

#### a)   *Start of Phase B*

186   The monthly Management Fee according to Item 7.1 is being applied with start of Phase B (Item 6.2 MV) and amounts to EUR 700,000 per month or EUR 8,400,000 per year. To calculate the fee due, it must be determined when Phase B began.

187   Claimant states that Phase B began after conclusion of Phase A, effective August 1, 2010 (KS, para. 147). Respondent states that Supplement K-21 makes it clear that Phase 1 (i.e. Phase A) was completed on September 7, 2010, and that Phase B had begun to run (Rejoinder* para. 56).

188   The Management Contract only expressly regulates the beginning of the first phase (Phase A). Its start date was contracted for February 1, 2010 (Article 4.1). Phase A is defined in Art. 6.1. of the Management Contract, Phase B in Art. 6.2. Phase A comprises the following services (cf. Supplement K-1, Item 6. l):

      (a)   Control of Revenue and Expenditure

      (b)   Control of Financial Organization

      (c)   Start with Installation of Software in Accordance With the International Standard

      (d)   Management and Selection of All Medicinal Drugs and All Hospital Material in Accordance with European Standard and Quality

      (e)   Professional Control of Quality of Recruitment Vetting and Quantity of Employees, and Report to the Administrative Council.

189   Phase A was to be remunerated in the amount of EUR 840,000 (Item 6.1 Section 2 MV); this amount was paid by Respondent at the end of February 2010 (KS para. 63).

190   Phase B was defined in the Management Contract as follows (Item 6.2 MV):

*This phase includes full responsibility for the technical part, personnel, location and all property on Marseilles. [...]*

191    In a "report on the Management Contract" from September 7, 2010 (Supplement K-21), Claimant concludes that 100% of the services for Phase A and 58% of the services for Phase B were rendered. A prerequisite for the provision of the pending 42% of services is the transfer of the overall management, which has not yet taken place. Thus, Phase B has been reached (for complete information cf. Supplement K-21 p. 15 and KS paras. 83-100).

192    The "Management Contract Report" (German: "Bericht zum Managementvertrag"; note transl.) from September 7, 2010 (Supplement K-21), the conclusion of which Respondent does not dispute, confirms the fulfillment of all Phase A services, except for the management and selection of medicinal drugs, which remained with Dr. Stamler (cf. para. 170 above), i.e. control of revenue and expenditure, control of financial organization, start with installation of software and control of quality and quantity of employees. The time when this work was completed can be determined on the basis of the following documents:

> Concerning the control of revenue and expenditure and control of financial organization, it follows from p. 6 of the Management Contract report that the company EPOS, on behalf of Claimant, audited the technical, management and financial departments of the hospital and summarized the results in an audit report dated July 2010. It can therefore be assumed that these tasks were completed by the end of July 2010.
>
> Regarding the start of the software installation process, the report on the Management Contract states, on the bottom of page 8, that the hospital's software systems went live on August 1, 2010. Thus, it is assumed that these tasks were completed as of August 1, 2010.
>
> Regarding control of quality and quantity of employees, Dr. Doehler, generated reports, one on August 6 and one on August 9, 2010, on the staffing situation and the number of the most common treatments in the clinic (cf. Supplement K-27). Because the reports are based on previous findings, it can be assumed that these were available by the beginning of August 2010.

193    It can therefore be assumed that Phase A was completed at the beginning of August 2010 and
       that Phase B had started.

194    Whether Phase B had been properly fulfilled is not to be reassessed by the Arbitration Tribunal,
       as it is bound by the findings of the first Arbitration Tribunal. The first Arbitration Tribunal
       dismissed, in a legally binding manner, Respondent's request for determination that Respondent
       lawfully exercised its right to raise a plea of non-performance and that Respondent's plea of
       non-performance was well-founded (cf. Interim Decision, para. 55 et seq.).

195    From a temporal point of view, this legally binding decision is limited to events up to and
       including August 2012, as the Arbitration Tribunal only took these into account. Therefore, the
       Parties were at liberty, in the present proceedings, to assert subsequent circumstances, provided
       that they were relevant to the assessment of the Claims (cf. Interim Decision, para. 66). Such
       arguments were not presented. It is undisputed that since April 2011, Claimant has no longer
       provided contractual services (cf. para. 177 et seq. above). Accordingly, the question of proper
       compliance by Claimant no longer arose.

### b)    End of Regular Contract Term

196    The contract provides for a fixed term of five years (Item 12.1. MV). According to Claimant,
       the regular contract term ran until January 31, 2015 (KS para. 178). According to Respondent,
       the regular contract term ended on December 14, 2014. Respondent calculates the five-year
       contract term from the date when the Management Contract was concluded, i.e. from December
       14, 2009 (Rejoinder para. 112 and Supplement K-l p. 13). In doing so, Respondent ignores that
       the Management Contract in Item. 4.1. specifies that the first phase of the contract will be in
       force as of February 1, 2010. Thus, the duration of the contract is to be calculated from that
       date, which leads to an expiry date of January 31, 2015.

### c)    *Result*

197    Subsequently, Claimant is in principle entitled to payment of the monthly Management Fee of EUR 700,000 pursuant to Item 7.1 MV from August 2010 until January 31, 2015, whereby from April 2011 onward, the saved expenditures as well as the country risk included in the determination of the Management Fee are to be deducted (cf. next section para. 4.a) et seq., para. 218 et seq.).

### 4.    Savings in Expenditures

### a)    *Claimant's Supplementary Information on Expenditures Saved with the Aid of an Auditor*

198    Claimant is to deduct from the Management Fee the expenditures it has saved from the time when Respondent no longer used its services. This follows from an analogous application of the principles for the calculation of losses suffered in accordance with Art. 97 OR, according to which the creditor's fulfillment interest lies in the net margin remaining after deduction of saved expenditures (BSK* OR I-Wiegand, Art. 97 N 38a with further references). Claimant does not dispute that principle; its own calculations also take saved expenditures into account (cf. KS para. 181 et seq.).

199    The Arbitration Tribunal holds it is correct that - as requested by Claimant -, no saved expenditures will be deducted from the Management Fee for the time until the end of March 2011. In March 2011, Claimant withdrew from the clinic and from Equatorial Guinea (para. 66 above). Up to this time, Claimant provided services under the Management Contract. The plea of non-fulfillment of services was rejected, with full legal force, by the first Arbitration Tribunal (para. 194 above).

200    From April 2011 onward, Claimant deducts monthly expenses of EUR 112,000. Claimant bases the calculation on a statement by auditing and tax consulting firm RSM Altavis GmbH ("**RSM**") dated July 15, 2014 (Supplement K-46; cf. KS para. 192 et seq.). In Procedural Decision No. 11, the Arbitration Tribunal stated that this statement required

(\*BSK = Basler Kommentare/Basel Commentaries = a publication commenting on the most important laws of Switzerland such as, for example, the OR; transl. note)

additional information. Accordingly, Claimant was instructed to provide a statement of all other expenditures saved, in addition to the summary in attachment K-46 (Expenditures Saved on Site), either at the central office in Hamburg, with third-party suppliers or elsewhere. The saved expenditures were to be determined and confirmed by an external auditor.

201    Claimant subsequently submitted an expert opinion from PricewaterhouseCoopers GmbH ("**SPwC**", Supplement K-93), which estimated the amount of saved expenditures at EUR 118,404 per month (Supplement K-93, para. 79) under additional consideration of one-time costs for software add-ons for the hospital administration in the amount of approximately EUR 118,891 for the months April to July 2011 (SPwC para. 43).

202    Respondent states that the calculation of the costs according to SPwC is neither verifiable nor traceable from Respondent's point of view and was based solely on Claimant's assessments and statements. Respondent states that, due to a lack of knowledge of the documents, it cannot verify these remarks and cannot commission its own "expert opinion." The statements by PwC are based on Claimant's one-sided representations and are therefore not meaningful. However, Respondent takes note of the amounts claimed by Claimant and takes the view that they should be deducted at least to the extent of the figures determined by Claimant (B-SeA*, paragraphs 10-17).

203    Respondent's objections are irrelevant. Claimant's appointment of an auditor to determine the expenditures saved was made based on the Arbitration Tribunal's request because it held that the legally satisfactory statement by auditing and tax consulting firm RSM Altavis GmbH dated July 15, 2014 (Supplement K-46) should be supplemented with regard to certain points. The issue of RSM's summary of expenditures saved had already been broached by Claimant in its Statement of Claim, without Respondent having asserted in its statement of defense or its

(*B-SeA = Beilage SeA/ Supplement SeA; transl. note)

Rejoinder that Respondent lacked the knowledge for assessing the items reported there. The objection that Respondent needed further documents from Claimant in order to be able to assess the expenditures saved was presented for the first time in Respondent's statement regarding SPwC. For that reason, this objection can relate a priori only to the additional statements made by PwC and not to the information already provided by RSM. Furthermore, if Respondent lacked certain documents to assess PwC's additional findings, it could have turned to the Arbitration Tribunal for an editorial request instead of staying idle, claiming that it could not comment on PwC's statements. At the very least, Respondent should have been able to clearly specify which statements it could comment on and in regard to which statements it was missing documents in order to do so. This did not happen. Respondent does not comment on any of the subsequently discussed categories of expenditures saved, apart from the fact that they should be deducted at least to the extent of the figures determined by Claimant or PwC (B-SeA, para. 15-17).

### b)    *Expenses to be Covered By Management Fee*

204    When determining the expenditures saved, it must be borne in mind that Claimant only had to pay part of the expenditures out of the Management Fee. According to Item 2.1 MV, Claimant was provided with a budget out of which Claimant was able to pay the arising business expenses. These included personnel costs (excluding the costs of salaries of Claimant's employees on site; cf. Item 6.2 MV), costs for specialists, material costs and other costs necessarily associated with the operation of a hospital (Item 2. 1 MV lit. c and d)

205    Respondent then asserts in its statement from August 14, 2017 that Item 6 of the MV is to be strictly separated from the Management Fee (Item 7.1). For Phase B, the costs amounted to EUR 700,000 per month (Item 6.2); that sum includes all the expenses related to the four employees provided by Claimant (with the exception of their living expenses, which were

passed on to Respondent) and the expenses related to the central office in Hamburg. The Management Fee was not intended to cover these costs, but was owed separately and in addition, as a pure profit (B-SeA para. 14, 22).

206     This newly raised argument is belated and therefore ignorable. Respondent did not use this argument, neither in the statement of defense nor in the rejoinder. Nor did it clearly deny Claimant's arguments that the Management Fee had served to cover certain expenses incurred by Claimant (cf. e.g. KS, para. 62, 229 et seq.). Finally, there is no indication that Claimant would have been paid the monthly amount of EUR 700,000 in addition to the monthly Management Fee of EUR 700,000. Respondent itself states that the expenditures saved are to be deducted from the Management Fee (B-SeA, para. 17).

*c)*     *Salary Expenses, Ancillary Salary Costs, External Legal and Consulting Fees and Other Operational Expenses*

207     PwC, in its supplementary statement regarding costs incurred on site, comes to the same conclusion as RSM Altavis GmbH. According to RSM Altavis GmbH and PwC, most of the ongoing expenses are attributable to the salary expenses for the four employees working on the project, namely Döhler (chief physician), Mensching (accountant), Kronenberger (financial director) and Gerard (technical director). PwC bases its salary claims on the underlying employment contracts. The calculated expenses of **EUR 59,583** per month are not objectionable.

208     Ancillary salary costs and travel expenses of **EUR 13,000** per month are plausible. The same applies to the calculated external legal and consulting fees of **EUR 24,000** per month and the other operational expenses of **EUR 15,000**.

### d)   *Continuous Training and Education*

209    Regarding advanced education and training, PwC states that the expenses for such educational measures according to the Management Contract should be borne out of the budget (SPwC, para. 36). This is to be accepted because Item 3.3 para. 2 MV stipulates that the costs for further education of the employees are to be covered by the budget. For the use of e-learning software for training purposes, Claimant had available, in accordance with Item 10.I MV, a lump sum of EUR 100,000 per year and an amount of EUR 100 per employee. Axel Regenhardt, then Claimant's IT officer for the Bata project, stated in his testimony that e-learning units had to be produced on a regular basis. For the Bata project, he estimated the number of units at 30-40 with production costs between EUR 15,000 and EUR 20,000 (WP Regenhardt p. 201 et seq. N 4 et seq.). For the modification of the modules (rebuilding or adaptation) during the contract period, he estimated the costs incurred from EUR 2,000 up to EUR 15,000, depending on how extensive the change was (WP Regenhardt p. 203 N 26-31).

210    In light of these estimated figures, PwC's comments (SPwC, para. 36) are plausible in that the costs of maintaining and expanding the e-learning software and providing the e-learning systems, including the costs of creating new modules, were covered by the cost reimbursement rule for the use of the (e-learning) software in accordance with Art. 10.1 MV. These costs are therefore not to be considered as expenditures saved in relation to the Management Fee.

### e)   *Software for Hospital Administration*

#### aa)   *Software Development Costs*

211    Pursuant to Item 3.4 MV, Claimant was obligated to *"develop and provide adequate software for hospital administration, human resources and the control of essential operational processes and to make it available to the hospital."*

The basic facilities were supposed to be operational within four months of taking over the hospital, while the software for the highly specialized departments and the control of the medicinal drug supply from abroad, for business administration controlling as well as individual personnel deployment planning was supposed to be operational no later than twelve months after handover of the facility. For this activity, PwC calculates costs of EUR 29,723 per month (SPwC para.37). The amount is based on information provided by Claimant concerning salary expenses for the employees involved in the project (50% of the working time of Axel Regenhardt, 100% of working time of Messrs. Smaka, Kanbari and Thies). The cost level determined by PwC is plausible. PwC considers these costs as one-time costs for the period from April to July 2011, i.e. a **total amount of EUR 118,891,** because work related to development would probably have been necessary until then (SPwC para.37). This assumption is plausible as well.

### bb)  *Software Adaptation and Maintenance Costs*

212      Claimant, referring to PwC, argues that software adaptation and maintenance costs, after completion of development-related tasks, are to be paid out of the budget (K-SeA para. 14, SPwC para. 37). Where this is derived from is unclear. It can only be deduced from the Management Contract that Claimant must bear the developmental costs, but not that the additional software adaptation or maintenance costs payable by Claimant would have to be paid out of the budget. Because these costs are related to the software which Claimant has to develop and provide pursuant to Art. 3.4 MV, the Arbitration Tribunal holds that these costs are to be borne by Claimant.

213      Claimant and its experts have not provided any information on the amount of those costs. According to Axel Regenhardt, then Claimant's IT officer for the Bata project, the costs for the normal support and maintenance operation range from EUR 12,000 to possibly

Case 1:20-cv-03572-RJL Document 1-1 Filed 12/08/20 Page 108 of 221

EUR 15,000 monthly, consisting of two to three FTEs ("full time equivalents", i.e. full-time equivalents for persons such as developers, support technicians) with an estimated gross salary of EUR 3,500 to 4,000 (WP Regenhardt p. 199 et seq. N 25 et seq.). Contrary to Claimant's statements (K-SeA para. 18), this information concerns expenses related to the hospital system in Bata, not the future hospital or the portal clinics. In the absence of any other information provided by Claimant, it is appropriate to accept the maximum amounts as provided by Axel Regenhardt, i.e. monthly support and maintenance costs of **EUR 15,000**. These are to be applied over the entire remaining term of the Management Contract.

### f) *Additional Costs at the Central Office in Hamburg*

214    The additional costs calculated by PwC for the central office in Hamburg in the amount of **EUR 6,819** per month, consisting of recruitment costs, EPOS reports and the proportional monthly salaries and travel expenses of the employees working on the project at the central office (SPwC p. 20) are traceable and plausible. It should be noted that the higher costs of IT staff at headquarters from April to July 2011 for the completion of software development (50% of the work time of Axel Regenhardt, respectively 100% of the work time of Messrs. Smaka, Kanbari and Thies) were already considered as part of the software costs (cf. para. 211 above). The same applies to software support and maintenance costs (cf. para. 213 above).

### g) *Relevance of Project Costs for Portal Clinics*

215    Ulrich Marseille, on the occasion of the Evidentiary Hearing in connection with the expenditures saved, explained that the preparation of the project for the expansion of health care services in Equatorial Guinea (completion of a second clinic in Malabo and construction of portal clinics spread throughout the country) would have cost between EUR 80,000 and EUR 100,000 per month if this project had been continued. According to Ulrich Marseille,

these costs would initially have been covered out of the Management Fee (cf. WP Marseille, p. 106 N 22-33 and p. 107 N 1-7, p. 108 N 21 et seq., p. 109 et seq. ).

216     Claimant submits that it has, in reliance on the statements made by Respondent concerning the clinic in Malabo and the expansion of the satellite clinics and in anticipation of the Management Fee from a later Management Contract for the clinic in Malabo, already incurred expenses which were not remunerated and are, due to lack of factual relation to the Management Fee - according to the Management Contract of December 14, 2009 -, not to be considered as expenditures saved (K-SeA, para. 24). Respondent also states that Respondent's acquisition services are not related to the Management Contract. Claimant has voluntarily and at its own risk invested these costs in the hope of obtaining another contract (cf. B-SeA, para.18).

217     The Arbitration Tribunal considers Claimant's explanations regarding the testimony of Ulrich Marseille to be convincing; they are also recognized by Respondent. The Management Contract is limited to the hospital in Bata and does not include expenses in connection with other projects. The Management Fee was therefore a compensation for the expenses associated with the hospital in Bata. If Claimant used a surplus resulting from the Management Fee internally to pay Claimant's costs related to other planned projects, then it is irrelevant for the calculation of the saved expenditures under the Management Contract.

### h)     Overview of Expenditures Saved

| | Monthly Expenditure Savings | One-Time Expenditure Savings |
|---|---|---|
| **In EUR** | | |
| **1. Salary Expenses** | **59,583** | |
| Prof. Dr. Döhler (salary and bonus) | 27,083 | |
| Hr. Mensching (salary) | 5,833 | |
| Hr. Kronenberger (salary and bonus) | 16,667 | |

| | | |
|---|---|---|
| Hr. Gerard | 10,000 | |
| **2. Ancillary Salary Costs and** | | |
| **Travel Expenses** | **13,000** | |
| **3. External Legal and Consulting Fees** | **24,000** | |
| **4. Other Operational Expenses** | **15,000** | |
| **5. Advanced Training and Education** | **from budget** | |
| **6. Hospital Administration Software** | **15,000** | **118,091** |
| Software Development Costs | | 118,091 |
| Software Adaptation and Maintenance Costs | 15,000 | |
| **7. Costs at the Central Office in Hamburg** | **6,819** | |
| **Total** | **133,402** | **118,891** |

### 5.      Country Risk Assessment

218    In the Statement of Claim from April 26, 2016, Claimant suggested that the calculation of the Management Fee had to take into account the considerable economic risk which it incurred in concluding the contract for the management of the La Paz hospital in a developing country. Political unrest, changes in the law and other imponderables were taken into account by Claimant with regard to the question whether this would make the provision of its services significantly more difficult or impossible. As an example, Claimant mentions the conversion of the rules of the payment system (KS para. 191). In Procedural Decision No 11, Claimant was asked to express in figures how the country risk was taken into account or budgeted in the calculation of the Management Fee.

219    As Claimant itself points out and as PwC confirms, the country risk for Respondent is very high (SPwC para. 65 et seq.). It further follows from Claimant's statements that it

took that risk into account as a return on the monthly Management Fee. However, it does not specify the amount of the surcharge. According to Claimant, the surcharge cannot be quantified because Claimant has never made an exact cash value calculation (para. 91, K-SeA, para. 33 above). Respondent also provides no concrete information on the amount of the surcharge, but states that the risk of immediate termination at any time is already included in the Management Fee (para 115 et seq., B-SeA para. 30 et seq. above).

220   The country risk must be deducted from the Management Fee as Respondent is hereby obligated to continue to pay to Claimant the contractually agreed Management Fee minus expenses saved until the end of the regular contract term. Country risk is reflected in risks in the exchange of services caused by the geographical location, i.e. conditions at the place of exchange of services (SPwC, paras. 57-59). Risks in the exchange of services not only include the risk that the contract service becomes completely impossible to fulfill. They also include aggravations of services, e.g. due to a change in the law or a change in the realities during the provision of services (such as the conversion of the payment system rules referred to by Claimant; para. 218 above), which in turn may increase the cost of providing the service. These risks do not apply to Claimant from the moment it left Equatorial Guinea, i.e. from April 2011 (para.195 above), because it is assumed that both sides have fulfilled without any problems. The risk surcharge is therefore to be assessed as a financial benefit, which must be deducted in the event of risk-free fulfillment.

221   In principle, Respondent bears the burden of proof that Claimant must take into account the value of the benefits it gains (BK-Weber, Art. 107 N 206, Koller, OR AT [50] N 15). However, the actual basis for the assessment of this question must be supplied by Claimant, as it was requested by Procedural Decision No. 11. Because the deduction cannot be proven numerically, the Arbitration Tribunal must estimate the amount of the risk surcharge added to the monthly Management Fee, using analogous application of Art. 42 Section 2 OR. According to PwC's

and Claimant's assessment, the very high country risk must have led to a significant surcharge of the Management Fee. This is also reflected in the fact that after deducting the expenditures saved (excluding non-recurring expenses), a monthly amount of EUR 566,598 remains (EUR 700,000 – 133,402). Taking into account Claimant's investments in the amount of EUR 3,032,200 on a straight-line basis over the entire contract period of 5 years, it also results in a monthly amortization deduction of EUR 50,537. There remains a monthly return of EUR 516,061 (or EUR 6,192,732 annually). The level of the return suggests that the - significant - country risk was, accordingly, very seriously taken into account when setting the return. According to the best estimate of the Arbitration Tribunal, the consideration of the country risk amounted to two-thirds of the remaining return, i.e. at EUR 344,041 per month.

222    Claimant points out that the country risk for Respondent has proved to be true (K-SeA, para. 36). But that would have been the case only if the contract could have been terminated prematurely by Respondent without payment of compensation. In the present case, however, Respondent is obligated under the contractual arrangement to continue to pay Claimant the contractually agreed Management Fee minus expenditures saved until the end of the regular contract term. Thus, the monthly amount of EUR 344,041 as a risk surcharge is to be deducted from the amount of EUR 566,598 (= Management Fee minus expenditures saved) from April 2011 until the end of the regular term.

223    The fact that Claimant has sought additional security against the country risk by including an Arbitration Clause in the contract (K-SeA, para. 36) does not conflict with the request that the surcharge for the country risk is to be deducted from the Management Fee. On the contrary: Due to the Arbitration Proceedings carried out as a result of the Arbitration Clause, Respondent i

is obligated to pay Claimant the monthly fee owed until the expiration of the regular contract term, which in turn means that the country risk has not materialized.

## 6.    Other Income and Related Efforts

224    In Procedural Decision No 11, Claimant was also asked to comment on other types of income, which it was able to earn after the departure of the last employees from Equatorial Guinea on March 16, 2011 through other use of freed capacities (on-site and at the central office) and to prove it and to quantify it. In addition, Claimant had to show what efforts it had made to obtain other revenue.

225    Claimant has demonstrated convincingly that in March 2011 it had no other projects for which the external service providers (in particular Messrs. Kronenberger, Döhler and Gerard) deployed at the Bata project could have been used. It is also credible that it was unlikely that a comparable project would be found in the near future (K-SeA para. 41 et seq.). Therefore, in view of its obligation to reduce expenses – analogous to its duty to mitigate loss –, Claimant acted appropriately and reasonably by terminating as soon as possible those contractual relationships which could be terminated at short notice. As a consequence, the saved expenses for salaries for the people working on site are reflected in the saved expenditures (para. 207 above).

226    With regard to associates working on the Bata project at the central office in Hamburg, in particular the IT staff, Claimant notes that as of March 16, 2011, only a fraction of their time was dedicated to this project and that during the freed-up time they were working on other tasks for Marseille Kliniken AG, Hamburg (K-SeA, para. 48). Because Claimant credibly asserted that no replacement project could be found for the Bata project, neither in comparable or lesser size (K-SeA para. 41), a deduction for other income earned with these employees is not attributable.

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 114 of 221

## 7.    Amount of Compensation Owed

227    For the period from August 2010 until and including March 2011, Claimant requests to be granted 10% of the Management Fee due during this period. The Arbitration Tribunal concludes that the Management Fee is payable from the commencement of Phase B, i.e. from August 1, 2010, so that the partial amount of 10% owed until March 2011 amounts to **EUR 560,000** ([10% of EUR 700,000] x 8 months).

228    For the period from April 2011 to and including August 2012, Claimant also requests to be granted 10% of the Management Fee incurred during this period minus the expenditures saved by Claimant, amounting to EUR 112,000 per month. Due to the calculation of the Arbitration Tribunal, expenses of EUR 133,402 saved from the monthly Management Fee are to be deducted. In addition, the surcharge for the country risk, estimated by the Arbitration Tribunal at EUR 344,041, is to be deducted from the monthly fee. In addition, there is a deduction for one-time expenses of EUR 118,891 from the total amount during the period from April to July 2011 (para. 211 above). This results in an amount of EUR 3,664,578 ([EUR 700,000 – 133,402 – 344,041] x 17 – EUR 118,891). Of this amount, Claimant is to be awarded the appealed partial amount of 10%, i.e. **EUR 366,458**.

229    For the period from September 2012 to and including January 2015, the saved expenses of EUR 133,402 and the country risk surcharge of EUR 344,041 are also to be deducted from the monthly Management Fee. This results in an amount of **EUR 6,454,153** ([EUR 700,000 – 133,402 – 344,041] x 29).

230    Overall, Respondent owes Claimant the amount of **EUR 7,380,611**. To the extent beyond that, Claimant's claims must be dismissed.

231    Respondent's contingent claims for a determination of the date of termination of the contract are valid in so far as it must be stated that the Management Contract was properly terminated by January 31, 2015.

## VII.    INTEREST

232    On the basis of Article 104 Section 1 OR, Claimant requests interest at the rate of 5% from the due date of the Management Fee to be paid in accordance with Item 7 MV.

233    Pursuant to Art. 104 Section 1 OR, a debtor who is in arrears with the payment of a financial debt has to pay default interest of 5% per annum. According to Art. 7.2 and 7.3 of the MV, the Management Fee must be paid in full for one year in advance and is always due three months before the end of the current accounting year. Due to the agreement on a certain expiry date (Art. 102 Section 2 OR), Respondent thus was in default, in each case, three months before the end of the current accounting year. The Management Fee was owed from the start of Phase B (Item 6.2 MV); Phase B began on August 1, 2010 (para. 186 et seq. above.). The settlement year therefore included the period from August 1 to and including July 31 of the following year, so that the Management Fees for this annual period was to be paid, in each case, by April 30 of the current accounting year, and Respondent was in default for non-payment by May 1 of each respective year.

234    However, this does not apply to the first annual rate of the Management Fee. A specific expiration date for this rate cannot be assumed because the date of payment of the first Management Fee was dependent on an uncertain future event (start of Phase B) (BK OR-Weber Art. 102 N 114). With regard to the claims covering the period from August 1, 2010 to and including July 31, 2011, no default can therefore be assumed as of May 1, 2010. On the contrary, Claimant needed to issue a reminder in order to serve Respondent with a notice of default for the first annual Management Fee for Phase B (Article 102 Section 1 OR).

235     By letter from January 31, 2011, Claimant unequivocally requested from Respondent that
        Respondent is to pay the Management Fee for Phase B no later than February 18, 2011 (cf. K-
        38, p. 4). This letter is to be regarded as a reminder, which is why, for the Management Fee of
        EUR 637,134 (= (10% of [EUR 700,000x8]) + (10% of [((EUR700,000 − 133,402 −
        344,041)x4) − 118,891]) − incurred between August 1, 2010 and July 31, 2011 −, 5% interest is
        owed retroactively from February 18, 2011.

236     The continued interest owed is as follows:

        -    For the Management Fee during the period from August 1, 2011 to July 31,
             2012 in the amount of EUR 267,068 (= 10% of [(EUR 700,000 − 133,402 −
             344,041)x 12]), a default interest of 5% is owed as of May 1, 2011.

        -    For the Management Fee from August 1, 2012 to July 31, 2013 in the amount
             of EUR 2,470,383 (= (10% of [EUR 700,000 − 133,402 − 344,041]) + ([EUR
             700,000 − 133,402 − 344,041]x11)), a default interest of 5% is owed as of May
             1, 2012.

        -    For the Management Fee from August 1, 2013 to July 31, 2014 in the amount
             of EUR 2,670,684 (= [EUR 700,000 − 133,402 − 344,041x12), a default
             interest of 5% is owed as of May 1, 2013.
        -
        -    For the Management Fee from August 1, 2014 to January 31, 2015 in the
             amount of EUR 1,335,342 (= [EUR 700,000 − 133,402 − 344,041]x6), a
             default interest of 5% is owed as of May 1, 2014.

## VIII.    COSTS

## A.    Determination and Distribution of Arbitration Costs

237     According to Art. 38 Swiss Rules, the Arbitral Award must contain a determination of the costs
        of the Arbitration Proceedings.

238     Included in the costs of arbitration pursuant to Art. 38 Swiss Rules are, in accordance with Art.
        38 (a) and (b) Swiss Rules, the fees of the Arbitration Tribunal  and its expenses and,  in
        accordance with  Art. 38 (f), the registration fee and  administrative costs pursuant to Appendix
        B.

239    In addition, the Arbitral Award shall determine the costs the Parties incurred for legal representation and legal assistance to the extent considered appropriate by the Arbitration Tribunal (Article 38 (e) Swiss Rules), as well as the travel expenses and other expenses of Witnesses in the amount in which these expenses are approved by the Arbitration Tribunal (Art. 38 (d) Swiss Rules).

240    According to Art. 40 (l) Swiss Rules, the costs of the Arbitration Proceedings are in principle borne by the unsuccessful Party. However, the Arbitration Tribunal may apportion any kind of costs between both Parties if it deems it appropriate with regard to the circumstances of the case.

241    According to Art. 40 (2) Swiss Rules, the Arbitration Tribunal may, with regard to the costs of legal representation and legal assistance, determine, in accordance with Art. 38 (e), in consideration of the circumstances of the case, which Party is to bear the costs, or divide these costs between the Parties if it determines that apportionment is appropriate.

242    As regards the distribution of costs, Respondent, in its letter from April 6, 2017, requested that the costs of the additional exchange of written pleadings (arbitration and compensation of Parties) for the statement on expenditures saved (cf. Procedural Decision No 11) should be based, regardless of the outcome of the proceedings, on the costs-by-cause principle (Article 40 Swiss Rules).

243    In its statement from March 2017, Claimant proposed that Respondent already bears a substantial part of the total costs because of the delays in the Arbitration Proceedings which Respondent had caused.

244    The Arbitration Tribunal cannot accept any of these views. Neither has Claimant caused the need for an additional exchange of written pleadings regarding expenditures saved, nor did Respondent delay the arbitration. Instead, the costs are divided between successful and unsuccessful Party.

245 Claimant, with regard to its main claim, prevails and receives 14% (EUR 7,380,611 of EUR 53,891,600, rounded); Respondent, accordingly, prevails in its claim and receives 86%. On the other hand, Claimant prevailed in the question of the jurisdiction of the Arbitration Tribunal. In view of the subordinate burden of examining the question of jurisdiction regarding the examination of the main claim, the Arbitration Tribunal finds it appropriate that Claimant should bear 70% and Respondent 30% of the costs of the arbitration. Furthermore, Claimant must compensate Respondent for 70% of Respondent's incurred costs, which the Arbitration Tribunal considers appropriate, while Respondent must compensate Claimant for 30% of the latter's costs, which the Arbitration Tribunal considers appropriate.

## B. Costs of Arbitration Tribunal Proceedings and Administrative Costs

246 Pursuant to Art. 39 (l) and (2) Swiss Rules, fees and expenses of the Arbitration Tribunal shall be commensurate with the amount in dispute, the difficulty of the dispute, the time invested and all other relevant circumstances and shall be determined in accordance with Appendix B (Schedule of the Costs of Arbitration).

247 Pursuant to Art. 2.6 of Appendix B of the Swiss Rules, amounts in currencies other than the Swiss franc shall be converted into Swiss francs at the rate of exchange applicable at the time the Notice of Arbitration is received or at the time any new claim, counterclaim, set-off defense or amendment to a claim or defense is filed.

248 Claimant has asserted claims amounting to EUR 53,891,600 (para. 11 above). The value in dispute is therefore CHF 55,663,600, converted at the rate of exchange applicable at the time the Notice of Arbitration was received, namely on January 30, 2015[2] (cf. letter from Secretariat from February 13, 2015).

249 Given the amount in dispute of CHF 55,663,600, the administrative costs are CHF 45,566 (Articles 2.3 and 6 of Appendix B). .

---

[2] Currency exchange rate EUR/CHF based on www.oanda.com.

250    Based on Art. 39 (1) and (2) and Art. 40 (4) Swiss Rules and Art. 2.3 of Appendix B, the
       Arbitration Tribunal, with the approval of the Court, sets the compensation of the Arbitration
       Tribunal at CHF 678,434. This amount covers expenses of the Arbitration Tribunal of CHF
       4,30 1 .45 (costs of the Oral Hearings of CHF 1,375.75 [CHF 1,000 for the premises and CHF
       375.75 for meals] as well as costs for courier services and telephone conferences of CHF
       2,925.70) as well as the fee of the Arbitration Tribunal in the amount of CHF 674,132.55
       Based on Art. 39 (3) Swiss Rules, the Chairwoman receives 45% of the fee and the co-
       arbitrators 27.5% of the arbitrator's fee. The chairwoman's share of the fee also includes the fee
       of the secretary of the Arbitration Tribunal.

251    Claimant has paid the entire advance on costs of CHF 724,000. This advance covers all the fees
       and expenses of the Arbitration Tribunal and the administrative costs and is used to cover those
       costs. Because Respondent must bear 30% of these costs, it must reimburse Claimant for the
       amount of CHF 217,200.

252    In addition, Claimant paid a registration fee of CHF 8,000, of which Respondent must refund
       30% to Claimant, i.e. CHF 2,400.

**C.     Costs Incurred by Parties**

**1.     Costs Claimed by Claimant**

253    In its Statement of Costs from March 6, 2017, Claimant claims it incurred costs in the following
       amount: EUR 229,352.50 for  Attorney Knak-Kammenhuber, EUR 23,706.02 for Witnesses'
       travel expenses, EUR 5,098.62 for SD Steno Deutschland GmbH and CHF 195,389.15 for Prof.
       Dr. med. Bernd Reinmüller's attorney's fees.

254    By a supplementary opinion dated October 16, 2017, Claimant asserts further expenses for
       attorney's fees incurred since Procedural Decision No. 11 for Bernd Reinmüller in

the amount of CHF 24.347 and costs incurred through PwC's services for the preparation of the expert opinion amounting to EUR 63,090.62. Furthermore, Claimant corrects the attorney's fees of Prof. Dr. med. Reinmüller according to the entry of March 6, 2017, due to an invoice error, to CHF 196,058.85, resulting in a total of CHF 220,405.85 for the costs of his representation. The fact that, contrary to what is stated in Claimant's statement from October 16, 2017, this is a CHF instead of a EUR amount, can easily be substantiated through the enclosed invoices.

## 2.    Costs Claimed by Respondent

255    In its Statement of Costs submitted on March 7, 2017, Respondent demands reimbursement of the following costs: EUR 125,000 for Jean-Charles Tchikaya's attorney's fees, EUR 75,000 for Evuy Nguema Mukue's attorney's fees and CHF 250,000 for attorney's fees from FRORIEP.

256    With an additional statement from October 19, 2017, Respondent asserts further costs of legal representation by FRORIEP of CHF 26,073.45 for the expenses incurred from the time Procedural Decision No. 11 was issued. In addition, it is clear from the submission from November 3, 2017 that the attorney's fees for Jean-Charles Tchikaya and Francisco Evuy Nguema Mukue, as opposed to the statement from March 7, 2017, are now EUR 153,000 and EUR 100,000, respectively.

## 3.    Appropriateness of Costs Borne By Parties

257    With regard to the appropriateness of the costs incurred by the opposing Party, the Parties submitted the following comments:

258    In its submission to the Arbitration Tribunal from March 14, 2017, Respondent states that it leaves it to the Arbitration Tribunal to determine whether Claimant's alleged legal fees were identified in light of the fact that the Statement of Claim primarily repeats submissions

of the first arbitration claim. Respondent also noted that the travel costs at EUR 3,200 per person for Witnesses are very high.

259    In its statement from March 14, 2017, Claimant requested that the attorney's fees for Jean-Charles Tchikaya and Francisco Evuy Nguema Mukue should be dismissed because those gentlemen did not have any visibly detectable activity in the present arbitration.

260    The Arbitration Tribunal shall review the appropriateness of the asserted representation costs (Article 38 lit. e Swiss Rules). For this reason, the Arbitration Tribunal requested through Procedural Decision No. 14 from October 2, 2017 additional information about the composition of these costs. The Parties only partially complied with these requests, which is why the Arbitration Tribunal once again invited the Parties by Procedural Decision No 15 from October 23, 2017 to provide information on the hours worked by RA Knak-Kammenhuber, RA Tchikaya and RA Nguema Mukue and to subsequently file a sufficiently detailed summary of the work that they performed during this time. The Parties have been advised that they otherwise run the risk that the Arbitration Tribunal will not be able to verify the appropriateness of the asserted representation costs due to lack of information and that thus one of the requirements for reimbursement of these costs is no longer met.

261    With its statement submitted on November 3, 2017, Claimant listed the work RA Knak-Kammenhuber had carried out as a total of 693 hours and 40 minutes (cf. Supplement K-99).

262    On November 3, 2017, Respondent lodged a "Facture d'Honoraire Recapitulative" (= summary of fees; transl. note) from RA Tchikaya and an invoice from RA Nguema Mukue, both dated October 27, 2017. In these documents, RA Tchikaya and RA Nguema Mukue now claim, contrary to the statement from March 7, 2017, EUR 153,000 (instead of EUR 125,000) and EUR 100,000 (instead of EUR 75,000) for attorney's fees, respectively.

263    With regard to Claimant's own costs, the Arbitration Tribunal concludes that the attorney's fees claimed by Prof. Dr. Reinmüller amounting to CHF 220,405.85 due to the complexity of the case, the number of written pleadings to be submitted and the conducted Evidentiary Hearing, are thus reimbursable. Also reimbursable are the costs of EUR 23,706.02 for travel expenses of Witnesses, EUR 5,098.62 for SD Steno Deutschland GmbH and EUR 63,090.62 for PwC.

264    As regards the costs claimed for RA Knak-Kammenhuber, Claimant stated that RA Knak-Kammenhuber had calculated the fee in accordance with the German Lawyers' Remuneration Act, to which she was obligated under German law if no other remuneration had been negotiated with the client (Statement of Costs from March 6, 2017 and additional statement from October 16, 2017). Applicable for the present arbitration, however, is Art. 38 lit.e Swiss Rules, according to which the Arbitration Tribunal only reimburses the costs of disputing Parties that it considers appropriate (para. 260 above). After reviewing the summary of work carried out by RA Knak-Kammenhuber (Attachment K-99), the Arbitration Tribunal concludes that this list is very general with respect to the individual activities. In many places these activities are denoted as "review of records" and "assistance for Prof. Reinmüller" and "review of written submissions by Prof. Reinmüller". However, in that regard, the statement confirms what Claimant itself stated in its submission from October 16, 2017, namely that Mrs. Knak-Kammenhuber had performed an internal legal service to Claimant. Claimant explains that fact by not having its own legal department. However, such activities cannot be compensated by an external attorney's fee. However, Claimant gives no explanation as to an appropriate compensation for the services of an internal legal department and no sufficiently detailed account of the activities of RA Knak-Kammenhuber as a substitute for an internal legal service. For this reason, the costs of RA Knak-Kammenhuber are not reimbursable.

265     With respect to Respondent's own costs, the Arbitration Tribunal concludes that FRORIEP's attorney's fees amounting to CHF 250,000 and CHF 26,073.45 are appropriate and thus reimbursable, given the complexity of the case, the number of legal documents to be submitted and the Evidentiary Hearing conducted.

266     However, it is not possible to assess the appropriateness of the claimed costs for RA Tchikaya and RA Nguema Mukue, as they both lack an account of the number of hours worked and a sufficiently detailed summary of activities of RA Tchikaya and RA Nguema Mukue. The "Facture d'Honoraire Recapitulative" from October 27, 2017, submitted by RA Tchikaya, is limited to the number of hours worked (total 340 hours). Also, it is not clear from the invoice of RA Nguema Mukue from October 27, 2017 which work he has done for the claimed fixed fee. Because neither RA Tchikaya nor RA Nguema Mukue did appear at the Arbitration Tribunal, and due to the lack of this information, the Arbitration Tribunal cannot assess the volume of services they performed in relation to this case and whether they have been appropriate. Accordingly, the costs claimed in relation to their activities are not reimbursable.

267     Consequently, Claimant's reimbursable costs amount to CHF 220,405.85 and EUR 91,895.26 (= EUR 23,706.02 + 5,098.62 + 63,090.62); those of Respondent amount to CHF 276,073.45.

268     Claimant has to pay 70% of Respondent's costs, i.e. CHF 193,251.40. Respondent is responsible for 30% of Claimant's costs, i.e. CHF 66,121.75 and EUR 27,568.58 (for distribution cf. para. 245 above).

## IX. ARBITRAL AWARD

1. The Arbitration Tribunal shall be competent for the handling of the submitted claims.

2. Respondent's contingent request for suspension of the proceedings until Claimant has initiated the arbitration process followed by due process in Equatorial Guinea, and, having obtained a court decision, intends to seek recourse against it, is rejected.

3. Respondent's contingent request for suspension of the proceedings until Claimant has sought due process before the competent Courts in Equatorial Guinea, and, having obtained a court decision, intends to seek recourse against it, is rejected.

4. It is determined that the Management Contract dated December 14, 2009 was properly terminated as of January 31, 2015.

5. Respondent is obligated to pay Claimant a total of EUR 7,380,611 and a default interest of 5%

- from February 18, 2011 on EUR 637,134;

- from May 1, 2011 on EUR 267,068;

- from May 1, 2012 on EUR 2,470,383;

- from May 1, 2013 on EUR 2,670,684;

- from May 1, 2014 on EUR 1,335,342.

6. In all other regards, the claim is rejected.

7. Fees and costs of the Arbitration Tribunal were set at CHF 678,434 and administrative costs at CHF 45,566. These costs are deducted from Claimant's advance payment of CHF 724,000.

Arbitration No. 600413-2015       Arbitral Award       87/87

8.     Respondent is obligated to reimburse Claimant for Claimant's share of the fees and expenses of the Arbitration Tribunal as well as for administrative expenses in the amount of CHF 217,200 and for its share of the registration fee of CHF 2,400.

9.     Claimant is obligated to pay Respondent CHF 193,251.40 as compensation for Claimant's own costs incurred.

10.     Respondent is obligated to pay Claimant CHF 66,121.75 and EUR 27,568.58 as compensation for Respondent's own costs incurred.

11.     Written notices to the representatives of the Parties by e-mail and by registered letter, and to the co-arbitrators and the Secretariat of the Court by email and regular mail.

Place of Arbitration: Zürich

_____          _____

Dr. Felix Fischer            Melissa Magliana
Date: December 18, 2017        Date: December 14, 2017

_____

Dr. Andrea Meier

Date: December 18, 2017



CERTIFIED TRUE COPY
OF THE ORIGINAL.
Geneva, 12ᵗʰ March 2019.



APOSTILLE
(Convention de la haye du 5 octobre 1961)
1. Pays: Suisse
   Le présant acte public
2. a été signé par H. G. Defacqr.
3. agissant en qualité de notaire
4. est revêtu du sceau/timbre de N.

........................................................

                   Attesté
5. à Genève          6. le 1 3 MARS 2019
ville et Canton de Genève
               7. nel 026420
                          10. Signature

Andrea GIL FERNANDEZ

# Affidavit of Translation

STATE OF COLORADO
DENVER COUNTY

I, **Gabriella Bertelmann,** am fluent in English and German. I
hereby certify that I have translated/verified pages 01-49 and
reviewed pages 50-87 (translated/verified by Bernhard Sulzer) of
the documents attached to this Affidavit:

| | |
|---|---|
| **Document 1**: Original German document, with the following document title, arbitration number, and names of disputing parties to which the document pertains: | **Document 2:** Translation of Document 1, with the following document title, arbitration number, and names of disputing parties to which the document pertains: |
| **Document title** (top center of cover page under names of disputing parties and arbitration tribunal): **Schiedsspruch** | **Document title** (top center of cover page under names of disputing parties and arbitration tribunal): **Arbitral Award** |
| **Arbitration number** (top center of cover page and top left side of every other page): **Verfahrens-Nr. 600413-2015** | **Arbitration number** (top center of cover page and top left side of every other page): **Arbitration No. 600413-2015** |
| **Names of disputing parties** (top center of cover page: **Marseille-Kliniken AG/ Regierung der Republik Äquatorialguinea** | **Names of disputing parties** (top center of cover page): **Marseille-Kliniken AG/ Government of the Republic of Equatorial Guinea** |

I further certify that, to the best of my knowledge, the attached
document in English is a true and accurate translation of the
attached document in German.

_(Signature of Translator/Verifier)_
Gabriella Bertelmann

Subscribed to and sworn before me this ___26___ day of
___JUNE___, ___2019___, by _GABRIELLA BERTELMANN_

Signature of Notary Public - State of _COLORADO_ )
___KEVIN T SHIGIO___
Print, type or stamp commissioned name of Notary Public)

KEVIN T SHIGIO
NOTARY PUBLIC - STATE OF COLORADO
NOTARY ID 20024039063
MY COMMISSION EXPIRES DEC 28, 2022

# Affidavit of Translation

**STATE OF OHIO**
**COUNTY OF LUCAS**

I, **Bernhard Sulzer,** am fluent in English and German. I hereby certify that I have translated/verified pages 50-87 and reviewed pages 1-49 (translated/verified by Gabriella Bertelmann) of the documents attached to this Affidavit:

| | |
|---|---|
| **Document 1**: Original German document, with the following document title, arbitration number, and names of disputing parties to which the document pertains: | **Document 2**: Translation of Document 1, with the following document title, arbitration number, and names of disputing parties to which the document pertains: |
| **Document title** (top center of cover page under names of disputing parties and arbitration tribunal): **Schiedsspruch** | **Document title** (top center of cover page under names of disputing parties and arbitration tribunal): **Arbitral Award** |
| **Arbitration number** (top center of cover page and top left side of every other page): **Verfahrens-Nr. 600413-2015** | **Arbitration number** (top center of cover page and top left side of every other page): **Arbitration No. 600413-2015** |
| **Names of disputing parties** (top center of cover page: **Marseille-Kliniken AG/ Regierung der Republik Äquatorialguinea** | **Names of disputing parties** (top center of cover page: **Marseille-Kliniken AG/ Government of the Republic of Equatorial Guinea** |

I further certify that, to the best of my knowledge, the attached document in English is a true and accurate translation of the attached document in German.

_(Signature of Translator/Verifier)_
Bernhard Sulzer

Subscribed to and sworn before me this ___26ᵀᴸ___ day of
___June___, ___2019___, by ___Bernhard Sulzer___.

(Signature of Notary Public - State of ___Ohio___ )
___Nicholas Lavoy___
(Print, type or stamp commissioned name of Notary Public)

NICHOLAS LAVOY
Notary Public, State of Ohio
My Comm. Expires June 19, 2021
Recorded in Lucas County



Marseille-Kliniken AG / Regierung der Republik Äquatorialguinea

Swiss Chambers' Arbitration Institution
Verfahrens-Nr. 600413-2015

# Schiedsspruch

**Marseille-Kliniken AG,** Chamerstrasse 67, CH-6300 Zug

**Klägerin**

vertreten durch Prof. Dr. Bernd Reinmüller, Bory & Associés, Avocats, 1, Place Longe-
malle, CH-1204 Genève

gegen

**Regierung der Republik Äquatorialguinea**, Präsidentenpalast, Rue du 12 Octobre, Ma-
labo, Äquatorialguinea

**Beklagte**

vertreten durch Jean-Charles Tchikaya, Cabinet d'Avocats, 15, Cours Georges Clemen-
ceau, F-33000 Bordeaux

und/oder Francisco Evui Nguema Mukue, GETESA-MALABO, C/ Rey Bonkoro n°7, Ma-
labo, Äquatorialguinea

und/oder Peter J. Merz und/oder Dr. Lucien Valloni, Froriep, Bellerivestrasse 201,
CH-8034 Zürich

Vor dem Schiedsgericht bestehend aus:

Dr. Felix Fischer (Mitschiedsrichter)
Melissa Magliana (Mitschiedsrichterin)
Dr. Andrea Meier (Vorsitzende)

INHALTSVERZEICHNIS

| | | |
|---|---|---|
| I. | ABKÜRZUNGSVERZEICHNIS | 4 |
| II. | EINLEITUNG | 6 |
| A. | Streitgegenstand | 6 |
| B. | Parteien | 6 |
| | 1. Klägerin | 6 |
| | 2. Beklagte | 7 |
| C. | Schiedsgericht | 7 |
| D. | Rechtsbegehren der Parteien | 9 |
| | 1. Klägerin | 9 |
| | 2. Beklagte | 13 |
| E. | Schiedsklausel | 16 |
| F. | Sitz des Schiedsgerichts | 16 |
| G. | Anwendbares Recht | 16 |
| H. | Anwendbare Verfahrensregeln | 17 |
| III. | VERFAHRENSGESCHICHTE | 17 |
| IV. | SACHVERHALT | 25 |
| A. | Der Managementvertrag für die Poliklinik La Paz (Bata) vom 14. Dezember 2009 | 25 |
| B. | Rückzug der Klägerin aus Äquatorialguinea im März 2011 | 26 |
| C. | Erstes Schiedsverfahren und Abschluss des Übereinkunftsprotokolls vom 28. Mai 2015 | 26 |
| V. | PARTEIVORBRINGEN | 27 |
| A. | Position der Klägerin | 27 |
| B. | Position der Beklagten | 34 |
| VI. | ERWÄGUNGEN | 41 |
| A. | Zuständigkeit des Schiedsgerichts | 41 |
| | 1. Auswirkung des Übereinkunftsprotokolls auf Ansprüche aus dem Managementvertrag | 41 |
| | 2. Zuständigkeit des Schiedsgerichts aufgrund Schiedsklausel im Managementvertrag | 45 |
| B. | Materielles | 52 |
| | 1. Frage der Vertragsauflösung durch die Beklagte | 52 |
| | a) Qualifikation des Managementvertrags | 52 |
| | b) Frage der Anwendbarkeit von Art. 404 OR | 54 |

Case 1:20-cv-03572-RJL    Document 1-1    Filed 12/08/20    Page 130 of 221

| | | | |
|---|---|---|---|
| | 2. | Konkludente Kündigung durch die Beklagte auf Ende der ordentlichen Vertragsdauer | 59 |
| | 3. | Beginn und Ende der Laufzeit der Management Fee | 61 |
| | | a) Beginn Phase B | 61 |
| | | b) Ende der ordentlichen Vertragsdauer | 63 |
| | | c) Ergebnis | 64 |
| | 4. | Ersparte Aufwendungen | 64 |
| | | a) Ergänzende Angaben der Klägerin zu den ersparten Aufwendungen unter Beizug eines Wirtschaftsprüfers | 64 |
| | | b) Aus der Management Fee zu bestreitende Ausgaben | 66 |
| | | c) Gehaltsaufwendungen, Gehaltsnebenkosten, externe Rechts- und Beratungskosten sowie sonstige betriebliche Aufwendungen | 67 |
| | | d) Fortbildungen und Schulungen | 68 |
| | | e) Software für die Krankenhausadministration | 68 |
| | | aa) Software-Entwicklungskosten | 68 |
| | | bb) Software-Anpassungs- und Wartungskosten | 69 |
| | | f) Weitere Kosten bei der Zentrale in Hamburg | 70 |
| | | g) Relevanz der Kosten für das Projekt betreffend Portalkliniken | 70 |
| | | h) Übersicht ersparte Aufwendungen | 71 |
| | 5. | Bewertung Länderrisiko | 72 |
| | 6. | Anderweitiger Erwerb und Bemühungen in diesem Zusammenhang | 75 |
| | 7. | Höhe der geschuldeten Entschädigung | 76 |
| VII. | | **ZINS** | 77 |
| VIII. | | **KOSTEN** | 78 |
| A. | | Festlegung und Verteilung der Kosten des Schiedsverfahrens | 78 |
| B. | | Kosten des Schiedsgerichts und Verwaltungskosten | 80 |
| C. | | Parteikosten | 81 |
| | 1. | Geltend gemachte Parteikosten der Klägerin | 81 |
| | 2. | Geltend gemachte Parteikosten der Beklagten | 82 |
| | 3. | Angemessenheit der geltend gemachten Parteikosten | 82 |
| IX. | | **SCHIEDSSPRUCH** | 86 |

Case 1:20-cv-03572-RJL    Document 1-1    Filed 12/08/20    Page 132 of 221

## 1.  ABKÜRZUNGSVERZEICHNIS

| | |
|---|---|
| Appendix B | Kostenordnung gemäss Swiss Rules, in Kraft ab 1. Juni 2012 |
| B-KN | Kostennote der Beklagten vom 7. März 2017 |
| B-SB | Stellungnahme der Beklagten vom 28. Februar 2017 zum Beweisergebnis |
| B-SeA | Stellungnahme der Beklagten vom 14. August 2017 zur K-SeA |
| Erster Schieds-spruch | Schiedsspruch vom 5. Dezember 2014 im Schiedsverfahren Nr. 600257-2011 |
| Erstes Schiedsver-fahren | Swiss Rules Schiedsverfahren Nr. 600257-2011 (mit Schiedsspruch vom 5. Dezember 2014 beendet) |
| MV | Managementvertrag für die Poliklinik La Paz (Bata) vom 14. Dezember 2009 (= Beilage K-1) |
| KA | Klageantwort vom 13. Juli 2016 |
| K-KN | Kostennote der Klägerin vom 6. März 2017 |
| KS | Klageschrift vom 26. April 2016 |
| K-SB | Stellungnahme der Klägerin vom 28. Februar 2017 zum Beweisergebnis |
| K-SeA | Stellungnahme der Klägerin vom 29. Mai 2017 zu den ersparten Aufwendungen |
| Sekretariat | Sekretariat des Schiedsgerichtshofs der Swiss Chambers' |

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 133 of 221

| | Arbitration Institution |
|---|---|
| SPwC | Stellungnahme der PricewaterhouseCoopers GmbH vom 24. Mai 2017 zu den ersparten Aufwendungen im Auftrag der Klägerin (= Beilage K-93) |
| WP | Wortprotokoll über die Schiedsverhandlung vom 5. Dezember 2016 |
| ZE | Zeugenerklärung |

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 134 of 221

## II.    EINLEITUNG

### A.    Streitgegenstand

1    Dem zu beurteilenden Streit liegt ein von den Parteien geschlossener Management-vertrag betreffend die Poliklinik La Paz (Bata) vom 14. Dezember 2009 (*Contrato de gestión del Hospital Policlínico La Paz (Bata))* ("**Managementvertrag**" oder "**MV**", Beilage K-1) zugrunde. Die Klägerin verlangt von der Beklagten die Bezahlung eines Honorars ("**Management Fee**") über EUR 53'891'600 zzgl. Zinsen. Die Beklagte erhebt die Einrede der Unzuständigkeit des angerufenen Schiedsgerichts. Zudem bestreitet sie die Forderung der Klägerin und macht geltend, der Manage-mentvertrag sei aufgelöst worden.

### B.    Parteien

### 1.    Klägerin

2    Die Klägerin, **Marseille-Kliniken AG**, ist eine nach Schweizer Recht organisierte Gesellschaft mit folgendem Sitz:

Chamerstrasse 67
6300 Zug
Schweiz

3    Die Klägerin ist vertreten durch:

**Prof. Dr. Bernd Reinmüller**
Bory & Associés, Avocats
1, Place Longemalle
1204 Genève
Schweiz
Telefon:  +41 22 718 88 44
Fax:       +41 22 718 88 48
E-Mail:   bre@verslaw.ch

### 2. Beklagte

4    Die Beklagte ist die **Regierung der Republik Äquatorialguinea** mit folgender offizieller Anschrift:

Präsidentenpalast
Rue du 12 Octobre
Malabo
Äquatorialguinea

5    Die Beklagte ist vertreten durch:

**Jean-Charles Tchikaya**
Cabinet d'Avocats
15, Cours Georges Clemenceau
F-33000 Bordeaux
E-Mail:  jctchikaya@avocatline.fr

**Francisco Evui Nguema Mukue**
GETESA-MALABO
C/ Rey Bonkoro n°7
Malabo
Äquatorialguinea
E-Mail:  sejomse@gmail.com

**Peter J. Merz und/oder Dr. Lucien Valloni**
Froriep Legal AG
Bellerivestrasse 201
CH-8034 Zürich
Telefon:  +41 44 386 60 00
E-Mail:  pmerz@froriep.ch
             lvalloni@froriep.ch

### C. Schiedsgericht

6    Das Schiedsgericht wurde nach den Regeln der Internationalen Schweizerischen Schiedsordnung (**"Swiss Rules"**, in Kraft seit Juni 2012) konstituiert.

7    Der durch die Klägerin bezeichnete und durch den Schiedsgerichtshof der Swiss Chambers' Arbitration Institution (**"Gerichtshof"**) bestätigte Mitschiedsrichter ist:

**Dr. Felix Fischer**
BodmerFischer AG
Limmatquai 94
Postfach 3978
8021 Zürich
Schweiz
Telefon:   +41 44 711 71 71
Fax:        +41 44 711 71 11
E-Mail:   fischer@bodmerfischer.ch

8   Die infolge Säumnis der Beklagten durch den Gerichtshof ernannte Mitschieds-
    richterin ist:

**Melissa Magliana, J.D.**
Homburger AG
Prime Tower
Hardstrasse 201
8005 Zürich
Schweiz
Telefon:   +41 43 222 10 00
Fax:        +41 43 222 15 00
E-Mail:   melissa.magliana@homburger.ch

9   Die durch die Mitschiedsrichter bezeichnete und durch den Gerichtshof bestätigte
    Vorsitzende des Schiedsgerichts ist:

**Dr. Andrea Meier**
Wartmann & Merker
Kirchgasse 48
8024 Zürich
Schweiz
Telefon:   +41 44 212 10 11
Fax:        +41 44 212 15 11
E-Mail:   a.meier@wartmann-merker.ch

10  Die mit dem Einverständnis der Klägerin und ohne Widerspruch der Beklagten, die
    sich nicht hat vernehmen lassen, vom Schiedsgericht ernannte Sekretärin ist:

**Gerarda Coppola**
Wartmann & Merker
Kirchgasse 48
8024 Zürich

Schweiz
Telefon: +41 44 212 10 11
Fax:      +41 44 212 15 11
E-Mail: g.coppola@wartmann-merker.ch

## D.    Rechtsbegehren der Parteien

## 1.    Klägerin

11    In der Einleitungsanzeige vom 28. Januar 2015 stellte die Klägerin folgendes Rechtsbegehren:

> *Die Beklagte sei zu verpflichten, der Klägerin gestützt auf den Managementvertrag vom 14. Dezember 2009 CI-1 €53'891'600 zu bezahlen, nebst Zins zu 5 % ab Fälligkeit der einzelnen Teilansprüche bzw. monatlichen Vergütungen.*
>
> *Unter Kosten- und Entschädigungsfolgen zu Lasten der Beklagten.*

12    Dieses Rechtsbegehren präzisierte die Klägerin in der Klageschrift vom 26. April 2016 wie folgt:

> *I. In Bezug auf die Zuständigkeit des Schiedsgerichts beantrage ich folgendes zu erkennen:*
>
> *1. Das Schiedsgericht ist für die Beurteilung der Streitigkeit zwischen den Parteien zuständig.*
>
> *2. Der Beklagten werden alle Kosten im Zusammenhang mit der Frage der Zuständigkeit des Schiedsgerichts auferlegt, unabhängig vom Ausgang des Verfahrens in der Hauptsache.*
>
> *3. Die Kosten des Schiedsgerichts werden im Rahmen des Entscheids zur Hauptsache entschieden.*
>
> *II. In Bezug auf das Klagebegehren beantrage ich folgendes zu erkennen:*
>
> *1. Die Beklagte hat an die Klägerin, gestützt auf den Managementvertrag vom 14. Dezember 2009 für die Polyklinik „La Paz" (Bata), für die Monate August bis und mit Dezember 2010 und die Monate Januar bis und mit März 2011 den Teilbetrag von 10 % von 5.600.000,00 EURO, ergebend 560.000,00 EURO nebst 5 % Zinsen*

- *aus 560.000,00 EURO seit dem 01.05.2010*

*zu bezahlen.*

2. *Die Beklagte hat an die Klägerin für die Monate ab April 2011 bis und mit Dezember 2011 und die Monate Januar 2012 bis und mit August 2012 je 700.000,00 EURO abzüglich eingespartem Aufwand von monatlich 112.000,00 EURO, d.h. 588.000,00 EURO pro Monat, multipliziert mit 17 Monaten, ergebend 9.996.000,00 EURO, und hiervon einen Teilbetrag von 10 %, d.h. 999.600,00 EURO nebst 5 % Zinsen*

   - *aus 235.200,00 EURO seit dem 01.05.2010 und*

   - *aus 705.600,00 EURO seit dem 01.05.2011 und*

   - *aus 58.800,00 EURO seit dem 01.05.2012*

   *zu bezahlen.*

3. *Die Beklagte hat an die Klägerin für die Monate ab September 2012 bis und mit Januar 2015 je 700.000,00 EURO abzüglich erspartem Aufwand von monatlich 112.000,00 EURO, d.h. 588.000,00 EURO pro Monat, multipliziert mit 29 Monaten, ergebend 17.052.000,00 EURO nebst 5 % Zinsen*

   - *aus 6.468.000,00 EURO seit dem 01.05.2012*

   - *aus 7.056.000,00 EURO seit dem 01.05.2013*

   - *aus 3.528.000,00 EURO seit 01.05.2014*

   *zu bezahlen.*

4. *Die Beklagte hat an die Klägerin für die Monate ab Februar 2015 bis und mit Juli 2015 je 700.000,00 EURO abzüglich ersparter Aufwendungen von monatlich 112.000,00 EURO, d.h. 588.000,00 EURO pro Monat multipliziert mit 6 Monaten, ergebend 3.528.000,00 EURO nebst 5 % Zinsen*

   - *aus 3.528.000,00 EURO seit dem 01.05.2014*

   *zu bezahlen.*

5. *Die Beklagte hat an die Klägerin für die Monate ab August 2015 bis und mit Juli 2016 je 700.000,00 EURO abzüglich erspartem Aufwand von monatlich 112.000,00 EURO, d.h. 588.000,00 EURO pro Monat multipliziert mit 12 Monaten, ergebend 7.056.000,00 EURO nebst 5 % Zinsen*

   - *aus 7.056.000,00 EURO seit dem 01.05.2015*

   *zu bezahlen.*

6. Die Beklagte hat an die Klägerin für die Monate ab August 2016 bis und mit Juli 2017 je 700.000,00 EURO abzüglich des ersparten Aufwands von monatlich 112.000,00 EURO, d.h. 588.000,00 EURO pro Monat multipliziert mit 12 Monaten, ergebend 7.056.000,00 EURO nebst 5 %

   - aus 7.056.000,00 EURO seit dem 01.05.2016

   zu bezahlen.

7. Es wird auf Antrag der Klägerin festgestellt, dass der Managementvertrag von 14. Dezember 2009 nicht aufgelöst ist und über den 31. Januar 2015 hinaus auch ab August 2017 bis und mit Januar 2020 fortbesteht,

   und ferner festgestellt,

   dass die Beklagte verpflichtet ist, die vertraglich vereinbarte, jährlich drei Monate vor Ablauf des Abrechnungsjahres im Voraus in einer Summe zu leistende Management Fee für das jeweilige Folgejahr gemäß Ziffer 7.2 des Managementvertrages vom 14. Dezember 2009 bei Fälligkeit der einzelnen Jahresraten in Höhe von 8.400.000,00 EURO abzüglich erspartem Aufwand von 112.000,00 EURO monatlich multipliziert mit 12 Monaten, d.h. 588.000,00 EURO pro Monat multipliziert mit 12 Monaten, ergebend 7.056.000,00 EURO jährlich bis zum Ablauf des Managementvertrages bis und mit Januar 2020 zu bezahlen und bei Verzug nebst 5 % Zinsen seit Fälligkeit der jeweiligen Jahresrate für den Zeitraum ab 1. August 2017 bis und mit 31. Juli 2018 ab dem 01.05.2017, für den Zeitraum ab 1. August 2018 bis mit 31. Juli 2019 ab dem 01.05.2018 und für den Zeitraum ab 1. August 2019 bis und mit 31. Januar 2020 ab dem 01.05.2019.

8. Die Kosten und Entschädigungslasten des Schiedsverfahren trägt die Beklagte, auf jeden Fall in Höhe des von ihr wegen Säumnis nicht eingezahlten Kostenvorschusses.

9. Ferner beantragen wir die Zulassung und Annahme weiterer Ausführungen und Beweismittel, insbesondere aus dem Entscheid zur Zuständigkeit des Schiedsgerichts vom 16. September 2013 in dem Schiedsverfahren Nr. 600257-2011 und aus dem Schiedsverfahren Nr. 600257-2011 zur Änderung/Ergänzung und Konkretisierung des Vortrags (nebst Klageanträgen) der Klägerin durch das Schiedsgericht.

13    In der Replik vom 16. September 2016 ergänzte die Klägerin ihr Begehren wie
      folgt:

> 1. *Der Antrag zu 1.) der Beklagten, festzustellen, dass die Einrede der Beklagte zur Unzuständigkeit des Schiedsgerichts zulässig und begründet ist, ist abzuweisen.*
>
> 2. *Der Antrag zu 2.) der Beklagten, dass sich das Schiedsgericht für den ihm vorgelegten Rechtsstreit insgesamt für unzuständig erklärt, ist abzuweisen.*
>
> 3. *Die klägerischen Anträge zur Zuständigkeit (A.I. 1-3 Klagebegründung) sind zu erkennen.*
>
> 4. *Die Eventualanträge zu den Anträgen 1 und 2 der Beklagten:*
>
>    *a) Das Schiedsgericht sistiert das Verfahren, bis das von der Klägerin einzuleitende Schlichtungsverfahren und hernach das ordentliche Gerichtsverfahren in Äquatorialguinea mit Urteil entschieden ist und sich die Klägerin dagegen zur Wehr setzen will.*
>
>    *b) Das Schiedsgericht sistiert das Verfahren, bis das von der Klägerin einzuleitende ordentliche Gerichtsverfahren vor den zuständigen Gerichten in Äquatorialguinea mit Urteil entschieden und sich die Klägerin dagegen zur Wehr setzen will.*
>
>    *sind abzuweisen.*
>
> 5. *Die Beklagte trägt die Kosten des Schiedsverfahrens (inklusive einer angemessenen durch das Schiedsgericht zuzusprechenden Parteientschädigung zugunsten der Klägerin).*
>
> 6. *Die Anträge 1 bis 7 der Beklagten auf den Seiten 3 und 4 der Klageantwort vom 13. Juli 2016 sind kostenpflichtig abzuweisen.*
>
> *Die Klägerin beantragt darüber hinaus nunmehr – neben den bereits in der Klagebegründung gestellten Anträgen 1-6 – anstelle des bisherigen Feststellungsbegehren nach Antrag 7 der Klägerin in ihrer Klagebegründung vom 26. April 2016 – folgendes zu erkennen:*
>
> 7. *a) Es wird festgestellt, dass der Managementvertrag vom 14. Dezember 2009 nicht aufgelöst ist und über den 31. Januar 2015 hinaus auch ab August 2017 bis und mit Januar 2020 fortbesteht.*

*b) Die Beklagte hat an die Klägerin die vertraglich vereinbarte, jährlich drei Monate vor Ablauf des Abrechnungsjahres im Voraus in einer Summe zu leistende Management Fee für das jeweilige Folgejahr gemäß Ziffer 7.2 des Managementvertrages vom 14. Dezember 2009 bei Fälligkeit der einzelnen Jahresraten in Höhe von 8.400.000,00 EURO abzüglich erspartem Aufwand von 112.000,00 EURO monatlich multipliziert mit 12 Monaten, ergebend 7.056.000,00 EURO jährlich bis zum Ablauf des Managementvertrages bis und mit Januar 2020 zu bezahlen und bei Verzug nebst 5 % Zinsen seit Fälligkeit der jeweiligen Jahresrate für den Zeitraum ab 1. August 2017 bis und mit 31. Juli 2018 ab dem 1. Mai 2017, für den Zeitraum an 1. August 2018 bis und mit 31. Juli 2019 ab dem 1 Mai 2018 und für den Zeitraum ab 1. August 2019 bis und mit 31. Januar 2020 ab dem 1 Mai 2019,*

*hilfsweise:*

*Die Beklagte hat an die Klägerin als entgangenen Gewinn für die Monate ab August 2017 bis und mit Januar 2020 je 700.000,00 EURO pro Monat abzüglich des ersparten Aufwands in Höhe von 112.000,00 pro Monat, d.h. 588.000,00 EURO pro Monat multipliziert mit 30 Monaten, ergebend, 17.640.000,00 EURO nebst 5 % Zinsen aus 17.640.000,00 EURO seit dem 14. Juli 2016 zu bezahlen.*

*Die Klageanträge 8. und 9. in der Klagebegründung werden weiterhin gestellt.*

## 2.    Beklagte

14    In der Klageantwort vom 13. Juli 2016 stellte die Beklagte folgendes Rechtsbegehren:

1. *Das Schiedsgericht stellt fest, dass die Einrede der Beklagten zur Unzuständigkeit des Schiedsgerichts zulässig und begründet ist.*

2. *Das Schiedsgericht erklärt sich für den ihm vorgelegten Rechtsstreit insgesamt für unzuständig.*

3. *Die klägerischen Anträge zur Zuständigkeit (A.I.1 bis 3 Klagebegründung) sind abzuweisen, soweit überhaupt auf sie einzutreten ist.*

4. *Eventualantrag zu den Anträgen 1 und 2:*

   a) *Das Schiedsgericht sistiert das Verfahren, bis das von der Klägerin einzuleitende Schlichtungsverfahren und hernach das ordentliche Gerichtsverfahren in Äquatorialguinea mit Urteil entschieden und sich die Klägerin dagegen zur Wehr setzen will.*

   b) *Das Schiedsgericht sistiert das Verfahren, bis das von der Klägerin einzuleitende ordentliche Gerichtsverfahren vor den zuständigen Gerichten in Äquatorialguinea mit Urteil entschieden und sich die Klägerin dagegen zur Wehr setzen will.*

5. *Die Klägerin trägt die Kosten des Schiedsverfahrens (inkl. einer angemessenen durch das Schiedsgericht zuzusprechenden Parteientschädigung zugunsten der Beklagten).*

*und für den Fall, dass sich das Schiedsgericht für zuständig erklären würde, mit folgenden*

## ANTRÄGEN:

1. *Das Schiedsgericht weist die Klage der Klägerin vollumfänglich ab, soweit darauf einzutreten ist.*

2. *Eventualantrag zum Antrag 1:*

   *Das Schiedsgericht stellt fest, dass der Managementvertrag vom 14. Dezember 2009 spätestens im März 2011 mit sofortiger Wirkung aufgelöst wurde und weist die Klage im Umfang der Anträge II.2 bis II.9 (Klagebegründung) ab.*

3. *Eventualantrag zum Antrag 2:*

   *Das Schiedsgericht stellt fest, dass der Managementvertrag vom 14. Dezember 2009 spätestens am 12. September 2011 mit sofortiger Wirkung aufgelöst wurde und weist die Klage im Umfang der Anträge II.2 bis 9 (Klagebegründung) ab.*

4. *Eventualantrag zum Antrag 3:*

   *Das Schiedsgericht stellt fest, dass der Managementvertrag vom 14. Dezember 2009 jedenfalls auf 14. Dezember 2014 aufgelöst wurde und weist die Klage im Umfang der Anträge II.4 bis 9 (Klagebegründung) ab.*

5. *Eventualantrag zum Antrag 4:*

   *Das Schiedsgericht stellt fest, dass der Managementvertrag vom 14. Dezember 2009 spätestens mit Abschluss der Vereinbarung vom 26. Mai 2015 mit sofortiger Wirkung aufgelöst wurde und*

> *weist die Klage im Umfang der Anträge II.6 bis 9 (Klagebe-gründung) ab.*

6. *Eventualantrag zum Antrag 5:*

   *Das Schiedsgericht stellt fest, dass der Managementvertrag vom 14. Dezember 2009 spätestens mit Zustellung dieser Klageant-wort an die Klägerin mit sofortiger Wirkung aufgelöst wurde und weist die Klage im Umfang der Anträge II.6 bis 9 (Klage-begründung) ab.*

7. *Die Klägerin trägt die Kosten des Schiedsverfahrens (inkl. einer angemessenen durch das Schiedsgericht zuzusprechenden Par-teientschädigung zugunsten der Beklagten).*

15   Zudem stellt die Beklagte am 19. Oktober 2017 duplicando folgende Anträge (vgl. Duplik S. 5):

1. *Der in der Replik vom 16. September 2016 gestellte Antrag 1 ("Der Antrag zu 1.) der Beklagten, festzustellen, dass die Einre-de der Beklagten zur Unzuständigkeit des Schiedsgerichts zuläs-sig und begründet ist, ist abzuweisen") ist abzuweisen.*

2. *Der in der Replik vom 16. September 2016 gestellte Antrag 2 ("Der Antrag zu 2.) der Beklagten, dass sich das Schiedsgericht für den ihm vorgelegten Rechtsstreit insgesamt für unzuständig erklärt ist abzuweisen") ist abzuweisen.*

3. *Der in der Replik vom 16. September 2016 gestellte Antrag 3 ("Die klägerischen Anträge zur Zuständigkeit (A.I. 1-3 Klage-begründung) sind zu erkennen") ist abzuweisen.*

4. *Der in der Replik vom 16. September 2016 gestellte Antrag 4 ("Die Eventualanträge zu den Anträgen 1 und 2 der Beklag-ten[...]") ist abzuweisen.*

5. *Der in der Replik vom 16. September 2016 gestellte Antrag 5 ("Die Beklagte trägt die Kosten [...]") ist abzuweisen.*

6. *Der in der Replik vom 16. September 2016 gestellte Antrag 6 ("Die Anträge 1 bis 7 der Beklagten auf den Seiten 3 und 4 [...]") ist abzuweisen.*

7. *Der in der Replik vom 16. September 2016 gestellte Antrag 7a ("Es wird festgestellt, dass der Managementvertrag [...] nicht aufgelöst ist [...]") ist abzuweisen.*

8. *Der in der Replik vom 16. September 2016 gestellte Antrag 7c ("Die Beklagte hat an die Klägerin die vertraglich vereinbarte,*

> *jährlich drei Monate vor Ablauf des Abrechnungsjahres im Voraus in einer Summer zu leitenden Management Fee [...]") ist abzuweisen.*

9. *Der in der Replik vom 16. September 2016 hilfsweise gestellte Antrag 7b ("Die Beklagte hat an die Klägerin als entgangener Gewinn für die Monate ab August 2017 [...]") ist abzuweisen.*

## E.    Schiedsklausel

16    Die Klägerin beruft sich im vorliegenden Schiedsverfahren auf die Schiedsklausel gemäss Art. 14 Abs. 3 des Managementvertrages:

> Deutsche Fassung:
>
> *Bei Streitigkeiten aus diesem Vertrag, werden die Parteien versuchen vor der Anrufung der Gerichte von Guinea Ecuatorial eine einvernehmliche Lösung zu finden. Für den Fall von Streitigkeiten verpflichten sich die Parteien ein Schiedsverfahren vor der Handelskammer in Zürich durchzuführen.*
>
> Spanische Fassung:
>
> *En caso de litigio, las partes se sentarán para resolver amigablemente el problema, caso contrario se dirigiarán a los tribunales de Guinea Ecuatorial. En caso de desacuerdo de una de las partes, podrá recurrir al tribunal de la Cámara de Comercio de Zurich.*

## F.    Sitz des Schiedsgerichts

17    Der Gerichtshof legte Zürich, Schweiz, als Sitz des Schiedsgerichtes fest.

## G.    Anwendbares Recht

18    Das Schiedsgericht hat mit Zwischenentscheid vom 15. März 2016 entschieden, dass die vorliegende Streitsache dem schweizerischen Recht untersteht.

**H.     Anwendbare Verfahrensregeln**

19      Dieses Schiedsverfahren untersteht den Swiss Rules, Art. 176 ff. des Bundes-
        gesetzes über das Internationale Privatrecht (IPRG) und den besonderen Verfah-
        rensregeln, welche im Verfahrensleitenden Beschluss Nr. 1 vom 16. Dezember
        2015 festgehalten sind und das Schiedsgericht im weiteren Verfahren erlassen hat.

**III.    VERFAHRENSGESCHICHTE**

20      Die Klägerin leitete das vorliegende Schiedsverfahren mit Einleitungsanzeige vom
        28. Januar 2015 an das Sekretariat des Schiedsgerichtshofs der Swiss Chambers'
        Arbitration Institution ("**Sekretariat**") ein. Mit Schreiben vom 13. Februar 2015
        forderte das Sekretariat die Beklagte auf, innert 30 Tagen ihre Einleitungsantwort
        einzureichen, in welcher sie sich auch zur Anzahl der Schiedsrichter und zur Ver-
        fahrenssprache äussern sollte. Des Weiteren wurden die Parteien eingeladen, sich
        innert 30 Tagen auf einen Sitz des Schiedsverfahrens zu einigen.

21      Mit Schreiben vom 11. März 2015 teilte die Klägerin mit, dass sie bezüglich des
        Sitzes des Schiedsverfahrens mangels Rückmeldung der Beklagten keine Einigung
        mit ihr hatte finden können.

22      Mit Schreiben vom 20. April 2015 hielt das Sekretariat fest, dass die Beklagte in-
        nert Frist keine Einleitungsantwort eingereicht und sich nicht zur Anzahl der
        Schiedsrichter geäussert und sich die Parteien nicht auf einen Sitz des Schiedsver-
        fahrens geeinigt hatten. Der Gerichtshof hatte die Streitsache daher in Anwendung
        von Art. 6(1) und 6(2) Swiss Rules einem Dreierschiedsgericht zugewiesen. Die
        Klägerin wurde aufgefordert, innert 15 Tagen ein Mitglied des Schiedsgerichts zu
        bezeichnen, die Beklagte innert 30 Tagen. Das Sekretariat informierte die Parteien
        überdies, dass der Gerichtshof gemäss Art. 16 (1) Swiss Rules den Sitz des
        Schiedsverfahrens selber bestimmen oder das Schiedsgericht auffordern werde,
        diesen zu bestimmen. Die Klägerin bezeichnete daraufhin mit Schreiben vom
        1. Mai 2015 Dr. Felix Fischer als Schiedsrichter.

Case 1:20-cv-03572-RJL Document 1-1 Filed 12/08/20 Page 146 of 221

23    Mit E-Mail vom 5. Mai 2015 teilte Rechtsanwalt Jean-Charles Tchikaya dem Sek-
      retariat mit, dass er die Beklagte vertrete, und bat um Zustellung der Einleitungsan-
      zeige. Er wiederholte diese Mitteilung mit E-Mail vom 11. Mai 2015, welche er
      auch dem Rechtsvertreter der Klägerin zustellte (vgl. Beilage K-66). Mit Schreiben
      vom 3. Juli 2015 forderte das Sekretariat Rechtsanwalt Tchikaya auf, eine Voll-
      macht einzureichen. Dieser Aufforderung kam er in der Folge aber nicht nach.

24    Mit E-Mail vom 8. Juli 2015 teilten stattdessen die Rechtsanwälte Dr. Sergio Esono
      Abeso Tomo und Francisco Evui Nguema mit, dass sie die Beklagte vertreten.

25    Mit Schreiben vom 25. September 2015 informierte das Sekretariat die Parteien,
      dass der Gerichtshof den von der Klägerin bezeichneten Schiedsrichter Dr. Felix
      Fischer bestätigt und gestützt auf Art. 5(1) Swiss Rules Frau Melissa Magliana als
      Mitglied des Schiedsgerichts ernannt hatte. Mit Schreiben vom 5. November 2015
      wurden die Parteien darüber informiert, dass der Gerichtshof Dr. Andrea Meier als
      Vorsitzende des Schiedsgerichts bestätigt hatte.

26    Mit Schreiben vom 9. November 2015 schlug das Schiedsgericht den Parteien ver-
      schiedene Daten für eine Organisationssitzung zwecks Besprechung der Verfah-
      rensregeln und des Provisorischen Zeitplans vor. Ausserdem setzte das Schiedsge-
      richt den Kostenvorschuss auf CHF 724'000 fest und forderte die Parteien auf, je
      die Hälfte, d.h. je CHF 362'000, innert 20 Tagen zu bezahlen. Dieses Schreiben
      konnte dem Vertreter der Klägerin am 10. November 2015 sowie den Vertretern
      der Beklagten am 11. November 2015, der Beklagten selbst erst am 20. November
      2015 per Kuriersendung zugestellt werden.

27    Die Klägerin teilte mit Schreiben vom 16. November 2015 ihre Verfügbarkeit für
      eine Organisationssitzung am 11. Dezember 2015 mit. Die Beklagte liess sich nicht
      vernehmen.

28    Mit Schreiben vom 19. November 2015 übermittelte das Schiedsgericht den Par-
      teien den Entwurf des Verfahrensleitenden Beschlusses Nr. 1 sowie des Provisori-

schen Zeitplans und setzte ihnen Frist bis zum 8. Dezember 2015, um sich dazu schriftlich zu äussern. Dieses Schreiben wurde dem Vertreter der Klägerin am 20. November 2015 sowie den Vertretern der Beklagten und der Beklagten selbst am 23. November 2015 per Kuriersendung zugestellt.

29  Nachdem sich die Beklagte zu den vorgeschlagenen Daten für eine Organisationssitzung nicht hatte vernehmen lassen, setzte das Schiedsgericht diese mit Schreiben vom 26. November 2015 auf den 11. Dezember 2015 in Zürich fest. Dieses Schreiben wurde dem Vertreter der Klägerin am 27. November 2015 sowie den Vertretern der Beklagten am 30. November 2015 zugestellt. Nach mehreren gescheiterten Zustellungsversuchen infolge Annahmeverweigerung der Kuriersendung konnte das Schreiben der Beklagten schliesslich am 14. Dezember 2015 zugestellt werden.

30  Die Klägerin reichte ihre Kommentare zum Entwurf des Verfahrensleitenden Beschlusses Nr. 1 und dem Provisorischen Zeitplan fristgerecht am 7. Dezember 2015 ein. Die Beklagte liess sich nicht vernehmen.

31  Während der hälftige Anteil am Kostenvorschuss von der Klägerin fristgerecht mit Valutadatum vom 30. November 2015 bezahlt wurde, blieb die Bezahlung durch die Beklagte auch nach der Nachfristansetzung durch das Schiedsgericht im Schreiben vom 4. Dezember 2015 aus. Das Schiedsgericht forderte deshalb in Anwendung von Art. 41 Abs. 4 Swiss Rules die Klägerin mit Schreiben vom 21. Dezember 2015 auf, den Anteil der Beklagten zu bezahlen. Die Klägerin bezahlte daraufhin auch den Anteil des Kostenvorschusses der Beklagten von CHF 362'000 fristgerecht am 6. Januar 2016.

32  Mit Schreiben vom 7. Dezember 2015 wies das Sekretariat die Parteien darauf hin, dass der Gerichtshof als Sitz des Schiedsverfahrens Zürich festgelegt hatte.

33  Am 11. Dezember 2015 fand die Organisationssitzung in Zürich statt, zu welcher nur die Klägerin erschien. Die Beklagte blieb der Sitzung unentschuldigt fern. An-

Case 1:20-cv-03572-RJL Document 1-1 Filed 12/08/20 Page 148 of 221

lässlich der Organisationssitzung wurden der Entwurf des Verfahrensleitenden Beschlusses Nr. 1 sowie der Provisorische Zeitplan besprochen.

34　Im Anschluss an die Organisationssitzung stellte das Schiedsgericht den Parteien am 16. Dezember 2015 den bereinigten Verfahrensleitenden Beschluss Nr. 1 inkl. Provisorischen Zeitplan zu. Dieser wurde dem Vertreter der Klägerin am 17. Dezember 2015 sowie den Vertretern der Beklagten und der Beklagten selbst am 18. Dezember 2015 zugestellt. Das Schiedsgericht setzte den Parteien gleichzeitig Frist an, um zur Frage des anwendbaren Rechts, der Verfahrenssprache und der Bindungswirkung des Schiedsspruchs vom 5. Dezember 2014 im Swiss Rules Verfahren Nr. 600257-2011 zwischen den Parteien (**"erster Schiedsspruch"**) Stellung zu nehmen. Die Klägerin nahm fristgerecht in ihrem Schreiben vom 23. Januar 2016 Stellung. Die Beklagte liess sich nicht vernehmen.

35　Am 15. März 2016 erliess das Schiedsgericht einen Zwischenentscheid und Verfahrensleitenden Beschluss Nr. 2. Darin entschied das Schiedsgericht, dass die in Dispositiv-Ziffern 1, 4, 5, 7 und 10 des ersten Schiedsspruchs beurteilten Feststellungsbegehren Bindungswirkung für die Beurteilung der klägerischen Ansprüche haben und ausserhalb des Umfangs dieser Bindungswirkung die Ansprüche frei beurteilt werden. Das Schiedsgericht entschied überdies, dass die Streitsache dem schweizerischen Recht untersteht. Ausserdem wurde Deutsch als Verfahrenssprache festgelegt.

36　Mit E-Mail vom 15. März 2016 zeigte Rechtsanwalt Dr. Sergio Esono Abeso Tomo an, dass er die Klägerin nicht länger vertrete. Am 17. März 2016 informierte Rechtsanwalt Jean-Charles Tchikaya das Schiedsgericht, dass er und die Rechtsanwälte Peter J. Merz sowie Evuy Francisco die Klägerin neu vertreten würden. Das Schiedsgericht forderte daraufhin mit Schreiben vom 22. März 2016 die Rechtsanwälte Peter J. Merz sowie Francisco Evuy Nguema u.a. auf, zu bestätigen, dass sie die Beklagte vertreten würden, und mitzuteilen, ob für den weiteren Verlauf des

Verfahrens Kurierzustellungen an die Beklagte nur an den in der Schweiz ansässigen Rechtsanwalt Peter J. Merz erfolgen könnten.

3' Mit Schreiben vom 7. April 2016 bestätigte Rechtsanwalt Peter J. Merz, dass er und/oder Dr. Lucien Valloni die Beklagte vertreten würden und dass Kurierzustellungen an die Beklagte an die Schweizer Rechtsvertreter unter gleichzeitiger Benachrichtigung der übrigen Vertreter der Beklagten per E-Mail erfolgen dürften. Ferner stellte er den Antrag, es sei Französisch als sekundäre Verfahrenssprache zuzulassen.

3 Mit Schreiben vom 11. April 2016 wurde die Klägerin aufgefordert, sich zum Antrag der Beklagten betreffend sekundäre Verfahrenssprache zu äussern. Die Klägerin nahm fristgerecht am 19. April 2016 hierzu Stellung und beantragte, der Antrag der Beklagten sei abzuweisen.

39 Am 26. April 2016 reichte die Klägerin fristgerecht ihre Klagebegründung ein.

40 Mit Verfahrensleitendem Beschluss Nr. 3 vom 2. Mai 2016 liess das Schiedsgericht Französisch als sekundäre Verfahrenssprache unter Beachtung bestimmter Modalitäten zu. Mit Eingabe vom 13. Mai 2016 ersuchte die Klägerin das Schiedsgericht, auf den Verfahrensleitenden Beschluss zurückzukommen und diesen dahingehend zu ändern, dass Eingaben der Beklagten auf Französisch nur mit einer Übersetzung auf Deutsch eingereicht werden könnten. Diesen Antrag wies das Schiedsgericht mit Verfahrensleitendem Beschluss Nr. 4 vom 18. Mai 2016 ab.

41 Die Klageantwort ging innert erstreckter Frist (vgl. Verfahrensleitender Beschluss Nr. 5 vom 2. Juni 2016) am 13. Juli 2016 beim Schiedsgericht ein. Mit Verfahrensleitendem Beschluss Nr. 6 vom 19. Juli 2016 lud das Schiedsgericht die Beklagte ein, die fehlenden schriftlichen Zeugenerklärungen einzureichen.

42 Mit Eingaben vom 25. Juli 2016 bzw. 28. Juli 2016 beantragten beide Parteien die Durchführung eines zweiten Schriftenwechsels und einer Beweisverhandlung.

43      Am 5. August 2016 fand eine telefonische Organisationssitzung mit den Parteien statt. Daraufhin erliess das Schiedsgericht mit Verfahrensleitendem Beschluss Nr. 7 vom 11. August 2016 den revidierten provisorischen Zeitplan.

44      Mit Eingabe vom 18. August 2016 reichte die Beklagte fristgerecht die Zeugenerklärungen ("**ZE**") der Herren Jean-Charles Tchikaya und Pantaléon Mayiboro ein. Das Schiedsgericht stellte mit E-Mail vom 22. August 2016 fest, dass die Zeugenerklärungen der Herren Juan Oló Mba Nseng sowie Marcellino Oyono nach wie vor fehlten. Es forderte die Beklagte daher auf, mitzuteilen, bis wann die fehlenden Zeugenerklärungen eingereicht werden würden, und wies auf Art. 9.2.2 des Verfahrensleitenden Beschlusses Nr. 1 hin. Die Beklagte informierte das Schiedsgericht mit Schreiben vom 23. August 2016, dass die fehlenden Zeugenerklärungen spätestens bis 5. September 2016 vorliegen sollten. Am 5. bzw. 6. September 2016 reichte die Beklagte die Zeugenerklärung von Juan Oló Mba Nseng ein und erklärte, die Zeugenerklärung von Marcellino Oyono sei noch ausstehend.

45      Die Replik vom 16. September 2016 und die Duplik vom 19. Oktober 2016 wurden fristgerecht eingereicht.

46      Mit Verfahrensleitendem Beschluss Nr. 8 vom 25. Oktober 2016 setzte das Schiedsgericht den Parteien Frist an, um mitzuteilen, welche der von den Parteien benannten Zeugen an der Beweisverhandlung zur Befragung erscheinen sollten.

47      Mit Schreiben vom 8. November 2016 informierte der Rechtsvertreter der Beklagten, Peter J. Merz, dass der Kontakt zum bisherigen Repräsentanten der Beklagten abgebrochen und er deshalb nicht in der Lage sei, die Namen der an der Beweisverhandlung teilnehmenden Zeugen zu nennen. Da er infolge des Abbruchs der Kontakte nicht angeben könne, ob die Zeugen und die Beklagte gehörig vorgeladen worden seien, ersuche er um Verschiebung der auf den 5./6. Dezember angesetzten Beweisverhandlung. Die Klägerin beantragte in ihrer Stellungnahme vom 11. November 2016 die Abweisung des beklagtischen Verschiebungsgesuchs.

48    Das Schiedsgericht erstreckte den Parteien mit Verfahrensleitendem Beschluss Nr. 9 vom 15. November 2016 die Frist für die Mitteilung der an der Beweisverhandlung teilnehmenden Zeugen und wies das Verschiebungsgesuch der Beklagten ab.

49    Mit Eingabe vom 25. November 2016 kam die Klägerin ihrer Benennung der einzuvernehmenden Zeugen nach. Der Rechtsvertreter der Beklagten informierte gleichentags, dass er keine Bestätigung erhalten habe, ob die von der Beklagten benannten Zeugen an der Beweisverhandlung teilnehmen würden.

50    Die Beweisverhandlung fand am 5. Dezember 2016 in den Räumlichkeiten der Homburger AG in Zürich statt.

51    Mit Verfahrensleitendem Beschluss Nr. 10 vom 12. Dezember 2016 erliess das Schiedsgericht den revidierten provisorischen Zeitplan.

52    Die Stellungnahmen der Parteien zum Beweisergebnis gingen beim Schiedsgericht fristgerecht am 28. Februar 2017 ("K-SB" bzw. "B-SB") und die Kostennoten der Parteien am 6. bzw. 7. März 2017 ein ("K-KN" bzw. "B-KN"). Die Parteien nahmen sodann mit Eingaben vom 14. März 2017 je Stellung zu den eingereichten Kostennoten ("K-SKN" bzw. "B-SKN").

53    Mit Verfahrensleitendem Beschluss Nr. 11 vom 30. März 2017 lud das Schiedsgericht die Klägerin ein, ergänzende Ausführungen zur Kalkulation der Management Fee, den ersparten Aufwendungen und anderweitigem Erwerb zu machen.

54    Mit Schreiben vom 6. April 2017 beantragte die Beklagte, es seien die Kosten für den zusätzlichen Schriftenwechsel unabhängig vom Ausgang des Verfahrens gestützt auf das Verursacherprinzip der Klägerin aufzuerlegen. Ferner solle sich der zusätzliche Schriftenwechsel in Anbetracht des Gleichbehandlungs- und Waffengleichheitsprinzips nicht nachteilig für sie auswirken.

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 152 of 221

5:      Mit Schreiben vom 1. Mai 2017 ersuchte die Klägerin um Erstreckung der Frist zur Einreichung der Stellungnahme zur Kalkulation der Management Fee, den ersparten Aufwendungen und anderweitigem Erwerb (vgl. vorn Rz. 53). Diese Frist wurde ihr vom Schiedsgericht mit E-Mail vom 2. Mai 2017 antragsgemäss bis zum 29. Mai 2017 erstreckt.

5:      Die Stellungnahme der Klägerin ging fristgerecht am 29. Mai 2017 beim Schiedsgericht ein ("K-SeA"). Die Beklagte beantragte gleichentags per E-Mail, es sei ihr die Frist für die Stellungnahme zu den neuen Vorbringen der Klägers auf Ende August 2017 anzusetzen, da die Eingabe für die Klientin noch übersetzt werden müsse und im Juli/August die Ferienabwesenheit beginnen würde. Das Schiedsgericht setzte mit Verfahrensleitendem Beschluss Nr. 12 vom 30. Mai 2017 die Frist für die Beklage auf den 15. August 2017 an. Die Beklagte reichte ihre Stellungnahme fristgerecht am 14. August 2017 ein ("B-SeA").

5:      Mit Schreiben vom 21. August 2017 ersuchte die Klägerin das Schiedsgericht um Ansetzung einer Frist zur Stellungnahme zur beklagtischen Eingabe vom 14. August 2017. Mit Verfahrensleitendem Beschluss Nr. 13 vom 22. August 2017 setzte das Schiedsgericht der Klägerin Frist bis zum 5. September 2017 an und der Beklagten Frist für eine allfällige Erwiderung bis zum 19. September 2017. Beide Eingaben erfolgten fristgerecht. Mit Verfahrensleitendem Beschluss Nr. 14 vom 2. Oktober 2017 erklärte das Schiedsgericht das Verfahren für geschlossen und forderte die Parteien zur Einreichung der ergänzenden Kostennoten bis zum 20. Oktober 2017 auf. Diese wurden fristgerecht eingereicht.

58      Mit Verfahrensleitendem Beschluss Nr. 15 vom 23. Oktober 2017 lud das Schiedsgericht die Parteien ein, bestimmte Angaben zu ihren Kostennoten nachzureichen. Die Parteien reichten ihre ergänzenden Angaben fristgerecht am 3. November 2017 ein.

## IV.　SACHVERHALT

## A.　Der Managementvertrag für die Poliklinik La Paz (Bata) vom 14. Dezember 2009

59　Die Parteien schlossen am 14. Dezember 2009 einen Managementvertrag für die Poliklinik La Paz (Bata) (*Contrato de gestión del Hospital Policlínico La Paz (Bata)*, Beilage K-1).

60　Darin verpflichtete sich die Klägerin, das Management der Poliklinik La Paz einschliesslich verschiedener Aus- und Fortbildungsaufgaben und der Entwicklung und Bereitstellung der Software für die Krankenhausadministration zu übernehmen.

61　Die Hauptpflichten der Klägerin werden im Managementvertrag wie folgt umschrieben:

- ·　Ziff. 3.1: Betrieb der Poliklinik (Management), Erteilung unbeschränkter Generalvollmacht durch die Beklagte

- ·　Ziff. 3.2: Treffen aller für den Betrieb der Poliklinik erforderlichen Personalentscheidungen

- ·　Ziff. 3.3: Aus- und Fortbildung der Beschäftigten (inkl. Fortbildungskurse auf dem E-Learningsystem der Klägerin gegen Gebühr, vgl. Ziff. 10.1)

- ·　Ziff. 3.4: Entwicklung und Bereitstellung (inkl. Installation, vgl. Ziff. 6.1) der Software für die Krankenhausadministration

- ·　Ziff. 3.5: Zurverfügungstellung des "Brand Name".

62　Die Leistungen der Klägerin wurden gemäss Managementvertrag in zwei Phasen eingeteilt:

63　*Phase A* des Vertrages beinhaltet gemäss Ziff. 6.1 des MV a) die Kontrolle der Ein- und Ausgaben sowie b) die Kontrolle der Finanzorganisation, c) den Beginn mit der Installation der Software im internationalen Standard, d) das Management und die Auswahl aller Medikamente und Krankenhausmaterial mit europäischem Standard und in entsprechender Qualität und schliesslich e) die professionelle Kontrolle

der Qualität der Auswertung und der Quantität der Mitarbeiter und Mitteilung an den Verwaltungsrat. Für diese Leistungen war eine Entschädigung von EUR 840'000 vorgesehen. In diesem Betrag sind alle Kosten beinhaltet, ausgenommen die Wohnkosten, Wasser, Strom und lokale Transporte für die bereitgestellten Mitarbeiter.

64    Die *Phase B* des Managementvertrages beinhaltet gemäss Ziff. 6.2 die Übernahme der vollständigen Verantwortung für den technischen Teil, Personal, Belegenheit und das gesamte Eigentum. Es wurde vereinbart, dass die Klägerin hierfür eine sog. "Management Fee" von monatlich EUR 700'000 erhalten sollte (Ziff. 7.1 MV).

65    Unbestritten ist, dass spätestens im Jahr 2011 die Phase A abgeschlossen war (vgl. Duplik Rz. 47). Uneinigkeit herrscht jedoch über den genauen Zeitpunkt des Abschlusses der Phase A bzw. des Beginns der Phase B (vgl. dazu hinten Rz. 186 ff.).

**B.    Rückzug der Klägerin aus Äquatorialguinea im März 2011**

66    Die Parteien halten übereinstimmend fest, dass die Klägerin ab Dezember 2010 auf die Software der Beklagten keinen Zugriff mehr hatte (vgl. Replik Rz. 313 a.E. sowie Duplik Rz. 15). Am 14. März 2011 wurden der für die Klägerin vor Ort tätige Direktor und der Technische Leiter der Poliklinik La Paz (Herren Kronenberger und Gerard) aufgefordert, die Poliklinik innerhalb von 48 Stunden zu räumen und das Land zu verlassen. Ihre Ausreise erfolgte am 16. März 2011 (KS Rz. 121; Beilage K-42; ZE Kronenberger, S. 5, Beilage K-39). Mit der Abreise der Herren Kronenberger und Gerard zog sich die Klägerin aus der Klinik bzw. aus Äquatorialguinea zurück (vgl. KS Rz. 121, KA Rz. 57 und Duplik Rz. 125).

**C.    Erstes Schiedsverfahren und Abschluss des Übereinkunftsprotokolls vom 28. Mai 2015**

67    Nachdem sich die Klägerin aus Äquatorialguinea im März 2011 zurückgezogen hatte, leitete sie am 20. Juni 2011 das Schiedsverfahren Nr. 600257-2011 ("erstes

Case 1:20-cv-03572-RJL Document 1-1 Filed 12/08/20 Page 155 of 221

Schiedsverfahren") ein. Sie erhob eine Teilklage im Umfang von 90% und verlangte damit die Bezahlung der Management Fee für die Phase B ab August 2011 bis und mit August 2012.

68     Das erste Schiedsverfahren resultierte in einem Schiedsspruch vom 5. Dezember 2014 (vgl. Beilage K-2). In diesem wurde die Beklagte u.a. verpflichtet, der Klägerin für die Monate August bis Dezember 2010 und die Monate Januar bis und mit März 2011 EUR 5'040'000 zzgl. 5% Zins seit 1. Februar 2011 sowie für die Monate April 2011 bis und mit Dezember 2011 und die Monate Januar 2012 bis und mit August 2012 EUR 8'996'400 zzgl. 5% Zins seit 3. September 2012 zu bezahlen (vgl. Beilage K-2 S. 85), d.h. total EUR 14'036'400 zzgl. Zins und Kosten.

69     Im Übereinkunftsprotokoll vom 28. Mai 2015 einigten sich die Parteien darauf, die aus dem Schiedsspruch resultierende Forderung auf einen Betrag von EUR 16'460'218.77 festzuschreiben (vgl. B-1; Präambel und Art. 1). Es wurden dabei auch dazugehörige Zahlungsmodalitäten zur *Durchführung* des Schiedsspruchs vom 5. Dezember 2014 festgelegt (vgl. B-1; Präambel und Art. 3). Strittig ist, ob die im vorliegenden Verfahren geltend gemachten Forderungen vom Übereinkunftsprotokoll erfasst und durch die Bezahlung der Vergleichssumme abgegolten wurden (vgl. dazu hinten Rz. 117 ff.).

70     Weiter strittig ist, ob die Beklagte den Managementvertrag aufgrund der zahlreichen Beschwerden und der Ausweisung der Mitarbeiter der Klägerin im März 2011 oder zu einem späteren Zeitpunkt konkludent mit sofortiger Wirkung oder jedenfalls ordentlich gekündigt hat oder ob sich der Vertrag mangels Kündigung um weitere fünf Jahre verlängerte.

## V     PARTEIVORBRINGEN

### A     Position der Klägerin

71     Die Klägerin macht gegenüber der Beklagten Forderungen aus einem Managementvertrag vom 14. Dezember 2009 geltend. Mit der vorliegenden Klage macht

sie weitere Ansprüche aus dem Managementvertrag geltend, zusätzlich zu der be-
reits im ersten Schiedsspruch zugesprochenen Entschädigung (vorn Rz. 68). Die
Klägerin sei nach wie vor bereit, ihre Tätigkeit für die Beklagte wieder aufzuneh-
men, sofern die Beklagte ihren vertraglichen Pflichten nachkomme (KS Rz. 1 ff.).

72      Bezüglich der Zuständigkeit des Schiedsgerichts führt die Klägerin Folgendes aus:
        Die Beklagte berufe sich auf das Übereinkunftsprotokoll vom 28. Mai 2015. Es
        treffe nicht zu, dass die dortige Schiedsklausel der Schiedsklausel im Management-
        vertrag vorgehe und diese ersetzen solle. Diese Vereinbarung sei ausschliesslich
        zur Regelung der im ersten Schiedsverfahren anerkannten Ansprüche getroffen
        worden. Nach Ergehen des Schiedsspruchs am 5. Dezember 2014 habe die Kläge-
        rin im Februar 2015 ein Vollstreckungsverfahren gegen die Beklagte eingeleitet.
        Unabhängig hiervon habe die Klägerin die Beklagte über Rechtsanwalt Tomo di-
        rekt zur Zahlung aufgefordert (Replik Rz. 6 ff.).

73      Die Klägerin verweist sodann auf ein Gespräch am 23. März 2015 in Hamburg und
        weitere Korrespondenz und Telefonate mit Jean-Charles Tchikaya, in denen man
        sich schliesslich auf Tilgung der Forderung in drei Raten geeinigt habe. Vor Unter-
        zeichnung des Übereinkunftsprotokolls habe Ulrich Marseille darauf hingewiesen,
        dass in diesem Schiedsverfahren nur eine Teilforderung geltend gemacht worden
        sei und weitere Forderungen im Schiedsgerichtsverfahren Nr. 600413-2015 anhän-
        gig seien, worauf Jean-Charles Tchikaya die Auffassung vertreten habe, dass erst
        die titulierten Forderungen erledigt werden sollten. Somit habe das Überein-
        kunftsprotokoll allein dazu gedient, die Forderungen im Schiedsspruch vom 5. De-
        zember 2014 zu regeln (Replik Rz. 31 ff.).

74      Dieselbe Auslegung ergebe sich auch klar und deutlich aus dem Übereinkunftspro-
        tokoll, da dieses in der Präambel sowie Art. 1 und 4 auf das erste Schiedsverfahren
        und den dortigen Schiedsspruch Bezug nehme. Die drei Raten gemäss Art. 3 ent-
        sprächen sodann summenmässig genau den erkannten Ansprüchen. Sonstige An-
        sprüche der Klägerin seien nicht mitumfasst (Replik Rz. 75 ff.). Die Schiedsklausel

im Übereinkunftsprotokoll sei akzeptiert worden, da die vereinbarten Ratenzahlungen bei (teilweiser) Nichterfüllung durch die Beklagte evtl. einen neuen Rechtsstreit notwendig gemacht hätten (Replik Rz. 87 ff.).

73  Sofern die Beklagte die Zuständigkeit des Schiedsgerichts mit der Begründung bestreite, die Gerichte von Äquatorialguinea seien zuerst anzurufen, sei die Schiedsklausel auszulegen. Es bestehe ein übereinstimmender Wille der Parteien, eine Schiedsvereinbarung abzuschliessen. Es gehe vorliegend allein um die Frage, ob vor Anrufung des Schiedsgerichts zunächst der ordentliche Rechtsweg in Äquatorialguinea durchlaufen werden müsse. Die Schiedsklausel sei normativ in der Weise auszulegen, dass sie möglichst effizient funktioniere. Einer Stufenfolge der Rechtswege stehe auch entgegen, dass die Rechtskraft der Entscheidung des staatlichen Gerichts einer erneuten Entscheidung durch ein Schiedsgericht entgegenstehe (KS Rz. 23 ff.).

74  Die vorgenannten Ausführungen würden auch durch das Verhalten der Parteien im vorliegenden Schiedsverfahren bestärkt: Die Beklagte sei über die Einleitung des Schiedsverfahrens orientiert worden, habe sich hierzu aber nicht geäussert, woraus auf ihre Zustimmung zur Zuständigkeit des Schiedsgerichts geschlossen werden könne (KS Rz. 37 ff.).

75  Des Weiteren sei die Streitbeilegungsklausel von der Beklagten formuliert worden und nach der Unklarheitenregel deshalb zu ihren Lasten auszulegen. Weiter handle es sich bei der Vereinbarung einer Zuständigkeit der staatlichen Gerichte als zwingende Voraussetzung für die Einleitung eines Schiedsverfahrens um eine überraschende Klausel. Ferner wäre das Bestehen auf der Durchführung eines staatlichen Verfahrens vorliegend als missbräuchliche Rechtsausübung anzusehen (KS Rz. 43 ff.). Es gebe auch keinen Vorrang der spanischen Version. Es sei in den Verhandlungen zwischen den Parteien klar gewesen, dass weder die spanische noch die deutsche Version Vorrang haben solle (Replik Rz. 109).

78  Zur Begründung der Klage bringt die Klägerin vor, am 14. Dezember 2009 sei es nach längeren Verhandlungen zum Abschluss des Managementvertrags zwischen den Parteien gekommen (vgl. Beilage K-1). Die Aufgaben der Klägerin seien in eine Phase A und eine Phase B aufgeteilt worden (Ziff. 6 MV) (KS Rz. 54 ff.).

79  Die Gegenleistung der Beklagten habe in verschiedenen Zahlungen, insbesondere einer Management Fee, bestanden (Ziff. 7 MV). Die Kosten in der Phase A umfassten den Betrag von EUR 840'000. Die Kosten für die Phase B beliefen sich auf EUR 700'000 monatlich (KS Rz. 61 f.).

80  Am 7. September 2010 habe die Klägerin einen umfassenden Bericht zum Managementvertrag (Beilage K-21) erstellt, in welchem sie zum Ergebnis komme, dass die Leistungen aus Phase A zu 100% und die Leistungen aus Phase B zu 58% erbracht worden seien. Damit sei die Phase B bereits erreicht gewesen, was die Zahlung der vereinbarten Managementgebühr von EUR 700'000 monatlich, zahlbar für ein Jahr im Voraus, fällig gestellt habe. Zudem habe die Beklagte durch die Herren Dr. Donato Ndong Oburu und Dr. Pedro Ndong Asumu im Januar 2010 [recte: 2011] für die Beklagte bestätigt, dass die Phase A erfüllt worden sei (Beilage K-36; KS Rz. 85 ff.).

81  Die Beklagte habe nach Beendigung der Phase A den geschuldeten Betrag von EUR 8'400'000 nicht bezahlt. Die Klägerin habe ihre Arbeit gleichwohl fortgesetzt und habe immer wieder um Zahlung gebeten. In der Folge sei es zu Schwierigkeiten und Problemen gekommen, welche eine korrekte Erfüllung des Managementvertrages erschwert hätten, so das Abwerben des Mitarbeiters Mensching, Nichteinhaltung von Terminen, Löhne, die mit erheblicher Verspätung gezahlt worden seien, Satellitenleitungen, welche auf Anweisung des Ministers unterbrochen worden seien, so dass die Klägerin keinen Support für das IT-System, dessen Wartung aus Deutschland erfolgt sei, habe geben können, ausstehende Zahlungen seitens der Beklagten für erbrachte Leistungen durch die Klägerin etc. (KS Rz. 107 ff.).

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 159 of 221

82    Der Software-Ingenieur Kanbari sei am 6. Januar 2011 in das Hospital nach Bata
      entsandt worden, um etwaige Schwierigkeiten beim Lauf der Softwarelösungen zu
      justieren, sei aber des Grundstücks verwiesen worden. Die Klägerin habe der Be-
      klagten wiederholt das Angebot gemacht, das IT-System in Ordnung zu bringen,
      obwohl die Ursache allein bei der Beklagten gelegen habe, welche die Satellitenlei-
      tung habe unterbrechen lassen. Der Minister Marcellino Oyono Ntumutu habe in
      einem Telefonat mit Fritz Kronenberger am 15. Januar 2011 aber nur wissen wol-
      len, wie der Vertrag aufgelöst werden könne (KS Rz. 111 ff.).

83    Am 11. März 2011 habe eine Sitzung mit dem Verwaltungsrat, Mitarbeitern der
      Beklagten und (teilweise) der Klägerin stattgefunden. Bevor sich die Mitarbeiter
      der Klägerin, die Herren Kronenberger (Leiter Finanzen) und Gerard (Leiter Tech-
      nik), zur Sache hätten äussern können, seien sie des Raumes verwiesen worden.
      Am 14. März 2011 seien sie aufgefordert worden, das Hospital La Paz innerhalb
      von 48 Stunden zu räumen und das Land zu verlassen (KS Rz. 117 ff.).

84    Es treffe nicht zu, dass der Vertrag ungeachtet der vertraglichen Regelung nach
      Art. 404 OR jederzeit kündbar sei. Die Parteien hätten einen Vertrag mit fester
      Dauer von fünf Jahren vereinbart, mit einer automatischen Verlängerung mangels
      Kündigung. Es handle sich um einen gemischten Vertrag, bei dem gerade nicht der
      auftragsrechtliche Teil, insbesondere die erforderliche Vertrauensbasis, stark zu
      gewichten sei, sondern der werkvertragliche Teil bei weitem überwiege. Zudem
      fehle es an einem besonderen Vertrauensverhältnis zwischen den Parteien und der
      Schutzbedürftigkeit. Vielmehr sei es die Beklagte, welche erhebliche Vertragsbrü-
      che begangen habe. Nach dem gemeinsamen Willen der Parteien sei in zahlreichen
      Bereichen ein Erfolg geschuldet gewesen. Aus rechtlicher Sicht habe der Manage-
      mentvertrag somit überwiegend einen erfolgsbestimmten und damit werkvertrags-
      ähnlichen Charakter. Die Klägerin sei als Totalunternehmerin einzustufen. Auch
      ein Werkvertrag könne gekündigt werden; diese Voraussetzungen lägen aber defi-
      nitiv nicht vor (Replik Rz. 209 ff.).

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 160 of 221

85      Der Vertrag sei nicht gekündigt worden. Zwar habe ein Telefongespräch zwischen den Zeugen Kronenberger und dem Minister Marcellino stattgefunden, an welchem der Minister angedeutet habe, dass man den Vertrag aufheben könne. Mehr sei zu diesem Thema nicht gesagt worden. Eine Kündigung liege darin aber nicht vor; die Befragung des Zeugen Kronenberger habe gezeigt, dass ihm keine Möglichkeit gegeben worden sei, an seinen Arbeitsplatz zurückzukehren und weiterzuarbeiten (K-SB Rz. 290). Die nach Deutschland zurückgekehrten Mitarbeiter, insbesondere der Zeuge Kanbari, hätten weitergearbeitet, um das IT-System weiterzuentwickeln, d.h. jederzeit bereit zu sein, das System vor Ort wieder zu unterstützen (vgl. K-SB Rz. 372-376).

86      Der Vertrag in seiner ursprünglichen Fassung sei unstreitig bis 31. Januar 2015 gelaufen, habe jedoch nicht am 31. Januar 2015 geendet, da sich der Vertrag automatisch um fünf Jahre verlängere, es sei denn, er werde mit einer Frist von einem Jahr vorher gekündigt. Eine Kündigung sei nie ausgesprochen worden (KS Rz. 177 ff.; Replik Rz. 161 ff., 329 ff.).

87      Vorliegend eingeklagt würden nunmehr die nach Ergehen des ersten Schiedsspruchs verbleibenden 10% der monatlichen Vergütung von je EUR 700'000 für die Zeit von August 2010 bis und mit August 2012. Darüber hinaus habe die Klägerin Ansprüche für den Zeitraum von September 2012 bis und mit Januar 2015 sowie auch für den Zeitraum bis und mit Januar 2020, da der Managementvertrag nicht aufgelöst worden sei (KS Rz. 150 ff.).

88      Aus der Beweisverhandlung habe sich ergeben, dass ein Fall von Vertragsreue vorliege. Nachdem die Beklagte die Leistungen der Klägerin gerne in Anspruch genommen und mitbekommen habe, wie sie das Krankenhaus nach professionellen Regeln umgestaltet habe, habe die Beklagte geglaubt, dass sie das nun ohne die Klägerin fortsetzen könne (K-SB Rz. 5). Die Klägerin habe ihre Leistung weiterhin erbracht bzw. zu erbringen versucht (K-SB Rz. 10 mit Verweis auf WP Kronenberger S. 260 N 13-15).

8   Zu den ersparten Aufwendungen hält die Klägerin fest, dass sich diese auf monat-
    lich EUR 118'404 beliefen, zuzüglich einmaliger Kosten von EUR 118'891 für die
    Softwareerweiterung der Krankenhausadministration etc. (K-SeA Rz. 4). Die Klä-
    gerin stützt sich dabei auf eine "Gutachtliche Stellungnahme" der Wirtschaftsprü-
    fungsgesellschaft PricewaterhouseCoopers GmbH ("**SPwC**", Beilage K-93). Zum
    Einwand der Beklagten, ihr würden die PwC vorgelegten Unterlagen nicht zur Ver-
    fügung stehen, führt die Klägerin aus, dass  es sich um die Unterlagen handle, wel-
    che im Rahmen des laufenden Verfahrens zur Verfügung gestellt worden seien
    (Stellungnahme zur B-SeA Rz. 11).

90  Die *Aufwendungen für die Erarbeitung des Projektes betreffend den Ausbau des
    Gesundheitswesens in Äquatorialguinea*, d.h. die Fertigstellung einer Klinik in Ma-
    labo sowie die Errichtung von Satellitenkliniken, seien sog. Vorleistungen in Form
    von Akquisitionskosten der Klägerin, welche nicht vergütet worden seien. Mangels
    sachlichen Bezugs zur Management Fee gemäss Ziff. 6.2. MV seien diese Kosten
    daher nicht zu berücksichtigen (K-SeA Rz. 23 ff.; SPwC Rz. 51).

91  Zum *Länderrisiko* hält die Klägerin fest, dass dieses sowohl zum Zeitpunkt des
    Abschlusses des MV als auch heute als besonders hoch eingeschätzt werde. In der
    Mehrheit der Fälle werde die Beklagte sogar der höchsten Risikoklasse zugeordnet.
    Die Beurteilung der Wirtschaftlichkeit von langlaufenden Projekten erfolge bevor-
    zugt mittels eines Barwertkalküls, wobei sich das jeweilige Länderrisiko im Dis-
    kontierungszinssatz widerspiegle. Eine genaue Barwertkalkulation sei seitens der
    Klägerin zum Managementvertrag nicht gemacht worden. Allerdings sei in einer
    analogen Überlegung eine Renditeerwartung auf die getätigten Vorlaufkosten und
    Investitionen formuliert worden, die es für die vorteilhafte Beurteilung des Projek-
    tes nötig gemacht habe, künftig risikoadäquate Rückflüsse in Form der Manage-
    ment Fee in der vertraglich vereinbarten Höhe abzüglich der zu erwartenden Kos-
    ten zu generieren. Eine Quantifizierung des bei der Kalkulation des Projektes be-
    rücksichtigten Länderrisikos als Geldbetrag sei nicht möglich. Das Länderrisiko

habe sich bei der Beklagten bewahrheitet (K-SeA Rz. 28-36; vgl. zum Ganzen SPwC Rz. 55 ff.).

92     Zum *anderweitigen Erwerb* führt die Klägerin aus, sie habe nichts durch anderwei-
       tige Verwendung der ab dem 16. März 2011 frei gewordenen Kräfte erworben und
       dies auch nicht absichtlich unterlassen. Die Klägerin habe keine Möglichkeit ge-
       habt, die von ihr für das Projekt in Bata engagierten, zum grössten Teil externen
       Dienstleister woanders einzusetzen. Es seien zu dieser Zeit keine anderen Projekte
       vorhanden gewesen und die Vertragsverhältnisse mit den externen Dienstleistern
       seien aufgehoben worden. Das gesamte Projekt mit den vielschichtigen Aufgaben
       einschliesslich der Entwicklung des Gesundheitswesens in einem afrikanischen
       Land habe eine Dimension gehabt, die nicht durch andere Projekte gleicher Art und
       Grösse, nicht einmal in einer geringeren Grössenordnung hätten ersetzt werden
       können (K-SeA Rz. 39 ff.). Das komplexe Entwicklungsprojekt lasse sich innerhalb
       einer kurzen Zeitspanne überhaupt nicht so schnell ersetzen, um die Mitarbeiter der
       Klägerin "nahtlos" einsetzen zu können (Stellungnahme zur B-SeA, Rz. 29).

**B.     Position der Beklagten**

93     Die Beklagte erhebt in ihrer Klageantwort die Unzuständigkeitseinrede, mit folgen-
       der Begründung:

94     Am 28. Mai 2015 hätten die Parteien eine umfassende Vereinbarung zur definitiven
       Beilegung des zwischen ihnen entstandenen Streits geschlossen (Beilage B-1). Bei
       diesem Übereinkunftsprotokoll handle es sich um einen *Gesamtvergleich*. Bei sei-
       nem Abschluss am 28. Mai 2015 sei das erste Schiedsverfahren bereits abgeschlos-
       sen und das zweite bereits eingeleitet gewesen. Ziff. 7 der Vereinbarung enthalte
       eine Schiedsklausel, Ziff. 4 eine Saldoklausel (KA Rz. 14 ff.).

95     Aufgrund des Ziels der Parteien, den zwischen ihnen laufenden Rechtsstreit voll-
       umfänglich beizulegen, sei es der klare Parteiwille, dass die Schiedsklausel des
       Übereinkunftsprotokolls der im Managementvertrag verankerten Schiedsklausel

vorgehe und diese ersetze. Dieser Zweck sei auch dadurch ersichtlich, dass die Parteien in Ziff. 5 vereinbart hätten, dass die ganze Vereinbarung dahinfalle, wenn sich die Beklagte in Zahlungsverzug befinde. Die Parteien hätten eine umfassende und endgültige Gesamtlösung gewollt (KA Rz. 19 ff.).

16    Für die Beklagte sei die Sache mit Abschluss des Übereinkunftsprotokolls erledigt gewesen (Duplik Rz. 13). Die Klägerin habe im Übereinkunftsprotokoll auf EUR 2'000'000 verzichtet. So viele Zugeständnisse seitens der Klägerin hiessen nichts anderes, als dass auch die Klägerin die ganze Angelegenheit als erledigt erachtet habe (Duplik Rz. 15 ff.).

      Im vorliegenden Verfahren verschweige die Klägerin bewusst die Existenz der Vereinbarung vom 28. Mai 2015. Anscheinend betrachte sie diese Vereinbarung als unverbindlich. Wolle sie aber diese Vereinbarung anfechten, müsse sie dies vor einem ICC-Schiedsgericht tun (KA Rz. 22).

      Sollte das Schiedsgericht zum Schluss kommen, dass die Schiedsklausel im Managementvertrag durch die neue Vereinbarung nicht ersetzt worden sei, sei Folgendes anzuführen: Die deutsche Übersetzung der Schiedsklausel im Managementvertrag (*"Bei Streitigkeiten aus diesem Vertrag, werden die Parteien versuchen vor der Anrufung der Gerichte von Guinea Ecuatorial eine einvernehmliche Lösung zu finden [...]"*) stimme mit der spanischen Originalversion nicht überein.

      Es sei der Parteiwille gewesen, dass die spanische Fassung des Managementvertrags Vorrang habe. Die Parteien hätten am Vertrag handschriftliche Änderungen auf Spanisch vorgenommen und visiert. Ferner hätten beide Parteien die linke Seite (spanische Version) unterschrieben, dagegen nicht die deutsche Version. Demzufolge gelte die spanische Version und die Parteien hätten zuerst ein Gerichtsverfahren in der Republik Äquatorialguinea führen und erst nach Urteilsfällung das vorliegende Schiedsverfahren anrufen müssen (KA Rz. 26 ff.; Replik Rz. 25 ff.).

99    Eine objektive Auslegung der Schiedsklausel führe zum selben Ergebnis: Es wäre
      nicht verständlich, dass Spanisch und Deutsch gleichbedeutend seien, wenn Ver-
      tragsänderungen im Vertrag selber nur auf Spanisch gemacht worden seien und die
      Übersetzung nicht gemeinsam in Auftrag gegeben worden sei. Im Übrigen hätten
      die Parteien sogar die falsche Übersetzung der Schiedsklausel ("*vor der Anrufung
      der Gerichte von Guinea Ecuatorial*") nicht anders verstehen können, als dass diese
      Gerichte zuerst angerufen werden müssten (KA Rz. 38, Duplik Rz. 31 ff.).

101   Der Zeuge Marseille habe bestätigt, dass die Klägerin einen deutschen oder neutra-
      len Gerichtsstand gewünscht habe und die Beklagte demgegenüber nicht bereit ge-
      wesen sei, eine Gerichtsstand- oder Schiedsklausel zu vereinbaren, ohne das Ge-
      richt der Republik Äquatorialguinea zu involvieren. Entsprechend sei ein Kompro-
      miss gefunden worden, wonach zuerst die Gerichte der Republik Äquatorialguinea
      und dann ein Schiedsgericht nach den Regeln der Schweizer Handelskammer vor-
      zusehen seien. Der Zeuge Marseille habe lediglich die Reihenfolge (zuerst sei das
      Schiedsgericht in Zürich und dann die Republik Äquatorialguinea vorgesehen)
      verwechselt; dies stehe im krassen Widerspruch zum übersetzten Text des Vertra-
      ges (B-SB Rz. 19).

102   Die Klägerin habe direkt vor dem Schiedsgericht geklagt, ohne ein Gerichtsverfah-
      ren in der Republik Äquatorialguinea durchzuführen. Infolgedessen müsse sich das
      Schiedsgericht für unzuständig erklären. Eventualiter sei das Verfahren zu sistieren
      und den Parteien Frist anzusetzen, um ihnen zu ermöglichen, das Schlichtungsver-
      fahren sowie das ordentliche Gerichtsverfahren in Äquatorialguinea durchzuführen
      (KA Rz. 39 ff.).

103   Zum Materiellen führt die Beklagte Folgendes aus: Die Vereinbarung vom 28. Mai
      2015 regle den Streit zwischen den Parteien abschliessend, weshalb die Klage ab-
      zuweisen sei. Indem die Klägerin diese zentrale Vereinbarung vom 28. Mai 2015
      verschweige, handle sie ausserdem rechtsmissbräuchlich (KA Rz. 73 ff.).

104    Aus dem ersten Schiedsverfahren und der Klagebegründung im vorliegenden Verfahren gehe ferner hervor, dass die Klägerin spätestens im März 2011 die Republik Äquatorialguinea definitiv verlassen habe und seitdem für die Beklagte nicht mehr tätig sei. Seitdem habe die Beklagte den Managementvertrag als aufgehoben bzw. gekündigt betrachtet, was sie auch im ersten Schiedsverfahren durch Erhebung ihrer Widerklage geltend gemacht habe. Die Klägerin anerkenne selber, dass die Beklagte seit Anfang 2011 versucht habe, den Vertrag zu kündigen, und führe selber aus, dass ihre Mitarbeiter im März 2011 durch die Beklagte ausgewiesen worden seien. Mit dem ersten Schiedsspruch habe die Klägerin eine Entschädigung bis August 2012 erhalten. Spätestens seit März 2011 habe die Klägerin keine Dienstleistungen mehr an die Beklagte erbracht, da ihre Dienste weder gefragt noch benötigt würden, da die Klinik in der Zwischenzeit von einem anderen Unternehmen gemanagt werde. Trotzdem versuche die Klägerin heute eine Entschädigung für ihre Nichtleistung zu erhalten. Sie beharre dabei auf einer Entschädigung bis 2020, obwohl sie wisse, dass sie für die Beklagte nie mehr tätig sein werde, da das im Spital- und Pflegebereich absolut elementare Vertrauen nicht mehr vorliege (KA Rz. 55 ff.).

105    Die Beklagte verweist auf die Aussagen des Zeugen Marseille, wonach der Vertrag im Dezember 2010 faktisch beendet worden sei bzw. die Klägerin den Vertrag gekündigt habe (vgl. B-SB Rz. 21 f.). Die Klägerin habe das Verhalten spätestens im März 2011 als Vertragsaufhebung bzw. Kündigung verstanden und es sei der Klägerin klar gewesen, dass die Beklagte auf deren Dienstleistung verzichtet habe (B-SB Rz. 30). Ausserdem habe der Zeuge Marseille dargelegt, dass die Nichtbefolgung der Weisung, Patienten nur gegen Vorschuss oder Sicherstellung der Behandlungskosten zu behandeln, zu einem Vertrauensbruch geführt habe. Der Grund dieses Vertrauensbruchs sei auf die Klägerin zurückzuführen gewesen (vgl. B-SB Rz. 24 und 30).

106    Aus den Aussagen des Zeugen Regenhardt ergebe sich, dass die IT-Entwicklung Ende 2010 vollständig abgewickelt und das IT-System funktionsfähig gewesen sei.

Ausserdem sei klar, dass die Klägerin ab Ende 2010 keinen Zugriff auf das IT-System der Beklagten mehr gehabt habe, dass sie ab diesem Zeitpunkt nie wieder Zugriff erlangt habe und dass sie spätestens im Januar 2011 darüber informiert gewesen sei, dass die Beklagte ihre Dienstleistungen nicht mehr benötigt habe. Die Auflösung des Vertrages sei somit klar kommuniziert worden (vgl. B-SB Rz. 44-47). Der Zeuge Kanbari habe ebenfalls die konkludente Willenserklärung der Beklagten, den MV aufzulösen, als Erklärungsempfänger für die Klägerin erhalten und an sie weitergeleitet (B-SB Rz. 51). Auch der Zeuge Kronenberger habe bewusst entgegengenommen, dass die Beklagte mit der Klägerin nicht mehr habe arbeiten wollen, und gewusst, dass der MV aufgelöst gewesen sei, als er das Land verlassen habe (B-SB Rz. 55-63).

107    Beim Managementvertrag handle es sich um einen Auftrag. Dieser habe darin bestanden, die Poliklinik in Bata zu verwalten. Projekte betreffend Portalkliniken oder eine Krankenpflegeschule seien nie Gegenstand des Managementvertrags gewesen (Duplik Rz. 54 ff.). Es handle sich um einen gemischten Vertrag, wobei der auftragsrechtliche Teil und das gegenseitige Vertrauen stark zu gewichten seien. Art. 404 Abs. 1 OR sei daher auf den Managementvertrag zwingend anwendbar, weshalb Ziff. 12 MV nicht anwendbar sei und die Beklagte den Vertrag jederzeit mit sofortiger Wirkung habe kündigen dürfen (KA Rz. 89 ff., Duplik Rz. 60 ff.).

108    Eine solche Kündigung habe die Beklagte aufgrund der zahlreichen Beschwerden und der Ausweisung der Mitarbeiter bereits im März 2011 zum Ausdruck gebracht. Diese konkludente Kündigung sei nicht zur Unzeit erfolgt. Die Klägerin habe für die Zeit bis August 2012 eine Entschädigung von EUR 16'460'218.77 erhalten, obwohl sie für die Beklagte nicht mehr tätig gewesen sei, und besondere Nachteile seien weder ersichtlich noch habe die Klägerin substantiiert, dass die Kündigung zur Unzeit erfolgt sei (KA Rz. 97 ff., Duplik Rz. 64 ff.).

109   Eventualiter sei die Kündigung mit Erhebung der Widerklage im ersten Schiedsver-
      fahren erfolgt, mit welcher die Beklagte klar zum Ausdruck gebracht habe, dass sie
      die Zusammenarbeit mit der Klägerin als aufgehoben erachtete (KA Rz. 105 ff.).

110   Sofern das Schiedsgericht nicht von einem Kündigungsrecht mit sofortiger Wir-
      kung ausgehe, habe die Beklagte den Managementvertrag spätestens im März 2011
      ordentlich gemäss Ziff. 12 gekündigt. Der Managementvertrag sehe keine besonde-
      re Kündigungsform vor, weshalb er konkludent habe gekündigt werden können. All
      die konkludenten Handlungen der Beklagten bildeten eine Kündigung und der Ma-
      nagementvertrag sei, sofern nicht sofort aufgelöst, jedenfalls nicht um weitere fünf
      Jahre automatisch verlängert worden (KA Rz. 109 f.).

111   Eventualiter habe die Beklagte den Managementvertrag mit der Unterzeichnung
      des Übereinkunftsprotokolls vom 28. Mai 2015 mit sofortiger Wirkung gekündigt.
      Sollte das Schiedsgericht die Meinung vertreten, dass die Beklagte den Manage-
      mentvertrag bis heute nicht gekündigt habe, erklärte die Beklagte mit der Kla-
      geantwort, den Vertrag mit sofortiger Wirkung zu kündigen (KA Rz. 115 ff.).

112   Zu der von der Klägerin eingereichten "gutachtlichen Stellungnahme" von PwC zu
      den ersparten Aufwendungen und der Berücksichtigung des Länderrisikos (Beilage
      K-93) hält die Beklagte fest, dass PwC sich bei deren Erarbeitung auf Darstellun-
      gen der Klägerin sowie auf allgemeine Unterlagen der Klägerin gestützt habe. Ihr
      würden diese Dokumente nicht zur Verfügung stehen, weshalb sie die Ausführun-
      gen von PwC nicht überprüfen könne. Die SPwC sei nicht aussagekräftig (B-SeA,
      Rz. 9-12).

113   Die *Gehaltsaufwendungen* für die vier Mitarbeiter der Klägerin vor Ort seien nicht
      von der Management Fee abgedeckt worden. Ziff. 6 MV befasse sich mit den Kos-
      ten der Durchführung des MV für die Phase A und B; diese seien strikt von der
      Management Fee zu trennen. Aus Ziff. 6 ergebe sich, dass sich die Kosten für die
      Dienstleistungen, welche während der Phase A erbracht werden, auf EUR 840'000
      beliefen (Ziff. 6.1). Für die Phase B des Vertrags beliefen sich die Kosten auf

EUR 700'000 pro Monat und somit auf EUR 8'400'000 pro Jahr (Ziff. 6.2). In diesem Betrag seien alle Kosten für die vier von Marseille bereitgestellten Mitarbeiter enthalten, ausgenommen deren Wohnkosten, Wasser, Strom und Fuhrpark. Diese Kosten seien der Beklagten überwälzt worden. Die Management Fee (Ziff. 7) sei also nicht dazu gedacht gewesen, diese Kosten zu decken, sondern sei separat und zusätzlich geschuldet gewesen (B-SeA, Rz. 14). Entgegen den Ausführungen der Klägerin und PwC sei davon auszugehen, dass die anfallenden Kosten, inkl. Kosten im Zusammenhang mit der Zentrale in Hamburg, durch die Kosten von Ziff. 6.2 MV abgedeckt seien, und dass die Management Fee (Ziff. 7.1) einen reinen Gewinn (bestehend aus dem Gewinn für die vergangene Periode und dem künftig entgangenen Gewinn) darstelle (B-SeA Rz. 22). Die von der Klägerin genannten ersparten Aufwendungen seien im Mindestumfang von EUR 118'404 von der Management Fee abzuziehen (B-SeA Rz. 17).

114  Des Weiteren hätten die *Akquisitionsleistungen* der Klägerin nichts mit der eingeklagten Forderung aus dem Managemententvertag zu tun und könnten deshalb nicht auf die Beklagte überwälzt werden (vgl. (B-SeA Rz. 18). Die Klägerin habe zu Recht anerkannt, dass keine vertragliche Grundlage für die Akquisitionskosten vorliegen und diese Kosten keinen Bezug zum MV aufweisen würden, weshalb sie in der Management Fee nicht zu berücksichtigen seien (B-S-SeA Rz. 9).

115  Die Management Fee setze sich ausschliesslich aus Gewinn und Länderrisiko zusammen (B-SeA Rz. 30). Das Risiko der sofortigen jederzeitigen Vertragsauflösung sei in der Management Fee bereits miteinberechnet und umfasse sozusagen eine Aufrechnung für künftig entgangenen Gewinn im Falle einer potentiellen jederzeitigen Vertragsauflösung. Mit der Bezahlung der Management Fee bis zum Vertragsabbruch sollte die Klägerin für das Szenario des Vertragsabbruches bereits entschädigt werden (vgl. B-SeA Rz. 32 f.). In dem zugesprochenen Betrag von EUR 16'460'218.77 für die Management Fee bis August 2012 gemäss erstem Schiedsspruch sei das Länderrisiko und damit auch das Risiko, dass der Managemententvertag jederzeit aufgelöst werden könne, sowie der entsprechende künftige

entgangene Gewinn, bereits enthalten (B-SeA Rz. 36). Die Klägerin anerkenne, dass bei der Berechnung der Management Fee das Risiko einer jederzeitigen Vertragsauflösung berücksichtigt worden sei. Die Management Fee umfasse sozusagen die Aufrechnung für künftig entgangenen Gewinn im Falle einer potentiellen jederzeitigen Vertragsauflösung (Stellungnahme zur K-SeA Rz. 10, Rz. 25).

1 6     Die Beklagte bestreitet sodann, dass die Klägerin keinen anderweitigen Erwerb habe erzielen können. Mit der Kündigung des Managementvertrags durch die Beklagte seien firmeneigene Mitarbeiter der Klägerin per März 2011 nicht mehr für das Projekt gebraucht worden. Mit diesen Mitarbeitern hätte die Klägerin folglich einen anderweitigen Mehrwert erzielen können, welcher vorliegend als anderweitiger Erwerb hätte angerechnet werden können. Die Klägerin unterliege einer Schadenminderungspflicht, gemäss welcher sie die freigewordenen Kräfte im Rahmen ihrer Zumutbarkeit und der ihr vorhandenen Möglichkeiten anderweitig einzusetzen habe. Sie habe es aber unterlassen, darzulegen, inwiefern sie sich überhaupt bemüht habe, die freigewordenen Kräfte nach der Kündigung des MV anderweitig einzusetzen (B-SeA Rz. 38 f.; Stellungnahme zur K-SeA Rz. 20).

## V.    ERWÄGUNGEN

### A.    Zuständigkeit des Schiedsgerichts

### 1.    Auswirkung des Übereinkunftsprotokolls auf Ansprüche aus dem Managementvertrag

11     Die Klägerin stützt die Zuständigkeit des Schiedsgerichts auf die Schiedsklausel im Managementvertrag. Die Beklagte hält dem entgegen, diese Schiedsklausel sei aufgrund des im Übereinkunftsprotokoll vom 28. Mai 2015 geschlossenen Gesamtvergleichs durch die dortige Schiedsklausel abgelöst worden, welche ein ICC-Schiedsverfahren vorsehe. Das Schiedsgericht sei deshalb nicht zuständig.

11     In erster Linie ist somit zu prüfen, ob die Schiedsklausel im Managementvertrag durch diejenige im Übereinkunftsprotokoll ersetzt wurde. Diese Frage hängt vorliegend davon ab, ob das Übereinkunftsprotokoll im Sinne einer Gesamtlösung alle

Ansprüche aus dem Managementvertrag zu regeln bezweckte oder ob es auf die Ansprüche der Klägerin aus dem ersten Schiedsspruch beschränkt ist. Im ersten Fall wäre die Zuständigkeit des Schiedsgerichts anhand der Schiedsklausel im Übereinkunftsprotokoll zu prüfen, im letzteren anhand derjenigen im Managementvertrag.

119    Bei der Vertragsauslegung ist der übereinstimmende wirkliche Wille der Parteien massgebend. Kann dieser nicht ermittelt werden, ist mit Hilfe einer Auslegung des Vertrags nach Treu und Glauben der mutmassliche Wille der Parteien festzustellen. Bei dieser objektivierten Betrachtungsweise wird darauf abgestellt, was vernünftige Parteien unter den gegebenen Umständen unter dem vorliegenden Wortlaut bzw. den abgegebenen Erklärungen wohl verstanden hätten (BSK OR I-Wiegand, Art. 18 N 11, 13; BGE 143 III 157 E. 1.2.2; 138 III 659 E. 4.2.1; 132 III 24 E. 4; 128 III 265 E. 3).

120    Bei der Ermittlung des tatsächlichen ebenso wie des mutmasslichen Parteiwillens bildet Ausgangspunkt Wortlaut und Systematik der abgegebenen Erklärungen, gefolgt von weiteren ergänzenden Auslegungsmitteln wie die Begleitumstände und das Verhalten der Parteien vor und nach Vertragsschluss (zum Ganzen BSK OR I-Wiegand, Art. 18 N 18 ff.).

121    Eine Auslegung nach Wortlaut und Systematik des Übereinkunftsprotokolls führt zu folgendem Resultat: Die Präambel bezieht sich ausdrücklich auf das Schiedsverfahren Nr. 600257-2011 und die dortige Verurteilung der Beklagten zur Zahlung von EUR 16'460'218.77 ("*Zur Durchführung des Schiedsspruchs [...] WURDE FOLGENDES VEREINBART*"). Im Vergleichstext selbst wird in Art. 1 auf die "*aus dem Schiedsspruch resultierenden endgültigen Forderung*" Bezug genommen; in Art. 2 erklärt sich die Klägerin damit einverstanden, den durch den Schiedsspruch zu ihren Gunsten festgelegten Zinsenlauf zum 31. Januar 2015 zu beenden und dauerhaft auf jegliche Ansprüche im Zusammenhang mit danach aufgelaufenen Zinsen zu verzichten. In Art. 3 stimmt sie einer Begleichung ihrer Forderung ge-

mäss Art. 1 in drei gleichen Zahlungen zu. In Art. 4 ist festgehalten, dass die Klägerin nach Erfüllung aller Zahlungsverpflichtungen durch die Beklagte auf alle Ansprüche gegen den Staat *"im Zusammenhang mit dem Schiedsspruch"* verzichten wird. In Art. 5 werden die Folgen des Zahlungsverzugs geregelt und die Klägerin erhält das Recht, die Begleichung des Gesamtbetrags *"ihrer Forderung"* zu betreiben (Beilage B-1).

122 Alle zitierten Artikel nehmen somit ausdrücklich und ausschliesslich auf das erste Schiedsverfahren bzw. auf die daraus resultierende Forderung Bezug. Das zu diesem Zeitpunkt bereits eingeleitete zweite Schiedsverfahren wird nicht erwähnt. Namentlich findet sich im Protokoll keine Bestimmung, wonach auch diese Ansprüche durch Vergleich erledigt sein sollten. Im Gegenteil beschränkt sich Art. 4, welcher sich mit der *"Rechtskraft"* des Protokolls befasst, auf alle Ansprüche im Zusammenhang *"mit dem Schiedsspruch"*, d.h. mit Ansprüchen aus dem ersten Schiedsverfahren. Auf diese – und damit nicht auf solche aus einem weiteren Schiedsverfahren – verzichtet die Klägerin in Art. 4, sofern die Beklagte ihre Zahlungsverpflichtungen erfüllt.

123 Wortlaut und Systematik des Übereinkunftsprotokolls sind somit hinsichtlich dessen Geltungsbereichs eindeutig: Dieses umfasst die Forderungen aus dem ersten Schiedsverfahren. Nicht erfasst sind allfällige weitere Forderungen aus dem Managementvertrag, einschliesslich solcher aus dem zweiten Schiedsverfahren. Die Tatsache, dass das Protokoll eine eigene Schiedsklausel enthält, die inhaltlich von der Schiedsklausel des Managementvertrags abweicht, ändert an dieser Schlussfolgerung nichts: Es spricht nichts dagegen, dass Parteien in einem Vergleich für Streitigkeiten aus oder im Zusammenhang mit diesem Vergleich von der im zugrundeliegenden Vertrag vorgesehenen Schiedsklausel abweichen.

124 Die eingereichte Korrespondenz und die Aussagen der Zeugen zu den Begleitumständen des Abschlusses des Übereinkunftsprotokolls bestätigen diesen Schluss:

125 Die Zeugen der Klägerin, Christiane Knak-Kammenhuber und Ulrich Marseille, haben bestätigt, dass an der Besprechung vom 23. März 2015 in Hamburg die Forderungen aus dem zweiten Schiedsverfahren nicht zur Sprache kamen (WP Knak-Kammenhuber S. 24 N 29-33; WP Marseille S. 38 N 29-33, S. 39 N 1-5, 19-21, 29-31, S. 40-41). Auch im Schreiben von Ulrich Marseille an den Vertreter der Beklagten, Jean-Charles Tchikaya, vom 31. März 2015 (Beilage K-56) ist im Betreff von "*[ü]berfällige[n] Zahlungen aus dem Schiedsurteil der International Arbitrage Zürich (Swiss Rules) gegen die Republik Äquatorial Guinea*" die Rede, d.h. das Schreiben bezieht sich nur auf die Zahlungen aus dem ersten Schiedsspruch.

126 Gemäss Zeugenaussage von Ulrich Marseille hat er die Forderungen aus dem zweiten Schiedsverfahren in einem Telefonat mit Jean-Charles Tchikaya angesprochen, welches nach dem 25. April 2015 stattfand. Jean-Charles Tchikaya habe die Auffassung vertreten, dass erst die titulierten Forderungen erledigt werden sollten; im Anschluss könne man sich den weiteren Forderungen und einer aussergerichtlichen vergleichsweisen Einigung zuwenden (WP Marseille S. 38 N 27-33, S. 39 N 1-6, S. 40 N 1-7, S. 80 f.). Dies habe Jean-Charles Tchikaya erneut anlässlich eines Telefonats mit ihm nach dem 22. Mai 2015 erklärt (Beilage K-54, S. 5).

127 Jean-Charles Tchikaya blieb der mündlichen Verhandlung unentschuldigt fern, obwohl die Klägerin sein Erscheinen verlangt hatte. Seine schriftliche Zeugenaussage hat daher unbeachtlich zu bleiben (vgl. Art. 9.2.4 des Verfahrensleitenden Beschlusses Nr. 1). Dasselbe gilt für die Zeugenerklärungen des ebenfalls nicht erschienenen Justizministers, Juan Olo Mba Nseng, welcher aber ohnehin nicht direkt an den Vergleichsgesprächen zw ischen den Parteien bezüglich des Übereinkunftsprotokolls beteiligt war.

128 Der für die Beklagte erschienene Zeuge Mayiboro sagte aus, seinem Verständnis nach sei die Sache mit Unterzeichnung des Protokolls erledigt gewesen (WP Mayiboro S. 121, S. 132 N 13-19). Aus der Einvernahme des Zeugen Mayiboro geht hervor, dass dieser keine nähere Kenntnis des Sachverhalts hat und lediglich anläss-

lich der Besprechung zwischen den Parteien in Hamburg mitgewirkt hat (vgl. WP
Mayiboro S. 121 N 32 f., S. 125 N 7-11, S. 131 f. N 26 ff., S. 142 f.). Zu seiner
Rolle während den Verhandlungen erklärte er, er sei wegen seiner Deutschkennt-
nisse zugezogen worden; er habe Jean-Charles Tchikaya begleitet (WP Mayiboro
S. 121 a.E., vgl. auch S. 125 N 7-11).

129     Die Verhandlungen für die Beklagte wurden von Jean-Charles Tchikaya geführt,
        welcher gemäss Aussage von Ulrich Marseille die Auffassung vertrat, dass die For-
        derungen aus dem zweiten Schiedsverfahren erst nach Abschluss des Vergleichs
        diskutiert werden sollten (vorn Rz. 126). Offen bleibt, ob dies auch die Meinung
        der Beklagten selbst war, doch kann dies im Aussenverhältnis nicht massgebend
        sein. Unter Würdigung aller Umstände kommt das Schiedsgericht somit zum
        Schluss, dass es dem übereinstimmenden wirklichen Willen der Parteien bzw. ihrer
        Vertreter entsprach, dass die Schiedsklausel des Übereinkunftsprotokolls sich nur
        auf Forderungen aus dem ersten Schiedsverfahren bezieht. Auch wenn man aber
        zum Schluss käme, dass sich dieser wirkliche Wille nicht ermitteln lässt, führt eine
        objektivierte Auslegung der Schiedsklausel angesichts der Eindeutigkeit von Wort-
        laut und Systematik des Protokolls (vorn Rz. 121 ff.) zum selben Schluss.

130     Da sich somit das Übereinkunftsprotokoll nur auf Forderungen aus dem ersten
        Schiedsverfahren bezieht, gilt für die im vorliegenden Schiedsverfahren erhobenen
        Ansprüche die Schiedsklausel des Managementvertrags.

## 2.      Zuständigkeit des Schiedsgerichts aufgrund Schiedsklausel im Management-
        vertrag

131     Ist somit die Schiedsklausel des Managementvertrags anwendbar, stellt sich als
        nächstes die Frage, ob das Schiedsgericht gemäss dieser Schiedsklausel für die vor-
        liegenden Ansprüche zuständig ist.

132     Es ist unbestritten, dass der Managementvertrag eine Schiedsklausel enthält und
        dass es der gemeinsame Parteiwille war, allfällige Streitigkeiten durch ein nach den

Regeln der Zürcher Handelskammer ernanntes Schiedsgericht beurteilen zu lassen. Auch unstrittig ist, dass die Schiedsklausel im Managementvertrag die Parteien bindet (Zuständigkeit *ratione personae*) und dass die von der Klägerin geltend gemachten Ansprüche unter die Schiedsklausel fallen (Zuständigkeit *ratione materiae*).

133    Jedoch behauptet die Beklagte, dem Schiedsgericht fehle die Zuständigkeit, da die Klägerin vor Einleitung dieses Schiedsverfahrens zuerst die Gerichte in Äquatorialguinea hätte anrufen müssen (vgl. KA Rz. 36 f., 42). Mangels Klageeinleitung und Abschlusses eines erstinstanzlichen Gerichtsverfahrens in der Republik Äquatorialguinea müsse sich das Schiedsgericht für unzuständig erklären oder, eventualiter, das Verfahren sistieren und den Parteien eine Frist ansetzen, die es ihnen ermögliche, das Schlichtungsverfahren sowie das ordentliche Gerichtsverfahren in Äquatorialguinea durchzuführen (vgl. KA Rz. 45).

134    Zur Beantwortung der Frage, ob die Klägerin vor Anrufung des Schiedsgerichts zuerst die Gerichte in Äquatorialguinea hätte anrufen müssen, ist die Schiedsklausel aufgrund des anwendbaren Rechts auszulegen. Bei internationalen Schiedsverfahren mit Sitz in der Schweiz ist dies gemäss Art. 178 Abs. 2 IPRG (i) das von den Parteien gewählte, (ii) das auf die Streitsache, insbesondere auf den Hauptvertrag anwendbare oder (iii) das schweizerische Recht. Vorliegend haben die Parteien für die Schiedsklausel nicht separat ein anwendbares Recht bestimmt. Es ist somit gemäss Art. 178 Abs. 2(ii) und (iii) auf Schweizer Recht abzustellen (Zwischenentscheid vom 15. März 2016, Rz. 35). Die Schiedsklausel gemäss Art. 14 Abs. 3 des Managementvertrages lautet wie folgt:

> Deutsche Fassung:
>
> Bei Streitigkeiten aus diesem Vertrag, werden die Parteien versuchen vor der Anrufung der Gerichte von Guinea Ecuatorial eine einvernehmliche Lösung zu finden. Für den Fall von Streitigkeiten verpflichten sich die Parteien ein Schiedsverfahren vor der Handelskammer in Zürich durchzuführen.

Spanische Fassung:

En caso de litigio, las partes se sentarán para resolver amigablemente el problema, caso contrario se dirigiarán a los tribunales de Guinea Ecuatorial. En caso de desacuerdo de una de las partes, podrá recurrir al tribunal de la Cámara de Comercio de Zurich.

Übersetzung gemäss beglaubigter Übersetzung durch die Klägerin (Beilage K-82): Im Falle von Streitigkeiten werden sich die Parteien zusammensetzen um das Problem freundschaftlich zu lösen, andernfalls werden sie sich an die Gerichte von Äquatorialguinea wenden. Im Falle des Nichteinverständnisses einer der Parteien kann das Gericht der Handelskammer in Zürich angerufen werden[1].

135　Die Parteien sind sich uneinig darüber, ob die spanische Fassung des Managementvertrags der deutschen Fassung vorgeht. Die Beklagte trägt vor, die deutsche Fassung der Schiedsklausel entspreche nicht der spanischen, welche massgeblich sei (KA Rz. 28 ff.). Die Klägerin behauptet, beide Fassungen seien gleichbedeutend (Replik Klägerin, Rz. 109).

136　Nach Auffassung des Schiedsgerichts besteht kein Grund, bei der Auslegung der Schiedsklausel der spanischen Fassung den Vorrang zu geben. Die Parteien haben sich für eine zweisprachige Version des Vertrags entschieden, ohne einer Sprache Vorrang zu geben. Das Argument der Beklagten, der Vorrang des Spanischen ergebe sich aus der (unbestrittenen) Tatsache, dass vor Unterzeichnung handschriftliche Änderungen auf Spanisch am Vertragstext angebracht worden seien (vorn Rz. 98), ist auf die Schiedsklausel (Ziff. 14 MV) nicht anwendbar: Diese weist keine solchen handschriftlichen Änderungen auf. Auch die (unbestrittene) Tatsache, dass der Vertrag nur auf der linken Seite, d.h. unter dem spanischen Text, unterschrieben wurde (vorn Rz. 98), ist kein Indiz dafür, dass die deutsche Fassung nachrangig sein sollte. Hätten die Parteien dies gewollt, hätten sie dies im Vertragstext klarstel-

---

[1]　Das Schiedsgericht schliesst sich der Übersetzung gemäss Beilage K-82 an. Die von der Beklagten angebotene Übersetzung (KA Rz. 29) ist nicht akkurat.

Case 1:20-cv-03572-RJL   Document 1-1   Filed 12/08/20   Page 176 of 221

len können. Ausserdem ist davon auszugehen, dass die Parteien nicht im selben Dokument parallel nebeneinander die deutsche und die spanische Fassung abgedruckt hätten, wenn sie der spanischen Fassung den Vorrang hätten geben wollen.

13      Bei der Auslegung der Schiedsklausel kann sich das Schiedsgericht somit sowohl des Wortlauts der deutschen als auch der spanischen Fassung bedienen. Beide Fassungen der Schiedsklausel erwähnen im ersten Satz eindeutig die Gerichte von Äquatorialguinea. Gemäss der deutschen Fassung sollen die Parteien versuchen, eine einvernehmliche Lösung *"vor der Anrufung"* der Gerichte von Äquatorialguinea suchen. Ähnlich verlangt die spanische Fassung, dass die Parteien versuchen werden, allfällige Streitigkeiten einvernehmlich zu lösen und sich, falls dies nicht gelingt (*"caso contrario"*), an die Gerichte von Äquatorialguinea wenden. Im zweiten Satz beider Fassungen der Schiedsklausel wird hingegen ein Schiedsgericht erwähnt. In der deutschen Fassung ist das Schiedsgericht *"[f]ür den Fall von Streitigkeiten"* vorgesehen. In der spanischen Version ist das Schiedsgericht *"im Falle des Nichteinverständnisses einer der Parteien"* anzurufen (*"[e]n caso de desacuerdo de una de las partes"*).

131     Was genau das Verhältnis zwischen den Gerichten von Äquatorialguinea und dem Schiedsgericht sein soll, bleibt anhand des Wortlauts unklar.

139     Wie bereits dargelegt, ist es vorliegend unbestritten, dass es der gemeinsame Wille der Parteien war, allfällige Streitigkeiten durch ein Schiedsgericht entscheiden zu lassen. Somit steht die Gültigkeit der Schiedsklausel nicht in Frage.

140     Strittig ist einzig, ob die Parteien die Zuständigkeit des Schiedsgerichts von der vorgängigen Durchführung eines staatlichen Verfahrens vor den Gerichten von Äquatorialguinea abhängig machen wollten. Der Zeuge der Klägerin, Ulrich Marseille, führt zu diesem Punkt aus, man habe sich anlässlich der Vertragsverhandlungen am 14.12.2009 in Malabo auf *"eine neutrale Institution, ein international operierendes Schiedsgericht"* geeinigt, für den Fall dass eine aussergewöhnliche Einigung scheitern sollte (Zeugenaussage Marseille, S. 6). Der gemeinsame Wille

sei gewesen, dass beide Parteien im Falle von Streitigkeiten direkt vor dem Schiedsgericht klagen können, ohne zuvor die Gerichte in Äquatorialguinea anrufen zu müssen; für die Klägerin sei es nicht vorstellbar gewesen, vor den äquatorialguineischen Gerichten zu prozessieren (Zeugenaussage Marseille, S. 6-7; WP Marseille, S. 44 N 5-11; S. 89 f.).

141   Zum Umstand, dass in der Schiedsklausel auch die Gerichte von Äquatorialguinea erwähnt werden, erklärte der Zeuge Marseille (WP Marseille, S. 90 N 7-10, bestätigt in WP S. 104 N 1-9):

> *Erst wollten die gar nicht. Dann haben wir gesagt: Dann können wir das nicht machen. So hiess es dann, dass er gesagt hat: Na ja, aber irgendwie muss auch Äquatorialguinea noch erwähnt werden. So kam es dann zu dieser Klausel.*

142   Die Beklagte hat keine Zeugen oder andere Beweismittel bezüglich Deutung des Wortlauts der Schiedsklausel, einschliesslich der Aussagen von Herrn Marseille zu den Verhandlungen in Malabo und dem Willen der Parteien bezüglich direkten Zugangs an das Schiedsgericht, angerufen. Das Schiedsgericht ist der Auffassung, dass der übereinstimmende wirkliche Wille der Parteien nicht ermittelt werden kann. Es ist deshalb eine objektivierte Auslegung der Schiedsklausel vorzunehmen und darauf abzustellen, was vernünftige Parteien unter den gegebenen Umständen unter dem vorliegenden Wortlaut bzw. den abgegebenen Erklärungen wohl verstanden hätten (vgl. bereits Rz. 118 sowie BSK OR I-Wiegand, Art. 18 N 11, 13; BGE 143 III 157 E. 1.2.2; 138 III 659 E. 4.2.1; 132 III 24 E. 4; 128 III 265 E. 3). Dabei ist zu berücksichtigen, was sachgerecht ist, weil nicht anzunehmen ist, dass die Parteien eine unangemessene Lösung gewollt haben (BGE 140 III 134 E. 3.2 S. 139; 122 III 420 E. 3a S. 424; 117 II 609 E. 6c S. 621; vgl. auch BGE 133 III 607 E. 2.2 S. 610).

143   Beim deutschen Wortlaut ist unklar, worauf sich die Formulierung *"Für den Fall von Streitigkeiten"* im zweiten Satz der Schiedsklausel des Managementvertrags bezieht. Der spanische Wortlaut spricht stattdessen von *"[i]m Fall des Nichteinver-*

... 

*ständnisses*"; es bleibt aber ebenso unklar, worauf sich dieses Nichteinverständnis bezieht. Denkbar wäre, dass sich die *"Streitigkeiten"* bzw. das *"Nichteinverständnis"* auf ein Urteil der Gerichte von Äquatorialguinea beziehen. Ebenfalls denkbar wäre, dass sich die *"Streitigkeiten"* bzw. das *"Nichteinverständnis"* auf die Frage der Anrufung der Gerichte von Äquatorialguinea an sich bezieht, was bedeuten würde, dass eine Partei, wenn sie diese Gerichte nicht anrufen will, stattdessen die Handelskammer in Zürich anrufen kann. Im Vergleich zur ersten Auslegungsvariante ist die zweite Auslegungsvariante sinnvoller, da sie den Parteien ermöglicht, direkt ein Schiedsverfahren einzuleiten, anstatt dem Schiedsverfahren ein staatliches Verfahren vorangehen zu lassen. Wie die Klägerin zu Recht anführt, müsste ein Schiedsgericht die materielle Rechtskraft eines früheren Entscheides (eines staatlichen Gerichts oder eines Schiedsgerichts) beachten und könnte davon nicht mehr abweichen (vorn Rz. 98; vgl. BGE 128 III 191, E. 4.a; 136 III 345, E. 2.1). Eine solche Zweitvorlage an ein Schiedsgericht wäre deshalb nicht sinnvoll.

14x    Die Frage stellt sich, ob Parteien vereinbaren können, dass ungeachtet der materiellen Rechtskraft eines staatlichen Urteils dieselbe Sache noch einmal vor einem Schiedsgericht verhandelt werden kann. Dies ist fraglich, insbesondere, da die materielle Rechtskraft gemäss Rechtsprechung des Bundesgerichts zum "ordre public" gehört (BGE 136 III 345). Unabhängig von der Frage der Zulässigkeit eines solchen Vorgehens wäre dies jedenfalls nicht sinnvoll, weil daraus zwei vollstreckbare Entscheide in derselben Sache resultieren würden. Ein solches Vorgehen ist nicht zweckmäßig und es ist deshalb nicht anzunehmen, dass vernünftige Parteien ein solches Vorgehen vereinbaren würden.

145    Hinzu kommt, dass Parteien, falls sie tatsächlich wünschen sollten, dass ein Schiedsgericht als eine Art Rekursinstanz gegenüber einem staatlichen Urteil amten sollte, wohl eine Frist für die Anrufung der Rekursinstanz vereinbaren und sich zu der Überprüfungsbefugnis des Schiedsgerichts äussern würden. Ferner wäre anzunehmen, dass sie in einem solchen Fall regeln würden, ob der staatliche Rechtsweg ausgeschöpft werden muss, bevor der Gerichtsentscheid dem Schiedsgericht unter-

breitet werden kann. All dies fehlt aber in der Schiedsklausel des Managementvertrags.

146   Der von der Beklagten angebrachte Vergleich mit dem *Court of Arbitration for Sport* (CAS) als Rekursinstanz (Duplik Rz. 33) ist unzulänglich, weil dort Gegenstand des Rekurses ein Verbandsentscheid ist, der nicht in Rechtskraft erwachsen kann, wenn eine Anfechtung des Entscheids vor dem CAS erfolgt.

147   Somit führt eine objektivierte Auslegung der Schiedsklausel des Managementvertrags zum Resultat, dass eine Partei für Streitigkeiten aus dem Managementvertrag ein Schiedsgericht in Zürich anrufen kann, ohne zuerst ein Verfahren vor den Gerichten in Äquatorialguinea durchführen zu müssen. Entsprechend ist das Schiedsgericht zur Behandlung der Ansprüche zuständig.

148   Auch für die von der Beklagten subsidiär beantragte Sistierung bis zur Einleitung eines Schlichtungsverfahrens und hernach der Entscheidung durch das ordentliche Gericht in Äquatorialguinea bzw. bis zur Entscheidung durch das ordentliche Gericht in Äquatorialguinea (Eventualantrag a und b zu den Anträgen 1 und 2, KA S. 3) besteht kein Grund. Der Schiedsklausel ist nicht zu entnehmen, dass die Klägerin vor Anrufung des Schiedsgerichts zuerst ein Schlichtungsverfahren einleiten müsste. Gemäss deutscher Fassung der Schiedsklausel werden die Parteien bei Streitigkeiten aus diesem Vertrag *"versuchen vor der Anrufung der Gerichte von Guinea Ecuatorial eine einvernehmliche Lösung zu finden"*. Gemäss spanischer Fassung werden die Parteien sich im Falle von Streitigkeiten *"zusammensetzen um das Problem freundschaftlich zu lösen"* (vorn Rz. 134). Von einem Schlichtungsverfahren ist dabei nicht die Rede, so dass der entsprechende Einwand der Beklagten, es müsse zuerst ein solches durchgeführt werden, nicht überzeugt.

149   Das Schiedsgericht ist deshalb für die Behandlung der eingeklagten Ansprüche zuständig.

**B.     Materielles**

**1.     Frage der Vertragsauflösung durch die Beklagte**

15t    Die Klägerin macht im vorliegenden Schiedsverfahren weitere Vergütungsansprüche aus dem Managementvertrag für die Zeitperiode von August 2010 bis und mit August 2012, für welche ihr im ersten Schiedsverfahren bereits eine Entschädigung von insgesamt EUR 14'063'400 (zzgl. Zinsen) zugesprochen wurde, geltend (vgl. Schiedsspruch aus erstem Schiedsverfahren, Dispositiv-Ziff. 2 und 3). Die Klägerin hatte damals nur einen Teilbetrag von 90% eingeklagt. Ferner macht die Klägerin Vergütungsansprüche für den Zeitraum ab September 2012 bis und mit Januar 2015 sowie darüber hinaus bis und mit Januar 2020 geltend, da sich der Managementvertrag mangels Kündigung automatisch um fünf Jahre verlängert habe (vgl. KS S. 3 f. sowie Replik S. 3 f.).

15    Die Beklagte wendet ein, dass der Managementvertrag konkludent spätestens im März 2011 mit sofortiger Wirkung gekündigt worden sei. Ein solches Kündigungsrecht ergebe sich zwingend aus Art. 404 Abs. 1 OR (vgl. KA Rz. 89 ff.).

15    Die Parteien haben in Art. 12.1 MV eine feste Laufzeit des Vertrags von fünf Jahren vereinbart, mit automatischer Verlängerung um fünf Jahre, es sei denn, der Vertrag werde mit einer Frist von einem Jahr vorher gekündigt (vgl. Beilage K-1). Die Frage stellt sich somit, ob die Beklagte gestützt auf die auftragsrechtliche Bestimmung von Art. 404 Abs. 1 OR den Managementvertrag vor Ablauf der vereinbarten Laufzeit mit sofortiger Wirkung kündigen konnte. Hierzu ist zu prüfen, ob die auftragsrechtliche Bestimmung von Art. 404 Abs. 1 OR auf den vorliegenden Vertrag anwendbar ist.

*a)    Qualifikation des Managementvertrags*

15    Die Auswertung der Vertragsbestandteile des vorliegend zu beurteilenden Managementvertrags ergibt, dass es sich um einen Innominatvertrag handelt, und zwar um einen gemischten Vertrag, in welchem Tatbestandsmerkmale verschiedene

Vertragstypen kombiniert werden (BSK OR I-Amstutz/Morin/Schluep, Einl. vor Art. 184 ff. N 8 f.):

154    In Ziff. 3.1 MV verpflichtet sich die Klägerin zum Betrieb der Poliklinik (Management). Die Beklagte erteilt ihr hierzu eine unbeschränkte Generalvollmacht. Die Klägerin trifft auch alle für den Betrieb erforderlichen Personalentscheidungen (Ziff. 3.2). Diese Aufgaben haben einen auftragsrechtlichen Charakter, denn die Klägerin verpflichtet sich zur Erbringung von Dienstleistungen in unabhängiger Position (vgl. Schmid/Stöckli/Krauskopf, Schweizerisches Obligationenrecht Besonderer Teil, 2. A., N 1877).

155    Bei der Verpflichtung zur Aus- und Fortbildung der Beschäftigten inkl. Fortbildungskurse auf dem E-Learningsystem der Klägerin gegen Gebühr (vgl. Ziff. 3.3. und 10.1 MV) liegt ein gemischter Vertrag in Form eines Kombinationsvertrages vor. Die Lehrpflicht ist auftragsrechtlicher Natur, während die Benutzung des E-Learningssystems einen mietrechtlichen Einschlag hat (vgl. Huguenin, Obligationenrecht Allgemeiner und Besonderer Teil, 2. A., N 4062). Erstellung und Anpassung der E-Learning-Einheiten haben einen werkvertraglichen Einschlag; die E-Learning Einheiten haben einem zu entwickelnden Ausbildungsplan zu entsprechen (Ziff. 1.4 und 1.5 MV).

156    Bei der Entwicklung und Bereitstellung der Software für die Krankenhausadministration (Ziff. 3.4 MV; inkl. Installation, vgl. Ziff. 6.1 MV sowie Softwareanpassungs- bzw. Wartungskosten; hinten Rz. 212 f.) ist – nebst dem kaufrechtlichen Element – ein Übergewicht des werkvertraglichen Elementes festzustellen, denn die Klägerin verpflichtete sich zur Erstellung eines individuell bestimmten Arbeitsergebnisses (vgl. BGE 124 III 456, E. 4.b, m.w.H.; BK-Koller, Art. 363 N 220).

157    Die Zurverfügungstellung des "Brand Name" inkl. Berechtigung zur Verwendung des Schriftzuges der Klägerin (vgl. Ziff. 3.5 MV) hat lizenzähnlichen Charakter. Es besteht dabei eine gewisse Nähe zum Miet- bzw. Pachtrecht; die herrschende Lehre

lehnt jedoch deren analoge Anwendung ab (vgl. Huguenin, a.a.O., N 3801; CHK-Zenhäusern, Vorb OR 184/Lizenz- und Know-how-Vertrag, N 13).

158      Die in der Replik erwähnte Konzeptionierung einer Krankenpflegeschule (vgl. Replik Rz. 257; vgl. auch WP Reinmüller, S. 12 N 17 ff.) gehört nicht zu den expliziten Aufgaben gemäss Managementvertrag. Allfällige Aufwendungen in diesem Zusammenhang und weiteren Projekten in Äquatorialguinea, z.B. die Fertigstellung und Betreibung des Krankenhauses in Malabo, waren nicht Bestandteil der Management Fee (vgl. WP Marseille, S. 109 N 12 ff.; ebenso die Beklagte in Duplik Rz. 154, B-SB Rz. 27, 33, B-SeA Rz. 18, B-S-SeA Rz. 9 f., 14, 24; zum Ganzen auch hinten Rz. 215 ff.).

### b)    *Frage der Anwendbarkeit von Art. 404 OR*

159      Als nächstes ist die Anwendbarkeit von Art. 404 OR zu prüfen. Die Mehrheit des Schiedsgerichts (Dr. Andrea Meier und Dr. Felix Fischer) kommt aus den folgenden Gründen zum Schluss, dass Art. 404 OR vorliegend nicht anwendbar ist.

160      Art. 404 Abs. 1 OR bestimmt, dass der Auftrag von jedem Teile jederzeit widerrufen oder gekündigt werden kann. Die Ausübung des jederzeitigen Widerrufs- bzw. Kündigungsrechts setzt keinen bestimmt gearteten Auflösungsgrund (z.B. einen "wichtigen Grund") voraus (BSK OR I-Weber Art. 404 N 5; BGE 106 II 160 = Pra 1980, 597).

161      Das auftragsrechtliche Beendigungsrecht nach Art. 404 Abs. 1 OR ist zwingend und kann von den Parteien nicht wegbedungen werden (BGE 115 II 464, E. 2a; BGE 109 II 462, E. 3e; BGer 4A_284/2013, E. 3.5.1; Gauch, a.a.O., N 1966). Die Rechtfertigung dieser Regel ist gemäss bundesgerichtlicher Rechtsprechung darin zu erblicken, dass der Beauftrage eine ausgesprochene Vertrauensstellung einnimmt und es keinen Sinn hat, den Vertrag noch aufrechterhalten zu wollen, wenn das Vertrauensverhältnis zwischen den Parteien zerstört ist (BGE 104 II 108 E. 4).

6    Bei Vorliegen eines gemischten Vertrags (Innominatvertrag) ist nach Auffassung des Bundesgerichts das sofortige Beendigungsrecht nach Art. 404 Abs. 1 OR nur anwendbar, wenn hinsichtlich der zeitlichen Bindung der Parteien die Bestimmungen des Auftragsrechts als sachgerecht erscheinen (BGer 4A_284/2013 E 3.5.1; 4A_2011 E. 2.2). Für diese Frage wird vor allem darauf abgestellt, ob nach Art des Vertrages ein Vertrauensverhältnis zwischen den Parteien unerlässlich ist und ihm besondere Bedeutung zukommt (BGer 4A_284/2013 E 3.5.1; 4C.24/1989 E. 2c).

16.    Mit der Anwendung von Art. 404 Abs. 1 OR auf gemischte Verträge hat sich das Bundesgericht vertieft in seinem Entscheid 4A_284/2013 vom 13. Februar 2014 befasst. Dem Entscheid lag eine Vereinbarung zugrunde, mit welcher im Rahmen einer "Zusammenarbeitsvereinbarung" die Liegenschaftsverwaltung der Y. Immobilien AG in die Räumlichkeiten der X. AG verlegt und dort von dieser organisiert und geleitet wurde. Das Mitbenutzungsrecht der Räume samt Infrastruktur wurde der Y. Immobilien AG nicht selbständig eingeräumt, sondern integriert in die Organisation der Beschwerdeführerin unter deren Leitung. Das Mitbenutzungsrecht selbst basierte mithin auf dem zwischen den Parteien bestehenden Vertrauensverhältnis. Ferner wurde der X. AG eine Vollmacht über das Betriebskonto erteilt, auf dem sie selbständig Abbuchungen vornehmen konnte. Tatsächlich nahm die X. AG noch nach erfolgter Kündigung durch die Y. Immobilien AG verschiedene Überweisungen an sich selbst vor, namentlich um sich für die Ausfälle wegen der vorzeitigen Vertragsbeendigung zu entschädigen. Das Bundesgericht kam zum Schluss, dass die Eingliederung in den Betrieb der X. AG und die umfangreichen Kompetenzen, die ihr übertragen wurden, im Vergleich zu einer gewöhnlichen Liegenschaftsverwaltung ein gesteigertes Vertrauensverhältnis voraussetzten, was die Anwendung der auftragsrechtlichen Bestimmungen auf die Vertragsauflösung als sachgerecht erscheinen liess (E. 3.5.2).

1c4    Der vorliegend zu beurteilende Vertrag betrifft das Management eines Krankenhauses, die Ausbildung der Mitarbeiter und die Entwicklung einer Krankenhaussoftware. Der Managementvertrag setzt sich aus auftragsrechtlichen, werkvertrags-

rechtlichen, lizenzrechtlichen, mietrechtlichen und kaufrechtlichen Elementen zu-
sammen (vorn Rz. 154 ff.). Bedeutende vertragliche Aufgaben wie der Betrieb des
Krankenhauses und die Aus- und Fortbildung der Beschäftigten weisen auftrags-
rechtliche Elemente auf. Bei der Gesamtwürdigung, ob eine Anwendung von Art.
404 OR sachgerecht ist, fallen aber auch die anderen im Managementvertrag vertre-
tenen Vertragstypen ins Gewicht, da die Kündigungsmöglichkeit ohne Vorliegen
eines wichtigen Grunds nur dem Auftragsrecht, nicht aber den anderen Vertragsty-
pen eigen ist. Zudem zeigt die nachfolgende Würdigung aller Umstände, dass nach
Art des Vertrags und insbesondere seiner Umsetzung durch die Parteien ein Ver-
trauensverhältnis zwischen den Parteien keine unerlässliche Voraussetzung für die
Durchführung des Vertrags war und die Beklagte den Schutz eines jederzeitigen so-
fortigen Kündigungsrechts ohne wichtigen Grund nicht benötigte.

165   Fraglos ist die Gesundheitsversorgung ein sensibler Bereich. Die Beklagte wählte
      dafür allerdings einen professionellen Dienstleister aus, dessen Aufgaben vertrag-
      lich geregelt wurden. Die vertragliche Regelung wiederum sah für die Klägerin
      weitreichende Kompetenzen bei der Führung des Klinikbetriebs: Ziff. 3.1 räumte
      der Klägerin eine Generalvollmacht ein, welche sie berechtigte, alle Erklärungen
      abzugeben und in Empfang zu nehmen, welche für den Betrieb des Krankenhauses
      notwendig waren. Gemäss Ziff. 3.2. MV durfte sie alle Personalentscheidungen
      treffen, alle Arten von Lieferverträgen mit Patienten und Angehörigen schliessen
      sowie alle anderen Verträge schliessen, die ihr für einen wirtschaftlich vernünftigen
      Klinikbetrieb geeignet erschienen. Dazu wurde der Klägerin gemäss Ziff. 2.1 MV
      ein Budget zur Verfügung gestellt, aus welchem sie nach bestem Wissen und Ge-
      wissen alle betriebswirtschaftlich notwendigen Kosten zu bestreiten hatte.

166   Zusätzlich zum Vertragstext sind aber auch die weiteren relevanten Umstände zu
      berücksichtigten, wozu namentlich die Umsetzung des Vertrags durch die Parteien
      und damit verbundene Beschränkungen der vertraglichen Befugnisse gehören. Eine
      solche Gesamtbetrachtung zeigt, dass sich die Beklagte bei den betrieblichen Ent-
      scheidungen einschliesslich der finanziellen Fragen weitgehende Kontrollrechte

einräumte und die Entscheide der Klägerin der Bewilligung durch die Beklagte bedurften. Im Einzelnen:

1.57    Ulrich Marseille führte aus, dass die Mitarbeiter der Klägerin vor Ort alle Entscheidungen, einschliesslich Personalentscheidungen, von Dr. Pedro bewilligen lassen mussten (vgl. WP Marseille, S. 45 N 11 ff.):

> *Zeuge Marseille: Herr Marcelino war der Minister, aber in der Verwaltung war so ein Aufpasser. Das war ein Professor oder Doktor - den Namen habe ich jetzt gerade nicht -, der da den ganzen Tag eben saß und immer aufpasste. Wenn es Entscheidungen gab, musste man immer erst zu ihm gehen, und der musste die noch mal bestätigen. Also, wenn wir jetzt neue Ärzte aus Israel oder aus Südamerika eingestellt haben, konnten unsere Leute nicht unterschreiben, sondern da musste man immer zu diesem - ich weiß jetzt nicht, wie der Name - -*
>
> *Prof. Dr. Bernd Reinmüller: War es Dr. Pedro?*
>
> *Zeuge Marseille: Dr. Pedro. [...]*

1.58    Fritz Kronenberger führte in seiner Zeugenerklärung aus, dass Dr. Pedro sowie Dr. Donato Funktionsträger der Regierung innerhalb der Klinik waren (WP Kronenberger, S. 250 N 15 ff.).

1.59    Das Management des einheimischen Personals wurde gemäss Zeugenerklärung von Ralf Reinsch allein durch Dr. Pedro verantwortet (Zeugenerklärung Reinsch, Beilage K-14, S. 5 unten).

1.71    Die Verantwortung für Einkauf und Auswahl der Medikamente und des sonstigen Krankenhausmaterials verblieb auf Anweisung des Verwaltungsrats entgegen Ziff. 6.1.d) des Managementvertrags bei Dr. Stamler (KS Rz. 96, Beilage K-36; nicht bestritten). Dr. Stamler unterstand als deren Angestellter direkt der Beklagten (KS Rz. 96; nicht bestritten).

1.7    Herr Marcellino Oyono Ntutumu, der Gesundheitsminister von Äquatorialguinea, war Verwaltungsratspräsident der Klinik (vgl. Zeugenerklärung von Fritz Kronenberger vom 28. April 2011, Beilage K-39, S. 4). Herr Kronenberger, welcher für

die Klägerin für das Finanzmanagement vor Ort zuständig war, musste dem Verwaltungsrat über die Zahlen Bericht erstatten (WP Kronenberger, S. 271, N 6-17).

172    Schliesslich war der zuvor bei der Klägerin angestellte und Herrn Kronenberg unterstellte Buchhalter, Herr Mensching, ab 1. Januar 2011 direkt bei der Beklagten angestellt (KS Rz. 110; Beilage K-38 S. 1 f.; nicht bestritten).

173    Die letzte Entscheidungsbefugnis bezüglich Betriebsführung lag somit unverändert bei der Beklagten bzw. ihren Vertretern vor Ort. Die Beklagte bedurfte somit nicht des besonderen Schutzes, den das jederzeitige Kündigungsrecht gemäss Art. 404 OR bietet.

174    Auch ist zu berücksichtigen, dass im ersten Schiedsverfahren bindend festgestellt wurde, dass die Klägerin ihre Pflichten aus dem Managementvertrag ordnungsgemäss erfüllt hat. Das erste Schiedsgericht hat für dieses Schiedsverfahren verbindlich festgestellt, dass die Einrede der Beklagten betreffend Nicht- bzw. nicht ordnungsgemässer Erfüllung des Vertrages durch die Klägerin unbegründet war (vgl. Zwischenentscheid Rz. 49-51). Aufgrund ihrer ordnungsgemässen Erfüllung setzte die Klägerin somit keinen Grund für ein Misstrauen, welches auf Seiten der Beklagten ein besonderes Vertrauensverhältnis nötig gemacht hätte, damit die Vertragsbeziehung fortgesetzt werden konnte.

175    Angesichts der gemischten Natur des Managementvertrags, der Auswahl eines professionellen Dienstleisters für den Betrieb des Krankenhauses in Bata, der Tatsache, dass sich die Beklagte hinsichtlich der Führung des Krankenhauses weitreichende Entscheidungs- und Kontrollmöglichkeiten vorbehalten hatte, sowie der vertragsgemässen Erfüllung durch die Klägerin erscheint *in casu* ein besonderes Vertrauensverhältnis als keine unerlässliche Voraussetzung für die weitere Tätigkeit der Klägerin unter dem Managementvertrag. Es wäre daher nicht sachgerecht, der Beklagten die Möglichkeit eines jederzeitigen, unabhängig von einem wichtigen Grund bestehenden Kündigungsrechts mit sofortiger Wirkung gemäss Art. 404 OR zu gewähren.

Das Argument der Beklagten (vorn Rz. 104), sie habe das Vertrauen in die Kläge-
rin verloren (wobei dies aber nicht auf eine nicht ordnungsgemässe Erfüllung auf
Seiten der Klägerin zurückgeführt werden kann; vorn Rz. 174) rechtfertigt somit
keine *sofortige* Kündigung gemäss Art. 404 OR. Hingegen spielt der Umstand, in-
wiefern die Beklagte gegenüber der Klägerin diesen Vertrauensverlust und einen
Willen zum Ausstieg aus dem Vertrag kommuniziert hat, eine Rolle bei der Frage
der konkludenten Kündigung auf Ende der ordentlichen Vertragsdauer. Dies wird
im nachfolgenden Abschnitt untersucht.

2.      **Konkludente Kündigung durch die Beklagte auf Ende der ordentlichen Ver-
        tragsdauer**

177     Da die vertraglich vereinbarten Kündigungsvorschriften gemäss Ziff. 12.1 MV kei-
        ne Formvorschriften für eine Kündigung vorsehen, ist eine solche auch konkludent
        möglich. Aufgrund der Beweislage, namentlich der Erkenntnisse aus der mündli-
        chen Verhandlung, hält es das Schiedsgericht für erwiesen, dass die Beklagte den
        Managementvertrag im März 2011 konkludent gekündigt hat:

178     Hierfür spricht der Umstand, dass die Herren Kronenberger und Gerard am
        16. März 2011 aus dem Land ausgewiesen wurden (vgl. Zeugenerklärung Kronen-
        berger, Beilage K-39 S. 5; WP Marseille S. 50 N 10 ff.; WP Kronenberger
        S. 267 f.; S. 272 N 6-14; vgl. auch Beilage K-42). Nach dem Verlassen des Landes
        im März 2011 hat die Klägerin unstreitig für die Beklagte keine Dienstleistungen
        mehr in Äquatorialguinea erbracht (WP Regenhardt S. 180, N 17-21; WP Kronen-
        berger S. 272 N 16-24).

179     Die Beklagte hat der Klägerin mehrmals mitgeteilt, dass sie sich vom Vertrag lösen
        wollte. Gemäss Fritz Kronenberger hatte ihm der Minister am 15. Januar 2011 Fol-
        gendes gesagt (vgl. Zeugenerklärung Kronenberger, Beilage K-39 S. 5):

                *Wir haben kein Vertrauen mehr zu den Marseille-Kliniken. Die wei-
                tere Zusammenarbeit macht keinen Sinn mehr. [...] Ich habe keine
                Lust mehr. Und am besten ist es, wir heben den Vertrag auf!*

181  Dies hielt Fritz Kronenberger auch in seiner E-Mail an Axel Regenhardt vom 15. Januar 2011 fest (vgl. Beilage K-40).

18   Anlässlich der Schiedsverhandlung vom 5. Dezember 2016 bestätigte Fritz Kronenberger, dass Minister Marcellino aus dem Vertrag aussteigen wollte (WP Kronenberger S. 277 N28 f.):

> *Er [Minister Marcellino] wollte aus dem Vertrag raus, ganz klar, ja.*

182  Auch Ulrich Marseille hielt in seinem Schreiben vom 31. Januar 2011 Folgendes fest (vgl. Beilage K-38 S. 4):

> *Nach alledem dürfte feststehen, dass Sie gar kein Interesse mehr daran haben, dass der geschlossene Vertrag auch vertragsgetreu umgesetzt wird, als vielmehr dass Sie uns "kalt" aus dem Vertrag herausdrängeln wollen.*

183  In seiner Zeugenaussage bestätigte Ulrich Marseille, dass er den Beendigungswillen der Beklagten verstanden hatte. So hielt er fest (WP Marseille S. 53 N 19-24):

> *Wir haben das so empfunden, dass der Vertrag durch die normative Kraft des Faktischen beendet werden sollte. Also, ein bisschen salopp gesagt: Wir haben einen Vertrag, darüber haben wir ein paar Jahre verhandelt, wir haben uns viel Mühe gegeben, und jetzt wird der Vertrag einfach beendet, indem man die Leute so wegschickt.*

184  Die Zeugenaussagen zeigen somit, dass es für die Klägerin klar war, dass die Beklagte den Vertrag aufheben und in Zukunft ihre Dienstleistungen nicht mehr in Anspruch nehmen wollte.

185  Daraus folgt, dass die Beklage den Vertrag im März 2011 durch Wegweisung der Mitarbeiter der Klägerin konkludent gekündigt hat. Sie hat damit den Vertrag gemäss Art. 12.1 MV ordentlich per Ende der fünfjährigen Laufzeit gekündigt (vgl. zur Laufzeit hinten Rz. 196 ff.).

3.      **Beginn und Ende der Laufzeit der Management Fee**

*a,*      *Beginn Phase B*

18    Die monatliche Management Fee gemäss Ziff. 7.1 beginnt mit Eintritt der Phase B zu laufen (Ziff. 6.2 MV) und beträgt EUR 700'000 monatlich bzw. EUR 8'400'000 jährlich. Zur Ermittlung der geschuldeten Gebühr ist festzustellen, wann die Phase B begonnen hat.

18    Die Klägerin legt dar, die Phase B sei spätestens mit Abschluss der Phase A per 1. August 2010 eingetreten (KS Rz. 147). Die Beklagte führt aus, Beilage K-21 stelle klar, dass die Phase 1 (gemeint A) am 7. September 2010 erledigt gewesen sei und die Phase B zu laufen begonnen habe (Duplik Rz. 56).

18    Der Managementvertrag regelt nur den Beginn der ersten Phase (Phase A) ausdrücklich. Deren Eintritt war vertraglich auf den 1. Februar 2010 festgelegt worden (Art. 4.1). Phase A ist in Art. 6.1. des Managementvertrags definiert, Phase B in Art. 6.2. Die Phase A umfasst die folgenden Dienstleistungen (vgl. Beilage K-1 Ziff. 6.1):

       (a)     Kontrolle der Ein- und Ausgaben

       (b)  ˊ Kontrolle der Finanzorganisation

       (c)     Beginn mit der Installation der Software im internationalen Standard

       (d)     Management und Auswahl aller Medikamente mit europäischen Standard und in entsprechende Qualität, ebenso im Bezug auf das gesamte Krankenhausmaterial.

       (e)     Professionelle Kontrolle der Qualität der Auswertung und der Quantität der Mitarbeiter, und Mitteilung an den Verwaltungsrat.

18    Phase A war mit einem Betrag von EUR 840'000 zu vergüten (Ziff. 6.1 Abs. 2 MV); dieser Betrag wurde von der Beklagten Ende Februar 2010 bezahlt (KS Rz. 63).

19    Phase B wurde im Managementvertrag wie folgt definiert (Ziff. 6.2 MV):

> *Diese Phase beinhaltet die vollständige Verantwortung für den technischen Teil, Personal, Belegenheit und das gesamte Eigentum auf Marseille. [...]*

191 In einem "Bericht zum Managementvertrag" vom 7. September 2010 (Beilage K-21) kommt die Klägerin zum Ergebnis, dass die Leistungen aus Phase A zu 100% und die Leistungen aus Phase B zu 58% erbracht worden seien. Voraussetzung für die Erbringung der fehlenden 42% sei die Übertragung des Gesamtmanagements, welche noch nicht erfolgt sei. Damit sei die Phase B erreicht (vgl. zum Ganzen Beilage K-21 S. 15 sowie KS Rz. 83-100).

192 Der "Bericht zum Managementvertrag" vom 7. September 2010 (Beilage K-21), dessen Schlussfolgerungen die Beklagte nicht bestreitet, weist alle Leistungen aus Phase A mit Ausnahme des Managements und der Auswahl der Medikamente, welche bei Dr. Stamler verblieben (vorn Rz. 170), als erledigt aus, d.h. Kontrolle der Einnahmen und Ausgaben, Kontrolle der Finanzorganisation, Beginn mit der Installation der Software sowie Kontrolle Qualität und Quantität der Mitarbeiter. Der Zeitpunkt der Beendigung dieser Arbeiten lässt sich aufgrund folgender Unterlagen ermitteln:

- Betreffend Kontrolle der Einnahmen und Ausgaben und Kontrolle der Finanzorganisation ergibt sich aus S. 6 des Berichts zum Managementvertrag, dass die Firma EPOS im Auftrag der Klägerin die Bereiche Technik, Management und Finanzen im Krankenhaus geprüft und die Ergebnisse in einem Auditbericht mit Stand Juli 2010 zusammengefasst hat. Somit ist von der Erfüllung dieser Aufgaben per Ende Juli 2010 auszugehen.

- Betreffend Beginn der Installation der Software hält der Bericht zum Managementvertrag auf S. 8 unten fest, dass die Softwaresysteme im Krankenhaus am 1. August 2010 in Betrieb genommen wurden. Somit ist von der Erfüllung dieser Aufgaben per 1. August 2010 auszugehen.

- Betreffend Kontrolle Qualität und Quantität der Mitarbeiter erstellte Dr. Doehler am 6. bzw. 9. August 2010 einen Bericht zur Personalsituation und zur Anzahl der häufigsten Behandlungen in der Klinik (vgl. Beilage K-27). Da der Bericht auf vorgängig gesammelten Erkenntnissen beruht, ist davon auszugehen, dass diese per Anfang August 2010 vorlagen.

1! 1     Es kann daher davon ausgegangen werden, dass die Phase A Anfang August 2010 abgeschlossen und die Phase B begonnen hat.

1? ?     Ob nun Phase B richtig erfüllt worden war, ist vom Schiedsgericht nicht erneut zu beurteilen, da es diesbezüglich an die Feststellungen des ersten Schiedsgerichts gebunden ist. Dieses hat die Feststellungsbegehren der Beklagten, die Beklagte habe rechtmässig von ihrem Recht auf Erhebung einer Einrede der Nichterfüllung Gebrauch gemacht und die von der Beklagten erhobene Einrede der Nichterfüllung sei für begründet zu erklären, rechtskräftig abgewiesen (vgl. Zwischenentscheid Rz. 55 ff.).

19     In zeitlicher Hinsicht beschränkt sich diese Bindung zwar auf die Vorgänge bis und mit August 2012, da das erste Schiedsgericht nur diese berücksichtigt hat. Den Parteien war es im vorliegenden Verfahren daher unbenommen, später eingetretene Umstände geltend zu machen, sofern sie für die Beurteilung der Ansprüche relevant gewesen wären (vgl. Zwischenentscheid Rz. 66). Solche Argumente wurden nicht vorgetragen. Es ist unbestritten, dass die Klägerin seit April 2011 keine vertraglichen Leistungen mehr erbracht hat (vorn Rz. 177 ff.). Entsprechend stellte sich auch die Frage der ordnungsgemässen Erfüllung durch die Klägerin nicht mehr.

*b)*     *Ende der ordentlichen Vertragsdauer*

19(     Der Vertrag sieht eine feste Laufzeit von fünf Jahren vor (Ziff. 12.1. MV). Nach Auffassung der Klägerin lief die ordentliche Vertragsdauer bis zum 31. Januar 2015 (KS Rz. 178). Nach Auffassung der Beklagten war die ordentliche Vertragsdauer am 14. Dezember 2014 abgelaufen. Die Beklagte berechnet die fünfjährige Vertragsdauer ab dem Zeitpunkt des Abschlusses des Managementvertrages, d.h. ab dem 14. Dezember 2009 (Duplik Rz. 112 sowie Beilage K-1 S. 13). Dabei verkennt sie, dass der Managementvertrag selbst in Ziff. 4.1. festlegt, dass die erste Phase des Vertrags am 1. Februar 2010 in Kraft tritt. Somit ist die Vertragsdauer ab diesem Zeitpunkt zu berechnen, was zu einem Ablaufdatum per 31. Januar 2015 führt.

c      *Ergebnis*

1 7    Als Folge hat die Klägerin im Grundsatz Anspruch auf Bezahlung der monatlichen
       Management Fee von EUR 700'000 gemäss Ziff. 7.1 MV ab August 2010 bis 31
       Januar 2015, wobei ab April 2011 die ersparten Aufwendungen sowie das bei der
       Festsetzung der Management Fee einkalkulierte Länderrisikos abzuziehen sind (da-
       zu sogleich Rz. 4.a) ff., Rz. 218 ff.).

**4      Ersparte Aufwendungen**

*a      Ergänzende Angaben der Klägerin zu den ersparten Aufwendungen unter Beizug
       eines Wirtschaftsprüfers*

1' 3    Die Klägerin hat sich auf die Management Fee anrechnen zu lassen, was sie ab dem
       Zeitpunkt, als die Beklagte ihre Leistungen nicht mehr in Anspruch nahm, an Auf-
       wendungen erspart hat. Dies ergibt sich aus einer analogen Anwendung der Scha-
       densberechnungsgrundsätze gemäss Art. 97 OR, wonach das Erfüllungsinteresse
       des Gläubigers in der unter Abzug ersparter Aufwendungen verbleibenden Netto-
       marge besteht (BSK OR I-Wiegand, Art. 97 N 38a m.w.H.). Die Klägerin bestreitet
       diesen Grundsatz nicht; auch ihre eigenen Berechnungen berücksichtigen ersparte
       Aufwendungen (vgl. KS Rz. 181 ff.).

1! 9    Es ist aus Sicht des Schiedsgerichts korrekt, dass – wie von der Klägerin beantragt
       – bis Ende März 2011 keine ersparten Aufwendungen von der Managementgebühr
       abgezogen werden. Im März 2011 zog sich die Klägerin aus der Klinik bzw. aus
       Äquatorialguinea zurück (vorn Rz. 66). Bis zu diesem Zeitpunkt hat sie Leistungen
       unter dem Managementvertrag erbracht. Die Einrede der Nichterfüllung wurde vom
       ersten Schiedsgericht rechtskräftig abgewiesen (vorn Rz. 194).

2( )    Ab April 2011 bringt die Klägerin monatlich ersparte Aufwendungen von
       EUR 112'000 in Abzug. Die Klägerin stützt die Berechnung auf eine Aufstellung
       der Wirtschaftsprüfungs- und Steuerberatungsgesellschaft RSM Altavis GmbH
       ("RSM") vom 15. Juli 2014 (Beilage K-46; vgl. KS RZ. 192 ff.). Im verfahrenslei-
       tenden Beschluss Nr. 11 hielt das Schiedsgericht fest, dass diese Aufstellung ergän-

zungsbedürftig sei. Entsprechend wurde der Klägerin aufgetragen, zusätzlich zur Aufstellung gemäss Beilage K-46 (ersparte Aufwendungen vor Ort) eine Aufstellung über alle weiteren ersparten Aufwendungen vorzulegen, sei dies bei der Zentrale in Hamburg, bei Drittanbietern oder anderswo. Die ersparten Aufwendungen waren durch einen externen Wirtschaftsprüfer zu ermitteln und zu bestätigen.

2( Die Klägerin reichte in der Folge eine Gutachtliche Stellungnahme der PricewaterhouseCoopers GmbH ("SPwC", Beilage K-93) ein, mit welcher die ersparten Aufwendungen auf monatlich EUR 118'404 beziffert wurden (Beilage K-93 Rz. 79), unter zusätzlicher Berücksichtigung von einmaligen Kosten für die Softwareerweiterung der Krankenhausadministration in Höhe von rund EUR 118'891 für die Monate April bis Juli 2011 (SPwC Rz. 43).

20 Die Beklagte führt aus, dass die Berechnung der Kosten gemäss SPwC für sie weder überprüfbar noch nachvollziehbar seien und lediglich auf Einschätzungen und Ausführungen der Klägerin beruhten. Die Beklagte selbst könne mangels Kenntnis der Unterlagen keine eigenen Abklärungen zu diesen Ausführungen treffen und keine eigene "gutachtliche Stellungnahme" in Auftrag geben. Die SPwC beruhe auf einseitigen Darstellungen der Klägerin und sei deshalb nicht aussagekräftig. Die Beklagte nimmt jedoch die von der Klägerin geltend gemachten Beträge zur Kenntnis und ist der Ansicht, dass sie in diesem Mindestumfang abzuziehen seien (B-SeA, Rz. 10-17).

20: Die Einwände der Beklagten sind unbeachtlich. Die Beauftragung eines Wirtschaftsprüfers zur Ermittlung der ersparten Aufwendungen durch die Klägerin erfolgte auf Veranlassung des Schiedsgerichts, weil sie die im Recht liegende Aufstellung der Wirtschaftsprüfungs- und Steuerberatungsgesellschaft RSM Altavis GmbH vom 15. Juli 2014 (Beilage K-46) hinsichtlich bestimmter Punkte für ergänzungsbedürftig hielt. Die Aufstellung der RSM zu den ersparten Aufwendungen hatte die Klägerin bereits in ihrer Klageschrift thematisiert, ohne dass die Beklagte in ihrer Klageantwort und ihrer Duplik geltend gemacht hätte, es fehlten ihr die

Case 1:20-cv-03572-RJL    Document 1-1    Filed 12/08/20    Page 194 of 221

Grundlagen, um die dort ausgewiesenen Posten zu beurteilen. Den Einwand, sie hätte weitere Unterlagen von der Klägerin benötigt, um die ersparten Aufwendungen beurteilen zu können, hat sie erstmals in ihrer Stellungnahme zur SPwC vorgetragen. Aus diesem Grund kann sich dieser Einwand von vornherein nur auf die ergänzenden Ausführungen von PwC und nicht auf die bereits von RSM ermittelten Angaben beziehen. Darüber hinaus hätte sich die Beklagte, sofern ihr bestimmte Unterlagen zur Beurteilung der ergänzenden Feststellungen von PwC fehlten, mit einem Editionsbegehren an das Schiedsgericht wenden können, statt untätig zu bleiben und sich auf den Standpunkt zu stellen, sie könne sich zu den Feststellungen von PwC nicht äussern. Allermindestens hätte die Beklagte substantiiert dartun müssen, zu welchen Ausführungen sie Stellung nehmen kann und bezüglich welcher Ausführungen ihr hierzu Unterlagen fehlen. Dies ist nicht erfolgt. Die Beklagte äussert sich zu keiner der nachfolgend betrachteten Kategorien von ersparten Aufwendungen inhaltlich, ausser dass diese mindestens im Umfang der von der Klägerin bzw. PwC ermittelten Zahlen abzuziehen seien (B-SeA Rz. 15-17).

b)    *Aus der Management Fee zu bestreitende Ausgaben*

204    Bei der Bestimmung der ersparten Aufwendungen gilt es zu berücksichtigen, dass die Klägerin nur einen Teil der Kosten aus der Management Fee bestreiten musste. Gemäss Ziff. 2.1 MV wurde der Klägerin ein Budget zur Verfügung gestellt, aus welchem die Klägerin die betriebswirtschaftlich notwendigen Kosten bestreiten konnte. Dazu gehörten Personalkosten (ohne die Kosten der Gehälter der Mitarbeiter der Klägerin vor Ort; Ziff. 6.2 MV), Kosten für Spezialisten, Sachkosten und sonstige mit dem Betrieb eines Krankenhauses notwendigerweise verbundene Kosten (Ziff. 2.1 MV lit. c und d).

205    Die Beklagte behauptet sodann neu in ihrer Stellungnahme vom 14. August 2017, Ziff. 6 des MV sei strikt von der Management Fee (Ziff. 7.1) zu trennen. Für die Phase B beliefen sich die Kosten auf EUR 700'000 pro Monat (Ziff. 6.2); in diesem Betrag seien alle Kosten für die vier von der Klägerin bereitgestellten Mitarbeiter

(ausgenommen deren Wohnkosten, welche der Beklagten überwälzt worden seien) sowie die Kosten im Zusammenhang mit der Zentrale in Hamburg enthalten. Die Management Fee sei nicht dazu gedacht gewesen, diese Kosten zu decken, sondern sei separat und zusätzlich, als reiner Gewinn, geschuldet gewesen (B-SeA Rz. 14, 22).

2( Dieses neu vorgetragene Argument ist verspätet und deshalb nicht zu beachten. Die Beklagte hat dieses Argument weder in der Klageantwort noch in der Duplik vorgetragen. Sie hat dort auch nicht die Ausführungen der Klägerin substantiiert bestritten, die Management Fee habe dazu gedient, bestimmte Kosten der Klägerin zu decken (vgl. z.B. KS Rz. 62, 229 ff.). Es fehlt schliesslich auch jeder Hinweis darauf, dass der Klägerin der monatliche Betrag von EUR 700'000 zusätzlich zur Management Fee von monatlich EUR 700'000 ausbezahlt worden wäre. Die Beklagte führt denn auch selbst aus, dass die ersparten Aufwendungen von der Management Fee abzuziehen seien (B-SeA Rz. 17).

c) *Gehaltsaufwendungen, Gehaltsnebenkosten, externe Rechts- und Beratungskosten sowie sonstige betriebliche Aufwendungen*

20 Die ergänzende Stellungnahme von PwC kommt bezüglich der Kosten vor Ort zum selben Ergebnis wie RSM Altavis GmbH. Der Grossteil der laufenden Aufwendungen entfällt gemäss RSM Altavis GmbH und PwC auf die Gehaltsaufwendungen für die vier vor Ort mit dem Projekt beschäftigten Mitarbeiter Döhler (Chefarzt), Mensching (Buchhaltungsmitarbeiter), Kronenberger (Finanzdirektor) sowie Gerard (technischer Direktor). PwC stützt sich bei den eingesetzten Lohnansprüchen auf die zugrundeliegenden Arbeitsverträge. Die so ermittelten Kosten in Höhe von monatlich **EUR 59'583** sind nicht zu beanstanden.

20 Die zusätzlich eingesetzten Gehaltsnebenkosten bzw. Reisekosten in Höhe von monatlich **EUR 13'000** sind plausibel. Gleiches gilt für die ermittelten externen Rechts- und Beratungskosten von monatlich **EUR 24'000** und die sonstigen betrieblichen Aufwendungen von **EUR 15'000**.

### d)   *Fortbildungen und Schulungen*

20    Betreffend Fortbildungen und Schulungen hält PwC fest, dass die Kosten für solche Fortbildungsmassnahmen gemäss Managementvertrag aus dem Budget zu bestreiten waren (SPwC Rz. 36). Dem ist zuzustimmen, da Ziff. 3.3 Abs. 2 MV vorsieht, dass die Kosten für Fortbildung der Beschäftigten aus dem Budget bestritten werden. Für die Nutzung der E-Learning Software zu Fortbildungszwecken stand der Klägerin gemäss Ziff. 10.1 MV ein Pauschalbetrag von EUR 100'000 pro Jahr sowie ein Betrag von EUR 100 je Mitarbeiter zur Verfügung. Axel Regenhardt, der damalige IT-Verantwortliche der Klägerin für das Bata-Projekt, führte in seiner Zeugenbefragung aus, dass laufend E-Learning-Einheiten zu erstellen gewesen wären. Für das Bata-Projekt schätzte er die Anzahl von Einheiten auf 30-40 mit Erstellungskosten zwischen EUR 15'000 bis EUR 20'000 (WP Regenhardt S. 201 f. N 4 f.). Für die Änderung der Module (Neuerstellung oder Anpassung) während der Vertragsdauer schätzte er die anfallenden Kosten auf EUR 2'000 bis hin zu EUR 15'000, je nachdem, wie umfangreich die Änderung ausfällt (WP Regenhardt S. 203 N 26-31).

21·   Angesichts dieser geschätzten Zahlen sind die Ausführungen von PwC (SPwC Rz. 36) plausibel, dass die Kosten für die Pflege und den Ausbau der E-Learning Software und die Bereitstellung des E-Learning-Systems, einschliesslich der Erstellungskosten für neue Module, durch die Kostenvergütungsregel für die Nutzung der (E-Learning-) Software gemäss Art. 10.1 MV gedeckt waren. Diese Kosten sind mithin nicht als ersparte Aufwendungen in Bezug auf die Management Fee zu berücksichtigen.

### e)   *Software für die Krankenhausadministration*
### aa)   *Software-Entwicklungskosten*

21    Aufgrund von Ziff. 3.4 MV war die Klägerin verpflichtet, *"eine adäquate Software für die Krankenhausadministration, für das Personalwesen sowie für die Steuerung der wesentlichen Betriebsabläufe zu entwickeln und dem Krankenhaus beizustel-*

*len"*. Die grundlegenden Fazilitäten sollten innerhalb von vier Monaten nach Übernahme des Krankenhauses betriebsbereit sein, während die Software für die hochspeziellen Abteilungen sowie für die Steuerung der Medikamentenversorgung aus dem Ausland, des betriebswirtschaftlichen Controllings sowie der einzelnen Personaleinsatzplanung spätestens zwölf Monate nach Übergabe der Einrichtung betriebsbereit sein sollte. PwC veranschlagt für diese Tätigkeit Kosten in Höhe von EUR 29'723 monatlich (SPwC Rz. 37). Die Höhe basiert auf Angaben der Klägerin betreffend Gehaltsaufwand für die in das Projekt involvierten Mitarbeiter (50% der Arbeitszeit von Axel Regenhardt, jeweils 100% der Arbeitszeit der Herren Smaka, Kanbari und Thies). Die von PwC ermittelte Kostenhöhe ist plausibel. PwC betrachtet diese Kosten als einmalige Kosten für den Zeitraum April bis Juli 2011, d.h. von **insgesamt EUR 118'891**, da bis dahin voraussichtlich noch Entwicklungsarbeiten nötig gewesen wären (SPwC Rz. 37). Auch diese Annahme ist plausibel.

### bb) *Software-Anpassungs- und Wartungskosten*

21 Die Klägerin argumentiert mit Verweis auf PwC, dass die Softwareanpassungs- bzw. Wartungskosten nach Abschluss der Entwicklungsarbeiten aus dem Budget zu begleichen seien (K-SeA Rz. 14; SPwC Rz. 37). Woraus dies abgeleitet wird, ist unklar. Dem Managementvertrag ist lediglich zu entnehmen, dass die Klägerin die Entwicklungskosten tragen muss, nicht aber, dass die darüber hinausgehenden von der Klägerin zu erbringenden Softwareanpassungs- bzw. Wartungskosten aus dem Budget zu begleichen wären. Da diese mit der Software im Zusammenhang stehen, welche die Klägerin gemäss Art. 3.4 MV entwickeln und bereitstellen muss, ist das Schiedsgericht der Auffassung, dass diese Kosten von der Klägerin zu tragen sind.

21 Die Klägerin und ihre Gutachter haben keine Angaben zur Höhe dieser Kosten gemacht. Gemäss Axel Regenhardt, dem damaligen IT-Verantwortlichen der Klägerin für das Bata-Projekt, betragen die Kosten für den normalen Support- und Wartungsbetrieb EUR 12'000 bis möglicherweise EUR 15'000 monatlich, bestehend

aus zwei bis drei FTE ("full time equivalent", d.h. Vollzeitäquivalent für Personer wie Entwickler, Supporter) bei einem geschätzten Gehalt von EUR 3'500 bis 4'00( brutto (WP Regenhardt S. 199 f. N 25 ff.). Es handelt sich bei diesen Angaben ent gegen den klägerischen Ausführungen (K-SeA Rz. 18) um Ausgaben, welche das Krankenhaussystem in Bata betrafen, nicht das zukünftige Krankenhaus und die Portalkliniken. Mangels anderer Angaben durch die Klägerin ist es sachgerecht, auf die maximalen Angaben von Axel Regenhardt abzustellen, d.h. von monatlichen Support- und Wartungskosten von **EUR 15'000** auszugehen. Diese sind über die gesamte Restlaufzeit des Managementvertrags zu berücksichtigen.

f,    *Weitere Kosten bei der Zentrale in Hamburg*

2 '   Die von PwC ermittelten weiteren Kosten bei der Zentrale in Hamburg in Höhe von **EUR 6'819** monatlich, bestehend aus Rekrutierungskosten, EPOS Gutachten und den anteilsmässigen Monatsgehältern und Reisekosten der bei der Zentrale mit dem Projekt befassten Mitarbeiter (SPwC S. 20), sind nachvollziehbar und plausibel. Dabei ist zu berücksichtigen, dass der höhere Aufwand der IT-Mitarbeiter bei der Zentrale im Zeitraum April bis und mit Juli 2011 für die Fertigstellung der Soft- ware-Entwicklung (50% der Arbeitszeit von Axel Regenhardt, jeweils 100% der Arbeitszeit der Herren Smaka, Kanbari und Thies) bereits bei den Software-Kosten (vorn Rz. 211) berücksichtigt wurde. Gleiches gilt für die Software-Support- und Wartungskosten (vorn Rz. 213).

g,    *Relevanz der Kosten für das Projekt betreffend Portalkliniken*

2'    Ulrich Marseille erklärte anlässlich der Beweisverhandlung im Zusammenhang mit den ersparten Aufwendungen, dass für die Erarbeitung des Projektes betreffend den Ausbau des Gesundheitswesens in Äquatorialguinea (Fertigstellung einer zweiten Klinik in Malabo sowie Aufbau von im ganzen Land verteilten Portalkliniken) mo- natliche Kosten von EUR 80'000 bis EUR 100'000 angefallen wären, wenn dieses Projekt weitergetrieben worden wäre. Gemäss Aussage von Ulrich Marseille wären

diese Kosten zunächst aus der Management Fee bestritten worden (vgl. WP Marseille, S. 106 N 22-33 sowie S. 107 N 1-7, S. 108 N 21 f., S. 109 f.).

216    Die Klägerin führt dazu aus, dass sie im Vertrauen auf die Aussagen der Beklagten bezüglich der Klinik in Malabo und den Ausbau der Satellitenkliniken und in Erwartung der Management Fee aus einem späteren Managementvertrag für die Klinik in Malabo bereits Aufwendungen getätigt habe, die nicht vergütet worden seien und mangels sachlichem Bezug zur Management Fee gemäss Management Vertrag vom 14. Dezember 2009 nicht als ersparte Aufwendungen zu berücksichtigen seien (K-SeA Rz. 24). Auch die Beklagte führt aus, dass Akquisitionsleistungen der Beklagten in keinem Zusammenhang mit dem Managementvertrag stünden. Die Klägerin habe diese Kosten in der Hoffnung auf einen anderen Vertrag freiwillig und auf eigenes Risiko investiert (vgl. B-SeA Rz. 18).

217    Das Schiedsgericht erachtet die klägerischen Erläuterungen zur Aussage von Ulrich Marseille als überzeugend; sie werden überdies von der Beklagten anerkannt. Der Managementvertrag ist auf das Krankenhaus in Bata beschränkt und umfasst keine Aufwendungen im Zusammenhang mit weiteren Projekten. Die Management Fee stellte daher eine Entschädigung für die Aufwendungen im Zusammenhang mit dem Krankenhaus in Bata dar. Sofern die Klägerin einen aus der Management-Fee resultierenden Überschuss intern dazu verwendete, um Kosten zu begleichen, die ihr im Hinblick auf weitere geplante Projekte entstanden, ist dies für die Berechnung der ersparten Aufwendungen unter dem Managementvertrag irrelevant.

*h)*     *Übersicht ersparte Aufwendungen*

| in ꞏ ꞏ | Ersparte monatliche Aufwendungen | Ersparte einmalige Aufwendungen |
|---|---|---|
| **1.** ꞏ ꞏ altsaufwendungen | 59'583 | |
| Pr ꞏ ꞏr. Döhler (Gehalt und Prämie) | 27'083 | |
| Hr ꞏ asching (Gehalt) | 5'833 | |
| Hr ꞏ nenberger (Gehalt und Prämie) | 16'667 | |

| | | |
|---|---|---|
| Gerard | 10'000 | |
| ehaltsnebenkosten bzw. Reisekosten | 13'000 | |
| xterne Rechts- und Beratungskosten | 24'000 | |
| onstige betriebliche Aufwendungen | 15'000 | |
| ortbildungen und Schulungen | aus Budget | |
| oftware für die Krankenhausadministration | 15'000 | 118'891 |
| ware-Entwicklungskosten | | 118'891 |
| ware-Anpassungs- und Wartungskosten | 15'000 | |
| osten in der Zentrale in Hamburg | 6'819 | |
| me | 133'402 | 118'891 |

**Bewertung Länderrisiko**

Die Klägerin hatte in der Klageschrift vom 26. April 2016 vorgebracht, dass bei der Kalkulation der Management Fee das erhebliche wirtschaftliche Risiko zu berücksichtigen gewesen sei, welches sie mit dem Vertragsschluss zum Management des Krankenhauses La Paz in einem erst in der Entwicklung befindlichen Land eingegangen sei. Politische Unruhen, Gesetzesänderungen und andere Unwägbarkeiten habe die Klägerin mit Blick auf die Frage berücksichtigt, ob dies ihre Leistungen deutlich erschweren oder verunmöglichen würde. Als Beispiel erwähnt die Klägerin die Umstellung der Regeln des Bezahlsystems (KS Rz. 191). Mit Verfahrensleitendem Beschluss Nr. 11 wurde die Klägerin aufgefordert, in Zahlen anzugeben, wie das Länderrisiko bei der Kalkulation der Management Fee berücksichtigt bzw. budgetiert wurde.

Wie die Klägerin selbst ausführt und wie PwC bestätigt, ist das Länderrisiko bei der Beklagten als sehr hoch zu betrachten (SPwC Rz. 65 f.). Aus den Ausführungen der Klägerin folgt weiter, dass sie dieses Risiko als Renditezuschlag bei der monatli-

chen Management Fee berücksichtigt hat. Allerdings macht sie keine Angaben zur Höhe des Zuschlags. Gemäss Ausführungen der Klägerin lässt sich der Zuschlag nicht beziffern, weil eine genaue Barwertkalkulation seitens der Klägerin nie gemacht worden sei (vorn Rz. 91, K-SeA Rz. 33). Auch die Beklagte macht keine konkreten Angaben zur Höhe des Zuschlags, führt jedoch an, das Risiko der sofortigen jederzeitigen Vertragsauflösung sei in der Management Fee bereits miteinberechnet (vorn Rz. 115 ff., B-SeA Rz. 30 ff.).

2'  Das Länderrisiko muss von der Management Fee abgezogen werden, da die Beklagte vorliegend verpflichtet wird, der Klägerin weiterhin bis zum Ablauf der ordentlichen Vertragsdauer die vertraglich vereinbarte Management Fee abzüglich ersparter Aufwendungen zu bezahlen. Das Länderrisiko drückt sich in Risiken im Leistungsaustausch aus, welche der geographischen Lage geschuldet sind, d.h. Gegebenheiten am Ort des Leistungsaustauschs (SPwC Rz. 57-59). Risiken im Leistungsaustausch umfassen nicht nur das Risiko, dass die Vertragsleistung gänzlich unmöglich wird. Sie umfassen auch Erschwerungen der Leistungen, z.B. aufgrund einer Gesetzesänderung oder einer Änderung der tatsächlichen Gegebenheiten bei der Leistungserbringung (wie z.B. die von der Klägerin erwähnte Umstellung des Bezahlsystems; vorn Rz. 218), was wiederum zu höheren Kosten bei der Leistungserbringung führen kann. Diese Risiken entfallen bei der Klägerin ab dem Zeitpunkt, an dem sie sich aus Äquatorialguinea zurückgezogen hat, d.h. ab April 2011 (vorn Rz. 195), da sie so gestellt wird, wie wenn beide Seiten störungsfrei erfüllt haben. Der Risikozuschlag ist damit als Vorteil zu bewerten, welcher bei risikofreier Erfüllung in Abzug zu bringen ist.

22  Grundsätzlich trägt die Beklagte die Beweislast, dass sich die Klägerin Vorteile anrechnen lassen muss (BK-Weber, Art. 107 N 206; Koller, OR AT, § 50 N 15). Die tatsächlichen Grundlagen zur Beurteilung dieser Frage muss aber die Klägerin liefern, wozu sie mit Verfahrensleitendem Beschluss Nr. 11 aufgefordert wurde. Da sich der Abzug ziffernmässig nicht nachweisen lässt, muss das Schiedsgericht die Höhe des Risikozuschlags auf der monatlichen Management Fee schätzen, unter

analoger Anwendung von Art. 42 Abs. 2 OR. Das gemäss PwC und der Einschätzung der Klägerin sehr hohe Länderrisiko muss zu einem signifikanten Zuschlag bei der Management Fee geführt haben. Dies zeigt sich auch daran, dass nach Abzug der ersparten Aufwendungen (ohne einmalige Aufwendungen) ein monatlicher Betrag von EUR 566'598 verbleibt (EUR 700'000-133'402). Berücksichtigt man linear über die gesamte Vertragslaufzeit von 5 Jahren die Investitionen der Klägerin in Höhe von EUR 3'032'200, resultiert ferner ein monatlicher Amortisationsabzug von EUR 50'537. Es verbleibt eine monatliche Rendite von EUR 516'061 (bzw. jährlich EUR 6'192'732). Die Höhe der Rendite legt nahe, dass das – erhebliche - Länderrisiko bei der Festsetzung der Rendite entsprechend signifikant berücksichtigt wurde. Nach bestmöglicher Schätzung des Schiedsgerichts bewegt sich die Berücksichtigung des Länderrisikos bei zwei Drittel der verbleibenden Rendite, also bei EUR 344'041 monatlich.

2  Die Klägerin weist darauf hin, dass sich das Länderrisiko bei der Beklagten bewahrheitet habe (K-SeA Rz. 36). Das wäre aber nur dann der Fall gewesen, wenn der Managementvertrag von der Beklagten ohne Leistung einer Entschädigung vorzeitig hätte aufgelöst werden können. Vorliegend wird die Beklagte aber aufgrund der vertraglichen Regelung verpflichtet, der Klägerin weiterhin bis zum Ablauf der ordentlichen Vertragsdauer die vertraglich vereinbarte Management Fee abzüglich ersparter Aufwendungen zu bezahlen. Somit ist der monatliche Betrag von EUR 344'041 als Risikozuschlag vom Betrag von EUR 566'598 (= Management Fee abzüglich ersparter Aufwendungen) ab April 2011 bis zum Ende der ordentlichen Laufdauer abzuziehen.

22  Dass die Klägerin sich gegen das Länderrisiko zusätzlich abgesichert hat, indem sie im Vertrag eine Schiedsklausel aufgenommen hat (K-SeA Rz. 36), steht dem Umstand nicht entgegen, dass der Zuschlag für das Länderrisiko auf der Management Fee abzuziehen ist. Im Gegenteil: Aufgrund des infolge der Schiedsklausel durchgeführten Schiedsverfahrens wird die Beklagte verpflichtet, der Klägerin bis zum Ablauf der ordentlichen Vertragsdauer die geschuldete monatliche Management

Fee zu bezahlen, was wiederum dazu führt, dass sich das Länderrisiko nicht verwirklicht hat.

## 6.    Anderweitiger Erwerb und Bemühungen in diesem Zusammenhang

22    Die Klägerin wurde im Verfahrensleitenden Beschluss Nr. 11 auch aufgefordert, sich zum anderweitigem Erwerb zu äussern, welchen sie nach Ausreise der letzten Mitarbeiter aus Äquatorialguinea am 16. März 2011 durch anderweitige Verwendung der (vor Ort und bei der Zentrale) freigewordenen Kräfte erzielen konnte, und diesen zu belegen und zu beziffern. Ferner hatte die Klägerin darzutun, welche Anstrengungen sie unternommen hat, um anderweitigen Erwerb zu erzielen.

22    Die Klägerin hat glaubhaft dargetan, dass sie im März 2011 über keine anderen Projekte verfügte, auf welchen die auf dem Projekt in Bata eingesetzten externen Dienstleister (insbesondere die Herren Kronenberger, Döhler und Gerard) eingesetzt werden konnten. Auch ist glaubhaft, dass es unwahrscheinlich war, ein vergleichbares Projekt in naher Zukunft zu finden (K-SeA Rz. 41 ff.). Daher handelte die Klägerin im Hinblick auf ihre – analog zur Schadenminderungspflicht – bestehende Pflicht zur Aufwandminderung angemessen und vernünftig, indem sie diejenigen Vertragsverhältnisse, welche kurzfristig auflösbar waren, so rasch wie möglich beendete. Als Konsequenz kommen die dadurch eingesparten Gehälter für die vor Ort bereitgestellten Personen bei den ersparten Aufwendungen zum Tragen (vorn Rz. 207).

22    Bezüglich des bei der Zentrale in Hamburg mit dem Projekt in Bata beschäftigten Personals, insbesondere die IT-Mitarbeiter, hält die Klägerin fest, dass diese ab dem 16. März 2011 nur noch einen Bruchteil ihrer Zeit diesem Projekt gewidmet und sich in der freigewordenen Zeit mit anderen Aufgaben der Marseille Kliniken AG, Hamburg, befasst hätten (K-SeA Rz. 48). Da die Klägerin glaubhaft versichert hat, dass für das Bata-Projekt kein Ersatzprojekt gefunden werden konnte, weder in vergleichbarer Grösse noch in einer geringeren Grössenordnung (K-SeA Rz. 41), entfällt ein Abzug für anderweitigen mit diesen Mitarbeitern erzielten Erwerb.

### 7.    Höhe der geschuldeten Entschädigung

227    Die Klägerin verlangt für August 2010 bis und mit März 2011 die Zusprechung des Teilbetrags von 10% der während diesem Zeitraum anfallenden Management Fee. Das Schiedsgericht gelangt zum Schluss, dass die Management Fee ab Eintritt der Phase B, d.h. ab 1. August 2010, geschuldet ist, so dass sich der bis März 2011 geschuldete Teilbetrag von 10% auf **EUR 560'000** beläuft ([10% von EUR 700'000] x 8 Monate).

228    Für den Zeitraum April 2011 bis und mit August 2012 verlangt die Klägerin ebenfalls die Zusprechung des Teilbetrags von 10% der während diesem Zeitraum anfallenden Management Fee, abzüglich der ersparten Aufwendungen, welche die Klägerin auf EUR 112'000 monatlich beziffert hat. Aufgrund der Berechnung des Schiedsgerichts sind von der monatlichen Management Fee ersparte Aufwendungen von EUR 133'402 abzuziehen. Ferner ist der Zuschlag für das Länderrisiko, welchen das Schiedsgericht auf EUR 344'041 schätzte, von der monatlichen Gebühr abzuziehen. Hinzu kommt ein Abzug für einmalige Aufwendungen in Höhe von EUR 118'891 auf dem Gesamtbetrag im Zeitraum April bis Juli 2011 (vorn Rz. 211). Es resultiert ein Betrag von EUR 3'664'578 ([EUR 700'000 − 133'402 − 344'041] x 17 − EUR 118'891). Von diesem Betrag ist der Klägerin der eingeklagte Teilbetrag von 10%, d.h. **EUR 366'458**, zuzusprechen.

229    Für den Zeitraum September 2012 bis und mit Januar 2015 sind ebenfalls von der monatlichen Management Fee die ersparten Aufwendungen von EUR 133'402 und der Länderrisikozuschlag von EUR 344'041 abzuziehen. Es resultiert ein Betrag von **EUR 6'454'153** ([EUR 700'000 − 133'402 − 344'041] x 29).

230    Insgesamt schuldet die Beklagte der Klägerin somit einen Betrag von **EUR 7'380'611**. Im darüber hinaus gehenden Umfang sind die Forderungen der Klägerin abzuweisen.

231   Die Eventualanträge der Beklagten auf Feststellung des Zeitpunktes der Vertrags-
auflösung sind insofern gutzuheissen, als festzustellen ist, dass der Management-
vertrag ordentlich per 31. Januar 2015 aufgelöst wurde.

## VI   ZINS

232   Die Klägerin verlangt gestützt auf Art. 104 Abs. 1 OR Zins in Höhe von 5% ab
Fälligkeit der jeweils zu leistenden Management Fee gemäss Ziff. 7 MV.

233   Aufgrund von Art. 104 Abs. 1 OR hat ein Schuldner, welcher mit der Zahlung einer
Geldschuld in Verzug ist, Verzugszinsen von 5% pro Jahr zu bezahlen. Gemäss
Art. 7.2 und 7.3 des MV ist die Management Fee jeweils für ein Jahr im Voraus in
einer Summe zu bezahlen und wird jeweils drei Monate vor Ablauf des laufenden
Abrechnungsjahres zur Zahlung fällig. Aufgrund der Vereinbarung eines bestimm-
ten Verfalltages (Art. 102 Abs. 2 OR) war die Beklagte damit jeweils drei Monate
vor Ablauf des laufenden Abrechnungsjahres in Verzug. Die Management Fee war
mit Eintritt der Phase B geschuldet (Ziff. 6.2 MV); die Phase B begann am
1. August 2010 (vorn Rz. 186 ff.). Das Abrechnungsjahr umfasste somit jeweils
den 1. August bis und mit 31. Juli des Folgejahres, so dass die Management Fees
für diese Jahresperiode jeweils per 30. April des laufenden Abrechnungsjahres zu
entrichten war und die Beklagte bei Nichtleistung am 1. Mai des jeweiligen Jahres
in Verzug war.

234   Dies gilt aber nicht für die erste Jahresrate der Management Fee. Für diese kann
nicht von einem bestimmten Verfalltag ausgegangen werden, da das Datum der Be-
zahlung der ersten Management Fee von einem zukünftigen, ungewissen Ereignis
(Eintritt der Phase B) abhängig war (BK OR-Weber Art. 102 N 114). Für die An-
sprüche im Zeitraum 1. August 2010 bis und mit 31. Juli 2011 kann folglich nicht
von einer Inverzugsetzung per 1. Mai 2010 ausgegangen werden. Vielmehr war ei-
ne Mahnung der Klägerin nötig, um die Beklagte für die erste jährliche Manage-
ment Fee für die Phase B in Verzug zu setzen (Art. 102 Abs. 1 OR).

23.  Die Klägerin hat die Beklagte mit Schreiben vom 31. Januar 2011 unmissverständ-
lich aufgefordert, die Management Fee für die Phase B spätestens bis zum
18. Februar 2011 zu bezahlen (vgl. K-38 S. 4). Dieses Schreiben ist als Mahnung
zu betrachten, weshalb auf der im Zeitraum 1. August 2010 bis und mit 31. Juli
2011 aufgelaufenen Management Fee im Betrag von EUR 637'134 (= (10% von
[EUR 700'000x8]) + (10% von [((EUR 700'000 − 133'402 − 344'041)x4) −
118'891]) 5% Zins ab dem 18. Februar 2011 geschuldet ist.

23(  Der weitere Zinsenlauf gestaltet sich wie folgt:

- Für die Management Fee im Zeitraum vom 1. August 2011 bis 31. Juli 2012
  im Betrag von EUR 267'068 (= 10% von [(EUR 700'000 − 133'402 −
  344'041)x12]) ist ab 1. Mai 2011 ein Verzugszins von 5% geschuldet.

- Für die Management Fee im Zeitraum vom 1. August 2012 bis 31. Juli 2013
  im Betrag von EUR 2'470'383 (= (10% von [EUR 700'000 − 133'402 −
  344'041]) + ([EUR 700'000 − 133'402 − 344'041]x11)) ist ab 1. Mai 2012
  ein Verzugszins von 5% geschuldet.

- Für die Management Fee im Zeitraum vom 1. August 2013 bis 31. Juli 2014
  im Betrag von EUR 2'670'684 (= [EUR 700'000 − 133'402 − 344'041]x12)
  ist ab 1. Mai 2013 ein Verzugszins von 5% geschuldet.

- Für die Management Fee im Zeitraum vom 1. August 2014 bis 31. Januar
  2015 im Betrag von EUR 1'335'342 (= [EUR 700'000 − 133'402 −
  344'041]x6) ist ab 1. Mai 2014 ein Verzugszins von 5% geschuldet.

## VI   KOSTEN

### A.   Festlegung und Verteilung der Kosten des Schiedsverfahrens

237  Gemäss Art. 38 Swiss Rules hat der Schiedsspruch eine Festlegung der Kosten des
Schiedsverfahrens zu enthalten.

238  In den Kosten des Schiedsverfahrens gemäss Art. 38 Swiss Rules enthalten sind
gemäss Art. 38(a) und (b) Swiss Rules das Honorar des Schiedsgerichts und seine
Auslagen sowie gemäss Art. 38(f) die Einschreibegebühr und die Verwaltungskos-
ten gemäss Appendix B.

2       Der Schiedsspruch hat darüber hinaus die Kosten der Parteien für rechtliche Vertre-
        tung und rechtlichen Beistand in der Höhe, die das Schiedsgericht für angemessen
        erachtet, festzulegen (Art. 38(e) Swiss Rules) sowie die Reisekosten und sonstigen
        Auslagen von Zeugen in der Höhe, in der diese Auslagen vom Schiedsgericht ge-
        billigt werden (Art. 38(d) Swiss Rules).

2       Gemäss Art. 40(1) Swiss Rules sind die Kosten des Schiedsverfahrens grundsätz-
        lich von der unterliegenden Partei zu tragen. Das Schiedsgericht kann jedoch jede
        Art von Kosten zwischen den Parteien aufteilen, wenn es dies unter Berücksichti-
        gung der Umstände des Falls für angemessen erachtet.

2       Gemäss Art. 40(2) Swiss Rules steht es dem Schiedsgericht bezüglich der Kosten
        für rechtliche Vertretung und rechtlichen Beistand nach Art. 38(e) unter Berück-
        sichtigung der Umstände des Falls frei, zu bestimmen, welche Partei die Kosten zu
        tragen hat, oder diese Kosten zwischen den Parteien aufzuteilen, wenn es feststellt,
        dass eine Aufteilung angemessen ist.

2       Bezüglich Verteilung der Kosten verlangte die Beklagte in ihrem Schreiben vom
        6. April 2017, dass die Kosten des zusätzlichen Schriftenwechsels (Schiedsgericht
        und Parteientschädigung) für die Stellungnahme bezüglich der ersparten Aufwen-
        dungen (vgl. Verfahrensleitenden Beschluss Nr. 11) unabhängig vom Ausgang des
        Verfahrens gestützt auf das Verursacherprinzip der Klägerin auferlegt werden
        (Art. 40 Swiss Rules).

24      Mit Stellungnahme vom 14. März 2017 beantragte die Klägerin ihrerseits, dass die
        Beklagte aufgrund der durch sie verursachten Verzögerungen des Schiedsverfah-
        rens bereits einen erheblichen Anteil an den Gesamtkosten zu tragen habe.

24      Das Schiedsgericht kann keinem dieser Standpunkte folgen. Weder hat die Kläge-
        rin die Notwendigkeit eines zusätzlichen Schriftenwechsels bezüglich der ersparten
        Aufwendungen allein verursacht noch hat die Beklagte das Schiedsverfahren ver-
        zögert. Stattdessen sind die Kosten nach Obsiegen und Unterliegen aufzuteilen.

Die Klägerin dringt betragsmässig zu 14% (EUR 7'380'611 von EUR 53'891'600 gerundet) mit ihrem Hauptanspruch durch, die Beklagte obsiegt entsprechend zu 86%. Obsiegt hat die Klägerin hingegen bei der Frage der Zuständigkeit des Schiedsgerichts. Angesichts des untergeordneten Aufwands der Prüfung der Frage der Zuständigkeit gegenüber der Prüfung des Hauptanspruchs hält es das Schiedsgericht für angemessen, dass die Klägerin 70% der Kosten des Schiedsverfahrens und die Beklagte 30% zu tragen hat. Ferner hat die Klägerin die Beklagte für 70% ihrer vom Schiedsgericht als angemessen erachteten Parteikosten zu entschädigen, während die Beklagte die Klägerin für 30% ihrer vom Schiedsgericht als angemessen erachteten Parteikosten zu entschädigen hat.

**B     Kosten des Schiedsgerichts und Verwaltungskosten**

Gemäss Art. 39(1) und (2) Swiss Rules müssen die Honorare und Auslagen des Schiedsgerichts dem Streitwert, der Schwierigkeit der Streitsache, der aufgewendeten Zeit und allen anderen hierfür massgeblichen Umständen angemessen sein und sind gemäss Appendix B (Kostenordnung) festzulegen.

Gemäss Art. 2.6 des Appendix B der Swiss Rules sind Beträge in anderen Währungen als Schweizer Franken zum Kurs bei Eingang der Einleitungsanzeige oder Anhängigmachung einer weiteren Klage, einer Widerklage, Verrechnungseinrede oder Änderung oder Ergänzung einer Klage, in Schweizer Franken umzurechnen.

Die Klägerin hat Ansprüche in Höhe von EUR 53'891'600 geltend gemacht (vorn Rz. 11). Der Streitwert beträgt deshalb CHF 55'663'600, umgerechnet zum Kurs bei Eingang der Einleitungsanzeige am 30. Januar 2015[2] (vgl. Schreiben des Sekretariats vom 13. Februar 2015).

Angesichts des Streitwerts von CHF 55'663'600 belaufen sich die Verwaltungskosten auf CHF 45'566 (Art. 2.3 und 6 des Appendix B).

---

[2]     Kurs EUR/CHF gemäss www.oanda.com.

2.    Gestützt auf Art. 39(1) und (2) sowie Art. 40(4) Swiss Rules und Art. 2.3 des Appendix B setzt das Schiedsgericht mit Genehmigung durch den Gerichtshof die Entschädigung des Schiedsgerichts auf CHF 678'434 fest. Dieser Betrag deckt Auslagen des Schiedsgerichts in Höhe von CHF 4'301.45 (Kosten der mündlichen Verhandlung von CHF 1'375.75 [CHF 1'000 für die Räumlichkeiten und CHF 375.75 für die Verpflegung] sowie Kosten für Kurierkosten und Telefonkonferenzen von CHF 2'925.70) sowie das Honorar des Schiedsgerichts in Höhe von CHF 674'132.55 Gestützt auf Art. 39(3) Swiss Rules erhält die Vorsitzende 45% des Honorars und die Mitschiedrichter je 27.5% des Schiedsrichterhonorars. Der Anteil der Vorsitzenden am Honorar umfasst auch das Honorar der Sekretärin des Schiedsgerichts.

25   Die Klägerin hat den gesamten Kostenvorschuss in Höhe von CHF 724'000 bezahlt. Dieser Kostenvorschuss deckt die Gesamtheit des Honorars und der Auslagen des Schiedsgerichts und der Verwaltungskosten und wird zur Deckung dieser Kosten verwendet. Da die Beklagte 30% dieser Kosten zu tragen hat, hat sie der Klägerin einen Betrag im Umfang von CHF 217'200 zurückzuerstatten.

25   Ferner hat die Klägerin eine Einschreibegebühr von CHF 8'000 bezahlt, wovon die Beklagte der Klägerin 30%, d.h. CHF 2'400, zurückzuerstatten hat.

C    **Parteikosten**

**1.    Geltend gemachte Parteikosten der Klägerin**

25   Die Klägerin macht in ihrer Kosteneingabe vom 6. März 2017 Parteikosten in folgender Höhe geltend: EUR 229'352.50 für Frau Rechtsanwältin Knak-Kammenhuber, EUR 23'706.02 für Reisekosten der Zeugen, EUR 5'098.62 für SD Steno Deutschland GmbH sowie CHF 195'389.15 für Rechtsanwaltskosten von Prof. Dr. Bernd Reinmüller.

25   Mit ergänzender Stellungnahme vom 16. Oktober 2017 macht die Klägerin für den seit dem Verfahrensleitenden Beschluss Nr. 11 angefallenen Aufwand weitere

Rechtsanwaltskosten von Prof. Dr. Bernd Reinmüller in Höhe von CHF 24'347 gel-
tend sowie Kosten von PwC für die Erstellung der Gutachtlichen Stellungnahme in
Höhe von EUR 63'090.62. Ferner korrigiert sie die Rechtsanwaltskosten von Prof.
Dr. Reinmüller gemäss Eingabe vom 6. März 2017 aufgrund eines Rechnungsfeh-
lers auf CHF 196'058.85, woraus ein Total von CHF 220'405.85 für die Kosten sei-
ner Vertretung resultiert. Dass es sich dabei entgegen den Angaben in der Eingabe
der Klägerin vom 16. Oktober 2017 um einen CHF- statt einen EUR-Betrag han-
delt, ergibt sich ohne weiteres aus den beigelegten Rechnungen.

**2.      Geltend gemachte Parteikosten der Beklagten**

2:      Die Beklagte verlangt mit Kosteneingabe vom 7. März 2017 Erstattung folgender
        Kosten: EUR 125'000 für Anwaltskosten von Jean-Charles Tchikaya, EUR 75'000
        für Anwaltskosten für Evuy Nguema Mukue und CHF 250'000 für Anwaltskosten
        von FRORIEP.

25      Mit ergänzender Stellungnahme vom 19. Oktober 2017 macht die Beklagte weitere
        Kosten der Rechtsvertretung durch FRORIEP von CHF 26'073.45 für den seit dem
        Verfahrensleitenden Beschluss Nr. 11 angefallenen Aufwand geltend. Überdies
        ergibt sich aus der Eingabe vom 3. November 2017, dass die Anwaltskosten für
        Jean-Charles Tchikaya und für Francisco Evuy Nguema Mukue im Gegensatz zur
        Kostennote vom 7. März 2017 neu EUR 153'000 bzw. EUR 100'000 betragen.

**3.      Angemessenheit der geltend gemachten Parteikosten**

25:     Bezüglich der Angemessenheit der Parteikosten der Gegenpartei nahmen die Par-
        teien wie folgt Stellung:

258     Mit Stellungnahme vom 14. März 2017 führte die Beklagte aus, dass sie es dem
        Gericht überlasse, zu beurteilen, ob die geltend gemachten Rechtsanwaltskosten der
        Klägerin angesichts des Umstandes, dass die Klageschrift vornehmlich die Ausfüh-
        rungen der ersten Schiedsklage wiederhole, ausgewiesen seien. Ferner merkte die

Beklagte an, dass die Reisekosten für die Zeugen mit EUR 3'200 pro Person sehr hoch seien.

259 Mit Stellungnahme vom 14. März 2017 beantragte die Klägerin, die Anwaltskosten für Jean-Charles Tchikaya und Francisco Evuy Nguema Mukue seien zurückzuweisen, da diese Herren im vorliegenden Schiedsverfahren keine sichtbare Tätigkeit entfaltet hätten.

260 Das Schiedsgericht hat die Angemessenheit der geltend gemachten Vertretungskosten zu überprüfen (Art. 38 lit. e Swiss Rules). Aus diesem Grund verlangte das Schiedsgericht mit Verfahrensleitendem Beschluss Nr. 14 vom 2. Oktober 2017 ergänzende Angaben zur Zusammensetzung dieser Kosten. Die Parteien kamen diesen Ersuchen nur teilweise nach, weshalb das Schiedsgerichts die Parteien mit Verfahrensleitendem Beschluss Nr. 15 am 23. Oktober 2017 noch einmal dazu einlud, Angaben zu den von RAin Knak-Kammenhuber bzw. RA Tchikaya und RA Nguema Mukue geleisteten Stunden und eine genügend detaillierte Auflistung der Arbeiten, welche sie während dieser Stunden ausgeübt haben, nachzureichen. Die Parteien wurden darauf hingewiesen, dass sie andernfalls das Risiko tragen, dass das Schiedsgericht aufgrund fehlender Angaben die Angemessenheit der geltend gemachten Vertretungskosten nicht nachprüfen kann und damit eine der Voraussetzungen für eine Erstattung dieser Kosten entfällt.

261 Mit Eingabe vom 3. November 2017 listete die Klägerin auf, welche Arbeiten RAin Knak-Kammenhuber im Umfang von insgesamt 693 Stunden und 40 Minuten geleistet hat (vgl. Beilage K-99).

262 Die Beklagte reichte am 3. November 2017 eine "Facture d'Honoraire Recapitulative" von RA Tchikaya sowie eine Honorarrechnung von RA Nguema Mukue ein, beide mit Datum vom 27. Oktober 2017. Darin machen RA Tchikaya bzw. RA Nguema Mukue neu im Gegensatz zur Kostennote vom 7. März 2017 EUR 153'000 (anstatt EUR 125'000) bzw. EUR 100'000 (anstatt EUR 75'000) für Anwaltskosten geltend.

26    Bezüglich der Parteikosten der Klägerin kommt das Schiedsgericht zum Schluss, dass die geltend gemachten Rechtsanwaltskosten von Prof. Dr. Reinmüller in Höhe von CHF 220'405.85 angesichts der Komplexität des Falls, der Anzahl einzureichender Rechtsschriften und der durchgeführten Beweisverhandlung angemessen und damit rückerstattungsfähig sind. Ebenfalls rückerstattungsfähig sind die Kosten von EUR 23'706.02 für Reisekosten der Zeugen, EUR 5'098.62 für SD Steno Deutschland GmbH und EUR 63'090.62 für PwC.

26·   Zu den geltend gemachten Kosten für RAin Knak-Kammenhuber hat die Klägerin als Erklärung angeführt, dass RAin Knak-Kammenhuber auf Streitwertbasis nach dem deutschen Rechtsanwaltsvergütungsgesetz abgerechnet habe, wozu sie nach deutschem Recht verpflichtet sei, wenn mit dem Mandanten nicht eine andere Vergütung ausgehandelt worden sei (Kostennote vom 6. März 2017 sowie ergänzende Stellungnahme vom 16. Oktober 2017). Für das vorliegende Schiedsverfahren ist jedoch Art. 38 lit. e Swiss Rules massgebend, wonach das Schiedsgericht nur die Parteikosten zurückerstattet, die es als angemessen erachtet (vorn Rz. 260). Nach Durchsicht der Auflistung der geleisteten Arbeiten von RAin Knak-Kammenhuber (Beilage K-99) gelangt das Schiedsgericht zum Schluss, dass diese in Bezug auf die einzelnen Tätigkeiten generisch bleibt. An vielen Stellen ist generisch von "Aktenstudium" die Rede, weiter von "Zuarbeit für Prof. Reinmüller" und "Durchsicht Schriftsatzentwurf Prof. Reinmüller". Die Aufstellung bestätigt aber insoweit, was die Klägerin selbst in ihrer Eingabe vom 16. Oktober 2017 ausgeführt hat, nämlich dass Frau RAin Knak-Kammenhuber gegenüber der Klägerin Aufgaben eines internen Rechtsdienstes wahrgenommen hat. Die Klägerin erklärt diesen Umstand damit, dass sie über keine eigene Rechtsabteilung verfüge. Tätigkeiten dieser Art können aber nicht zu einem externen Rechtsanwaltstarif entschädigt werden. Angaben zu einer angemessenen Entschädigung für die Dienste einer internen Rechtsabteilung bleibt die Klägerin aber schuldig, ebenso wie eine genügend detaillierte Aufstellung über die Tätigkeiten von Frau RAin Knak-Kammenhuber als Ersatz für einen internen Rechtsdienst wahrgenommen hat. Aus diesem Grund sind die Kosten von RAin Knak-Kammenhuber nicht rückerstattungsfähig.

26:   Bezüglich der Parteikosten der Beklagten kommt das Schiedsgericht zum Schluss, dass die geltend gemachten Rechtsanwaltskosten von FRORIEP in Höhe von CHF 250'000 und CHF 26'073.45 angesichts der Komplexität des Falls, der Anzahl einzureichender Rechtsschriften und der durchgeführten Beweisverhandlung angemessen und damit rückerstattungsfähig sind.

26(   Nicht beurteilt werden kann hingegen die Angemessenheit der geltend gemachten Kosten von RA Tchikaya und RA Nguema Mukue, da sowohl Angaben zur Anzahl geleisteter Stunden als auch eine genügend detaillierte Auflistung der Tätigkeiten von RA Tchikaya und RA Nguema Mukue fehlen. Die "Facture d'Honoraire Recapitulative" vom 27. Oktober 2017 von RA Tchikaya beschränkt sich auf die Angabe der geleisteten Stunden (total 340 Stunden). Auch aus der Honorarrechnung von RA Nguema Mukue vom 27. Oktober 2017 ist nicht ersichtlich, welche Arbeiten er für das geltend gemachte fixe Honorar geleistet hat. Da sowohl RA Tchikaya als auch RA Nguema Mukue gegenüber dem Schiedsgericht nicht in Erscheinung getreten sind, kann das Schiedsgericht ohne diese Angaben nicht beurteilen, welche Leistungen sie bezüglich dieses Verfahrens erbracht haben und ob diese angemessen waren. Entsprechend sind die in Bezug auf ihre Tätigkeit geltend gemachten Kosten nicht rückerstattungsfähig.

26;   Demzufolge belaufen sich die rückerstattbaren Parteikosten der Klägerin auf CHF 220'405.85 sowie EUR 91'895.26 (= EUR 23'706.02 + 5'098.62 + 63'090.62); diejenigen der Beklagten auf CHF 276'073.45.

26ε   Die Klägerin hat 70% der Kosten der Beklagten, d.h. CHF 193'251.40, zu tragen. Die Beklagte hat 30% der Kosten der Klägerin, d.h. CHF 66'121.75 und EUR 27'568.58 zu tragen (zur Verteilung vorn Rz. 245).

## IX    SCHIEDSSPRUCH

1.    Das Schiedsgericht ist für die Behandlung der eingeklagten Ansprüche zuständig.

2.    Der Eventualantrag der Beklagten auf Sistierung des Verfahrens, bis das von der Klägerin einzuleitende Schlichtungsverfahren und hernach das ordentliche Gerichtsverfahren in Äquatorialguinea mit Urteil entschieden ist und sich die Klägerin dagegen zur Wehr setzen will, wird abgewiesen.

3.    Der Eventualantrag der Beklagten auf Sistierung des Verfahrens, bis das von der Klägerin einzuleitende ordentliche Gerichtsverfahren vor den zuständigen Gerichten in Äquatorialguinea mit Urteil entschieden ist und sich die Klägerin dagegen zur Wehr setzen will, wird abgewiesen.

4.    Es wird festgestellt, dass der Managementvertrag vom 14. Dezember 2009 ordentlich per 31. Januar 2015 aufgelöst wurde.

5.    Die Beklagte wird verpflichtet, der Klägerin total EUR 7'380'611 zu bezahlen, sowie einen Verzugszins von 5%

-    ab 18. Februar 2011 auf EUR 637'134;

-    ab 1. Mai 2011 auf EUR 267'068;

-    ab 1. Mai 2012 auf EUR 2'470'383;

-    ab 1. Mai 2013 auf EUR 2'670'684;

-    ab 1. Mai 2014 auf EUR 1'335'342.

6.    Im Mehrumfang wird die Klage abgewiesen.

7.    Honorar und Auslagen des Schiedsgerichts wurden auf CHF 678'434 und die Verwaltungskosten auf CHF 45'566 festgelegt. Diese Kosten werden vom Kostenvorschuss der Klägerin in Höhe von CHF 724'000 bezogen.

Case 1:20-cv-03572-RJL    Document 1-1    Filed 12/08/20    Page 215 of 221

8.    Die Beklagte wird verpflichtet, der Klägerin ihren Anteil am Honorar und den Auslagen des Schiedsgerichts sowie an den Verwaltungskosten im Umfang von total CHF 217'200 und ihren Anteil an der Einschreibegebühr im Umfang von CHF 2'400 zurückzuerstatten.

9.    Die Klägerin wird verpflichtet, der Beklagten CHF 193'251.40 als Entschädigung für die Parteikosten zu zahlen.

10.    Die Beklagte wird verpflichtet, der Klägerin CHF 66'121.75 und EUR 27'568.58 als Entschädigung für die Parteikosten zu zahlen.

11.    Schriftliche Mitteilung an die Parteivertreter per E-Mail und Einschreiben sowie an die Mitschiedsrichter und das Sekretariat des Gerichtshofs per E-Mail und Post.

edsort:    Zürich

'elix Fischer
m: 18. 12. 2017

Melissa Magliana
Datum: 14. 12. 2017

Dr. Andrea Meier
Datum:    18. 12. 2017

37.docx



CERTIFIED TRUE COPY
OF THE ORIGINAL.
Geneva, 12th March 2019.



APOSTILLE
(Convention de la Haye du 5 octobre 1961)

1. Pays: Suisse

Le présent acte public

2. a été signé par M<sup>e</sup> G. Defago.

3. agissant en qualité de notaire

4. est ravêtu du sceau/timbre de ......................... u

.....................................................................

Attesté

5. à Genève     6. le  1 3 MARS 2019

8. sous N° no. 0 2 6 4 2 0

République et Canton de Genève

9. sceau / timbre     10. Signature

Andrea GIL FERNANDEZ

# EXHIBIT A-3



**From:** Gerarda Coppola <g.coppola@wartmann-merker.ch>
**Date:** 19 December 2017 at 16:36:56 CET
**To:** '"REINMUELLER, Bernd"' <bre@verslaw.ch>, '"pmerz@froriep.ch"'
<pmerz@froriep.ch>, '"Ivalloni@froriep.ch"' <Ivalloni@froriep.ch>,
'"jctchikaya@yahoo.fr"' <jctchikaya@yahoo.fr>, '"sejomse@gmail.com"'
<sejomse@gmail.com>
**Copy:** '"fischer@bodmerfischer.ch"' <fischer@bodmerfischer.ch>,
'"Melissa.Magliana@homburger.ch"' <Melissa.Magliana@homburger.ch,> '"Eliane
Rossire"' <Eliane.Rossire@zhk.ch>, Andrea Meier <a.meier@wartmann-
merker.ch>
**Subject: Proceedings no. 600413-2015**

Dear Madam, dear Sir,

Please find attached the arbitration award in the above mentioned proceedings, as
instructed by the Court of Arbitration. The signed originals will be sent by
registered letter or by post today.

Kind regards

Gerarda Coppola
(Secretary)

_____

lic. jur. Gerarda Coppola
Attorney
Wartmann & Merker
Attorneys/ Attorneys at Law
Kirchgasse 48
CH - 8024 Zurich
Tel. +41 44 212 10 11
Fax +41 44 212 15 11
g.coppola@wartmann-merker.ch
www.wartmann-merker.ch

_____

[Disclaimer in English]

# Redacted - Attorney-Client Privileged

**Von:** Gerarda Coppola <g.coppola@wartmann-merker.ch>
**Datum:** 19. Dezember 2017 um 16:36:56 MEZ
**An:** "'REINMUELLER, Bernd'" <bre@verslaw.ch>, "'pmerz@froriep.ch'" <pmerz@froriep.ch>,
"'lvalloni@froriep.ch'" <lvalloni@froriep.ch>, "'jctchikaya@yahoo.fr'" <jctchikaya@yahoo.fr>,
"'sejomse@gmail.com'" <sejomse@gmail.com>
**Kopie:** "'fischer@bodmerfischer.ch'" <fischer@bodmerfischer.ch>,
"'Melissa.Magliana@homburger.ch'" <Melissa.Magliana@homburger.ch>, "'Eliane Rossire'"
<Eliane.Rossire@zhk.ch>, Andrea Meier <a.meier@wartmann-merker.ch>
**Betreff: Verfahren Nr. 600413-2015**

Sehr geehrte Damen und Herren

Anbei sende ich Ihnen im Auftrag des Schiedsgerichts den Schiedsspruch im obgenannten
Verfahren. Die unterzeichneten Originale werden heute per Einschreiben bzw. Post versandt.

Freundliche Grüsse

Gerarda Coppola
(Sekretärin)

_____

lic.iur. Gerarda Coppola
Rechtsanwältin
Wartmann & Merker
Rechtsanwälte/Attorneys at Law
Kirchgasse 48
CH - 8024 Zürich
Tel. +41 44 212 10 11
Fax +41 44 212 15 11
g.coppola@wartmann-merker.ch
www.wartmann-merker.ch
_____

*This communication, and the information it contains is for the sole use of the intended recipient. It is confidential, may be legally privileged and protected by law. Unauthorized use, copying or disclosure of any part thereof may be unlawful. If you have received this communication in error, please destroy all copies and kindly notify the sender. If you send us messages by e-mail, we take this as your authorization to correspond with you by e-mail.*



T 718.384.8040
W TargemTranslations.com
E projects@targemtranslations.com
A 185 Clymer St. Brooklyn, NY 11211

## CERTIFIED TRANSLATION

I, Wolf Markowitz, Manager at Targem Translations, Inc., located at 185 Clymer Street in Brooklyn, New York, a language service with a firm track record of providing expert language services to the business and legal community of more than 50 years, do hereby certify that our team of translators, editors and proofreaders are professionally trained and vastly experienced in providing professional translations, from German to English and vice versa; and they have professionally translated the document referenced as **"December 19, 2017 Email Correspondence"** from German to English, faithfully, accurately and completely, to the best of their expertise and experience.

Date: December 7, 2020

_____
Wolf Markowitz



Signature of Notary Public
ROCHAL WEISS
NOTARY PUBLIC-STATE OF NEW YORK
No 01WE6293785
Qualified in Kings County
My Commission Expires 12-16-2021

