**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARSEILLE-KLINIKEN AG,<br><br>Petitioner,<br><br>v.<br><br>REPUBLIC OF EQUATORIAL GUINEA,<br><br>Respondent. | ) | Civil Case No. 20-3572 (RJL) |

## MEMORANDUM OPINION

October 28th, 2026 [Dkt. #1]

Petitioner Marseille-Kliniken AG won an arbitration award against respondent the Republic of Equatorial Guinea and then filed a petition to confirm the award. On November 17, 2023, I confirmed the award while deferring to the arbitral tribunal's interpretation of the parties' dispute-resolution clause. *See* Mem. Op. [Dkt. #22]. Our Circuit Court vacated and remanded, holding that I should interpret the dispute-resolution clause in the first instance. *See Marseille-Kliniken AG v. Republic of Equatorial Guinea*, 153 F.4th 1262, 1271–72 (D.C. Cir. 2025). On remand, the parties submitted supplemental briefs addressing the proper interpretation of the dispute-resolution clause. Because the parties agreed to arbitrate before the Chamber of Commerce in Zurich, Swiss choice-of-law rules apply. Under Swiss choice-of-law rules, Swiss law governs interpretation of the dispute-resolution clause, and the dispute-resolution clause did not require litigation in the

Equatoguinean courts before proceeding to arbitration. Accordingly, I will **GRANT** the petition to confirm the arbitration award.

## BACKGROUND

### I. Facts

I previously recounted the facts in my opinion confirming the award. *See* Mem. Op. [Dkt. #22] at 1–3; *see also Marseille-Kliniken AG v. Republic of Equatorial Guinea*, 153 F.4th 1262, 1265–66 (D.C. Cir. 2025). To summarize, petitioner Marseille-Kliniken AG ("petitioner") is a corporation established under the laws of Switzerland with its principal place of business in Switzerland. *See* Pet. to Confirm Int'l Arb. Award ("Pet. to Confirm") [Dkt. #1] ¶ 6. Respondent is the Republic of Equatorial Guinea ("respondent"), a foreign state. *Id.* ¶ 7.

In 2009, respondent and petitioner entered into a contract in which petitioner agreed to operate a public hospital in the city of Bata in the Republic of Equatorial Guinea. *Id.* ¶¶ 15–16, 19. At some point after petitioner started running the hospital, the relationship between the parties broke down, and respondent blocked petitioner's access to the hospital's IT systems. *Id.* ¶ 23.

The contract between the parties ("Management Agreement") contains a dispute-resolution clause in both Spanish and German. Decl. of Ulrich Marseille, Ex. A-2, Arbitral Award ("Award") [Dkt. #1-1] ¶ 134. The parties accept the following translations:

**Spanish Version**

In the event of disputes[,] the Parties will meet and solve the problem amicably, otherwise they will turn to the Court of Equatorial Guinea. If one of the parties does not agree, the Court of the Chamber of Commerce in

Zürich may be called upon.

**German Version**

In the event a dispute should arise from this contract the Parties shall attempt to find an amicable solution prior to calling upon the Courts in Equatorial Guinea. In the event disputes should arise, the Parties agree to engage in Arbitration Proceedings before the Chamber of Commerce in Zürich.

*Id.*

In 2011, petitioner instituted arbitration in Switzerland for a portion of its damages. *Id.* ¶ 67. In 2014, petitioner was awarded €14,036,400 plus interest and costs. *Id.* ¶ 68. The parties settled the claims related to the first arbitration. Pet. to Confirm ¶ 30.

In 2015, petitioner instituted a second arbitration in Switzerland for its remaining damages. *See* Award ¶¶ 11–12. In 2019, the tribunal rejected respondent's arguments that the dispute-resolution clause required litigation in the courts of Equatorial Guinea before arbitration and held that it had jurisdiction. *See id.* ¶¶ 133–47. The tribunal then awarded petitioner €7,380,611 plus interest and costs. *Id.* at 86. At no point did petitioner seek to sue in the courts of Equatorial Guinea before proceeding to arbitration.

## II. Procedural History

In December 2020, petitioner filed a petition to confirm the second arbitration award in this Court. *See* Pet. to Confirm. Respondent opposed, arguing principally that the award could not be enforced under the New York Convention because the parties did not first litigate their claims in the courts of Equatorial Guinea before resorting to arbitration. *See* Statement of P. & A. in Opp'n to Pet'r's Pet. to Confirm International Arbitration Award [Dkt. #16] at 11–23. On November 17, 2023, I granted the petition to confirm. *See* Mem.

Op. [Dkt. #22]; *Marseille-Kliniken AG v. Republic of Equatorial Guinea*, 2023 WL 8005153, at *1 (D.D.C. Nov. 17, 2023). I first held that there was subject-matter jurisdiction under 28 U.S.C. § 1330(a) because the Foreign Sovereign Immunity Act's arbitration exception applied. *See* 2023 WL 8005153, at *2. I found that petitioner had established the "existence of an arbitration agreement, an arbitration award[,] and a treaty governing the award." *Id.* (quoting *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021)). Specifically, the Management Agreement is an "arbitration agreement," the tribunal's 2019 award is an "arbitration award," and the New York Convention, a treaty, governs the award. *Id.*

On the merits, I held that under *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25 (2014), deference was warranted to the tribunal's interpretation of the Management Agreement's dispute-resolution clause because any requirement that the parties first litigate in the courts of Equatorial Guinea was a "procedural precondition[] for the use of arbitration." *See* 2023 WL 8005153, at *3 (quoting *BG Grp., PLC*, 572 U.S. at 34).

Respondent appealed. Our Circuit Court affirmed that there was subject-matter jurisdiction under the Foreign Sovereign Immunities Act but vacated and remanded on the merits. *See Marseille-Kliniken AG v. Republic of Equatorial Guinea* ("*Marseille-Kliniken*"), 153 F.4th 1262, 1264 (D.C. Cir. 2025). Our Circuit held that under *BG Group* "'courts presume that the parties intend courts, not arbitrators' to resolve substantive 'disputes about arbitrability.'" *Id.* at 1269 (quoting *BG Grp., PLC*, 572 U.S. at 34). "On the other hand, 'courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the

use of arbitration.'" *Id.* (quoting *BG Grp., PLC*, 572 U.S. at 34). Our Circuit held that the Management Agreement's reference to local litigation fell into the former category because it "has substantive import" and is "more than just a claims-processing rule." *Id.* at 1269–70. Our Circuit explained that "both parties agree that any resolution of the contract claims by the domestic courts of Equatorial Guinea would bind the Swiss arbitral forum as to those claims." *Id.* at 1269. So if the local litigation requirement applies, "Marseille-Kliniken could pursue before the arbitrators only international claims keyed to any gross abuse in how the domestic courts handled the domestic claims before them." *Id.* "The provision thus bears not only on *when* the parties may arbitrate, but also on *what claims* they may submit to the arbitrators," and therefore is "presumptively for courts to construe." *Id.* at 1270.

Our Circuit Court thus remanded the case back to me to interpret the agreement in the first instance, flagging several questions to address:

*First*, "what law should govern interpretation of the dispute-resolution clause[?]" *Id.* at 1271. *Second*, "what interpretive principles should govern[?]" *Id.* at 1272. For example, "should the court just decide what reading of the governing text is most plausible?" *Id.* "To what extent should it consider extrinsic evidence[?]" *Id.* *Third*, "should the court consider at all Equatorial Guinea's Foreign Investment Law, which requires exhaustion of local remedies for disputes arising from investment projects approved under that law?" *Id.*

On January 20, 2026, I held a status conference in which petitioner proposed a supplemental briefing schedule addressing the proper interpretation of the Management

Agreement. *See* Minute Entry (Jan. 20, 2026). The parties have now submitted their supplemental briefs. *See* Pet'r's Opening Br. Addressing Issues Raised by the D.C. Circuit Related to Pet. to Confirm Int'l Arb. Award ("Pet'r Suppl. Br.") [Dkt. #39]; [Corrected] Resp't's Mem. in Opp'n to Pet'r's Opening Br. on Remand ("Resp't Suppl. Br.") [Dkt. #45-1]; Pet'r's Reply Br. on Remand in Supp. of Its Pet. to Confirm Int'l Arb. Award ("Pet'r Reply") [Dkt. #46]. The petition to confirm the award is now ripe.

## LEGAL STANDARD

"The Federal Arbitration Act (FAA) provides for the confirmation of arbitral awards—that is, conversion of the awards into enforceable legal judgments." *Marseille-Kliniken*, 153 F.4th at 1265. The FAA governs international arbitration awards made pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, "commonly known as the New York Convention." *Id.* "The FAA requires federal courts to confirm such awards unless one of the grounds for refusal in the New York Convention is present." *Id.* (citing 9 U.S.C. § 207). "As relevant here, the Convention permits a court to refuse enforcement if the award addresses a dispute 'not falling within the terms of the submission to arbitration.'" *Id.* (quoting N.Y. Convention art. V.1(c)). "The grounds for refusal 'are tightly construed, and the burden is placed on the party opposing enforcement.'" *Id.* (quoting *Diag Hum. S.E. v. Czech Republic – Ministry of Health*, 907 F.3d 606, 609 (D.C. Cir. 2018)).

## ANALYSIS

### I. Choice of Law

The parties first disagree over the correct approach to identifying the law governing interpretation of the arbitration clause. Petitioner argues that "in the absence of a choice-of-law provision in an arbitration agreement, the choice of law principles of the seat of the arbitration governs, which in turn mandates application of Swiss law on the merits." Pet'r Suppl. Br. at 6. Respondent argues that I should "apply[] the principles and presumptions found in the Restatement (Second) of Conflict of Laws," which supplies the U.S. choice-of-law rules. Resp't Suppl. Br. at 2. But even under Swiss choice-of-law rules, respondent argues that both the Restatement and Swiss law support applying Equatoguinean law to the Management Agreement. *Id.*

I find petitioner's approach more persuasive. In cases involving international arbitration awards governed by the New York Convention, "an agreement specifying the place of the arbitration creates a presumption that the procedural law of that place applies to the arbitration." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 291 (5th Cir. 2004); *see also Steel Corp. of Philippines v. Int'l Steel Servs., Inc.*, 354 F. App'x 689, 692 (3d Cir. 2009) (applying the "same presumption"). When determining the "law applicable to the arbitration agreement," courts have looked to the "seat of arbitration." *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 153 (D.D.C. 2018); *see also Progress v. OTL Firearms & Imports Corp.*, 2025 WL 2614946, at *1 (D. Ariz. Sept. 10, 2025) (similar). Here, the parties specified that any

arbitration would occur in the "Chamber of Commerce of Zurich," Award ¶ 134, so Swiss procedural law applies.

Respondent's arguments for applying U.S. choice-of-law rules do not withstand any scrutiny. Respondent argues that the Restatement applies because of the "Supreme Court's guidance that federal courts 'should normally apply the principles supplied by American law'" when "interpret[ing] the arbitration agreement as part of a motion to confirm an arbitration award." Resp't Suppl. Br. at 2–3 (quoting *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014)). To the contrary, *BG Group* supports petitioner's position when read in context. The full quote says "where . . . a federal court is asked to interpret [the parties'] intent pursuant to a motion to vacate or confirm an award *made in the United States* under the Federal Arbitration Act, it should normally apply the presumptions supplied by American law." *BG Grp., PLC*, 572 U.S. at 37 (emphasis added). The opinion goes on to cite authorities stating that "arbitral awards pursuant to treaties are subject to review under the arbitration law of *the state where the arbitration takes place*." *Id.* (emphasis added) (internal quotation marks omitted). While most of the events in *BG Group* took place in Argentina, the parties "agreed to site the arbitration in Washington, D.C." *Id.* at 30. Here, where the parties agreed that any arbitration would take place in the "Chamber of Commerce of Zurich," Award ¶ 134, Swiss law applies.

Indeed, the Fifth Circuit rejected the argument that the court should conduct a "multifactor choice-of-law analysis" when "the parties presumptively chose Swiss procedural law as the *lex arbitri* when they designated Switzerland as the site of the arbitration." *Karaha Bodas Co.*, 364 F.3d at 292. Similarly, respondent's "previous

arguments that Swiss arbitral law applied strongly evidence the parties' contractual intent." *Id.* As petitioner points out, respondent argued both before me and before our Circuit Court that "well-settled Swiss law" applied to interpretation of the arbitration clause. *See* Br. for Def.-Appellant at 21, *Marseille-Kliniken AG v. Republic of Equatorial Guinea*, 153 F.4th 1262 (D.C. Cir. 2025); Statement of P. & A. in Opp'n to Pet'r's Pet. to Confirm Int'l Arb. Award [Dkt. #16] at 13–15. To be sure, respondent described the application of Swiss law as "questionable." Statement of P. & A. in Opp'n to Pet'r's Pet. to Confirm Int'l Arb. Award at 14 n.5. But respondent never affirmatively argued that the Restatement's choice-of-law provisions applied instead of Swiss choice-of-law rules, and respondent's "belated[]" argument thus cannot overcome the presumption that the parties selected Swiss law when choosing the Chamber of Commerce of Zurich as the site of the arbitration. *Karaha Bodas Co.*, 364 F.3d at 292.

Respondent argues that "the dispute-resolution clause did not require arbitration in Switzerland" and "[a]rbitral institutions . . . routinely administer international arbitrations outside of France or Switzerland." Resp't Suppl. Br. at 6–7. Respondent cites no authority for why this distinction matters, and again to the contrary in *Karaha Bodas Co.*, the "arbitration proceeding . . . physically occurred in Paris, but the Award was 'made in' Geneva, the place of the arbitration in the legal sense and the presumptive source of the applicable procedural law." 364 F.3d at 291–92.[1]

---

[1] The Fifth Circuit cited UNCITRAL rules in making this distinction, which are not applicable here. *See Karaha Bodas Co.*, 364 F.3d at 292. While UNCITRAL rules do not apply here, respondent has not offered any compelling authority to support the distinction it makes.

In sum, Swiss choice-of-law rules apply here.

## II. Application of Swiss Choice-of-Law Rules

The Swiss Private International Law Act ("PILA") supplies the relevant Swiss choice-of-law rules. The parties submitted dueling expert reports applying the PILA. Petitioner's expert argues that under the PILA, Swiss law applies to interpretation of the agreement. *See* Expert Rep. of Dr. Florian Mohs ("Mohs Rep.") [Dkt. #39-3]; Second Expert Rep. of Dr. Florian Mohs ("Mohs Reply Rep.") [Dkt. #46-1]. Respondent's expert argues that Equatoguinean law applies. Expert Rep. of Dr. Thomas Rohner ("Rohner Rep.") [Dkt. #45-3]. Distinguishing between the two expert reports is challenging because both purport to apply Swiss law, but ultimately petitioner's expert is more persuasive.

Article 178(2) of PILA provides: "As regards its substance, an arbitration agreement is valid if it conforms either to the law chosen by the parties, to the law governing the subject-matter of the dispute, in particular the law governing the main contract, or to Swiss law." Rohner Rep. ¶ 36. Both experts agree that "the arbitration agreement is valid from a substantive perspective if it complies with at least one of three possible legal systems, namely either the law chosen by the parties, the law applicable to the dispute, or Swiss law." Rohner Rep. ¶ 37; *see* Mohs Rep. ¶ 15.

Insofar as Article 178(2) addresses the validity and interpretation of the arbitration clause, petitioner prevails. Petitioner's expert argues that under Swiss law the dispute-resolution clause was valid and there was no need to exhaust remedies in Equatoguinean courts. *See* Mohs Rep. ¶¶ 19–41. Respondent does not even argue that under Swiss law the agreement was invalid. *See* Resp't Suppl. Br. at 11–15 (interpreting the dispute-

resolution clause under only Equatoguinean law). So if the dispute-resolution clause complied with Swiss law, per Article 178(2), the agreement is valid.

Respondent tries to avoid Article 178(2) by arguing that it "governs only the validity of the arbitration agreement; it is not the rule that fixes the law governing interpretation of the Management Agreement's dispute-resolution clause." Resp't Suppl. Br. at 10. But here the relevant question is not what law governs the parties' substantive claims against one another—the *lex causae*—but what law "controls the procedural side of the proceeding"—the *lex arbitri*. *Corporacion AIC, SA v. Hidroelectrica Santa Rita S.A.*, 66 F.4th 876, 883 (11th Cir. 2023).[2] Our Circuit Court directed me to decide "threshold questions of arbitrability," including interpretation of the dispute-resolution clause, not the substantive commercial law governing the parties' claims. *See Marseille-Kliniken*, 153 F.4th at 1270. Swiss law therefore applies to interpretation of the dispute-resolution clause.

[2] In any case, even if the relevant inquiry is what substantive law governs, petitioner argues that Swiss substantive law also governs the dispute under PILA Articles 187 and 117(2). PILA Article 187 "sets forth a closest connection test (absent a choice of law) as the relevant conflict-of-rule test . . . to determine the law applicable to the merits of a dispute." Mohs Rep. ¶ 16; *see* Rohner Rep. ¶ 17. In determining what state has the "closest connection," PILA Article 117(2) provides that "[s]uch a connection is presumed to exist with the state of habitual residence of the party that has to perform the characteristic obligation," i.e., the "contract[] to perform services." Mohs Rep. ¶ 16 n.12. Petitioner—the "party that has to perform the characteristic obligation"—is a Swiss company, so petitioner argues that "the closest connection" is Switzerland, and Swiss law therefore applies to interpretation of the Management Agreement. Pet'r Suppl. Br. at 7. Respondent's expert contends that Article 117(2) is irrelevant because it "applies only in proceedings before state courts—it does not apply in international arbitration proceedings." Rohner Rep. ¶ 25. But respondent's multifactor analysis under Article 187 in favor of Equatoguinean law is not persuasive, *see* Resp't Suppl. Br. at 9–10, and in any case petitioner's expert contends that Article 117(2) may apply in international arbitrations, *see* Mohs Reply Rep. ¶ 23.

## III. Whether the Dispute-Resolution Clause Requires Local Litigation Under Swiss Law

The determination that Swiss law applies to interpretation of the dispute-resolution clause resolves the case, because respondent does not advance any argument that under Swiss law the dispute-resolution clause requires litigation in Equatoguinean courts before seeking arbitration. *See generally* Resp't Suppl. Br.

Briefly, petitioner argues that under Swiss law, "preference is to be given to an interpretation of the contract that preserves the arbitration agreement." Mohs Rep. ¶ 23. Both the German and Spanish versions of the dispute-resolution clause "contain a submission to arbitration," and "even the Spanish translation that Equatorial Guinea favors does not require local litigation to precede arbitration." Pet'r Suppl. Br. at 13 (quoting Mohs Rep. ¶¶ 28–29).

Swiss law permits consideration of extrinsic evidence in interpreting an arbitration clause, Mohs Rep. ¶ 24, and here petitioner has offered the testimony of Ulrich Marseille regarding his understanding of the dispute-resolution clause, *see* Pet'r Suppl. Br. at 13–14. Marseille's understanding was that there was no requirement that the parties litigate first in the courts of Equatorial Guinea before seeking arbitration. *See id.* at 14.

Finally, our Circuit Court suggested that the parties should address whether "domestic law [must] conform to any international-law norm favoring exhaustion of local remedies." *Marseille-Kliniken*, 153 F.4th at 1272. However, respondent—as the party bearing the burden of "opposing enforcement," *id.* at 1265—does not attempt to argue that international law norms apply here at all. *See generally* Resp't Suppl. Br. Respondent

merely argues that any agreement to arbitrate first "would have violated mandatory norms of Equatoguinean law," *id.* at 18, which are not applicable here.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the petition to confirm the arbitration award [Dkt. #1] is **GRANTED**. An accompanying order will issue contemporaneously with this opinion.

RICHARD J. LEON
United States District Judge